UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**'08 CV 5520**

| | |
|---|---|
| CITIGROUP GLOBAL MARKETS INC., | |
| Plaintiff, | Case No. 08 CV _____ |
| v. | **VERIFIED COMPLAINT** |
| VCG SPECIAL OPPORTUNITIES MASTER FUND LIMITED f/k/a CDO PLUS MASTER FUND LIMITED, | |
| Defendant. | |

Plaintiff Citigroup Global Markets Inc. ("CGMI"), by its undersigned

attorneys, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, as and for its complaint

against defendant VCG Special Opportunities Master Fund Limited f/k/a CDO Plus

Master Fund Limited ("VCG") in this action, alleges on its own knowledge or otherwise

on information and belief:

## Nature of the Action

1.      This is an action to enjoin an arbitration that defendant VCG has

initiated against its prime broker, CGMI, before the Financial Industry Regulatory

Authority ("FINRA"), entitled *VCG Special Opportunities Master Fund Limited f/k/a*

*CDO Plus Master Fund Limited* v. *Citigroup Global Markets Inc.* (FINRA Dispute

Resolution Arbitration Number 08-01430) (the "FINRA Arbitration").

2.      The FINRA Arbitration relates to a credit default swap ("CDS")

transaction between VCG and CGMI's affiliate Citibank, N.A ("Citibank").  VCG has

already brought an action regarding the same CDS transaction in this Courthouse entitled

*VCG Special Opportunities Master Fund Ltd.* v. *Citibank, N.A., No. 08 CV 01563* (BSJ)

(the "SDNY Action"), in which it asserts breach of contract, breach of the implied

covenant of good faith and fair dealing, unjust enrichment and related claims against Citibank.

3.    Although CGMI was not a party to, and did not broker, the CDS transaction, and despite the pending SDNY Action regarding the CDS transaction, VCG nonetheless initiated the FINRA Arbitration in Boca Raton, Florida, against CGMI, alleging that CGMI "suggested and arranged" the CDS transaction and "suckered" VCG into what VCG now refers to as an "unfair and exceptionally risky" transaction so that CGMI's "sister affiliate" Citibank could "steal" money from VCG's accounts.

4.    Whatever CGMI's role in the CDS transaction, the July 17, 2006 prime brokerage agreement between VCG and CGMI (the "Prime Brokerage Agreement") expressly provides that *no* dispute between those parties arising from or otherwise relating to that agreement, or relating to any transaction entered into under that agreement, will be resolved by arbitration.

5.    Moreover, VCG's blatant attempt to open a "second front" (and a duplicative one) with respect to its meritless complaints about the CDS transaction is entirely inappropriate.

6.    Accordingly, by this action, CGMI seeks a declaratory judgment that, under the clear and unambiguous terms of the parties' agreement, VCG is precluded from proceeding with the FINRA Arbitration, and a permanent injunction preventing VCG from doing so.

7.    CGMI also seeks to litigate in this action any of the purported (and meritless) claims VCG in fact is raising against CGMI with respect to the CDS transaction, and will seek to have this action consolidated with the SDNY Action.

## The Parties

8.      Plaintiff CGMI is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York.

9.      Upon information and belief, defendant VCG is an Isle of Jersey exempted corporation having its principal place of business at Le Masurier House, St. Helier JE2 4YE Jersey, Channel Islands.

10.     Upon information and belief, VCG was initially incorporated under the name of "CDO Plus Master Fund Ltd." in Jersey on June 13, 2006, and changed its name to "VCG Special Opportunities Master Fund Limited" effective November 21, 2006.

11.     Upon information and belief, VCG is a hedge fund with experience investing in credit derivative transactions, including CDS transactions, and has approximately $50,000,000 of capital under management.

## Jurisdiction and Venue

12.     This Court has subject matter jurisdiction over this complaint based on 28 U.S.C. § 1332, because the parties are of diverse citizenship, and the amount in controversy is over $75,000, exclusive of interest and costs.

13.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(d).

14.     Jurisdiction and venue are also proper here by virtue of Paragraph 20 of the Prime Brokerage Agreement, in which the parties expressly submit to the jurisdiction and venue of this Court.

### Factual Background

#### The Prime Brokerage Agreement

15.     On July 17, 2006, VCG and CGMI entered the Prime Brokerage Agreement, pursuant to which CGMI contracted to provide prime brokerage services (generally, clearing and settling trades in fixed income securities) for VCG.  (Ex. A.)

16.     The Prime Brokerage Agreement, which is governed by New York law  (*id.* ¶ 19), expressly provides that:  "NO DISPUTE OR CONTROVERSY BETWEEN THE PARTIES HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION HEREUNDER OR BREACH HEREOF OR THEREOF SHALL BE SUBJECT TO OR SETTLED BY ARBITRATION."  (*Id.* ¶ 20) (capitalization in original).

#### The CDS Transaction

17.     Separately, in September of 2006, VCG and Citibank entered into a standard International Swaps and Derivative Association, Inc. ("ISDA") Master Agreement, contemplating that the parties would subsequently enter into various CDS transactions.  CGMI was not a party to, and did not broker (nor settle or clear) the ISDA Master Agreement between VCG and Citibank.

18.     Thereafter, in the summer of 2007, VCG approached Citibank to enter into a specific CDS transaction referencing a collateralized debt obligation vehicle (or "CDO").  CDOs are structured finance vehicles that generally own certain assets, often debt securities or other revenue-generating assets, and in turn issue their own debt and equity to investors.

19.     Under a typical CDS transaction of this type, one party (known as the "protection buyer") pays periodic fixed amounts to the other party (the "protection

seller") with respect to a specified amount of a "reference obligation" (usually, a debt instrument such as a bond or note) issued by a "reference entity," here, a CDO. In return, the protection seller is generally obligated to provide certain consideration to the protection buyer if specific events occur with respect to the reference obligation or the reference entity (usually, a negative event with respect to the creditworthiness of the reference entity or obligation). The CDS protection buyer need not actually own the reference obligation or have any relationship to the reference entity.

20.     On or about June 29, 2007, Citibank and VCG entered into a CDS transaction for which a CDO called the "Millstone III CDO LTD III-A" (the "Millstone III CDO") served as the defined "Reference Entity," and the Millstone III CDO's Class B Notes, due July 5, 2046, served as the defined "Reference Obligation."

21.     The CDS transaction was comprised of four agreements, , including the ISDA Master Agreement (collectively, the "CDS Contract"), all based on market standard documentation provided by ISDA.

22.     Under the CDS Contract, Citibank acted as protection buyer and agreed to make periodic "Fixed Payments" to VCG, which acted as protection seller. In return, VCG agreed to make certain "Floating Payments" upon the occurrence of certain defined "Floating Amount Events" with respect to the Reference Obligation, the Millstone III CDO Class B Notes. In addition, the parties' CDS Contract permitted Citibank, in the event of changes in the market value of the CDS Contract, to demand that VCG post additional collateral with Citibank to secure VCG's payment obligations under the CDS Contract. CGMI was not a party to, and did not broker (nor settle or clear)the CDS Contract.

23.     Between July and November 2007, the cost of CDS protection referencing CDOs increased substantially due to negative market conditions. Beginning in August 2007, Citibank was entitled to, and did, pursuant to the CDS Contract, request additional collateral from VCG as security against VCG's payment obligations under the CDS contract. VCG satisfied these requests, sometimes using funds from its prime brokerage account for this purpose.

24.     On January 9, 2008, Citibank notified VCG that a Floating Amount Event occurred under the CDS Contract in the form of an "Implied Writedown" and that, as a result, VCG owed Citibank $10,000,000.

25.     VCG refused to pay Citibank the $10,000,000.

26.     Citibank therefore exercised its rights under the CDS Contract to cause an early termination of the parties' CDS Contract, apply the collateral VCG had posted to the amount VCG owed to Citibank and demand payment from VCG of the remaining amount owed.

27.     Thus, pursuant to its rights under the CDS Contract, Citibank notified VCG that it was setting off a portion of the $10,000,000 VCG owed to Citibank against $9,325,747.62 of posted collateral held by Citibank, resulting in $674,252.38 due and payable from VCG to Citibank, with interest.

**The Southern District of New York Litigation**

28.     Instead of paying the amount it owed Citibank under the CDS Contract, in February of 2008, VCG filed the SDNY Action against Citibank. (Ex. B.)

29.     In its complaint in the SDNY Action, VCG alleges that Citibank's requests for additional collateral were improper (*id.* ¶¶ 1-2, 34) and that Citibank was not

entitled to the $10,000,000 payment because no Implied Writedown occurred under the parties' CDS Contract (*id.* ¶¶ 1, 3, 37-41).

30.    On April 23, 2008, Citibank answered VCG's complaint, asserting various defenses, and brought a counterclaim for breach of the CDS Contract by VCG. (Ex. C.) Citibank alleges that it was indeed entitled to demand additional collateral from VCG under the CDS Contract, that an Implied Writedown had in fact triggered VCG's Floating Payment obligations, and that VCG's failure to pay its Floating Payment obligations and to indemnify Citibank constitute breaches of the CDS Contract. (*Id.* ¶¶ 28, 35, 58).

31.    On May 20, 2008, VCG answered Citibank's counterclaim. (Ex. D.) On May 22, 2008, VCG and Citibank had a Rule 26(f) conference and agreed upon a discovery schedule.

**The FINRA Arbitration**

32.    Despite having already initiated a lawsuit in the Southern District of New York in connection with the CDS Contract, despite the fact that CGMI was not a party to and did not broker the CDS Contract, and despite the plain language of Paragraph 20 of the Prime Brokerage Agreement prohibiting arbitration, on May 1, 2008, VCG initiated the FINRA Arbitration by filing a Statement of Claim in the Boca Raton dispute resolution office of FINRA against CGMI, alleging various wrongdoing by its prime broker CGMI in connection with the same CDS Contract at issue in the SDNY Action. (Ex. E.)

33.    In the FINRA Arbitration, VCG alleges that CGMI breached various duties supposedly owed to VCG by inducing VCG into the CDS Contract, which VCG now calls an unfairly risky transaction, to benefit CGMI's "sister affiliate,"

Citibank. (*Id.* at 4-5). VCG alleges that Citibank's demands for additional collateral

provide "circumstantial evidence" that CGMI had "inside information" before the CDS

Contract was formed and that the CDS Contract was intended to benefit Citibank at

VCG's expense. (*Id.* at 8). Based on these allegations, VCG's Statement of Claim

asserts that CGMI is liable to VCG for "breach of fiduciary duty," "negligence," "fraud"

and other wrongdoing. ( *Id.* at 2.)

34.    CGMI's answer to VCG's statement of claim is currently due

June 27, 2008.

### First Claim for Relief
### (Declaratory Judgment as to Non-Arbitrability)

35.    CGMI repeats and realleges the allegations of paragraphs 1

through 34 of the Complaint above, as if fully set forth here.

36.    An actual and present controversy has arisen between the parties

with respect to whether VCG is precluded by its Prime Brokerage Agreement with CGMI

(or otherwise) from pursuing the FINRA Arbitration against CGMI.

37.    Because the express terms of the Prime Brokerage Agreement

clearly preclude VCG from pursuing the FINRA Arbitration against CGMI (and given

the duplicative nature of the FINRA Arbitration), CGMI is entitled to a declaratory

judgment that VCG is precluded from proceeding with the FINRA Arbitration.

### Second Claim for Relief
### (Declaratory Judgment as to Lack of Wrongdoing by CGMI)

38.    Plaintiff CGMI repeats and realleges its allegations of paragraphs 1

through 37 of the Complaint above, as if fully set forth here.

39.    As evidenced by VCG's complaint in the FINRA Arbitration, an

actual and present controversy exists between VCG and CGMI as to whether, with

respect to the CDS Contract, CGMI owes any fiduciary or other duty to VCG, or breached any such duty, or VCG is otherwise entitled to any relief as to CGMI.

40.      Because CGMI owes no fiduciary duty or any other duty to VCG with respect to the CDS Contract, breached no duties owed to VCG with respect to that contract, and because VCG is not entitled to any relief as to CGMI with respect to the CDS Contract, CGMI is entitled to a declaration so stating.

**Prayer for Relief**

WHEREFORE, CGMI is entitled to judgment as against VCG:

(i)      temporarily, preliminarily and permanently enjoining VCG from proceeding in any way with the FINRA Arbitration;

(ii)     declaring that VCG is not entitled to proceed in any way with the FINRA Arbitration;

(iii)    declaring that CGMI neither owed nor breached any duties allegedly owed to VCG as to the CDS Contract and that VCG is not entitled to any relief as to CGMI as to the CDS Contract;

(v)      awarding CGMI all attorney's fees and other costs associated with this action; and

(vi)    awarding any other and further relief that the Court deems just and proper.

Dated: June 18, 2008
        New York, New York

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:_____
            Allan J. Arffa
            Karen R. King
            David W. Wang

1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  212-373-3203
Facsimile:  212-373-0203

Email:  aarffa@paulweiss.com
Email:  kking@paulweiss.com
Email:  dwang@paulweiss.com

10

VERIFICATION

I, Angela G. Vogeli, Esq., declare under penalty of perjury under the laws of the United States of America, and pursuant to 28 U.S.C. § 1746, that:

I am Vice President and Legal Counsel at Citigroup Global Markets Inc.

I have read the foregoing Complaint and know the contents thereof.

The allegations contained in the Complaint are true and correct, based on my personal knowledge, information or belief, or based upon information provided to me by others in the company whom I believe to be the most reliable sources for such information.

Executed on this 18th day of June, 2008

_____
Angela G. Vogeli, Esq.

# Exhibit A

**citigroup**

## CUSTOMER AGREEMENT FOR PRIME BROKERAGE SERVICES

This Customer Agreement for Prime Brokerage Services, as supplemented by any Schedules or Annexes attached hereto (the "Agreement") by and between Citigroup Global Markets Inc. ("CGMI") and CDO Plus Master Fund, LTD ("Customer") is dated as of July 17, 2006 and sets forth the terms and conditions under which CGMI, its successors and assigns, will provide prime brokerage services to Customer on and after the date hereof and supplements any other agreement between Customer and CGMI relating to Customer's accounts ("Related Agreements").

1.  SCOPE OF PRIME BROKERAGE SERVICES. Subject to the terms and conditions set forth herein, CGMI will accept for clearance and settlement for Customer's account(s) trades in the products listed on Schedule A hereto executed by such executing broker(s) designated by Customer from time to time as an executing broker and with whom CGMI has entered into an agreement setting forth the terms and conditions under which such executing broker(s) will be authorized to accept orders from Customer for settlement by CGMI. On the day following execution ("T+1"), CGMI will send Customer a notification of each trade placed with its executing broker based upon the information provided by Customer. This notification is not a confirmation and may only contain some but not all of the information required to appear in a confirmation.

2.  COMPLIANCE WITH SEC NO-ACTION LETTER. The prime brokerage services provided hereunder shall be provided in compliance with the no-action letter dated January 25, 1994, issued by the Division of Market Regulation of the Securities and Exchange Commission, any supplements or amendments thereto and any related regulations and statutes (the "SEC Letter") to the extent applicable.

3.  CUSTOMER QUALIFICATIONS.

a.  Minimum Net Equity. Customer shall maintain in its account with CGMI such minimum net equity in cash or securities, as required by the SEC Letter, as such requirement may be amended from time to time (initially: (i) $100,000 in cash or securities with a ready market, for trades executed on behalf of a customer account managed by an investment adviser registered under Section 203 of the Investment Advisors Act of 1940 or a state securities administrator (a "Registered Investment Adviser"), or (ii) $500,000 in cash or securities with a ready market for trades executed on behalf of an account not managed by a Registered Investment Adviser). Such amount may be adjusted from time to time by CGMI in its sole discretion. In the event Customer fails to maintain the required minimum net equity in its account at any time and such failure shall remain unremedied for a period of one business day following the occurrence of the failure, Customer shall be deemed to be in default under this Agreement and CGMI may, in addition to any other rights and remedies it may have: (i) notify all executing brokers with whom it has a prime broker agreement on Customer's behalf that CGMI is no longer acting as Customer's prime broker and (ii) indicate that it does not know ("DK") any prime brokerage transaction commenced on Customer's behalf on the day after such notification is sent.

b.  Clearing Deposit. Customer shall also maintain in a separate account(s) with CGMI, a deposit of cash and/or fully paid for securities or other property acceptable to CGMI (the "Deposit") of a type and with a fair market value as specified in Schedule B attached hereto. Such amount may

be adjusted from time to time by CGMI in its sole discretion. In the event Customer fails to maintain the required minimum Deposit in such account at any time and such failure shall remain unremedied following the occurrence of the failure for a period of one business day, Customer shall be deemed to be in default under this Agreement and CGMI may, in addition to any other rights and remedies it may have: (i) notify all executing brokers with whom it has a prime broker agreement on Customer's behalf that CGMI is no longer acting as Customer's prime broker and (ii) indicate that it does not know ("DK") any prime brokerage transaction commenced on Customer's behalf on the day after such notification is sent. Note that this Deposit amount is in addition to and separate from any amount that may be required by CGMI in connection with Customer's effecting of trades that are cleared through CGMI's MBSCC account (the "MBSCC Margin Amount").

This account shall be under the exclusive control of CGMI, and Customer hereby grants to CGMI a first-priority security interest in the Deposit, including any additional amounts that may be deposited from time to time. Any cash deposited will earn interest at the rate agreed upon by the parties hereto. Customer shall not have access to this Deposit at any time and Customer may not request that such Deposit be used as payment for or applied against any obligation due and owing by Customer to CGMI or to any third-party; except that, (i) upon termination of Customer's prime brokerage relationship with CGMI, CGMI shall return to Customer any portion of the Deposit, if any, remaining in the account after CGMI applies such Deposit against any of Customer's outstanding obligations to CGMI or any of its affiliates at such time, (ii) in its sole discretion, CGMI may use any portion of the Deposit from time to time to satisfy the Customer's shortfalls or defaults pursuant to this or any Related Agreement and (iii) Customer may substitute other collateral for collateral currently comprising all or part of the Deposit so long as such other collateral has a market value (taking into account relevant haircuts) at least equal to the market value of the collateral to be substituted, such market value to be determined by CGMI in accordance with reasonable commercial standards.

4.    SETTLEMENT OBLIGATIONS.  Subject to the terms and conditions set forth herein, CGMI will settle trades executed on Customer's behalf by its executing broker(s) and reported to CGMI by Customer and the executing broker.

a.    Except as provided herein, CGMI shall accept for clearance and settlement each Customer trade for which the trade and settlement details it receives from Executing Broker and Customer match in all respects. Notwithstanding the foregoing, at any time prior to settlement CGMI may refuse to accept for clearance and settlement and may refuse to clear and settle any trade(s) (even if CGMI initially accepted such trade(s) for clearance and settlement) in good faith and in accordance with reasonable commercial standards (including, without limitation, if, taking into account all applicable house maintenance margin requirements, there would not be enough cash in the Customer's Account to settle the trade(s) or if a margin call would be required as a result of settling the trade(s) at issue or in the event of the filing of a petition or other proceeding in bankruptcy, insolvency or for the appointment of a receiver by or against Customer or if Customer fails to meet or maintain any required minimum deposit amounts as described in this Agreement).

b.    If CGMI does not accept settlement responsibility for a trade (or revokes its prior acceptance) it shall send Customer (promptly and in no event later than one business day after CGMI makes such determination) a cancellation notification to offset the notification, if any, sent to Customer under paragraph 1 of this Agreement. Customer shall be solely responsible, and liable to its executing broker, for settling such trade.

2

c.   In the event of: (i) the filing of a petition or other proceeding in bankruptcy, insolvency or for the appointment of a receiver by or against Customer's executing broker, (ii) the termination of Customer's executing broker's registration and the cessation of business by it as a broker-dealer, or (iii) Customer's executing broker's failure, inability or refusal, for any reason whatsoever or for no reason at all, to settle a trade, CGMI may decide not to settle any trades with such executing broker (regardless of whether CGMI shall previously have accepted such trades for clearance) and if CGMI agrees to settle any trades executed on Customer's behalf by such executing broker, regardless of whether CGMI previously shall have Dked, disaffirmed or otherwise determined not to accept settlement responsibility for such trade, Customer shall be solely responsible, and liable to CGMI, for any losses arising out of or incurred in connection with CGMI's agreement to settle such trades.

5.   <u>CUT-OFF TIMES.</u>  All requests for wire-transfers of funds out of Customer's account(s) and all requests for delivery of securities out of Customer's account(s) must be received by CGMI by the time specified in CGMI's Global Guidance and Procedures Document, attached hereto as Exhibit B.  Any instructions received by CGMI after such cut-off times may not be processed by close of business on such day.

6.   <u>FINANCING TRANSACTIONS.</u>  CGMI reserves the right to require, upon notice to Customer, that transactions that Customer executes as an offset to, or for the purpose of closing out, a long or short financing position carried by CGMI, be executed with CGMI.  This requirement would not apply to any such offset or close-out transactions executed by Customer prior to CGMI's notification of Customer. Any such transactions required to be executed with CGMI will be executed at market prices to be determined in accordance with reasonable commercial standards.

7.   <u>NON-EXCLUSIVE PRIME BROKER.</u>  If any other institution concurrently acts as prime broker for Customer with respect to any products, whether or not CGMI also acts as prime broker for Customer with respect to such products, Customer shall, upon request of CGMI, require each such prime broker to provide to CGMI by 9:00 a.m. (NYT) on the business day following the day that such request is made, a report of all Customer positions and settlement terms for trades pending settlement held by such prime broker as of the close of business on the preceding business day.

8.   <u>LOSS LIABILITY.</u>  CGMI shall not be liable for any loss, damage, cost or expense incurred by Customer under the terms of this Agreement (including but not limited to any losses and debit balances in Customer's account, any and all margin required to be provided or maintained in respect of any of Customer's account, the Deposit and the MBSCC Margin Amount), except to the extent such loss, damage, cost or expense is a direct result of the gross negligence or willful misconduct of CGMI. In no event shall CGMI be liable for any consequential damages incurred by Customer.

9.   <u>INDEMNITY.</u>  Customer agrees to indemnify and hold harmless CGMI from and against, any loss, damage, cost or expense in connection with, arising out of or in any way related to the transactions contemplated and relationship established by this Agreement or any applicable Principal Letter (as defined in Annex I, if applicable), or any action or omission by CGMI in connection with this Agreement or any Clearing Agreement, including reasonable costs, expenses and attorneys' fees of attorneys chosen by CGMI incurred in defending any such claim or liability, except that Customer shall not be liable for any loss, liability or expense that is determined to be the direct result of acts or omissions on the part of CGMI constituting gross negligence or willful misconduct. These indemnification obligations shall survive the termination of this Agreement and all related Clearing Agreements.  For purposes of this paragraph, "CGMI"

3

shall mean Prime Broker, its affiliates, successors and assigns and any director, officer, employee or agent of any of the foregoing.

10.    <u>DEFAULT OR INSOLVENCY.</u>  In addition to the rights of CGMI set forth in paragraph 7 of the Customer's Margin Agreement, in the event that Customer (a) fails to make any payment or delivery when due under this Agreement or otherwise breaches any term of this Agreement, (b) becomes insolvent or commences or has commenced against it any action for the appointment of a trustee, receiver, administrator to or for the liquidation, winding up or dissolution, or for the reorganization, composition or arrangement of its debts or any other procedure under any law of any applicable jurisdiction having the same or analogous effect, (c) makes any representation which is untrue or materially misleading when made, (d) fails to perform any covenant agreed to hereunder or (e) fails to pay its debts as they fall due or admits its inability to pay its debts, CGMI shall have the right to liquidate in a commercially reasonable manner all securities held by CGMI for Customer and may reduce any amounts due and owing to Customer under any transaction between Customer and CGMI by setting off against such amounts any amounts due and owing to CGMI by Customer.

Furthermore, in addition to any other rights and remedies of CGMI, should Customer default to CGMI, any of its affiliates or to any third party with respect to any trade accepted for clearance by CGMI or otherwise default to CGMI or any of its affiliates under this Agreement, CGMI, in its sole discretion, may elect to (i) suspend clearance and settlement with respect to any subsequent Customer trades, (ii) apply the Deposit, any other cash or other property of Customer, or any portion thereof, to any amounts due and owing to CGMI or any of its affiliates and/or any third party with respect to any outstanding trades and/or (iii) close-out any Customer positions held in Customer's account with CGMI to the extent necessary to satisfy any outstanding obligations due and owing by Customer to CGMI or to any third party.  CGMI may then resume settlement and clearance of Customer trades if (i) all outstanding trades accepted for clearance by CGMI have settled and (ii) Customer deposits additional funds into the Deposit account in an amount specified by CGMI.

11.    <u>REPRESENTATIONS.</u>  Customer hereby represents and warrants to CGMI (which representations will be deemed to be repeated as of each date on which Customer executes a trade for clearance by CGMI and/or deposits any additional cash, securities or other property into its account(s) with CGMI) that:  (a)  it has the power and authority to execute and deliver this Agreement and enter into the transactions contemplated hereby, (b) this Agreement constitutes a legal, valid, and binding obligation of Customer, enforceable against Customer in accordance with its terms, (c)  it is responsible for its investment decisions and is not relying on CGMI for investment advice, and (d) with respect to any cash, securities or other property for which Customer has granted to CGMI hereunder a first-priority security interest and lien (the "Property"), it has the power to grant a security interest in and lien on any such Property it transfers to CGMI and has taken all necessary actions to authorize the granting of that security interest and lien, it is the sole owner of or otherwise has a the right to transfer all Property it so transfers, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted hereunder.

12.    <u>COVENANTS.</u>  Customer covenants and agrees to promptly provide to CGMI copies of all notices of default received by Customer from any third-party.

13.    <u>MBSCC TRANSACTIONS.</u>  If CGMI has agreed to act as principal for Customer with respect to certain mortgage-related securities transactions for Customer through CGMI's account with the MBSCC, such arrangement shall be governed by Annex I hereto.

4

14.   REMEDIES CUMULATIVE.  The enumeration herein of specific remedies shall not be exclusive of any other remedies.  Any delay or failure by any party to this Agreement to exercise any right, power, remedy or privilege herein contained, or now or hereafter existing under any applicable statute or law, shall be construed to be a waiver of such right, power, remedy or privilege.  No single, partial or other exercise of any such right, power, remedy or privilege shall preclude the further exercise thereof or the exercise of any other right, power, remedy or privilege.

15.   CONTROLLING AGREEMENT.  In the event of an inconsistency between the terms of this Agreement and any other agreement between CGMI and Customer, the terms of this Agreement shall supersede the inconsistent term or terms of such other agreements to the extent of the inconsistency.

16.   ASSIGNMENT.  This Agreement may not be assigned by Customer without the express written consent of CGMI.

17.   TERMINATION.  This Agreement shall remain in full force and effect until terminated at any time by either of the parties hereto upon written notice to the other.  No termination of this Agreement shall affect the rights and/or obligations of either party hereto with respect to any transaction initiated prior to such termination.

18.   COUNTERPARTS.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and which together shall constitute a single agreement.

19.   GOVERNING LAW.  This agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of law.

20.   JURISDICTION AND VENUE.  NO DISPUTE OR CONTROVERSY BETWEEN THE PARTIES HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION HEREUNDER OR BREACH HEREOF OR THEREOF SHALL BE SUBJECT TO OR SETTLED BY ARBITRATION. EACH PARTY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE U.S. FEDERAL AND NEW YORK STATE COURTS LOCATED IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK AND WAIVES ANY RIGHT TO JURY TRIAL WITH RESPECT TO ANY ACTION ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION HEREUNDER.


IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.


CDO Plus Master Fund Ltd                          CITIGROUP GLOBAL MARKETS INC.

By: _____                     By: _____
      Name:  Eric H. Rosenfield                          Michael P Hynes
      Title:   Managing Director                          Managing Director


5

ANNEX I

## TERMS AND CONDITIONS GOVERNING MBSCC TRANSACTIONS

This Annex I sets forth the terms and conditions governing all transactions executed by CGMI on behalf of Customer through CGMI'S MBSCC account with the Mortgage Backed Securities Clearing Corporation ("MBSCC") pursuant to the MBS Clearing Corporation Participants Agreement, dated as of 7/17/06 by and between CGMI and the MBSCC and the MBS Clearing Corporation EPN User Agreement, dated as of 7/17/06, by and between Customer and the MBSCC (together, the "MBSCC Agreements"). Unless otherwise defined, capitalized terms used in this Annex shall have the meanings assigned in the Customer Agreement for Prime Brokerage Services of which it forms a part (such agreement, together with this Annex and any other schedules or exhibits, collectively referred to as the "Agreement").

1.    MBSCC Account. NOTE THAT THIS MBSCC ACCOUNT IS IN THE NAME OF CGMI AND THAT CGMI IS THE SOLE BENEFICIAL OWNER OF SUCH ACCOUNT. Any cash or securities payments due and owing to the MBSCC with respect to any transactions executed through the account are solely the obligation of CGMI and any cash or securities paid or payable by the MBSCC with respect to any transactions executed through the account are solely the property of and for the benefit of CGMI.

2.    CGMI as Principal. CGMI will execute certain transactions in certain mortgage-related securities through its MBSCC account. Since CGMI is an MBSCC member and Customer is not, any trade executed through CGMI's MBSCC account must be executed by CGMI as principal. CGMI may, in its sole discretion, agree to act as principal at the behest of Customer with respect to such transactions, on a case by case basis, and clear such transaction through its MBSCC account.

3.    Execution of Transactions.
    a.    From time to time, authorized employees of Customer, as listed in Exhibit A, may initiate transactions ("Transactions") in certain mortgage-related securities between CGMI and dealers ("Dealers") that have been approved in advance by CGMI and that have entered into a principal letter (each, a "Principal Letter") substantially in the form of Exhibit A with CGMI. CGMI agrees that following each such initiation, such Dealer may contact a designated contact person at CGMI, as provided in the Principal Letter, so that the Transaction may be approved. Customer shall also contact a designated contact person at CGMI with the trade details (exclusive of pool allocations relating to TBA transactions) of any such Transaction so that CGMI may compare them to those provided by the relevant Dealer. Once approved by such a designated contact person, CGMI will act as principal in the Transaction as provided in the Clearing Agreement; provided, however, that Customer shall not be acting as CGMI's agent, and CGMI shall have sole discretion over whether it accepts or rejects a Transaction. If CGMI rejects a Transaction, it shall have no responsibility or liability with respect thereto.

    b.    If CGMI accepts a Transaction, Customer shall be responsible for the Dealer's performance of its obligations with respect thereto. For each accepted Transaction in which CGMI purchases a security from Dealer, Customer agrees to purchase such security as principal from CGMI on the same terms, and for each accepted Transaction in which Prime Broker sells a security to Dealer, Customer agrees to sell such security as principal to CGMI on the same terms; provided, however that in the event Dealer fails to perform its side of an accepted Transaction, CGMI may, at its option and not in limitation of any other right under this Agreement, the MBSCC Agreement or the applicable Clearing Agreement, (i) cancel its purchase or sale, as the case may be, with Customer or (ii) otherwise be compensated by Customer for any loss, costs and expenses related to or arising from Dealer's default.

6

4.    Margin Requirements.

a.    Any margin calls made by the MBSCC with respect to any Transaction cleared through CGMI's MBSCC account are the sole responsibility of CGMI; however, Customer agrees to pay to CGMI, by the close of business on the relevant business day, an amount equal to the amount of any margin payments paid or payable by CGMI to the MBSCC on such business day relating to any Transaction accepted by CGMI as provided above (the "MBSCC Margin Amount"). Concurrently with CGMI's posting of the MBSCC Margin Amount to the MBSCC, CGMI may segregate Customer assets held in its prime brokerage account in an amount equal to such MBSCC Margin Amount into a separate account. CGMI also shall apply an additional haircut, in the amount specified in Schedule B attached hereto ("Additional Haircut"), to each open MBSCC trade(s), which amount shall also be segregated into such separate account.

b.    The MBSCC Margin Amount and any Additional Haircut required by CGMI shall be governed by the same terms and conditions as those set forth in Section 3(b) of the Agreement relating to the Clearing Deposit, except that, Customer shall not be paid interest on such amounts. Failure of Customer to maintain the necessary MBSCC Margin Amount and additional haircut shall be deemed to be a default by Customer under the Agreement.

c.    The only types of collateral accepted by the MBSCC to meet margin calls are cash, U.S. Treasuries, or mortgage pools. CGMI will accept from Customer only the same type of collateral posted by CGMI to the MBSCC to reimburse CGMI for margin payments made by CGMI to the MBSCC relating to Transactions executed by CGMI on behalf of Customer.

5.    Customer Trading Cap. The "Customer Trading Cap" applicable to trades done through CGMI's MBSCC account with respect to each Customer account is set forth on the attached Schedule B. CGMI shall apply an Additional Haircut, in the amount specified in Schedule B, on all open MBSCC trades that exceed the Customer Trading Cap.

6.    Fees. In addition to any other fees relating to the prime brokerage relationship, CGMI will charge Customer a monthly fee, that CGMI will specify in the term sheet, for the use of its MBSCC account. In addition, Customer shall be responsible to CGMI for any MBSCC charges or other costs charged to CGMI relating to Transactions in which CGMI acts as principal. Customer agrees that CGMI may withdraw cash from Customer's accounts in payment of such fee or any other commissions, fees, mark ups, mark downs or charges owed by Customer to CGMI.

7.    Inconsistency. In the event of an inconsistency between the terms of this Annex and the Agreement, the terms of this Annex shall supersede the inconsistent term or terms of the Agreement to the extent of the inconsistency.

7

SCHEDULE A

**PRODUCTS WHICH CGMI WILL ACCEPT FOR CLEARANCE AND SETTLEMENT ON BEHALF OF CUSTOMER:**

Fixed Income Securities in countries where CGMI has the ability to clear and safekeep on behalf of client

This Schedule A may be amended from time to time by mutual agreement of the parties hereto.

8

SCHEDULE B

## SUPPLEMENTAL TERMS AND CONDITIONS

1.  <u>Clearing Deposit</u>.  The fair market value of the Deposit, as defined in Section 3(b) of the Agreement, shall be:  **$250,000 USD to be held in a separate account at the custodian.**

Such Deposit may consist of cash and/or the types of collateral listed in Section 2 below to be held in a segregated account.  CGMI will provide to Customer a daily report of all collateral held by CGMI that comprises the Deposit.  This report shall specify the securities held as collateral, the value such securities (taking into account any applicable haircut) and the amount of any collateral surplus or deficit.

2.  <u>Clearing Deposit Haircuts</u>.  The following haircuts shall apply to securities of the type indicated which are deposited with CGMI by Customer as part of the Deposit, as defined in Section 3(b) of the Agreement:

(a) US Treasuries:

| | |
|---|---|
| 0-6 years | ½% |
| 6-11 years | 1% |
| 11-30 years | 2% |

(b) Mortgage Products:

| | |
|---|---|
| Pools (GNMA/FNMA/FHLMC) | 3% |
| Agency CMO | 5% |

3.  <u>MBSCC Customer Trading Cap</u>.  The Customer Trading Cap shall be equal to $_____ Billion

4.  <u>MBSCC Additional Haircuts</u>.

(a)    There shall be no Additional Haircut applied to any open MBSCC trade that does not exceed the applicable Customer Trading Cap, which amounts represent the net value of trades done through CGMI's MBSCC account for each such account.

(b)    An Additional Haircut of 2% shall be applied to any open MBSCC trades that exceed the applicable Customer Trading Cap.  Any additional collateral required to be posted in connection with the Additional Haircut may consist of the same types of collateral permitted for the Deposit, as specified in Section 2 of this Schedule.  CGMI will provide Customer with a daily report of all such collateral deposited with CGMI in connection with the Additional Haircut.  This report shall specify the securities held as collateral, the value such securities (taking into account any applicable haircut) and the amount of any collateral surplus or deficit.  CGMI will also provide to Customer a monthly report specifying the current MBSCC Customer Trading Cap and how such amount was calculated.

9

EXHIBIT A

**FORM OF PRINCIPAL LETTER**

«date_sent»

«title» «first_name» «last_name»
«executing_broker»
«address_1»
«address_2»
«city» «state» «post_code»

Dear «title» «last_name»:

This letter sets forth the procedures concerning certain transactions involving either the purchase or sale of securities initiated by «customer» with «executing_broker» and in which Citigroup Global Markets Inc. ("CGMI") will act as principal for «customer» in such trades. Employees of «customer» by telephone may directly contact «executing_broker» trading desk to initiate transactions between «executing_broker» and «customer» however, such employees will not be acting as agent of CGMI and the proposed transactions will not be accepted or consummated by CGMI until your trading desk confirms the transaction with CGMI detailing the transaction and giving us the name of the employee of «customer» who initiated the transaction. CGMI agrees that once a transaction has been approved by the designated CGMI contact person:

(Updated telephone list to be inserted upon distribution of letter)

CGMI will thereafter act as principal in the trade and you agree that «executing_broker» will always act as principal on the other side of the trade. All «executing_broker»'s customary documentation for trades where CGMI acts as principal, regardless of how initiated should be sent directly to CGMI, attention Prime Brokerage Services, 333 West 34th Street, 4th Floor, New York, New York 10001 and CGMI will send you its customary documentation for trades in which it acts as principal.

10

«executing_broker» will immediately terminate any transactions initiated by «customer» but not approved by the designated CGMI contact person. «customer» agrees to reimburse «executing_broker» for any losses and all reasonable cost incurred in connection with any such terminations.

Upon receipt by CGMI of a signed copy hereof, this Agreement will remain in force, unless terminated in writing by either party. All transactions entered into, before notice of termination is received, shall be handled in accordance with the above.

Very truly yours,

Citigroup Global Markets Inc.

By: _____

Date:_____

«customer»

By:_____

Date:_____

«executing_broker»

By:_____

Date:_____

11

### Citigroup Global Markets Inc
### Fixed Income Prime Brokerage
### Guidelines and Procedures

**Account Coverage:**

As a client of our Fixed Income Prime Brokerage service, you will be assigned an Account Management team to handle all aspects of your Prime Brokerage relationship with CGMI. Your Account Management team will include an Account Manager on our Prime Brokerage Trading Desk and an Account Manager in our dedicated Middle Office Service group that supports our Prime Brokerage clients.

Your Account Manager on the Prime Brokerage Trading Desk will be your point of contact for all financing business, managing your daily cash position and receiving all of your trade and cash instructions each day. The primary areas of focus for your Middle Office Account Manager are overseeing settlements, following the collection of dividends and interest, margining and account reconciliation. Our service goal is to offer clients a superior level of service by having your Account Management team work together throughout the day to ensure that you receive an integrated and coordinated Prime Brokerage service.

**Client Reporting:**

CGMI will provide, through the Internet, a reporting package containing a variety of reports to be used to reconcile activity and positions. The following two reports must be carefully reviewed each day:

- **Entry Date Transaction Summary:** This report contains all trades and activities received the prior day and processed by CGMI for the client's behalf. This report should be used to ensure all transactions were received and processed the previous day. Any discrepancy should be communicated as soon as possible to your Account Manager.

- **Settlement Date Transaction Summary:** This reports reflects all transactions that settled in your account the prior day. This report should be reviewed to ensure all transactions confirmed to settle the prior day with their Account Manager were accurately reflected in the account. Any discrepancy should be communicated as soon as possible to your Account Manager.

    CGMI will reconcile between the closing balance in this report and the balance agreed upon for the previous day's close. The Account Manager and the client will review any variance.

    We will supply these same reports, at your request, to a third party accountant or administrator. **It will be the client's responsibility to ensure the activity in these reports agrees with any information you have provided to the third party.**

12

**Transaction Settlements:**

All trades will be settled in the Prime Brokerage account on a contractual settlement basis. All funds wired or received will be settled on an actual settlement basis.

- **Domestic Trade Instructions:**
  Daily trade tickets should be received by CGMI's Prime Broker trading desk no later than 5:00 p.m. on trade date. In the case of cash trades, CGMI's Prime Broker Trading Desk should receive the ticket within 30 minutes of their execution and at least 2 hours prior to the wire deadline.

  Attached is an outline of cutoffs for trade instructions for clients using a CGMI MBSCC account.

- **International Trade Instructions:**
  The attached matrix outlines the cutoff times for trade tickets to be received at CGMI's Prime Broker trading desk for all international trade instructions.

- **Financing Away Trades:**
  Domestic financing trades executed away from CGMI should be received by CGMI's Prime Broker trading desk within 30 minutes of their execution and at least 2 hours prior to the wire deadline.

  International financing trades should be received at CGMI's Prime Broker trading desk by the cutoff times outlined in the attached matrix.

  Financing away trade tickets should be clearly marked as finance trades and include the following: repo or reverse, counterparty **(including complete receive and delivery instructions)**, quantity, start date, end date, price, principal, close out interest, net money and any special trade instructions like "pair-off" or "quantity breakdown".

  We will provide a daily report of all outstanding financing positions being held away sorted by counterparty.

13

- **Federal Fund Wires:**
  Fund wire instructions should be forwarded to CGMI's Prime Broker trading desk and received no later than 2:00 p.m. on settlement date.

  The client is required to set up a separate bank account, outside CGMI and in the same name as the CGMI account. This account should be used to facilitate any third party wires, such as paying legal fees, accounting expenses or fees for the Management Company. CGMI will not release third party fund wires on the client's behalf.

  All outgoing wires must include an authorized signature from the account. The client is required to provide a sample signature of all authorized signatures.

  Incoming wires should include the following: 1) client's full legal name, 2) Prime Brokerage account number, 3) cusip if applicable, 4) reason for funds (i.e. coupon, swap).

  **Any instructions received after the stated cutoffs may result in additional fees being charged to the account. In addition, any loss due to fails will be passed along to the account. (These charges are referenced in your Term Sheet.)**

  Attached is a matrix of CGMI's delivery instructions for all incoming securities and funds to be communicated by the client to their counterparts.

## Dividends, Principal and Interest Payments:

- **Positions held at CGMI:**

  CGMI will credit your Prime Brokerage account any coupon interest or principal due the account for any position, held over record date, in either safekeeping or on financing with CGMI.

- **Positions held away from CGMI:**

  **DTC and PTC Securities:**
  CGMI will track and credit the account for any position held away providing the client instructs us on the delivery as a repo. Making deliveries through the clearing facility on repo codes allows us to receive credit for the payments on payable date.

  **Fed wireable Securities:**
  The Federal Reserve System does not provide any features for tracking and collecting principal and interest payments for securities delivered between members. We therefore are unable to control the collection of P+I payments and require our clients to claim any funds for their own account.

  We will credit the client's Prime Broker account for any federal fund wires received as a result of these claims.

14

**Euroclear Securities:**

The Euroclear Depository does not provide any features for tracking and collecting interest payments for securities delivered between members. We therefore are unable to control the collection of coupon payments and require our clients to claim any funds for their own account.

We will credit the client's Prime Broker account for any funds received as a result of these claims.

For both Fed wireable and Euroclear securities, we will produce a report to indicate any principal and/or interest payments for your account. This report will be reviewed with the account to aid in the accurate tracking and collection of these receivables.

**Physical Securities:**

If securities are received on an outright purchase (must be in negotiable form), they will be sent directly to the agent to be registered in CGMI's name. Any instructions to sell or finance these securities, with another broker, during the registration period will result in a fail and the costs will be charged to the account.

Securities reversed into CGMI for the client's account will not be sent to transfer and any delivery will be made for your behalf.

## Executing Brokers:

Any broker the client intends executing trades with and clearing through CGMI must be: 1) pre approved by CGMI and 2) an executing broker agreement must be in place prior to the trade being accepted by CGMI.

In order to ensure the proper documentation is in place to settle trades with a new broker, the client must notify CGMI prior to executing the trade with a new broker. We can not accept trades without a signed executing broker agreement signed and on file.

## Pricing:

Securities held by CGMI, but not financed with CGMI, will be priced and valued on a best effort basis. We encourage our clients to have their administrators or independent accountants verify prices with a third party prior to any calculation of Net Asset Value.

15

# CGMI - Fixed Income Prime Brokerage

### International Fixed Income Settlement Instruction Deadlines

The following instruction deadlines represent the time a trading ticket must be received by your Account Manager. These cut-off times will enable CGMI to instruct our clearing agents with sufficient time to match instructions with the counter party and allow an opportunity to resolve discrepancies and avoid fails.

| Euroclear and Cedel Deadline | Time | Days Prior to Settlement |
|---|---|---|
| All Products | 12:00 pm | One Day (1). |

| Local Markets Deadline | Time | Days Prior to Settlement |
|---|---|---|
| Argentina | 4:00 pm | Two Days (2) |
| Australia | 8:00 am | Three Days (3) |
| Austria | 12:00 pm | Three Days (3) |
| Belgium | 12:00 pm | Two Days (2) |
| Brazil | 12:00 pm | Two Days (2) |
| Canada | 1:00 pm | Same Day |
| Denmark | 10:00 am | Two Days (2) |
| Finland | 11:00 am | Three Days (3) |
| France | 4:00 pm | Two Days (2) |
| Germany | 12:00 pm | Two Days (2) |
| Ireland | 10:00 am | Two Days (2) |
| Italy | 4:00 pm | Two Days (2) |
| Japan | 4:00 pm | Two days (2) |
| Mexico | 1:00 pm | Two Days (2) |
| Netherlands | 12:00 pm | Two Days (2) |
| New Zealand | 12:00 pm | Three days (3) |
| Norway | 11:00 am | Three days (3) |
| Russia | 11:00 am | Two Days (2) |
| South Africa | 12:00 pm | Two Days (2) |
| Spain | 4:00 pm | Two Days (2) |
| Sweden | 10:00 am | Two Days (2) |
| Switzerland | 4:00 pm | Three days (3) |
| Turkey | 12:00 pm | Two Days (2) |
| United Kingdom | 12:00 pm | Two days (2) |
| Venezuela | 12:00 pm | Two Days (2) |

**\*\*\* All times are US EST**

16

## CGMI - Fixed Income Prime Broker

MBSCC Fees and Submission Cut Offs

### Fees:

| | |
|---|---|
| Trade for Trade | $2.50 per million |
| SBOD Netting | $2.00 per million |
| Administrative Fee | $900.00 per month |
| Allocations | $60.00 per million |
| Trade Date compliance | $500.00 per month ** |

**MBSCC will charge your account for trades not submitted timely or in error. The charge will occur if the error percentage of trades not submitted or corrected by trade date plus one is greater than 10%.

### Cut Offs for MBSCC Submission:

**Pre Netout Day   (48 hrs prior to notification day)** - Trades must be submitted to the Prime Broker Desk by 4:00pm. This will allow for the trades to be checked with the brokers and submitted for guaranteed netout.

**Netout Day- (1day prior to pool notification day)** - Trades must be received by the Prime Broker Desk prior to 9:00am to be submitted for that class netout. These trades must be verbally confirmed with the broker and then sent to MBSCC. Any errors in the submission of the trades by either the broker or CGMI will result in the trade not netting. Any trade received after 9:00am will be done on a best efforts basis.

**Skipday Trading - (Trading on pool notification day)**- As a general policy there will be no skipday trading. Any exception to this policy must be agreed to by your Account Manager on the Prime Broker Desk. Any trade agreed to will be done on a best efforts basis and any fail costs resulting from late allocations will be charged to your account.

# Exhibit B

MINTZ & GOLD LLP
Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, N.Y. 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*
*VCG Special Opportunities Master Fund Ltd.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------X

VCG SPECIAL OPPORTUNITIES        :
MASTER FUND LIMITED,             :
                                 :
                    Plaintiff,   :     **COMPLAINT**
                                 :
          - against -            :     **ECF CASE**
                                 :
CITIBANK, N.A.,                  :
                                 :
                    Defendant.   :
------------------------------------------------------X

Plaintiff VCG Special Opportunities Master Fund Limited ("Plaintiff"), by and

through its attorneys, Mintz & Gold LLP, alleges as follows:

**Introduction**

1.    This action concerns two distinct disagreements regarding the scope of

Plaintiff's obligations under a credit default swap. The gravamen of this action is that

Defendant, Citibank, N.A. ("Citibank"), improperly demanded and extracted from

Plaintiff a total of $9,960,000 of collateral for a $10,000,000 swap that it bought from the

Plaintiff, based upon an erroneous reading of the swap transaction documents. Citibank

then compounded its unreasonable demand for and retention of those sums by declaring a

credit default and notifying Plaintiff that it would be required to remit the entire amount of the swap.

2.  The timing and sequence of events highlights the commercially unreasonable nature of Citibank's conduct. Within scant weeks after it bought the swap from Plaintiff, Citibank ostensibly determined that the creditworthiness of the reference obligation (and/or the Plaintiff) had drastically deteriorated – even though the reference obligation was thinly traded and was still an investment-grade instrument. Citibank was more likely in a panic over recent turmoil in the debt markets connected to the sub-prime mortgage lending crisis. In any event, Citibank accelerated its demands for additional margin. For months, Plaintiff disputed Citibank's entitlement to demand the collateral but was met with silence until, in December 2007, Citibank grudgingly returned a mere $667,822.88 and otherwise refused Plaintiff's demand for a return of the balance.

3.  Then, in January 2008, Citibank notified Plaintiff that, due to an "implied write-down" of the reference obligation, a credit default had taken place, as the result of which Plaintiff owed the full $10,000,000. However, Citibank's assertion that a write-down had taken place was inaccurate. The parties have come to an impasse, with Citibank holding almost *20% of Plaintiff's total capital* hostage in a margin account.

4.  In essence, therefore, this action is about two misreadings by Citibank of the economics and structure of the swap. Citibank's first error concerns the duty to post margin and the second error concerns the events that would constitute a credit default. In light of Citibank's conduct, it is plain that there was no meeting of the minds regarding the subject matter of the transaction. Plaintiff therefore seeks, *inter alia*, declaratory relief, rescission of the swap, restitution of all sums it paid to Citibank, and damages.

### The Parties

5.    Plaintiff is an Isle of Jersey exempted corporation having its principal

place of business at Le Masurier House, St. Helier JE2 4YE Jersey, Channel Islands.

6.    Upon information and belief, Citibank is a national banking association

with a principal place of business at 399 Park Avenue, New York, N.Y. 10043.

### Jurisdiction and Venue

7.    The parties are of diverse citizenship and the amount in controversy

exceeds the sum of $75,000, exclusive of interests and costs.  Accordingly, this Court

possesses subject matter jurisdiction of the action pursuant to 28 U.S.C. § 1332.

8.    In the swap agreement, the parties agreed to submit to the jurisdiction of

the Courts of the State of New York and the United States District Court in the Borough

of Manhattan, and stipulated to the application of New York law.

### Substantive Allegations

*The Millstone Credit Default Swap*

9.    Plaintiff is a hedge fund with approximately $50,000,000 of capital under

management.

10.    On or about June 29, 2007, Plaintiff entered into a credit default swap

transaction with Citibank by which Plaintiff sold Citibank credit protection against the

risk of a credit default by a collateralized debt obligation, or "CDO," up to a maximum of

$10,000,000.

11.    A credit default swap is a contract under which two financial institutions

trade the default risk of a debt instrument, such as a corporate bond or, in this case, a

CDO.  A credit default swap bears some similarities to an insurance policy, except that

3

neither counterparty to the swap necessarily holds the debt instrument on which the swap is based. The underlying debt instrument is called the "reference obligation." Under the credit default swap agreement, one party (the "protection buyer," which in this case is Citibank) pays a fixed, periodic fee to the seller of the swap (the Plaintiff, here). In return for receiving the fee, the seller of the swap agrees to undertake the credit exposure of the underlying debt instrument, *i.e.*, to pay all or a portion of the unpaid obligation to the buyer of the swap upon the triggering of certain credit defaults.

12.    In this case, the fee to be paid to Plaintiff is 5.50% per annum, calculated on the "notional amount" of $10,000,000 of a collateralized debt obligation, Class B Notes of Millstone III CDO Ltd. III-A, which were issued pursuant to an Indenture dated July 5, 2006.[1]

13.    The contract documents governing the counterparties' rights and obligations under the swap are the 2002 version of the Master Agreement of the International Swap Dealers Association ("ISDA"), dated September 1, 2006 (the "ISDA Master Agreement"), the Schedule to the ISDA Master Agreement, dated as of September 1, 2006, the 1994 ISDA Credit Support Annex and the Confirmation Letter by Citibank, dated July 5, 2007. The Confirmation Letter, in turn, incorporates the 2003 ISDA Credit Derivatives Definitions and the ISDA Standard Terms Supplement for use with Credit Transactions on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement (the "CDO PAUG Form").

---

[1] Neither the Plaintiff nor Citibank actually owns the CDO. Rather, the counterparties simply trade in, or "hedge," the CDO's credit risk. Thus, the amount of the debt obligation on which the fixed fee is calculated (and thus the amount up to which the seller agrees to undertake exposure in the event of a credit default in return) is termed the "notional" amount.

14.   By the terms of the foregoing documents, in the event of any conflict between the Confirmation Letter and the ISDA Master Agreement, the terms of the Confirmation Letter control.

*Initial Margin, Variation Margin*
*and Floating Payments*

15.   When Plaintiff and Citibank executed the swap, Plaintiff paid Citibank $2,000,000, or 20% of the $10,000,000 notional amount of the Millstone CDO.  In the Confirmation Letter, this $2,000,000 in collateral is defined as the "independent amount." For purposes of clarity, however, this Complaint instead refers to the deposit of $2,000,000 as the "initial margin."  The purpose of the initial margin was to secure Citibank against the credit risk of the counterparty (Plaintiff), *i.e.*, in case Plaintiff did not make good on its promise to pay in the event of a credit default by the Millstone CDO.

16.   Under the Confirmation Letter, the only payments that Citibank may demand from Plaintiff *after* the initial margin are "Floating Payments."  Citibank may require Floating Payments *only* on the basis of a good faith determination by the Calculation Agent (which in this case is Citibank) that a "Floating Amount Event" had taken place: (i.) the obligor on the reference obligation (the CDO) had failed to make a required principal payment, (ii) an interest shortfall had taken place, or (iii) a write-down had taken place under the reference obligation's governing instrument.  However, Citibank may *not* demand a Floating Payment on the basis of the perceived creditworthiness of the counterparty (Plaintiff).[2]

---

[2]   There is another scenario, not at issue in this case, whereby a counterparty that buys credit default protection may declare a "Credit Event" to have taken place and require early settlement of the trade.  Such an instance would include, in addition to a write-down, or a failure to pay interest or principal, an event where one or more rating agencies downgrade the reference obligation below a certain threshold or otherwise withdraw their assigned rating (a "Distressed Ratings Downgrade").

5

17.    Apart from the initial margin, Floating Payments and credit events, the Confirmation Letter does not otherwise authorize Citibank to demand payments of any kind to secure Citibank against the credit risk of the counterparty (Plaintiff) or the reference obligation.

18.    By contrast, on other swaps, *e.g.*, interest rate swaps, additional margin may be collected after the initial margin. In such cases, the additional margin is referred to as "variation margin" and is based upon a downward movement in the daily mark-to-market value of the underlying reference obligation.

19.    Plaintiff wired the $2,000,000 of initial margin to Citibank's account on or about July 3, 2007.

*Citibank Squeezes Plaintiff for More Money*

20.    However, within less than a month, on August 1, 2007 Citibank demanded variation margin in the amount of $2,133,400.17, resulting in a total collateralization of over 40% of the notional amount of the swap. Citibank then ratcheted up its demands for margin over the weeks that followed:

| | |
|---|---|
| July 3, 2007 | $2,000,000 (initial margin) |
| August 1, 2007 | $2,133,400.17 |
| August 23, 2007 | $2,064,534.14 |
| September 4, 2007 | $1,686,854.00 |
| November 5, 2007 | $2,075,489.47 |

21.    In sum, over a period of five months Citibank demanded, and Plaintiff paid, $9,960,277.78 – as compared to a total credit risk of $10,000,000 from an investment-grade debt instrument.

22.    However, upon information and belief, during the entire period described in the table above, and as of the date of this Complaint, the reference obligation (Class B Notes of Millstone III CDO Ltd. III-A) had not experienced any shortfall in principal or interest payments whatsoever.

23.    Similarly, during the same period, no write-down had taken place such that Plaintiff could properly have been required to make any payment to Citibank.

24.    Under paragraph 7(b) of the CDO PAUG Form, Citibank, as calculation agent, was obliged to determine Plaintiff's obligation to pay Floating Payments *solely* upon the basis of a report of the servicer of the underlying reference obligation.

25.    While Plaintiff delivered the sums requested by Citibank, commencing around August 20, 2007, Plaintiff repeatedly questioned Citibank's mark-to-market calculation of the credit risk of the reference obligation.

26.    While Plaintiff believed it was not obligated to pay the sums demanded by Citibank, it did so because it was concerned that Citibank might seize upon Plaintiff's refusal to post variation margin as an excuse to declare a technical default and seize Plaintiff's collateral – which ultimately, Citibank did.

27.    On each such occasion, Citibank failed to provide the requested information, but instead continued to demand additional margin.

28.    On or about December 19, 2007, after receiving a demand letter from the undersigned counsel, Citibank forwarded a copy of the servicer's report for the monthly period of October 31, 2007 to November 29, 2007.

29.    The servicer's report revealed that no credit event had yet taken place such that Plaintiff should have been required to make a Floating Payment. Nor had any

7

downgrade to the Millstone reference obligation been announced by the rating agencies, Standard & Poors or Moody's.

30.    It was not until December 26, 2007, that Citibank finally responded that it was entitled to require variation margin pursuant to the Credit Support Annex to the ISDA Master Agreement, due to the deterioration in the mark-to-market value of the reference obligation.

31.    Thus, Citibank did not at that time claim that an actual credit default had taken place. Rather, Citibank confirmed that the entire amount that it had collected represented variation margin based on its calculation of "the current mark to market of the Transaction (or 'Secured Party's Exposure')" while conceding that, "as of last week, our calculation of this amount found that [Plaintiff] was entitled to have $667,822.88 returned."

32.    Plaintiff thereupon demanded the return of all of the sums that it had paid after the initial margin, but Citibank only returned $667,822.88.

33.    Even if Citibank had been entitled to demand variation margin, *i.e.*, to secure Citibank against the deteriorating credit risk of the reference obligation (which was beyond the obligations accepted by Plaintiff in the Confirmation Letter), Citibank failed even to make a proper estimate of the required collateral. Had it based its calculation on the servicer's report, it would never have demanded anything approaching the sums that it collected from Plaintiff. Indeed, by Plaintiff's calculation, using similar CDO's as a point of comparison, the reference obligation may have actually appreciated during the same period when Citibank was demanding collateral.

34.    Instead, upon information and belief, Citibank contrived margin calls to require money from its counterparty so that Citibank could protect its own position in a deteriorating credit market, and/or because it was concerned about the creditworthiness of the Plaintiff.[3]

*Citibank Jumps the Gun and*
*Declares a Credit Default*

35.    On January 9, 2008, Citibank sent Plaintiff a "Floating Amount Event Notice," stating, in relevant part:

> This letter is notice to you that an Implied Writedown has occurred with respect to the Reference Obligation on or about, January 4, 2008. The Implied Writedown Amount in respect of such Floating Amount Event is USD 10,000,000.00 (the "Floating Amount").

36.    Citibank purportedly based its determination that an "Implied Write-down" had taken place upon an inferred under-collateralization of the CDO. Citibank informed Plaintiff that the entire $10,000,000 of the notional amount was due and payable on the ground that the reference obligation had failed the "overcollateralization test" set forth in the CDO's indenture.[4]

37.    However, the agreement does not give Citibank the right to demand Floating Payments based upon an "Implied Write-down"; rather, Citibank may only require Plaintiff to pay in the event of an actual "Write-down" to the reference obligation.

---

[3]    Ultimately, on January 15, 2008, Citibank announced that it had written off $18.1 billion from its investment portfolio.

[4]    Generally, the overcollateralization test applicable to the Class B Notes represents the outstanding balance of the CDO's collateral assets divided by the aggregate outstanding principal amount of the Class A and Class B Notes. The test is failed if that ratio falls below 101.56%. According to the servicer, that ratio was approximately 97% in December.

38.     According to the definition of the term "Implied Writedown Amount" provided in the CDO PAUG Form:

> "Implied Writedown Amount" means, (i) if the Underlying Instruments[5] do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, an amount determined by the Calculation Agent [Citibank] equal to the excess, if any, of the Current Period Implied Writedown Amount over the Previous Period Implied Writedown Amount, in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, *and (ii) in any other case, zero.*

(Emphasis added).

39.     "Writedown," in turn, is defined in relevant part as "the occurrence at any time on or after the Effective Date of:

> (i)     (A)     a writedown or applied loss (*however described in the Underlying Instruments*) resulting in a reduction in the Outstanding Principal Amount (other than as a result of a scheduled or unscheduled payment of principal); or
>
>         (B)     the attribution of a principal deficiency or realized loss (*however described in the Underlying Instruments*) to the Reference Obligation resulting in a reduction or subordination of the current interest payable on the Reference Obligation; . . ."

(Emphasis added).

40.     The "Underlying Instruments" of the reference obligation in this case, including the indenture, do, in fact, provide for "writedowns, applied losses, principal deficiencies and/or realized losses."

---

[5]     The Underlying Instruments of the reference obligation are the "indenture, trust agreement, pooling and servicing agreement or other relevant agreement(s) setting forth the terms of the Reference Obligation."

41. Thus, Citibank erroneously issued its Floating Amount Event Notice, and no credit default has taken place requiring Plaintiff to pay the sums demanded by Citibank.

42. Plaintiff therefore immediately disputed Citibank's assertion that a Floating Amount Event had actually taken place, for the reasons set forth above.

43. However, by letter dated January 30, 2008, Citibank notified Plaintiff that it intended to treat Plaintiff's refusal to pay the sums demanded as an event of default under the swap agreement.

44. Upon an event of default under the swap agreement, Citibank would immediately terminate the swap and foreclose on the collateral.

45. On February 1, 2008, Citibank made good on its threat and issued a Notice of Default and Early Termination, stating that it intended to "liquidate, close out and/or otherwise exercise our rights and remedies with respect to the [ISDA] Agreement."

## AS AND FOR A FIRST CAUSE OF ACTION
### (For Declaratory Judgment)

46. Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

47. By reason of the foregoing, there is a live and present controversy between the parties as to: (i) whether Citibank's requests for variation margin, based upon the Credit Support Annex to the ISDA Master Agreement, are inconsistent with, and therefore superseded by, the Confirmation Letter's limitation of payments to actual write-down's, failures to pay principal and interest shortfalls; and (ii) whether the underlying instruments of the reference obligation provide for writedowns, applied losses, principal deficiencies or realized losses, such that the "Implied Writedown" is, by definition, zero.

11

## AS AND FOR A SECOND CAUSE OF ACTION
### (For Rescission)

48.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

49.    No meeting of the minds had been achieved at the time that the parties entered into the swap transaction. Based upon the Confirmation Letter and the negotiations leading up to it, Plaintiff had agreed to sell credit protection on a credit default swap, not to take the risk of daily mark-to-market movements in the value of the reference obligation. Citibank was aware that the Confirmation Letter stipulated only Floating Payments, not margin based upon daily changes in the creditworthiness of the Millstone CDO, but did not address the discrepancy until after Plaintiff had closed on the trade in June 2007. As to Plaintiff, the mistake was honest and excusable, such that enforcement of the variation margin provision would therefore be unconscionable.

50.    Accordingly, Plaintiff is entitled to an equitable rescission of the swap agreement and restitution of all sums paid to Citibank.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of Contract)

51.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

52.    Plaintiff has performed all of its obligations under the swap agreement.

53.    Citibank has breached the agreement, *inter alia*, by prematurely demanding Floating Payments and by retaining the deposit of collateral far in excess of the amount actually required.

54.    Plaintiff has been thereby damaged in an amount to be determined at trial.

12

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

55.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

56.    By gradually making oppressive margin demands without justification, Citibank acted in a manner so as to deprive Plaintiff of the right to receive the benefit of the swap agreement, namely, the premium to be paid by Citibank on the notional amount at a cost to Plaintiff no greater than the opportunity cost of the collateral actually required to secure counterparty risk and credit risk.

57.    To the extent that the swap agreement gave Citibank any discretion as calculation agent in the determination of the credit risk of the reference obligation, the implied covenant of good faith and fair dealing included a promise on the part of Citibank not to act arbitrarily or irrationally in exercising that discretion.

58.    By extracting sums from Plaintiff far in excess of what Citibank actually required, Citibank has damaged Plaintiff in an amount to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

59.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

60.    By extracting an unnecessarily large amount of collateral from Plaintiff, Citibank received money properly belonging to the Plaintiff.

61.    Citibank has benefited and is benefiting from the receipt of those funds and, under principles of equity and good conscience, Citibank should not be permitted to retain such collateral in any amount beyond the sums required to offset the credit risk of the reference obligation.

13

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Conversion)

62.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

63.    Citibank intentionally retained and then, beyond the scope of its authorization, disposed of the collateral properly belonging to Plaintiff.

64.    The funds in question are specifically identifiable in that they were deposited solely to collateralize the swap and were required to be returned to Plaintiff.

65.    Citibank has failed and refused to comply with Plaintiff's demand that Citibank return the excess collateral.

66.    Citibank has effected a set-off against and has already foreclosed (or is in the process of foreclosing) upon the collateral, without justification.

**WHEREFORE,** Plaintiff demands judgment as follows:

A.    On the First Cause of Action, a judicial declaration that (i) Citibank's requests for variation margin, based upon the Credit Support Annex to the ISDA Master Agreement, are inconsistent with and superseded by the Confirmation Letter, because the Confirmation Letter limits Citibank's right to require payments to actual write-down's, failures to pay principal and interest shortfalls and distressed rating downgrades of the reference obligation; and (ii) Citibank does not have the right to declare an early termination of the trade because no Floating Amount Event or Credit Event has taken place;

B.    On the Third, Fourth, and Sixth Causes of Action, damages in an amount to be determined at trial, plus interest and costs;

14

C.    On the Second and Fifth Causes of Action, restitution of the sums paid by

      Plaintiff to Citibank under the swap agreement;

D.    On the Second Cause of Action, rescission of the swap agreement;

E.    On the Sixth Cause of Action, an award of compensatory and punitive

      damages; and

F.    Interest, costs, and such other and further relief as to the Court may seem

      proper and equitable.

Dated: New York, New York
      February 14, 2008

           **MINTZ & GOLD LLP**

           *Terence W. McCormick*

           Steven G. Mintz (SM 5428)
           Terence W. McCormick (TM 2713)
           470 Park Avenue South
           10th Floor North
           New York, N.Y. 10016-6819
           Tel: (212) 696-4848
           Fax: (212) 696-1231
           mintz@mintzandgold.com
           mccormick@mintzandgold.com
           *Attorneys for Plaintiff*
           *VCG Special Opportunities Master Fund Ltd.*

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VCG SPECIAL OPPORTUNITIES MASTER FUND LIMITED,<br><br>         Plaintiff,<br><br>         -against-<br><br>CITIBANK, N.A.,<br><br>         Defendant. | 08 CV 01563 (BSJ)<br><br>**ANSWER AND COUNTERCLAIM** |
| CITIBANK, N.A.,<br><br>         Counterclaim-Plaintiff<br><br>         -against-<br><br>VCG SPECIAL OPPORTUNITIES MASTER FUND LIMITED,<br><br>         Counterclaim-Defendant. | |

**ANSWER**

        Defendant Citibank, N.A. ("Citibank"), by and through its undersigned counsel, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, for its answer to the complaint of plaintiff VCG Special Opportunities Fund Limited (*f/k/a* CDO Plus Master Fund Ltd.) ("VCG"), responds as follows:

        1.      Denies the allegations contained in paragraph 1 of the complaint, except admits that Citibank demanded, between July 2007 and November 2007, in accordance with Paragraph 3 of the 1994 International Swaps and Derivatives Association, Inc. ("ISDA") Credit Support Annex dated September 1, 2006 (the "Credit Support Annex") between Citibank and plaintiff, a total of $9,960,277.78 as collateral

security for plaintiff's "Obligations" to Citibank under the terms of the credit default swap transaction between plaintiff and Citibank (the "Obligations").

      2.    Denies the allegations contained in paragraph 2 of the complaint, except admits that, in or about December of 2007, Citibank returned to plaintiff $667,822.88.

      3.    Denies the allegations contained in paragraph 3 of the complaint, except admits that Citibank sent plaintiff a "Floating Amount Event Notice" dated January 9, 2008, in which Citibank notified plaintiff that a "Floating Amount Event" had occurred under the terms of the parties' credit default swap transaction, and that plaintiff owed Citibank a "Floating Amount" of $10,000,000, and respectfully refers the Court to the Floating Amount Event Notice for its entire contents.

      4.    Denies the allegations contained in paragraph 4 of the complaint, and, to the extent paragraph 4 purports to describe plaintiff's prayer for relief, Citibank avers that no response is required; nonetheless, for the avoidance of doubt, Citibank further avers that plaintiff is entitled to no relief, and that judgment should be entered in Citibank's favor both against plaintiff's purported claims and in favor of Citibank's counterclaim alleged below.

      5.    Admits, upon information and belief, the allegations contained in paragraph 5 of the complaint.

      6.    Admits the allegations contained in paragraph 6 of the complaint.

      7.    In response to the allegations contained in paragraph 7 of the complaint, admits, upon information and belief, this Court has subject matter jurisdiction to hear the alleged claims and counterclaim in this action.

8.    In response to the allegations contained in paragraph 8 of the complaint, admits that Citibank and plaintiff entered into an ISDA 2002 Master Agreement dated September 1, 2006 with an accompanying Schedule (the "Schedule") of the same date (together, the "ISDA Master Agreement"), and admits that, pursuant to Section 13(b)(i)(2) of the ISDA Master Agreement and Part 4(h) of the Schedule, the parties submitted to the jurisdiction of this Court and agreed to the application of New York law with respect to any suit, action, or proceedings relating to any dispute arising out of or in connection with the ISDA Master Agreement, and respectfully refers the Court to the ISDA Master Agreement for its entire contents.

9.    Admits, upon information and belief, the allegations contained in paragraph 9 of the complaint.

10.    Denies the allegations contained in paragraph 10 of the complaint, except admits that Citibank was a party to the credit default swap transaction (the "CDS Contract") evidenced by the confirmation letter dated July 5, 2007 between Citibank as "Buyer" and plaintiff as "Seller," with a Trade Date of June 29, 2007, and referencing Millstone III CDO LTD III-A as "Reference Entity" and the Millstone III Class B Notes due July 5, 2046 as the "Reference Obligation" (the "Confirmation"), as well as the ISDA Master Agreement, the Credit Support Annex and the ISDA Standard Terms Supplement For Use With Credit Derivatives Transactions On Collateralized Debt Obligations With Pay-As-You-Go Or Physical Settlement in the form published by ISDA on June 6, 2007 for general use by market participants (the "Standard Terms Supplement"; collectively, the "Swap Transaction Documents"), and respectfully refers the Court to the Swap Transaction Documents for their entire contents.

3

11.    Denies the allegations contained in paragraph 11 of the complaint, and, to the extent the allegations in paragraph 11 purport to describe the terms of the CDS Contract, respectfully refers the Court to the Swap Transaction Documents for their entire contents.

12.    Denies the allegations contained in paragraph 12 of the complaint, except admits that the "Fixed Rate" is defined in the Confirmation as 5.50% per annum, admits that the "Initial Face Amount" of the CDS Contract is defined in the Confirmation as $10,000,000. and respectfully refers the Court to the Confirmation and the other Swap Transaction Documents for their entire contents.

13.    Admits the allegations contained in paragraph 13 of the complaint, except avers that the Swap Transaction Documents together form a single agreement between the parties, and respectfully refers the Court to the Swap Transaction Documents for their entire contents.

14.    Denies the allegations contained in paragraph 14 of the complaint, except admits that the ISDA Master Agreement states, in Section 1(b), that "[i]n the event of any inconsistency between the provisions of any Confirmation and this Master Agreement [(including the Schedule)], such Confirmation will prevail for the purpose of the relevant Transaction," and avers that there is no inconsistency or conflict between the parties' payment obligations under the Confirmation and the parties' obligations to "Transfer Eligible Credit Support" in accordance with the terms of the Credit Support Annex.

15.    Denies the allegations contained in paragraph 15 of the complaint, except admits that, on or about July 3, 2007, plaintiff posted $2,000,000 with Citibank to

4

fulfill plaintiff's obligation to transfer the "Independent Amount" as defined by the Confirmation and admits that the purpose of the Independent Amount was to secure plaintiff's "Obligations" under the CDS Contract.

16.    Denies the allegations contained in paragraph 16 of the complaint, and respectfully refers the Court to the Swap Transaction Documents for their entire contents.

17.    Denies the allegations contained in paragraph 17 of the complaint, and respectfully refers the Court to the Swap Transaction Documents for their entire contents.

18.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 18 of the complaint.

19.    Denies the allegations contained in paragraph 19 of the complaint, except admits that plaintiff wired $2,000,000 to Citibank on or about July 3, 2007.

20.    Denies the allegations contained in paragraph 20 of the complaint, except admits that Citibank demanded Transfers of Eligible Credit Support in accordance with Paragraph 3 of the Credit Support Annex as collateral security for plaintiff's Obligations on or about the dates indicated, and in the amounts indicated, in that paragraph.

21.    Denies the allegations contained in paragraph 21 of the complaint, except admits that plaintiff had transferred a total of $9,960,277.78 to Citibank under the Credit Support Annex, of which amount $667,822.88 was returned by Citibank to plaintiff.

22.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 22 of the complaint, and avers that the fact of whether or not the Reference Entity has met its payment obligations with respect to the Reference Obligation is not in and of itself determinative of plaintiff's collateral posting obligations under the Credit Support Annex.

23.     Denies the allegations contained in paragraph 23 of the complaint, except admits that, between July 3, 2007 and November 5, 2007, Citibank did not notify plaintiff of the occurrence of any Floating Amount Events or "Credit Events" under the CDS Contract.

24.     Denies the allegations contained in paragraph 24 of the complaint, and respectfully refers the Court to the Swap Transaction Documents for their entire contents.

25.     Denies the allegations contained in paragraph 25 of the complaint, except admits that plaintiff transferred to Citibank the amount referred to in paragraph 21 above and that Citibank received certain communications from plaintiff concerning Citibank's collateral security calculations, and refers to those communications for their entire contents.

26.     Denies the allegations contained in paragraph 26 of the complaint, except admits that Citibank, as a result of plaintiff's failure to make a "Floating Payment" in accordance with the terms of the CDS Contract, caused the early termination of the CDS Contract and exercised its right as "Secured Party" to set off a portion of the Floating Amount payable by plaintiff to Citibank against the collateral that plaintiff had posted to secure plaintiff's Obligations to Citibank under the CDS Contract.

27. Denies the allegations contained in paragraph 27 of the complaint, except admits that, pursuant to Paragraph 3 of the Credit Support Annex, Citibank demanded security for plaintiff's Obligations.

28. Denies the allegations contained in paragraph 28 of the complaint, except admits that it received a letter from plaintiff's counsel, dated December 18, 2007, to which it respectfully refers the Court for the letter's entire contents, and admits that plaintiff's counsel forwarded to Citibank a copy of a monthly servicer report of the Reference Entity, dated December 04, 2007 and covering the period from October 31, 2007 to November 29, 2007 (the "November Servicer Report"), to which Citibank respectfully refers the Court for its entire contents.

29. Denies the allegations contained in paragraph 29 of the complaint, and respectfully refers the Court to the November Servicer Report for its entire contents.

30. Denies the allegations contained in paragraph 30 of the complaint, except admits that, by email dated December 26, 2007 (the "December 26 Email"), Citibank notified plaintiff that Citibank was entitled under the terms of the Credit Support Annex to calculate its "Exposure" to plaintiff under the CDS Contract based on a mark-to-market valuation of its replacement cost of the CDS Contract and to demand a Transfer of Eligible Credit Support, and respectfully refers the Court to the December 26 Email and the Credit Support Annex for their entire contents.

31. Denies the allegations contained in paragraph 31 of the complaint, except admits that, as of December 26, 2007, Citibank had not notified plaintiff of a Floating Amount Event or Credit Event under the terms of the CDS Contract, but rather, in the December 26 Email, explained the basis for its calculation of the plaintiff's

7

collateral transfer obligations under the terms of the Credit Support Annex, and respectfully refers the Court to the December 26 Email for its entire contents.

32.    Denies the allegations contained in paragraph 32 of the complaint, except admits that Citibank in or about December 2007 returned to plaintiff collateral in the amount of $667,822.88 that plaintiff had previously posted.

33.    Denies the allegations contained in paragraph 33 of the complaint.

34.    Denies the allegations contained in paragraph 34 of the complaint.

35.    Denies the allegations contained in paragraph 35 of the complaint, except admits that, on January 9, 2008, Citibank sent plaintiff a "Floating Amount Event Notice" pursuant to paragraph 3 of the Standard Terms Supplement, and respectfully refers the Court to that Notice and the Standard Terms Supplement for their entire contents.

36.    Denies the allegations contained in paragraph 36 of the complaint, except admits that, on January 9, 2008, Citibank sent plaintiff a Floating Amount Event Notice in which it notified plaintiff that a Floating Amount Event in the form of an "Implied Writedown" had occurred with respect to the Reference Obligation and that the Floating Amount payable as a result of such Floating Amount Event was $10,000,000, and respectfully refers the Court to the Floating Amount Event Notice for its entire contents.

37.    Denies the allegations contained in paragraph 37 of the complaint.

38.    Denies the allegations contained in paragraph 38 of the complaint, except admits that paragraph 8(c) of the Standard Terms Supplement provides a

definition of the term "Implied Writedown Amount," and respectfully refers the Court to the Standard Terms Supplement for its entire contents.

      39.     Denies the allegations contained in paragraph 39 of the complaint, except admits that paragraph 8(c) of the Standard Terms Supplement provides a definition of the term "Writedown," and respectfully refers the Court to the Standard Terms Supplement for its entire contents.

      40.     Denies the allegations contained in paragraph 40 of the complaint.

      41.     Denies the allegations contained in paragraph 41 of the complaint.

      42.     Denies allegations contained in paragraph 42 of the complaint.

      43.     Denies the allegations contained in paragraph 43 of the complaint, except admits that Citibank sent to plaintiff a "Notice of Failure to Pay," dated January 30, 2008, and respectfully refers the Court to that Notice for its entire contents.

      44.     Denies the allegations contained in paragraph 44, and respectfully refers the Court to the Notice of Failure to Pay for its entire contents.

      45.     Denies the allegations contained in paragraph 45 of the complaint, except admits that, following plaintiff's refusal to remedy its failure to pay the Floating Amount during the applicable grace period pursuant to the terms of the CDS Contract, Citibank sent plaintiff a "Notice of Default and Early Termination," dated February 1, 2008, pursuant to which it designated February 1, 2008 as the "Early Termination Date" with respect to the CDS Contract, and respectfully refers the Court to that Notice for its entire contents.

46.    With respect to the allegations contained in paragraph 46 of the complaint, repeats and realleges here its responses to paragraphs 1 through 45 of the complaint as set forth above.

47.    Denies the allegations contained in paragraph 47 of the complaint.

48.    With respect to the allegations contained in paragraph 48 of the complaint, repeats and realleges here its responses to paragraphs 1 through 47 of the complaint as set forth above.

49.    Denies the allegations contained in paragraph 49 of the complaint.

50.    Denies the allegations contained in paragraph 50 of the complaint.

51.    With respect to the allegations contained in paragraph 51 of the complaint, repeats and realleges here its responses to paragraphs 1 through 50 of the complaint as set forth above.

52.    Denies the allegations contained in paragraph 52 of the complaint.

53.    Denies the allegations contained in paragraph 53 of the complaint.

54.    Denies the allegations contained in paragraph 54 of the complaint.

55.    With respect to the allegations contained in paragraph 55 of the complaint, repeats and realleges here its responses to paragraphs 1 through 54 of the complaint as set forth above.

56.    Denies the allegations contained in paragraph 56 of the complaint.

57.    Denies the allegations contained in paragraph 57 of the complaint.

58.    Denies the allegations contained in paragraph 58 of the complaint.

59.    With respect to the allegations contained in paragraph 59 of the complaint, repeats and realleges here its responses to paragraphs 1 through 58 of the complaint as set forth above.

60.    Denies the allegations contained in paragraph 60 of the complaint.

61.    Denies the allegations contained in paragraph 61 of the complaint.

62.    With respect to the allegations contained in paragraph 62 of the complaint, repeats and realleges here its responses to paragraphs 1 through 61 of the complaint as set forth above.

63.    Denies the allegations contained in paragraph 63 of the complaint.

64.    Denies the allegations contained in paragraph 64 of the complaint.

65.    Denies the allegations contained in paragraph 65 of the complaint, except admits that Citibank has refused to comply with plaintiff's demand for the return of certain monies paid to Citibank under the CDS Contract.

66.    Denies the allegations contained in paragraph 66 of the complaint.

## AFFIRMATIVE DEFENSES[1]

### First Defense

1.    Plaintiff has failed to state a claim upon which relief may be granted.

### Second Defense

2.    Plaintiff's purported claims against defendant are barred, in whole or in part, by the doctrines of laches, estoppel or waiver.

---

[1]    By listing a defense as an affirmative defense here, Citibank in no way concedes it bears the burden of proof (or any other burdens) as to a particular defense.

### Third Defense

3.     Plaintiff is equitably estopped from seeking the relief it seeks against defendant in this action.

### Fourth Defense

4.     Plaintiff's' purported claims against defendant are barred, in whole or in part, by the doctrine of unclean hands.

### Fifth Defense

5.     The rights and obligations of the parties are governed by the terms of the agreement between the parties, and, therefore, plaintiff's tort claims are precluded as a matter of law.

### Sixth Defense

6.     The purported claims asserted in the complaint are barred, in whole or in part, by the doctrines of setoff and/or recoupment.

### Seventh Defense

7.     Damages, if any, alleged to have been suffered by plaintiff were caused, in whole or in part, by the intentional conduct, negligent conduct, fault, or other culpable conduct of plaintiff or others over whom plaintiff exercised control.

### Eighth Defense

8.     At all times, Citibank has acted in accordance with the relevant agreement between the parties, and, therefore, plaintiff is not entitled to the judgment demanded.

### Ninth Defense

9.     Plaintiff is not entitled to any funds under the terms of the relevant agreement between the parties.

### Tenth Defense

10.    At all times, plaintiff had equal or superior knowledge of all relevant matters, including (1) the rights and obligations of the parties under the Swap Transaction Documents; (2) the value of the "Credit Support Amount" as defined by the Credit Support Annex; (3) the value of the "Exposure" as defined by the Credit Support Annex; and (4) the financial condition of the "Reference Obligation" as defined by the Confirmation.

### Eleventh Defense

11.    Plaintiff has failed to mitigate any damages it has allegedly suffered.

### Twelfth Defense

12.    Plaintiff's purported claims are barred by plaintiff's wrongdoing, as set forth in the counterclaim below and otherwise.

### Thirteenth Defense

13.    Plaintiff's purported claims are barred by plaintiff's material breaches of the CDS Contract, as set forth in the counterclaim below and otherwise.

### Fourteenth Defense

14.    Plaintiff's purported damages are nonexistent, speculative, not of the nature or to the extent alleged, and were not the foreseeable result of Citibank's alleged conduct.

### Fifteenth Defense

15.    Plaintiff's purported claims are barred by its failure to invoke the dispute resolution provisions of the CDS Contract.

### Sixteenth Defense

16.     Plaintiff's purported claims are barred because Citibank was entrusted with authority under the CDS Contract to make the determinations it made.

### RESERVATION OF RIGHTS

Citibank expressly reserves the right to amend and/or supplement this answer, its affirmative defenses, and all other pleadings. Citibank asserts all defenses (affirmative or otherwise) that may be revealed during the course of discovery or other investigation.

### COUNTERCLAIM

Defendant and counterclaim-plaintiff Citibank, N.A. ("Citibank"), for its counterclaim against plaintiff and counterclaim-defendant VCG Special Opportunities Master Fund Limited (*f/k/a* CDO Plus Master Fund Ltd.) ("VCG"), by its attorneys, alleges as follows:

### Introduction

1.     This counterclaim arises from VCG's clear-cut and wrongful breaches of its contractual obligations to Citibank under a credit default swap transaction (sometimes referred to as a "CDS").

2.     Generally speaking, credit default swap transactions are credit derivative transactions that are privately negotiated between sophisticated counterparties to manage or trade certain risks with respect to a financial asset, referred to in the CDS documents as the "reference obligation." The issuer or obligor with respect to the obligation is generally referred to as the "reference entity."

3.     Under a typical credit default swap, one party (the protection buyer) pays periodic fixed amounts determined by reference to a specified (or "notional")

14

amount of the reference obligation, and the other party (the protection seller) pays the protection buyer certain amounts if specified events occur with respect to the reference obligation or the reference entity. Credit default swaps do not require either party to hold the underlying reference obligation; often, in fact, neither party owns the reference obligation. These transactions enable parties to transfer or hedge credit risks, or to trade credit risks based upon their views of the market place. CDS transactions are widely executed and traded by a broad array of parties including banks, other financial institutions, asset managers, high net worth individuals, and other sophisticated investors.

4.      Effective as of June 29, 2007, VCG and Citibank entered into a credit default swap transaction (the "CDS Contract") for which a collateralized debt obligation vehicle (or "CDO") called the "Millstone III CDO LTD III-A" served as the defined "Reference Entity" and its Class B Notes due July 5, 2046 served as the defined "Reference Obligation."

5.      Under the parties' CDS Contract, Citibank acted as protection "Buyer" and agreed to make periodic "Fixed Payments" to VCG based on a fixed percentage of 5.50% per annum on an "Initial Face Amount" of $10,000,000 referencing the Reference Obligation. VCG acted as protection "Seller" and agreed, among other things, to make certain "Floating Payments" upon the occurrence of defined "Floating Amount Events" with respect to the Reference Obligation.

6.      As part of the CDS Contract, VCG was required to post with Citibank an "Independent Amount" as initial collateral, and to transfer additional "Eligible Credit Support" from time to time, to secure its future payment obligations under the CDS Contract.

7.     Citibank regularly made its required Fixed Payments in accordance with the terms of the CDS Contract, and fully abided by the terms of the Contract. It was therefore entitled to the full benefit of VCG's promised performance under the CDS Contract.

8.     Over the course of the transaction, due to negative market developments affecting the value of the CDS Contract, Citibank was entitled to, and did demand, pursuant to the terms of the parties' CDS Contract, that VCG post additional collateral with Citibank.

9.     In January 2008, a Floating Amount Event occurred under the CDS Contract in the form of a "Writedown." As a result, in accordance with the terms of the CDS Contract, VCG was obligated to pay Citibank $10,000,000 upon notice from Citibank that such Floating Amount Event had occurred. VCG refused to pay that amount to Citibank.

10.     After several discussions with VCG regarding its refusal to pay, and after the contractual cure period had elapsed, Citibank exercised its right to cause the early termination of the CDS Contract and to set off, in partial satisfaction of the amount due from VCG, the collateral VCG had posted. Citibank thereafter demanded payment of the remaining difference between the collateral that had been posted and the total amount VCG owed to Citibank under the CDS Contract.

11.     VCG refused to pay that amount, and instead brought its meritless claims in this action.

12.     Accordingly, Citibank now brings this counterclaim to recover the amount VCG still owes to it under the CDS Contract, along with other relief.

**Parties**

13.     Citibank is a national banking association and a wholly owned subsidiary of Citigroup, Inc.  Citibank has its principal place of business at 399 Park Avenue, New York, New York 10043.

14.     Upon information and belief, VCG is an Isle of Jersey exempted corporation having its principal place of business at Le Masurier House, St. Helier JE2 4YE Jersey, Channel Islands.

15.     Upon information and belief, VCG was initially incorporated under the name of "CDO Plus Master Fund Ltd." in Jersey on June 13, 2006, and changed its name to "VCG Special Opportunities Master Fund Limited" effective November 21, 2007.

16.     Upon information and belief, VCG is a hedge fund with experience investing in credit derivative transactions, including CDS transactions with respect to CDOs and other sophisticated commercial transactions, and has approximately $50,000,000 of capital under management.

**Jurisdiction and Venue**

17.     This Court has subject matter jurisdiction over this counterclaim, pursuant to 28 U.S.C. § 1332, because the parties are of diverse citizenship, and the amount in controversy is over $75,000, exclusive of interest and costs.

18.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(d).  In the CDS Contract, the parties agreed to submit disputes relating to that agreement to the jurisdiction of this Court.

## CDS Transactions and CDSs on CDOs

19.    As noted above, CDS transactions have emerged as a method to hedge, transfer or otherwise trade in certain risks associated with particular financial instruments. Over the past several years, the markets in credit derivative transactions have experienced dynamic and sustained growth and today represent a highly liquid marketplace.

20.    As the use of credit derivative transactions became more widespread in the market, it became common to use securities issued by CDOs as the reference obligations for CDS transactions. CDOs are special purpose vehicles that raise money through the issuance of debt securities to investors and generally invest the proceeds in a portfolio of assets, such as bonds or asset-backed securities, which often include commercial or residential mortgage-backed securities. Income from the portfolio of assets is the main source of funds for the CDO to use to repay holders of the CDO's debt securities.

21.    The International Swaps and Derivatives Association, Inc. ("ISDA"), a global trade association representing leading financial institutions worldwide in the privately negotiated derivatives industry, responded to these trends by developing standardized documentation for trading credit risk with respect to CDO securities. These widely used ISDA forms are available to market participants for transactional use on ISDA's website at www.isda.org. To give a sense of the size of these credit derivative markets, we note that, pursuant to data published by ISDA, the notional amount outstanding of credit derivatives grew by 32% in the first six months of 2007 to $45.46 trillion from $34.42 trillion at the end of 2006.

18

**The Parties' Transaction**

22.    On June 29, 2007, VCG and Citibank agreed to the CDS Contract, which they confirmed on July 5, 2007, using market standard ISDA documentation. As noted above, pursuant to the CDS Contract VCG "sold" to Citibank credit protection referencing the Reference Obligation.

23.    As part of their CDS Contract, the parties executed the following documents (collectively, the "Swap Transaction Documents"):

- An ISDA 2002 Master Agreement dated September 1, 2006 and an accompanying Schedule of the same date (together, the "ISDA Master Agreement"), using the forms published by ISDA, with certain changes set forth in the Schedule as negotiated and agreed to between the parties. (A copy of the ISDA Master Agreement is attached as Ex. 1 and incorporated here by reference.);

- A 1994 ISDA Credit Support Annex to the Schedule to the ISDA Master Agreement dated as of September 1, 2006 (the "Credit Support Annex"), also using the appropriate form published by ISDA, with certain elections and changes as negotiated and agreed to between the parties. (A copy of the Credit Support Annex is attached as Ex. 2 and incorporated here by reference.);

- A confirmation letter for Credit Derivative Transactions on Collateralized Debt Obligations with Pay-As-You-Go or Physical Settlement (Dealer Form) dated July 5, 2007 with a Trade Date of June 29, 2007 (the "Confirmation") again using a form published by ISDA. (A copy of the

19

Confirmation is attached as Ex. 3 and incorporated here by reference.); and

- The ISDA Standard Terms Supplement For Use With Credit Derivative Transactions on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement in the form published by ISDA on June 6, 2007 (the "Standard Terms Supplement"), which was incorporated by reference in the Confirmation. (A copy of the Standard Terms Supplement is attached as Ex. 4 and incorporated here by reference.)

24. Under the terms of the parties' CDS Contract, Citibank acted as protection "Buyer" in the transaction and agreed to make, for the term of the CDS Contract, periodic "Fixed Payments" to VCG based on a fixed percentage of 5.50% per annum on an "Initial Face Amount" of $10,000,000. VCG acted as protection "Seller" and agreed, among other payments, to make certain "Floating Payments" to Citibank if any of the defined "Floating Amount Events" occurred with respect to the Reference Obligation during the term of the CDS Contract. The term of the CDS Contract was to run until the final maturity date of the Reference Obligation in July 2046, subject to any earlier amortization or liquidation of the Reference Obligation, or early termination of the CDS Contract. (Ex. 3; Ex. 4 at ¶¶ 1, 2.)

### Collateral Requirements

25. Pursuant to the Confirmation, VCG was required to post with Citibank initial collateral (called an "Independent Amount") equal to 20% of the $10,000,000 of the Initial Face Amount, or $2,000,000, as security for VCG's "Obligations" under the CDS Contract (the "Obligations"). (Ex. 3.)

26.    Under the Credit Support Annex, Citibank also was authorized from time to time to require VCG to post additional collateral (or "Eligible Credit Support") under certain circumstances. Pursuant to Paragraph 4(c) of the Credit Support Annex, Citibank (as "Valuation Agent") was to determine the amount of such additional credit support by making a mark-to-market calculation of the replacement cost of the CDS Contract (referred to as Citibank's "Exposure"). Such Exposure reflects how much it would cost Citibank to enter into another contract that would preserve the economic equivalent of the CDS Contract it had with VCG based upon the then current market value of the CDS Contract.

27.    Under the Credit Support Annex, Citibank was entitled to calculate its Exposure on a daily basis. Paragraph 5 of the Credit Support Annex sets forth the mechanics of resolving any dispute over the Valuation Agent's calculations of the amount of collateral to be posted. (Ex. 2 at ¶¶ 3, 4(c), 5, 13(c).)

### VCG Is Required to Post Additional Collateral

28.    Between July and November 2007, the CDO market suffered a severe and unprecedented decline. As the market for CDOs declined, the cost of CDS protection referencing these CDOs substantially increased. As a result, the replacement cost of the CDS Contract increased, and hence Citibank's Exposure to VCG increased. Accordingly, Citibank was entitled, pursuant to the Credit Support Annex, to demand additional collateral from VCG as security against VCG's payment obligations under the CDS Contract.

29.    Applying the formula for the calculation of additional collateral set forth in the Credit Support Annex, Citibank repeatedly calculated its Exposure on a mark-to-market basis pursuant to the Credit Support Annex. (Ex. 2 at ¶¶ 3, 12.)

21

30.    As a result of such calculations, on several occasions during the second half of 2007, Citibank demanded additional Eligible Credit Support from VCG.

31.    Although VCG now purports to claim it was never required to post any additional Eligible Credit Support, in fact, in response to Citibank's demands for additional Eligible Credit Support, VCG posted with Citibank, between August 1, 2007 and November 5, 2007, a total of $7,760,277.78 (all in addition to VCG's initial collateral posting of the Independent Amount) to secure its Obligations to Citibank.

32.    VCG raised certain questions as to the calculation of Exposure by Citibank, yet it continued to meet Citibank's demands for additional collateral under the Credit Support Annex. By its own admission, VCG did not invoke the dispute resolution provisions mandated by Paragraph 5 of the Credit Support Annex to trigger a re-calculation of Citibank's Exposure determinations. In fact, in an August 20, 2007 letter, VCG acknowledged that it "did not follow the protocol called for in the documents related to dispute."

33.    Pursuant to Citibank's calculation of its Exposure in December 2007 based upon conditions in the market at the time, Citibank determined that it should return $667,822.88 of the posted collateral to VCG, and Citibank promptly returned that amount to VCG.

### Implied Writedowns

34.    Under the CDS Contract, Citibank acted as the "Calculation Agent." The Calculation Agent is authorized to make certain calculations and determinations with respect to the CDS Contract, including, but not limited to the determination of the occurrence of a "Floating Amount Event" and the calculation of the Floating Amount payable as a result. (Ex. 4 at ¶ 7(b).) Parties to a CDS transaction

select, on a contract-by-contract basis, the party that will act as the Calculation Agent;
here, VCG and Citibank chose Citibank to serve in that role.

35.    Pursuant to the Standard Terms Supplement, the Floating Amount
Events that would trigger VCG's Floating Payment obligation to Citibank were a "Failure
to Pay Principal," an "Interest Shortfall" or a "Writedown" with respect to the Reference
Obligation. (Ex. 4 at ¶ 3.) Under the Standard Terms Supplement, parties to a CDS
transaction can negotiate whether an "Implied Writedown" will serve as a "Writedown"
and thereby trigger a Floating Payment obligation. Here, as clearly provided in the
Confirmation, the parties agreed that "Implied Writedown" was applicable, would
constitute a "Writedown" with respect to the Reference Obligation, and could therefore
trigger VCG's Floating Payment obligation to Citibank.

36.    Pursuant to the terms of the Standard Terms Supplement, if (1) the
parties have elected an Implied Writedown and if (2) the Reference Obligation's
"Underlying Instruments do not provide for writedowns, applied losses, principal
deficiencies or realized losses … to occur in respect of the Reference Obligation," the
Calculation Agent is to determine whether an "Implied Writedown" has occurred in
respect of the Reference Obligation. (Ex. 4 at ¶ 8(c).) Generally speaking, the Implied
Writedown mechanism provides for the buyer of protection to receive a payment when
the assets of the Reference Entity cease to fully collateralize the Reference Obligation. In
determining an Implied Writedown Amount, the Calculation Agent relies on information
provided in periodic Servicer Reports of the Reference Entity to assess the existing
collateralization levels and, in doing so, applies the numbers contained in the Servicer
Reports to a formula provided in the Standard Terms Supplement.

37.    As noted above, in the Confirmation, the parties had elected that an "Implied Writedown" would be applicable to their CDS Contract.  (Ex. 3).

38.    Further, under the Standard Terms Supplement, the "Underlying Instruments" mean "the indenture, trust agreement, pooling and servicing agreement or other relevant agreement(s) setting forth the terms of the Reference Obligation." (Ex. 4 at ¶ 8(c).)  Here, the Underlying Instruments of the Reference Obligation did not provide for any writedowns, applied losses, principal deficiencies or realized losses "in respect of the Reference Obligation." (A copy of the Indenture, dated July 5, 2006, between Millstone III CDO, Ltd, Millstone III CDO, LLC, and JPMorgan Chase Bank, N.A. is attached as Ex. 5 and incorporated here by reference.)

39.    Accordingly, in this CDS transaction, Citibank, as the Calculation Agent, was to determine whether an Implied Writedown had occurred in respect of the Reference Obligation.  The Standard Terms Supplement in paragraph 8(c) provides detailed instructions for the calculation of the Implied Writedown Amount.  In particular, the Implied Writedown calculation is based upon an "Overcollateralization Ratio" of the Reference Obligation, which is stated in the Servicer Report of the Reference Entity.

40.    The Overcollateralization Ratio is the ratio of the aggregate balance of the portfolio of assets of the Reference Entity, as calculated by the trustee of the Reference Entity in accordance with the terms of the Underlying Instruments (the "Determined Balance"), to the outstanding principal amount of the Reference Obligation and any other debt obligations of the Reference Entity that are paid at the same time or prior to payment of the Reference Obligation.  In other words, if the Determined Balance is less than the face amount of the Reference Obligation and all senior obligations that are

24

payable prior to the Reference Obligation, then the Overcollateralization Ratio will be less than 100%. The Overcollateralization Ratio is calculated on a regular basis by the trustee of the Reference Entity and included in each Servicer Report.

      41.    The application of an Overcollateralization Ratio that is less than 100% to the Implied Writedown calculation in the Standard Terms Supplement will result in an Implied Writedown in respect of the reference obligation. A buyer of protection under a CDS transaction that negotiates "Implied Writedown" as applicable is entitled to collect on its protection once the Implied Writedown is determined pursuant to the terms of the Standard Terms Supplement, even without a reduction in the face amount of the reference obligation or a realization of a loss to that obligation.

## The Implied Writedown Floating Amount Event

      42.    In January of 2008, Citibank, acting as Calculation Agent, took the Overcollateralization Ratio with respect to the Reference Obligation from the Millstone III CDO's Servicer Report, dated January 7, 2008 (the "December Servicer Report"), and in turn, used the Overcollateralization Ratio in calculating the Implied Writedown Amount. Application of the Overcollateralization Ratio to the formula contained in the Standard Terms Supplement resulted in a determination by Citibank that an Implied Writedown had occurred. Specifically, the December Servicer Report indicated the Overcollateralization Ratio for the Reference Obligation had dropped to 97.089% from an Overcollateralization Ratio of 100.711% reflected in the Millstone III CDO's prior Servicer Report, dated December 4, 2007 (the "November Servicer Report"). (Copies of the November Servicer Report and December Servicer Report are attached as Ex. 6 and 7 and incorporated here by reference.)

43.     According to the December Servicer Report, the Determined Balance was $2,098,575,860.60. (Ex. 7 at 12.) The total outstanding principal amount of all senior obligations of the Reference Entity that would have to be satisfied prior to the Reference Obligation and the outstanding principal amount of the Reference Obligation was $2,161,500,000. Because the Determined Balance was significantly less than $2,161,500,000, the Overcollateralization Ratio was less than 100%.

44.     Citibank applied 97.089%, the Overcollateralization Ratio, to the formula set forth in the Standard Terms Supplement and determined that due to the calculation of an Implied Writedown, Citibank was entitled to provide notice to VCG of the occurrence of a Floating Amount Event in the form of a Writedown.

45.     Citibank therefore notified VCG on January 9, 2008 in a "Floating Amount Event Notice" that a Writedown had occurred and that a Floating Amount equal to $10,000,000 was due from VCG as a result. (A copy of the Floating Amount Event Notice is attached as Ex. 8 and incorporated here by reference).

**VCG Fails to Satisfy Its Obligations**

46.     Payment of the Floating Amount was due on January 14, 2008. (Ex. 4 at ¶ 3.)

47.     VCG failed to pay the Floating Amount by January 14, 2008.

48.     As a result, on January 30, 2008, Citibank provided VCG with a formal "Notice of Failure to Pay," which notified VCG of Citibank's intention to treat VCG's failure to pay as an "Event of Default" pursuant to Section 5(a)(i) of the ISDA Master Agreement, if such failure was not remedied within one business day following

delivery of the Notice, as provided by the CDS Contract. (A copy of the Notice of Failure to Pay is attached as Ex. 9 and incorporated here by reference.)

49.    Under Section 6(a) of the ISDA Master Agreement, upon an Event of Default, Citibank had the right to cause an early termination of that Agreement.

50.    VCG failed to cure its prior failure to pay within the applicable cure period set forth in the CDS Contract. Consequently, on February 1, 2008, Citibank provided VCG with a formal "Notice of Default and Early Termination." In that Notice, Citibank designated February 1, 2008 as the "Early Termination Date" with respect to the CDS Contract and advised VCG of Citibank's intention to close out, liquidate and otherwise exercise its contractual rights and remedies under the ISDA Master Agreement. (A copy of the Notice of Default and Early Termination is attached as Ex. 10 and incorporated here by reference.)

51.    Following the early termination of the CDS Contract, Citibank, pursuant to its rights under the CDS Contract, provided VCG with a "Notice of Setoff" in which it notified VCG of the set-off of a portion of the $10,000,000 Floating Amount owed by VCG against the $9,325,747.62 of posted collateral held by Citibank ($9,292,454.90 plus interest amounts of $33,292.72). (Ex. 1 at ¶ 6(f).) In the Notice of Setoff, Citibank reserved all of its rights and notified VCG that VCG remained liable for the outstanding balance, which was due and immediately payable. (A copy of the Notice of Setoff is attached as Ex. 11 and incorporated here by reference.)

52.    Following the setoff of a portion of the Floating Amount against the posted collateral, Citibank calculated the remaining balance due and payable by VCG in accordance with the terms of the ISDA Master Agreement. In a "Calculation Notice,"

Citibank notified VCG of the remaining balance (the "Early Termination Amount") of $674,252.38 that was due to Citibank, along with interest calculated at a rate of the overnight London Interbank Offered Rate plus 1% per annum, compounding daily, from the date of the failure to pay. (A copy of the Calculation Notice is attached as Ex. 12 and incorporated here by reference.)

53.    VCG refused to pay, and as of the date of this counterclaim has still not paid, the Early Termination Amount of $674,252.38, plus accrued interest.

### VCG's Failure to Indemnify

54.    The ISDA Master Agreement also imposes certain indemnification obligations on VCG. Pursuant to Section 11 of the ISDA Master Agreement, VCG agreed to indemnify and hold harmless Citibank for and against all reasonable out-of-pocket expenses, including legal fees incurred by Citibank, by reason of enforcement and protection of its rights under the CDS Contract. (Ex. 1 at ¶ 11.) VCG has made no such indemnification payments to date.

### FIRST CAUSE OF ACTION
### (Breach of Contract)

55.    Plaintiff repeats and realleges each of the allegations set forth above, as if fully realleged here.

56.    Citibank has performed all of its obligations under the CDS Contract.

57.    At all times, Citibank acted in good faith and in a commercially reasonable manner.

58.    VCG breached the CDS Contract by, among other things: (1) failing to pay the Floating Amount due following the occurrence and the delivery of

28

notice by Citibank of the Implied Writedown; (2) failing to pay the remaining unpaid Early Termination Amount; and (3) failing to indemnify Citibank.

59.     As a result of VCG's breaches of its contractual obligations, Citibank has been damaged in an amount to be determined at trial, but currently believed to be at least $674,252.38, plus interest, along with Citibank's fees and other expenses incurred in enforcing its rights to these amounts.

WHEREFORE, Citibank respectfully requests that the Court enter a judgment:

(i)     awarding Citibank all of its damages incurred as a result of VCG's breaches of its contractual obligations, in an amount to be determined at trial, but currently believed to be at least $674,252.38, plus interest;

(ii)     awarding Citibank all fees and other expenses, including but not limited to attorney's fees, incurred in connection with its collection of the amounts due under the CDS Contract; and

(iii)     such other and further relief as the Court may deem proper.

Date:   New York, New York
        April 23, 2008

                        PAUL, WEISS, RIFKIND, WHARTON &
                        GARRISON LLP

                        By:_____
                            Allan J. Arffa
                            Karen R. King
                            David W. Wang

                        1285 Avenue of the Americas
                        New York, New York  10019-6064
                        Telephone:  212-373-3203
                        Facsimile:  212-373-0203
                        Email:  aarffa@paulweiss.com
                        Email:  kking@paulweiss.com
                        Email:  dwang@paulweiss.com

# Exhibit D

**MINTZ & GOLD LLP**
Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, N.Y. 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*
*VCG Special Opportunities Master Fund Ltd.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
VCG SPECIAL OPPORTUNITIES         :
MASTER FUND LIMITED,              :          **08 CV 01563 (BSJ)**
                                  :
                    Plaintiff,    :
                                  :          **ANSWER TO COUNTERCLAIM**
        - against -               :
                                  :          **ECF CASE**
CITIBANK, N.A.,                   :
                                  :
                    Defendant.    :
-------------------------------------------------------X

Plaintiff VCG Special Opportunities Master Fund Limited ("Plaintiff"), by and through

its undersigned attorneys, Mintz & Gold LLP, as and for its Answer and Affirmative Defenses to

Defendant's Counterclaim herein, responds and alleges as follows:

1.    Plaintiff denies the allegations of paragraph 1 of the Counterclaim.

2.    Plaintiff responds that the allegations set forth in the first sentence of paragraph 2

of the Counterclaim constitute a legal conclusion as to which no responsive pleading is required.

Plaintiff admits the allegation of the second sentence of paragraph 2 of the Counterclaim.

3.    In response to paragraph 3 of the Counterclaim, Plaintiff admits that it is party to

a credit derivative transaction with Wachovia, the rights and obligations of which are defined by

the confirmation letter between the parties and otherwise respectfully refers the Court to the transaction documents between the parties for a complete and accurate description of their contents.

4.      Plaintiff admits the allegations of paragraph 4 of the Counterclaim.

5.      In response to paragraph 5 of the Counterclaim, Plaintiff admits that it is party to a credit derivative transaction with Wachovia, the rights and obligations of which are defined by the confirmation letter between the parties and otherwise respectfully refers the Court to the transaction documents between the parties for a complete and accurate description of their contents.

6.      Plaintiff denies the allegations of paragraph 6 of the Counterclaim.

7.      Plaintiff denies the allegations of paragraph 7 of the Counterclaim.

8.      Plaintiff denies the allegations of paragraph 8 of the Counterclaim.

9.      Plaintiff denies the allegations of paragraph 9 of the Counterclaim.

10.     Plaintiff denies the allegations of paragraph 10 of the Counterclaim.

11.     Plaintiff denies the allegations of paragraph 11 of the Counterclaim.

12.     In response to the allegations set forth in paragraph 12 of the Counterclaims, Plaintiff admits that Citibank has brought a counterclaim, but otherwise denies that it owes any sums to Citibank under the terms of the credit default swap.

13.     Plaintiff denies having knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 13 of the Counterclaim.

14.     Plaintiff admits the allegations of paragraph 14 of the Counterclaim.

15.     Plaintiff admits the allegations of paragraph 15 of the Counterclaim.

16.    Plaintiff admits that it is a hedge fund that has entered into two credit default swaps and otherwise denies the allegations of paragraph 16 of the Counterclaim.

17.    Plaintiff admits the allegations of paragraph 17 of the Counterclaim.

18.    Plaintiff admits the allegations of paragraph 18 of the Counterclaim.

19.    Plaintiff denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the Counterclaim.

20.    Plaintiff denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Counterclaim.

21.    Plaintiff denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 of the Counterclaim, except admits that ISDA has supplied generic forms for use in various credit derivative transactions.

22.    Plaintiff respectfully refers the Court to the language of the confirmation letter for the credit default swap transaction at issue in this action, and the other transaction documents, for a complete and accurate description of its contents and otherwise denies the allegations of paragraph 22 of the Counterclaim.

23.    Plaintiff respectfully refers the Court to the language of the confirmation letter for the credit default swap transaction at issue in this action, and the other transaction documents, for a complete and accurate description of their contents and otherwise denies the allegations of paragraph 23 of the Counterclaim.

24.    Plaintiff responds that the allegations of paragraph 24 of the Counterclaim constitute legal conclusions as to which no responsive pleading is required and respectfully refers the Court to the language of the confirmation letter for the credit default swap transaction

at issue in this action, and the other transaction documents, for a complete and accurate description of their contents.

25.    Plaintiff denies the allegations of paragraph 25 of the Counterclaim, except admits that the Independent Amount of the credit default swap transaction at issue in this case is $2,000,000.

26.    Plaintiff denies the allegations of paragraph 26 of the Counterclaim.

27.    Plaintiff denies the allegations of paragraph 27 of the Counterclaim.

28.    Plaintiff denies the allegations of paragraph 28 of the Counterclaim.

29.    Plaintiff denies having knowledge or information sufficient to form a belief as to the allegations of paragraph 29 of the Counterclaim

30.    Plaintiff denies the allegations of paragraph 30 of the Counterclaim, except admits that during the second half of 2007, Citibank improperly demanded additional margin.

31.    Plaintiff denies the allegations of paragraph 31 of the Counterclaim.

32.    Plaintiff denies the allegations of paragraph 32 of the Counterclaim.

33.    Plaintiff denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33 of the Counterclaim.

34.    Plaintiff responds that the allegations of paragraph 34 of the Counterclaim constitute legal conclusions as to which no responsive pleading is required and respectfully refers the Court to the confirmation letter for the credit default swap at issue in this action, and the other transactional documents, for a full and complete recitation of their contents.

35.    Plaintiff responds that the allegations of paragraph 35 of the Counterclaim constitute legal conclusions as to which no responsive pleading is required and respectfully

refers the Court to the confirmation letter for the credit default swap at issue in this action, and the other transactional documents, for a full and complete recitation of their contents.

36.    Plaintiff responds that the allegations of paragraph 36 of the Counterclaim constitute legal conclusions as to which no responsive pleading is required and respectfully refers the Court to the confirmation letter for the credit default swap at issue in this action, and the other transactional documents, for a full and complete recitation of their contents.

37.    Plaintiff responds that the allegations of paragraph 37 of the Counterclaim constitute legal conclusions as to which no responsive pleading is required and respectfully refers the Court to the confirmation letter for the credit default swap at issue in this action, and the other transactional documents, for a full and complete recitation of their contents.

38.    Plaintiff denies the allegations of paragraph 38 of the Counterclaim.

39.    Plaintiff responds that the allegations of paragraph 39 of the Counterclaim constitute legal conclusions as to which no responsive pleading is required and respectfully refers the Court to the confirmation letter for the credit default swap at issue in this action, and the other transactional documents, for a full and complete recitation of their contents.

40.    Plaintiff responds that the allegations of paragraph 40 of the Counterclaim constitute legal conclusions as to which no responsive pleading is required and respectfully refers the Court to the confirmation letter for the credit default swap at issue in this action, and the other transactional documents, for a full and complete recitation of their contents.

41.    Plaintiff denies the allegations contained in paragraph 41 of the Counterclaim.

42.    Plaintiff denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42 of the Counterclaim.

43.     Plaintiff denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43 of the Counterclaim.

44.     Plaintiff denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 44 of the Counterclaim.

45.     Plaintiff admits that Citibank transmitted a purported "Floating Amount Event Notice" on or about January 9, 2008, and otherwise denies the allegations of paragraph 45 of the Counterclaim.

46.     Plaintiff denies the allegations of paragraph 46 of the Counterclaim.

47.     Plaintiff denies the allegations of paragraph 47 of the Counterclaim.

48.     Plaintiff admits that Citibank transmitted a purported "Notice of Failure to Pay" on or about January 30, 2008 and otherwise denies the allegations of paragraph 48 of the Counterclaim.

49.     Plaintiff responds that paragraph 49 of the Counterclaim constitutes a legal conclusion as to which no responsive pleading is required and otherwise respectfully referss the Court to the ISDA Master Agreement for a complete statement of its contents.

50.     Plaintiff admits that Citibank transmitted a purported "Notice of Default and Early Termination," and otherwise denies the allegations of paragraph 50 of the Counterclaim.

51.     Plaintiff admits that Citibank transmitted a purported "Notice of Setoff," and otherwise denies the allegations of paragraph 51 of the Counterclaim.

52.     Plaintiff denies the allegations of paragraph 52 of the Counterclaim.

53.     Plaintiff denies the allegations of paragraph 53 of the Counterclaim.

54.     Plaintiff responds that paragraph 54 of the Counterclaim constitutes a legal conclusion as to which no responsive pleading is required, respectfully refers the Court to the

ISDA Master Agreement for a complete statement of its contents and otherwise denies the allegations of paragraph 54 of the Counterclaim.

55.    Plaintiff repeats and re-alleges its answers to each of the previous paragraphs of the Counterclaim as if fully set forth herein

56.    Plaintiff denies the allegations of paragraph 56 of the Counterclaim.

57.    Plaintiff denies the allegations of paragraph 57 of the Counterclaim.

58.    Plaintiff denies the allegations of paragraph 58 of the Counterclaim.

59.    Plaintiff denies the allegations of paragraph 59 of the Counterclaim.


## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

60.    The allegations of the Counterclaim, in whole or in part, fail to state a claim for which relief may be granted.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

61.    Plaintiff's performance under the swap agreement should be excused on the ground of mistake, namely, that Plaintiff intended only to secure Citibank against an actual credit default on the part of the reference obligation, and not against daily fluctuations in the mark-to-market valuation of the reference obligation.  Plaintiff's mistake was excusable because Citibank did not alert Plaintiff of its intentions to demand the payment of sums other than Floating Payments when the Confirmation Letter was executed, as the result of which it would be unconscionable to require Plaintiff to pay Citibank the notional amount of the reference obligation.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

62.    The damages, if any, alleged to have been suffered by Citibank are subject to offset by damages Citibank caused to Plaintiff as the result of Citibank's breach of the swap agreement.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

63.    The damages, if any, alleged to have been suffered by Citibank were caused, in whole or in part, by the intentional conduct, negligent conduct, fault, or other culpable conduct of Citibank or others over whom Citibank exercised control.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

64.    To the extent that Citibank was entitled to demand collateral at all, Plaintiff was entitled to suspend its performance upon Citibank's own breach of the swap agreement.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

65.    Plaintiff has already paid all monies due and owing under the terms of the swap agreement.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

66.    Citibank has failed to mitigate any damages it has allegedly suffered.

* * * * * *

## AS AND FOR A EIGHTH AFFIRMATIVE DEFENSE

67.    Plaintiff reserves the right to rely on such other additional defenses as may become available or apparent during discovery.

Dated: New York, New York
        May 20, 2008

**MINTZ & GOLD LLP**

/s/  Terence W. McCormick
Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, N.Y. 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*
*VCG Special Opportunities Master Fund Ltd.*


To:    **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
       Allan J. Arffa, Esq.
       David W. Wang, Esq.
       1285 Avenue of the Americas
       New York, New York  10019-6064
       *Attorneys for Defendant*
       *Citibank, N.A.*

9

# Exhibit E



*2008 06 879*

Financial Industry Regulatory Authority

2008 MAY 12 PM 2: 26

May 8, 2008

Harry Walters
Citigroup Global Markets, Inc.
111 Wall Street, 17th Floor
New York, NY 10005

Subject:   FINRA Dispute Resolution Arbitration Number 08-01430
VCG Special Opportunities Master Fund Ltd f/k/a CDO Plus Master Fund Ltd. vs.
Citigroup Global Markets Inc.

Dear Mr. Walters:

FINRA Dispute Resolution provides a forum for the resolution of disputes involving broker-dealers,
and members of the American Stock Exchange (AMEX), International Stock Exchange (ISE),
Philadelphia Stock Exchange (PHLX), NASDAQ, and Municipal Securities Rulemaking Board
(MSRB) registrants and/or their associated persons.

This office administers cases according to the procedures set forth in the NASD Code of
Arbitration Procedure (NASD Code). The most up-to-date version of the rules can be accessed or
downloaded from our Web site at http://www.finra.org. On our Web site you will also find FINRA
Dispute Resolution Party's Reference Guide, which contains important instructions concerning
filing your answer or other claims. If you do not have access to the Internet, you may call our office
to request a copy of these documents.

### Filing a Statement of Answer

Since you have been named as a party in this arbitration, enclosed is a copy of the Statement of
Claim. You are required by the NASD Code to arbitrate this dispute.

Your Statement of Answer must specify all relevant facts and available defenses to the Statement
of Claim submitted.[1]  In addition, your Answer may include any related claim(s) that you may have
against Claimant or any other party subject to arbitration under the rules. If you assert any of
these claims you must submit the applicable fee. Please refer to the Schedule of Fees[2] for the
related filing fee.

[1] Customer Code Rule 12303
Industry Code Rule 13303
Old Code Rule 10314(b)

[2] Customer Code Rule 12900
Industry Code Rule 13900
Old Code Rule 10332

Investor protection. Market integrity.     Dispute Resolution       Boca Center Tower 1        t  561 416 0277
                                           Southeast Regional Office  5200 Town Center Circle   f  301 527 4868
                                                                     Suite 200                  www.finra.org
                                                                     Boca Raton, FL
                                                                     33486-1015

Pursuant to the NASD Code,[3] you are required, on or before June 27, 2008, to send to Claimant and all other parties a signed Uniform Submission Agreement (form enclosed) and your Answer. Claimant or Claimant's counsel's address is provided at the end of this service letter.

The NASD Code also requires that you send to the Director of Arbitration:
(a) **the original and three copies** of the Uniform Submission Agreement, properly signed and dated by you;
(b) **the original and three copies** of your Answer; and
(c) **four copies** of any document(s) referred to in your Answer.

When sending copies of your Answer to the Director of Arbitration, please indicate that you have properly served your Answer on all parties. If you need an extension of time to file your Statement of Answer, you may contact Claimant directly and request one. If Claimant agrees to extend your time to file your Answer, please notify FINRA in writing of the new deadline for filing your Answer. You should also send a copy of that notice to Claimant and all other parties.

If your Answer is not served upon all parties, a motion to preclude your Answer may be made pursuant to the NASD Code.[4] In addition, failure to provide FINRA Dispute Resolution with copies of your Answer as described above will preclude it from inclusion in the package of pleadings provided to the Arbitrator(s).

## Hearing Location

If an arbitration involves a public customer, FINRA Dispute Resolution will generally select a hearing location closest to the customer's residence at the time the dispute arose.[5]

In disputes between AMEX, ISE, FINRA, NASDAQ or PHLX member firms, or MSRB Registrants and associated persons, FINRA Dispute Resolution will select the hearing location that is closest to the location where the associated person was employed at the time the dispute arose.

In industry disputes involving only member firms and/or MSRB Registrants unless the firms are in the same locale or the parties agree to a specific hearing location, FINRA Dispute Resolution will consider the following factors when deciding the hearing location:

1) Which party initiated the transactional at issue;
2) The location of witnesses and documents; and
3) The relative hardship of a party's travel to a location.

---

[3] Customer Code Rule 12303
Industry Code Rule 13303
Old Code Rule 10314(b)

[4] Customer Code Rule 12308
Industry Code Rule 13308
Old Code Rule 10314(b)(2)(c)

[5] Customer Code Rule 12213
Industry Code Rule 13213

The **ANTICIPATED** hearing location of this case is: Boca Raton, FL. This preliminary decision was made on behalf of the Director of Arbitration pursuant to the NASD Code.[6] A final decision regarding the hearing location will be rendered prior to the time the Panel is being appointed. The NASD Code[7] authorizes the presiding Panel to determine the time and date of all hearing(s).

If the anticipated initial hearing location listed above is **UNKNOWN**, FINRA Dispute Resolution is requesting recommendations from all parties for the hearing location based on the above applicable guidelines.

### Representation of Parties

FINRA Dispute Resolution has amended the NASD Code to address the representation of parties in arbitration.[8] This new rule permits parties to be represented pro se (on their own) or by an attorney admitted to practice and in good standing in any jurisdiction. A party may be represented by a non-attorney, unless state law prohibits such representation, the person is currently suspended or barred from the securities industry in any capacity, or the person is currently suspended or barred from the practice of law or disbarred. The amendments apply to any case in which parties provide FINRA with notice of representation on or after December 24, 2007.

### Other Information

Please review the NASD Code and FINRA Dispute Resolution Party's Reference Guide booklet. Should you require additional information regarding FINRA Dispute Resolution arbitration, please contact us and refer to the case number assigned to this case, which is 08-01430. FINRA Dispute Resolution encourages the parties to communicate among themselves to resolve issues that do not require FINRA Dispute Resolution intervention.

Pursuant to Article V, Section 2(c) of the FINRA By-Laws, if you are a registered representative with FINRA, you are required to keep your registration application current. Therefore you are advised to review the Form U4 to determine if disclosure of this matter is required. If so, your failure to update your registration application may result in the filing of a formal complaint based on any omission. Any questions regarding this disclosure requirement should be directed to FINRA Member Services Phone Center (301) 590-6500.

---

[6]Customer Code Rule 12213
 Industry Code Rule 13213
 Old Code Rule 10315

[7]Customer Code Rule 12600
 Industry Code Rule 13600
 Old Code Rule 10315

[8]Customer Code Rule 12208
 Industry Code Rule 13208

## Discovery

In disputes involving customers please review the applicable NASD Code provisions[9] and the attached Discovery Guidelines. In disputes involving only industry parties please review the applicable discovery code provisions for guidance.[10]

## Motions[11]

The time to respond to motions (other than motions to dismiss, as noted below) is governed by Customer and Industry Code Rules 12503(b) and 13503(b), respectively:

Responding to Motions
Parties have 10 days from the receipt of a written motion to respond to the motion, unless the moving party agrees to an extension of time, or the Director or the Panel decides otherwise. Responses to written motions must be served directly on each other party, at the same time and in the same manner. Responses to written motions must also be filed with the Director, with additional copies for each Arbitrator, at the same time and in the same manner in which they are served on the parties.

## Motions to Dismiss

FINRA Dispute Resolution does not have a rule that expressly addresses motions to dismiss claims before a hearing on the merits. Therefore, for cases proceeding according to the Old Code, Customer Code, or Industry Code, the response to a motion to dismiss will not be due until the Panel sets a deadline for the response.

Very truly yours,

JoAnne Sorrentino, CP
Senior Case Administrator
561-416-0277 Fax:301-527-4868

JYS:cw4:LC39E
idr:03/04/2008

Enclosures

CC:
    Richard A. Stephens, VCG Special Opportunities Master Fund
    7700 Congress Avenue, Suite 1109, Boca Raton, FL 33487

RECIPIENTS:

---

[9]Customer Code Rule 12506

[10]Industry Code Rule 13505 through and including Rule 13514

[11]For questions about motion practice under the Old Code, please contact your case administrator.

Harry Walters, Citigroup Global Markets, Inc.
Citigroup Global Markets, Inc., 111 Wall Street, 17th Floor, New York, NY 10005

## FINRA DISPUTE RESOLUTION

2008 MAY 12 PM 2: 26

| | |
|---|---|
| VCG SPECIAL OPPORTUNITIES MASTER FUND LTD. f/k/a CDO PLUS MASTER FUND LTD. | . . . |
| Claimant, | . . . |
| v. | . |
| CITIGROUP GLOBAL MARKETS INC. | . . |
| Respondent. | . |

FINRA Case No.:

### STATEMENT OF CLAIM

This arbitration is brought by VCG Special Opportunities Master Fund Ltd.,

formerly known as CDO Plus Master Fund Ltd ("Claimant" or "VCG") against

Citigroup Global Markets Inc. ("Respondent" or "Citigroup Global") in connection

with an investment contract product sold to VCG through Citigroup Global on or

about June 29, 2007, called a "credit default swap", resulting in almost $10,000,000

in compensatory damages to VCG. The amount of losses may increase, so the

compensatory damages in this arbitration are currently unstated.

Citigroup Global, a member of FINRA, is liable to VCG based on Citigroup

Global's breach of FINRA Conduct Rules (including Rule IM-2310-2 "Fair

Dealing",[1] Rule 2300 "Commercial Honor and Just and Equitable Principles of

---

[1] FINRA Conduct Rule IM 2310-2 *Fair Dealing with Customers*: "(a)(1)
Implicit in all member and registered representative relationships with customers and

Trade",[2] Rule IM-2310-3 "Suitability Obligations to Institutional Customers",[3] breach

of fiduciary duties, violations of other applicable FINRA Conduct Rules, negligence,

negligent supervision, violations of customer agreements, violations of the implied

covenant of good faith and fair dealing, fraud, constructive fraud, and any other legal

theories under federal and state law or FINRA practice that may be applicable to the

facts. Claimant seeks equitable, as well as legal, relief.[4]

---

others is the fundamental responsibility for fair dealing. Sales efforts must therefore
be undertaken only on a basis that can be judged as being within the ethical standards
of the Association's Rules, with particular emphasis on the requirement to deal fairly
with the public".

[2] FINRA Conduct Rule 2110. *Standards of Commercial Honor and Principles
of Trade*: "A member, in the conduct of its business, shall observe high standards of
commercial honor and just and equitable principles of trade".

[3] FINRA Conduct Rule 2310-3 *Suitability Obligations to Institutional
Customers*: .... "Members are expected to meet the same high standards of
competence, professionalism, and good faith regardless of the financial circumstances
of the customer.... If a customer is either generally not capable of evaluating
investment risk or lacks sufficient capability to evaluate the particular product, the
scope of a member's customer-specific obligations under the suitability rule would
not be diminished by the fact that the member was dealing with an institutional
customer".

[4] The Panel may note that, for court actions, the courts are split as to whether a
violation of FINRA Conduct Rues or NYSE Rules constitutes a cause of action for
proceeding in court. However, the issue is clear that a claimant *in FINRA arbitration*
can seek damages for violations of FINRA Conduct Rules. In the words of Linda D.
Fienberg, President of the FINRA (and former NASD) Dispute Resolution:

> In SRO/NASD arbitration, unlike in court, you get an equitable result.
> **You do not have to have a claim that is cognizable under state or
> federal law; it can be cognizable under NASD rules**. So, for example,
> there is only one cause of action under federal securities laws, that's 10-
> b. It's very limited; it has a very short statute of limitations. The rules

2

In essence, Citigroup Global engaged in unfair dealing and commercially dishonorable and inequitable trading practices by discriminating against customer VCG in favor of another customer [sister-affiliate Citibank under common control with Citigroup Global] and failing to disclose certain inside information known by Citigroup Global through proprietary sources that the investment contract with terms and with *the underlying collateralized debt obligation suggested and arranged by Citigroup Global,* was an unfair and exceptionally risky deal for VCG.  The undisclosed information [including internal analyses and mortgage data received by Citigroup Global from proprietary sources] was information that was unknown by, and not publicly available to, Claimant VCG.  **Citigroup offered to have the swap with either "Class B Notes of Millstone III CDO Ltd. III-A" ("Millstone") or one other CDO, both of which eventually were put on a credit "watch" list by Citigroup Global after the closing of the swap deal.** By arranging the "name" of the underlying obligation, and setting the terms of the deal, and not disclosing material information, Citigroup Global allowed and aided another customer, its sister-affiliate Citibank, to wrongfully extract (or in other words, "steal") about $10,000,000

---

that are applied by arbitrators looking for equitable relief are much broader than if they had to strictly follow the law.

Speech of Linda D. Fienberg, July 20, 2004, presented to North American Securities Administrators Association (NAASA) Arbitration Forum; available at www.connectlive.com/events/nasaa [39:20-40:00 min.] (emph. add.)

from VCG. Claimant VCG believes that, based on the circumstantial evidence of the

rapid requests by Citibank upon VCG for money under the investment contract,

within weeks of the inception of the investment contract, Citigroup Global knew

before the deal closed that VCG was undertaking a substantially higher risk than the

terms set by Citigroup Global. With a 5.5% annual payment to VCG [$500,000] for

putting up $10,000,000 of credit swap, with $2,000,000 cash already put up as

"margin" (i.e., security), the odds of default causing payment of the $10,000,000 were

supposed to be extremely low, and should have been a conservative investment for

VCG; but the documents received during discovery in this matter should reveal that

Citigroup Global had inside proprietary information, unknown to VCG and not

publicly available, indicating that this deal was extremely dangerous for VCG,

jeopardizing a large percentage of VCG's net worth (i.e., 40%) that Citigroup Global

knew was so limited, to wit, Citigroup Global knew that VCG had only $25 million

in capital at that time.

Ordinarily, brokers act on behalf of customers by making markets; and they

can, from time-to-time take a proprietary position based on their opinion of

risk/return. However, in this case, Citigroup Global crossed over the line of fair

dealing. Citigroup Global and its sister affiliate Bank knew that they were about to

experience billions of dollars in losses, and were looking to predatorily "steal" from

other accounts, such as Claimant VCG, to unfairly "pick off" their assets. Acting

with commercial dishonor, Citigroup Global "suckered" Claimant VCG into the swap

4

deal, with risk and terms that Citigroup Global knew, or should have known, were grossly unfair and predatory vis-à-vis Claimant, for the benefit of another client... the sister Bank.

This arbitration is brought under FINRA Code of Arbitration Procedure Rule 12200, providing that parties must arbitrate a dispute under the Code if requested by the customer, and "[t]he dispute arises in connection with the business activities of the member"; and also brought under Rule 12200 based on written arbitration clauses in any written agreements between the parties. During the period at issue, VCG was a customer of Citigroup Global through written and oral agreements and a course of business dealings, as well as through VCG's investment advisor, Vanquish Advisors LLC, formerly known as Rekon Advisors LLC. The dispute arises in connection with the business activities of Citigroup Global. The customer relationship between VCG and Citigroup Global was extensive, and caused VCG to trust Citigroup Global. As a customer, VCG, through its agents, was in almost constant contact with Citigroup Global by telephone and Bloomberg emails about potential deals, such as offers by Citigroup Global to sell to customer VCG the equity and debt from collateralized debt obligations, and offers to sell to customer VCG debt from mortgage backed securities. Some of the Citigroup Global agents with whom VCG did business were Jeff Gapusan, Donald Quentin and Jaime Aldama. Moreover, customer VCG has its Prime Brokerage Account with Citigroup Global.

5

Venue is proper in Boca Raton, Florida, which is the nearest FINRA hearing location to Claimant VCG's principal place of business in the United States, located in Delray Beach, Florida, during the misconduct of Citigroup Global at issue; and all communications with VCG's agents about the swap were transmitted to and from Delray Beach, Florida.[5]

Claimant VCG is a relatively tiny private investment company that, at the time of the June 29, 2007 transaction had only eight investors and net assets of about $25 million.[6] VCG trusted Citigroup Global as a fiduciary, and expected even-handed and fair treatment as a customer.

In the course of its business communications and dealings with Citigroup Global, VCG and its agents inquired about a credit default swap with Citigroup Global. Citigroup Global recommended either of two underlying debt instruments (called the "reference obligation"), one "name" being Millstone, a collateralized debt obligation ("CDO"). This was intended to be a conservative, relatively safe, investment for VCG, one that would produce an investment return commensurate with the risk. Besides recommending the "name", *Citigroup Global set the terms* consisting of a 5.5% annual fee calculated on $10,000,000 of Millstone, and VCG

---

[5] VCG is incorporated under the laws of the Isle of Jersey, Channel Isles.

[6] In a general non-legal parlance, VCG may be known as a tiny and relatively conservative/balanced hedge fund, since it is not regulated as a public mutual fund company. Just as there are conservative/balanced mutual funds, there exist conservative/balanced private investment companies.

required to place $2,000,000 as "initial margin" to secure the obligation; and in

return, VCG agreed to pay Citibank only upon the occurrence of a credit event.[7] Of

significance, under such an investment contract, neither of the swap's counterparties

(i.e., the parties buying and selling the credit default risk) necessarily holds the

Millstone debt instrument on which the swap is based, so it is _not_ insurance against

losses on the reference obligation suffered by one of the counterparties. Also of

significance, VCG thought that Citigroup Global was going to engage in the

investment contract as a principal, but at the last moment brought in another of its

customers instead, to wit, sister-affiliate Citibank, under common control. Whether

Citigroup Global was going to act as a principal, or as agent for another customer did

not matter, since the obligations of full disclosure, fair dealing, and commercial honor

continued _vis-à-vis_ VCG as a customer. Prior to the last-minute change, all dealings

by VCG and its agents were with Citigroup Global, which recommended the "name",

and set the terms of the deal, and therefore "recommended" it, according to the

industry standards and compliance manuals.[8]

It cannot just be coincidence that, Citigroup Global eventually put both

Millstone and the other recommended "name" on a credit watch list, providing

---

[7] Under the ISDA standard terms that govern the investment contract, a credit
event is defined as a "Writedown, Failure to Pay Principal or an Interest Shortfall".

[8] It is industry standard, and in virtually every compliance manual, that a
favorable comment by a broker to a security or an investment renders it a
"recommendation" by the broker on the purchase.

circumstantial evidence that it knew of serious problems with Millstone before the closing, and concealed the information from VCG.

Within weeks of the June 29, 2007 commencement of the swap, Citibank made more and more demands for margin based on its view of the fair value of the swap contract, eventually demanding and receiving almost $10 million from VCG by November 2007. The post-closing rapid demands for money by Citibank, the ultimate counterparty to the swap brought in by Citigroup Global, is *additional* circumstantial evidence that Citigroup Global, which set up the terms of the swap, had inside information *before* the deal was consummated, that VCG was unfairly undertaking a much higher risk than VCG was led to believe.

The post-closing demands for money by Citibank are currently the subject of litigation in New York.[9] In contrast, the claim in this arbitration is against Citigroup Global, *not* a party to the New York litigation, based on its unique obligations as a FINRA member, and other legal duties owed to its customer, to be decided by a panel of FINRA arbitrators. Citigroup Global, the FINRA member that was recommending the "name" and setting the terms for the swap, had obligations to disclose information to its customer VCG instead of concealing critical information and discriminating in

---

[9] Whether there is some overlap in the damages sought in the New York litigation against a bank and this arbitration against a broker-FINRA Member, is a matter to be determined, and could depend upon the ultimate theory of liability in any Panel Award. If Citibank contends in the litigation that an Award from this Panel somehow affects the amount of damages sought in the litigation (which will likely go to trial months or years after this arbitration's final hearing) it is a matter for a court, and should not concern this Panel.

favor of another customer that happened to be its sister-affiliate under the same corporate holding company.

## Discovery of Documents is This Unusual Arbitration Will Go Way Beyond the Discovery Guide

This is not the typical customer case that the Panel members are accustomed to seeing, where the FINRA Discovery Guide may cover most of the areas of discovery. Instead, it comes within the ambit of the prefatory language of the Discovery Guide saying that it "serves as a guide", and "it is not intended to remove flexibility from arbitrators or parties in a given case. Arbitrators can order the production of documents not provided for by the Document Production Lists...." Well, this is such a "given case" if ever the Panel will see one, requiring very specific document requests to ferret-out the truth about the concealment of critical information that should have been disclosed to customer VCG, which would have caused this investment contract never to occur, instead of Citigroup Global arranging for its sister-affiliate Citibank to essentially "steal" about $10,000,000 from the tiny investment company and its eight investors.

Areas of inquiry for document requests will include these types of parameters:

1.     What inside information did Citigroup Global have about the mortgage problems with the thousands of mortgages in the Millstone reference obligation, so that Citigroup Global, and its sister-affiliate, <u>knew</u> that actual and potential defaults in

the underlying collateral would cause a rapid extraction of the $10,000,000 from VCG?

2.    What inside information (such as internal analyses or computer models) did Citigroup Global have about the impending meltdown in the credit/mortgage markets so that it or its sister-affiliate would use the tiny investment company as a "patsy" to extract millions of dollars?

3.    What information did Citigroup Global have about Millstone and the other recommended "name" that resulted in both being put by Citigroup Global on a credit watch list?

4.    What communications occurred between Citigroup Global and its customer Citibank (including emails) to exchange information about the swap, and the impending mortgage meltdown, and about the pricing and counterparty risks (including "low level information" about the mortgages involved) which information should have been disclosed to VCG as a customer of Citigroup Global?

5.    What did Citigroup Global know about a "ratings migration", to wit, the impending downgrade in ratings of the mortgages or derivatives underlying Millstone, and similar "ratings migrations", that should have been disclosed?

6.    Essentially, in Nixonian terms, what did Citigroup Global know, and when did it know it?

The Panel will be asked to order broad discovery into these topics if Citigroup Global refuses to cooperate.

### Punitive Damages

If, as Claimant VCG expects, the evidence from the documents reveals that Citigroup Global concealed material information from VCG either through gross negligence or worse, punitive damages of at least three or four times compensatory damages should be assessed against Respondent Citigroup Global.

### Conclusion

Claimant VCG asks that the Panel issue an Award in its favor of compensatory damages in an amount to be proven, punitive damages in an amount at least three or four times compensatory damages, the costs of this arbitration, and such other and further relief as the Panel deems appropriate.

Richard A. Stephens
Law Office of Richard A. Stephens
7700 Congress Avenue, Suite 1109
Boca Raton, FL 33487
Florida Bar No. 977055
Tel.: (561) 981-8180
Fax: (561) 981-8153
bocalawyer@aol.com
Counsel for Claimant

Address and phone from May 30, 2008
through October 10, 2008, as follows:

1514 Beech Mountain Parkway
Beech Mountain, NC 28604
Tel (828) 387-2251
Fax (828) 387-9391

Dated: May 1, 2008

11