UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITIGROUP GLOBAL MARKETS INC.,

              Plaintiff,

    -against-

VCG SPECIAL OPPORTUNITIES MASTER
FUND LIMITED f/k/a CDO Plus Master Fund
Limited,

            Defendant.

No. 08 CV 5520 (BSJ)

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ................................................................................................3

I.    VCG ................................................................................................3

II.   CGMI ................................................................................................3

III.  The Customer Relationship Between VCG And CGMI ................................. 4

    A.  VCG Was A Long-Standing Customer Of CGMI ........................................ 4

    B.  CGMI Recommends The Credit Default Swap
    Transaction Which Gave Rise To VCG's Arbitration Demand ................................. 6

IV.   Procedural History ................................................................................ 7

    A.  The FINRA Arbitration ................................................................................ 7

    B.  The Action Against Citibank, N.A. ................................................................ 8

ARGUMENT ................................................................................................9

I.    Plaintiff's Motion Should Be Denied In Its Entirety ........................................ 9

    A. CGMI Cannot Succeed On The Merits Because The Facts It Has Concealed
    From the Court Make It Clear That It Must Participate In The Arbitration .............. 10

        i.  FINRA Rule 12200 Requires Arbitration ............................................. 12

            a.  CGMI Is A FINRA Member And VCG Has Requested Arbitration.............. 13

            b.  VCG Is A Customer Of CGMI ................................................ 13

            c.  VCG's Dispute With CGMI Arose In Connection
            With CGMI's Business Activities ................................................ 17

        ii.  The Prime Brokerage Agreement Is Irrelevant To The Arbitration .................... 18

        iii. Arbitrability Is The Only Issue Properly
        Before The Court On CGMI's Motion ................................................ 19

        iv. VCG Has Not Waived Its Right To Arbitrate........................................ 21

i

     B. CGMI Cannot Suffer Harm—Must Less Irreparable Harm—
       By Being Required To Fulfill Pre-Existing Legal Duties............................................. 22

     C. The Balance of Hardship Favors VCG ...................................................................... 23

II.     VCG Is Entitled To Its Attorneys' Fees and Costs ........................................................... 24

CONCLUSION................................................................................................................................26

## TABLE OF AUTHORITIES

**CASES**

*Adams v. Whitney, et al.*,
   No. 8:07-CV-00452 (LEK/RFT), 2008 WL 189905 (N.D.N.Y. Jan. 18, 2008)..........................9

*Beer v. Nutt*,
   No. 06 Civ. 94224 (HB), 2007 WL 13100 (S.D.N.Y. Jan. 3, 2007) .........................................17

*Bensadoun v. Jobe-Riat, et al.*,
   316 F.3d 171 (2d Cir. 2003) .....................................................................................................13

*Brady v. Calyon Securities (USA), et al.*,
   406 F. Supp. 2d 307 (S.D.N.Y. 2005) ......................................................................................11

*In the matter of the arbitration between Cherry v. Raymond James Fin. Servs., Inc.*,
   No. 05-03030, 2006 WL 3313526 (Nat'l Ass'n of Secs. Dealers, Inc. Dec. 22, 2006) ............12

*Coenen v. R.W. Pressprich & Co., Inc.*,
   453 F.2d 1209 (2d Cir. 1972) ...................................................................................................11

*Coleman v. Bd. of Educ. of the City of Mount Vernon*,
   990 F. Supp. 221 (S.D.N.Y. 1997) .............................................................................................9

*Cotton v. Slone*,
   4 F.3d 176 (2d Cir. 1993) .........................................................................................................21

*In the matter of the arbitration between Damis v. Ohio Sav. Secs., Inc.*,
   No. 01-1112, 2001 WL 1736694 (Nat'l Ass'n of Secs. Dealers, Inc. Dec. 3, 2001) ...............12

*Davis, et al. v. Hernandez, et al.*,
   166 F.3d 432 (2d Cir. 1999) .....................................................................................................16

*Dean Witter Reynolds, Inc. v. Byrd*,
   470 U.S. 213 (1985)...................................................................................................................23

*Doctor's Associates, Inc. v. Distajo*,
   107 F.3d 126 (2d Cir. 1997) ...............................................................................................21, 22

*Ermenegildo Zegna Corp. v. Zegna*,
   133 F.3d 177 (2d Cir. 1998) .....................................................................................................20

*Fengler, et al. v. Numismatic American, Inc., et al.*,
   832 F.2d 745 (2d Cir. 1987) .....................................................................................................16

*Fin. Network Inv. Corp. v. Becker*,
   305 A.D.2d 187 (1st Dep't 2003) .............................................................................................14

*In the matter of the arbitration between Gauzza v. Sterne Agee Fin. Servs.*,
    No. 06-03057, 2007 WL 2317540 (Nat'l Ass'n of Secs. Dealers, Inc. July 30, 2007) ............12

*Hanson Trust PLC v. SCM Corp.*,
    774 F.2d 47 (2d Cir. 1985) .....................................................................................................9

*Herbert J. Sims & Co., Inc. v. Roven*,
    548 F. Supp. 2d 759 (N.D. Cal. Mar. 7, 2008) ......................................................................16

*Hornor, Townsend & Kent, Inc. v. Hamilton*,
    218 F. Supp. 2d 1369 (N.D. Ga. 2002), *vacated on other grounds*,
    No. Civ.A.1:02 CV 2979 J, 2003 WL 23832424 (N.D. Ga. Sept. 29, 2003) ...........................14

*Howsam v. Dean Witter Reynolds*,
    537 U.S. 79 (2002).................................................................................................................20

*Intercity Co. Establishment v. Ahto, et al.*,
    13 F. Supp. 2d 253 (D. Conn. 1998)......................................................................................23

*Itel Containers Int'l Corp. v. Puerto Rico Marine Mgmt., Inc.*,
    108 F.R.D. 96 (D.N.J. 1985)..................................................................................................25

*John Hancock Life Ins. Co. v. Wilson, et al.*,
    254 F.3d 48 (2d Cir. 2001) .........................................................................................13, 14, 19

*Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship*,
    41 F.3d 861 (2d Cir. 1994), *cert. denied*, 117 S. Ct. 609 (1996)..............................................11

*Lawrence v. Wilder Richman Secs. Corp.*,
    359 F. Supp. 2d 161 (D. Conn. 2005).....................................................................................23

*Lehman Brothers, Inc. v. Certified Reporting Co.*,
    939 F. Supp. 1333 (N.D. Ill. 1996) ........................................................................................14

*Longstreet Assocs., L.P. v. Bevona*,
    16 F. Supp. 2d 290 (S.D.N.Y. 1998) ......................................................................................20

*Longstreet Assocs., L.P. v. Bevona*,
    No. 98 Civ. 0128 (BSJ), 1998 WL 27134 (S.D.N.Y. Jan. 23, 1998)........................................20

*In the matter of the arbitration between MML Investors Servs., Inv. and*
    *William D. Pittman Co., Inc.*, 210 A.D.2d 868 (3d Dep't 1994)...............................................14

*Motorola Credit Corp. v. Uzan*,
    274 F. Supp. 2d 481 (S.D.N.Y. 2003) ....................................................................................19

*Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n, Local 38*,
    351 F.3d 43 (2d Cir. 2003) ....................................................................................................21

iv

*O.N. Equity Sales Co. v. Staudt,*
   No. 2:07-CV-142, 2008 WL 271329 (D. Vt. Jan. 30, 2008) ....................................22

*Oppenheimer & Co., Inc. v. Neidhardt,*
   56 F.3d 352 (2d Cir. 1995) ...........................................................................13, 14

*PPG Indus., Inc. v. Webster Auto Parts Inc.,*
   128 F.3d 103 (2d Cir. 1997) ...................................................................................22

*PaineWebber, Inc. v. Bybyk,*
   81 F.3d 1193 (2d Cir. 1996) ...................................................................................23

*Phillips v. Audio Active Ltd.,*
   494 F.3d 378 (2d Cir. 2007) ...................................................................................20

*In the matter of the arbitration between Pike v. Weisberg, et al.,*
   No. 05-03522, 2006 WL 1816360 (Nat'l Ass'n of Secs. Dealers, Inc. June 14, 2006) ............12

*Porush v. Lemire,*
   6 F. Supp. 2d 178 (E.D.N.Y. 1998) ........................................................................23

*In re Ronco, Inc.,*
   838 F.2d 212 (7th Cir. 1988) ...................................................................................25

*Sands Bros. & Co. v. Nasser,*
   No. 03 Civ. 8128 (BSJ), 2004 WL 26550 (S.D.N.Y. Jan. 5, 2004)...........................................25

*Sharjah Inv. Co. Ltd. v. P.C. Telemart, Inc.,*
   108 F.R.D. 90 (S.D.N.Y. 1985) ...............................................................................25

*Spear, Leeds & Kellogg v. Central Life Ass. Co.,*
   85 F.3d 21 (2d Cir. 1996) .......................................................................................11

*Stoner v. N.Y.C. Ballet Co.,*
   No. 99 Civ. 0196 (BSJ), 2001 WL 1505492 (S.D.N.Y. Nov. 26, 2001) ....................................9

*Sussman v. Crawford,*
   488 F.3d 136 (2d Cir. 2007) .....................................................................................9

*The Deal, LLC v. Korangy Publ'g, Inc.,*
   309 F. Supp. 2d 512 (S.D.N.Y. 2004) ........................................................................9

*Virgin Enter. Ltd. v. Nawab,*
   335 F.3d 141 (2d Cir. 2003) .....................................................................................9

*WMA Secs., Inc. v. Rupert, et al.,*
   80 F. Supp. 2d 786 (S.D. Ohio 1999) ...............................................................22, 24

*World Group Secs., Inc. v. Allen*,
    No. CV 07-1657-PHX-JAT, 2007 WL 4168572 (D. Ariz. Nov. 20, 2007) ..............................11

*World Group Secs. v. Ko*,
    No. C035055 MJJ(EDL), 2004 WL 1811145 (N.D. Cal. Feb. 11, 2004)..................................16

## OTHER AUTHORITIES

Commodity Futures Modernization Act of 2000,
    Pub.L. No. 106-554, 114 Stat. 2763 ........................................................................................18

Fed. R. Civ. P. 65...........................................................................................................................16

Linda D. Fienberg, President of FINRA (and formerly NASD) Dispute Resolution,
    Remarks at North American Securities Administrators Association Arbitration
    Forum (July 20, 2004) (available at www.connectlive.com/events/nasaa) ..............................11

9 U.S.C. § 4....................................................................................................................................16

11 Wright & Miller, Fed. Prac. & Proc., § 2949....................................................................10, 16

28 U.S.C. § 1927............................................................................................................................24

Defendant VCG Special Opportunities Master Fund Limited f/k/a CDO Plus Master Fund Limited ("VCG") respectfully submits this memorandum of law in opposition to Citigroup Global Markets Inc.'s ("CGMI") motion for preliminary injunction (the "Motion").

## PRELIMINARY STATEMENT

Although CGMI seeks to invoke some of the federal courts' most sweeping powers to obtain extraordinary relief, it has been less than forthright with this Court. CGMI seeks a preliminary injunction barring VCG from proceeding with an arbitration against CGMI properly commenced before the Financial Industry Regulatory Authority ("FINRA") on May 1, 2008, captioned *VCG Special Opportunities Master Fund Limited f/k/a CDO Plus Master Fund Limited v. Citigroup Global Markets Inc.* (FINRA Dispute Resolution Arbitration Number 08-01430 (the "Arbitration"), on the purported ground that a prime brokerage agreement between VCG and CGMI "bars the use of arbitration to resolve disputes arising out of or otherwise relating to the parties' agreement."

But CGMI's Motion contains several significant, glaring and extremely troubling omissions. As set forth below, it is no coincidence that the facts CGMI omits from its papers require the denial of its Motion, as CGMI has failed to inform this Court that:

- CGMI, a registered broker/dealer, is a member of FINRA, the successor regulatory entity to the NASD.

- As a FINRA member, CGMI is legally bound by the organization's rules (the "Rules").

- Rule 12200 of the FINRA Code of Arbitration Procedure for Customer Disputes requires CGMI to arbitrate any dispute with a customer arising in connection with CGMI's business if that customer requests arbitration regardless of what any other agreement may say.

- VCG is CGMI's customer, because: (i) the parties have maintained a continuous customer/broker relationship since 2006, (ii) during the course of that relationship CGMI regularly offered VCG the opportunity to participate in investment

transactions involving collateralized debt obligations ("CDOs") including participation in credit default swaps, (iii) CGMI regularly advised VCG regarding the risks and benefits associated with these investment transactions, and (iv) CGMI offered the credit default swap at issue ("CDS") to VCG, advised VCG with respect to the risks and rewards associated with that CDS, and set the terms of the relevant CDS transaction.

In other words, because VCG is a customer of CGMI, and has demanded arbitration in connection with a dispute arising from CGMI's business, CGMI must participate in the Arbitration.

Faced with this fact, CGMI takes a pass. Its Motion makes no mention of FINRA's Rules, or the fact that those Rules require CGMI to participate in the Arbitration. Instead, CGMI insists that it is entitled to the drastic remedy of a preliminary injunction barring VCG from proceeding with the Arbitration, on the grounds that:

- CGMI is likely to succeed in obtaining a judgment declaring that it is not required to participate in the Arbitration because: (i) an unrelated prime brokerage agreement excludes arbitration as a remedy, (ii) CGMI's counsel make the wholly unsupported claim that their client did not "broker, clear or settle" the CDS at issue, and (iii) VCG has somehow "waived" its right to demand mandatory FINRA arbitration by suing CGMI's parent (against whom it has no arbitration right) in this Court.

- Complying with FINRA Rules that require its participation in the Arbitration will cause CGMI to suffer "irreparable harm."

- Participating in the Arbitration will cause CGMI greater hardship than VCG will suffer as a result of CGMI's refusal to comply with applicable FINRA Rules.

Each and every one of these arguments is meritless:

1. CGMI, a FINRA member, cannot succeed on the merits because it is required pursuant to FINRA Rules to proceed with an arbitration requested by a customer, VCG, in connection with a dispute arising out of CGMI's business activities.

2. CGMI's reliance on the parties' prime brokerage agreement is unavailing, as that agreement: (i) by its terms does not apply to the CDS dispute which gave rise to the Arbitration, and (ii) is a blatant and bad faith violation of FINRA Rules which render any attempt to bar arbitration sanctioned thereunder a legal nullity.

2

3. CGMI's wholly unsupported suggestion that VCG did not "broker, clear or settle" the CDS trade at issue: (i) cannot possibly satisfy its burden of showing likelihood of success on the merits under Rule 65, Fed. R. Civ. P., (ii) flies in the face of the indisputable fact that VCG was CGMI's customer for purposes of the FINRA Rules, and (iii) at a minimum, establishes VCG's right to discovery relating to the customer issue in aid of VCG's opposition to the Motion.

4. CGMI's "waiver" argument is for determination by an arbitrator, not this Court, and is in any event unavailing as it is directly contrary to controlling law in this Circuit.

5. CGMI cannot suffer any harm—much less irreparable harm—by being required to fulfill its pre-existing legal duties to which it voluntarily consented when it joined FINRA.

6. The balance of hardships tips decidedly in VCG's favor because the Arbitration is the *only* forum where it may seek redress for CGMI's violations of FINRA's Conduct Rules.

Accordingly, as set forth more fully below, CGMI's Motion should be denied in its entirety.

## BACKGROUND

### I.    VCG

VCG is an Isle of Jersey exempted corporation having its principal place of business at Le Masurier House, St. Helier JE2 4YE Jersey, Channel Islands.  Declaration of Jonnathan X. Wong, dated July 23, 2008 ("Wong Decl."), ¶ 4.  It is a hedge fund, which at the time of the transaction at issue in June 2007, had only eight investors and net assets of about $25 million. *Id.* at ¶¶ 5-6.  VCG was formerly known as CDO Plus Master Fund Limited ("CDO Plus"). *Id.* at ¶ 5.

### II.    CGMI

CGMI is a corporation organized and existing under the law of the State of New York, with its principal place of business in New York, New York.  Compl. ¶ 8.  It is the brokerage and securities arm of banking behemoth Citigroup.  The company provides brokerage, investment

3

banking, and asset management services to businesses, governments, and individuals. With over 39,000 employees, it has offices in major cities in the Americas, Europe, the Middle East, Africa, and Asia Pacific.

CGMI is a member of FINRA.[1] Declaration of Alan S. Gruber, dated July 23, 2008 ("Gruber Decl."), ¶ 2, Ex. A. At all times relevant to the instant action, CGMI employed Jeff Gapusan, Donald Quentin, and Jaime Aldama. *Id.* at ¶ 3, Ex. B; *see also* Wong Decl. ¶ 7, Ex. A. Messrs. Gapusan, Quentin, and Aldama are all registered members of FINRA. Gruber Decl. ¶ 3, Ex. B. Based on their publicly available FINRA records, these individuals are not, and have never been, employees of Citibank, N.A. *Id.*

## III. The Customer Relationship Between VCG And CGMI

### A. VCG Was A Long-Standing Customer Of CGMI

VCG has been a customer of CGMI since 2006. Wong Decl. ¶ 8. This customer relationship arose through written and oral agreements and business dealings. *Id.* at ¶ 9. During this relationship, VCG was in almost constant contact with CGMI by telephone and e-mail about potential deals, such as offers by CGMI to sell the equity and debt from collateralized debt obligations, and offers to sell debt from mortgage backed securities. *Id.* at ¶ 10. VCG and its representatives regularly communicated with several CGMI employees, including Jeff Gapusan, Donald Quentin, and Jaime Aldama. *Id.* Jeff Gapusan, as a Salesperson, was in charge of managing VCG's relationship with CGMI. *Id.* at ¶ 11.

---

[1] FINRA is the largest non-governmental regulator for all securities firms doing business in the United States. FINRA oversees nearly 5,000 brokerage firms, about 173,000 branch offices and more than 677,000 registered securities representatives. It was created in July 2007 through the consolidation of NASD and the member regulation, enforcement and arbitration functions of the New York Stock Exchange.

In mid-2006, almost a year before the brokered CDS contract at issue here, VCG entered into with CGMI (i) a master repurchase agreement, (ii) a global master repurchase agreement, and (iii) an institutional futures agreement. *Id.* at ¶ 12.

On July 17, 2006, VCG entered into a Prime Brokerage Agreement ("PBA") with CGMI. *Id.* at ¶ 13. "Prime brokerage" is the generic name for a bundled package of services offered by securities firms to hedge funds and other professional investors needing the ability to borrow securities and cash to be able to invest on a leveraged basis and achieve an absolute return. Here, CGMI was contracting to provide prime brokerage services involving the clearing and settling of trades of bonds and other fixed income securities. *See* Pl.'s Compl. at Ex. A.

The preamble to the PBA acknowledges that it is not the exclusive arrangement between VCG and CGMI, but merely "supplements any other agreement." *Id.* Paragraph 1 limits the scope of services covered by the PBA to those services involving "clearance and settlement" of trades executed by other "executing brokers." *Id.* Paragraph 1 further limits the services provided under the Agreement to those products listed on Schedule A. *Id.* Schedule A states that the "products which CGMI will accept for clearance and settlement on behalf of customer [are] fixed income securities in countries where CGMI has the ability to clear and safekeep on behalf of client." *Id.* The PBA purports to bar arbitration with respect to disputes arising from transactions covered by its terms. The credit default swap which gave rise to the Arbitration is not a "fixed income security." Notably, in light of the fact that the CDS contract is not a security and was not "cleared or settled" by CGMI, it does not appear on the prime brokerage reports provided to VCG by CGMI. Declaration of Alyssa D'Amore, dated July 23, 2008 ("D'Amore Decl."), ¶¶ 4-5.

5

**B.    CGMI Recommends The Credit Default Swap Transaction Which Gave Rise To VCG's Arbitration Demand**

In the summer of 2007, in the regular course of its business dealings with CGMI, VCG asked CGMI about the possibility of entering into a CDS trade.  Wong Decl. at ¶ 14.  CGMI recommended CDS trades relating to several underlying debt instruments, one being Class B Notes of Millstone III CDO Ltd. III-A, a CDO ("Millstone").  *Id.* at ¶ 15.  A credit default swap is a contract under which two financial institutions trade the default risk of a debt instrument, such as a corporate bond or, in this case, a CDO.  *Id.* at 16.  It bears some similarities to an insurance policy, except that *neither* counterparty to the swap holds the debt instrument on which the swap is based.  *Id.*  Under the credit default swap agreement, one party (the "protection buyer") pays a fixed, periodic fee to the seller of the swap.  *Id.*  In return for receiving the fee, the seller of the swap agrees to undertake the credit exposure of the underlying debt instrument, *i.e.*, to pay all or a portion of the unpaid obligation to the buyer of the swap upon the triggering of certain credit defaults.  *Id.*

VCG was advised by CGMI that this was a "clean deal" with highly-rated collateral.  *Id.* at ¶ 17.  Relying on CGMI's advice, VCG agreed to this transaction.  *Id.* at ¶ 18.  In addition to recommending the investment, CGMI set the terms of the transaction.  *Id.* at ¶ 19.  In this case, the fee to be paid to CGMI was 5.5% per annum, calculated on the "notional amount" of $10,000,000 of the collateralized debt obligation, Millstone.  *Id.*  VCG was required to place $2,000,000 as "initial margin" to secure the obligation.  *Id.*  In return, VCG agreed to pay CGMI only upon the occurrence of a credit event.  *Id.*  Neither VCG nor CGMI were to hold the CDO. *Id.*  Rather, the contractual relationship concerned the CDS only.  *Id.*  The terms of the contract were negotiated by VCG directly with CGMI employee, Jeff Gapusan, who acted as liaison for the trading desk at CGMI.  *Id.*  VCG and Mr. Gapusan communicated regularly during this time,

including by telephone. *Id.* All dealings by VCG and its representatives were with CGMI, which recommended Millstone and set the terms of the transaction. *Id.* at ¶ 21.

## IV.    Procedural History

### A.    The FINRA Arbitration

VCG initiated the Arbitration against CGMI on May 1, 2008 before FINRA. The Arbitration, properly venued in Boca Raton, Florida, resulted from CGMI's breaches of its unique obligations as a FINRA member, and other legal duties owed to its customer VCG.

As set forth in VCG's May 1, 2008 Statement of Claim (the "Arbitration Demand"), CGMI:

> [E]ngaged in unfair dealing and commercially dishonorable and inequitable trading practices by discriminating against customer VCG in favor of another customer . . . and failing to disclose certain inside information known by [CGMI] through proprietary sources that the investment contract with terms and with the underlying collateralized debt obligation suggested and arranged by [CGMI], was an unfair and exceptionally risky deal for VCG . . . [CGMI] suckered VCG into the swap deal, with risk and terms that [CGMI] knew, or should have known, were grossly unfair and predatory vis-a-vis VCG, for the benefit of another client.

Pl.'s Compl. at Ex. E, p. 3-5.

Based on CGMI's wrongful conduct, VCG's Arbitration Demand asserts, *inter alia*, the following claims:

- Breach of FINRA Conduct Rule 2310-2 -- Fair Dealing with Customers

- Breach of FINRA Conduct Rule 2300 -- Commercial Honor and Just and Equitable Principles of Trade;

- Breach of FINRA Conduct Rule 2310-3 -- Suitability Obligations to Institutional Customers;

- Breach of fiduciary duty;

- Negligence;

- Negligent supervision;

- Fraud; and

- Constructive fraud.

*Id.* at 1-2.

VCG has extended CGMI's time to respond to VCG's Statement of Claim in the Arbitration, and to stay all other events and deadlines in the Arbitration, pending the resolution of the Motion.  In the event VCG prevails on the Motion, CGMI will have at least 2 weeks after the decision so holding to file its response to the Statement of Claim.

### B.    The Action Against Citibank, N.A.

On February 14, 2008, VCG commenced an action in this Court against Citibank, N.A., captioned *VCG Special Opportunities Master Fund Limited v. Citibank, N.A.*, Case No. 08-CV-01563 (BSJ) (the "SDNY Action").  Unlike the Arbitration, the SDNY Action does not relate to CGMI's inducement of VCG to enter into the CDS, but instead Citibank, N.A.'s ("Citibank") demands for money *after* the parties entered into the CDS.  Specifically, the action relates to two distinct disagreements regarding the scope of VCG's obligations under the CDS:

- Citibank's improper demand and taking from VCG of a total of $9,960,000 of collateral for the $10,000,000 CDS, based upon an erroneous reading of the swap transaction documents.

- Citibank's unreasonable demand for and retention of those sums by declaring a credit default and notifying VCG that it would be required to remit the entire amount of the swap.

In its SDNY Complaint, VCG seeks declaratory relief, rescission of the swap, restitution of all sums VCG paid to Citibank, and damages.

## ARGUMENT

### I.    Plaintiff's Motion Should Be Denied In Its Entirety

A preliminary injunction "is an extraordinary remedy, and should not be routinely

granted." *Coleman v. Bd. of Educ. of the City of Mount Vernon*, 990 F. Supp. 221, 226

(S.D.N.Y. 1997) (Jones, J.).[2]  A party seeking a preliminary injunction in this Circuit must show

the likelihood of irreparable harm and either a likelihood of success on the merits or sufficiently

serious questions going to the merits to make them a fair ground for litigation, plus a balance of

hardships tipping decidedly in the moving party's favor. *Virgin Enters. Ltd. v. Nawab*, 335 F.3d

141, 145 (2d Cir. 2003); *Stoner v. N.Y.C. Ballet Co.*, No. 99 Civ. 0196 (BSJ), 2001 WL 1505492,

at *1 (S.D.N.Y. Nov. 26, 2001).

Here, as set forth below, CGMI cannot make this showing:

- CGMI, a FINRA member, cannot succeed on the merits because FINRA's rules require that it proceed with an arbitration requested by its customer VCG in connection with any dispute arising out of CGMI's business activities.

- CGMI's reliance on the PBA is unavailing, as that agreement: (i) by its terms does not apply to the CDS dispute which gave rise to the Arbitration, and (ii) is a blatant and bad faith violation of FINRA Rules which render any attempt to bar arbitration sanctioned thereunder a legal nullity.

- CGMI's wholly unsupported suggestion that VCG did not "broker, clear or settle" the CDS trade at issue: (i) cannot possibly satisfy its burden of showing likelihood of success on the merits under Rule 65, Fed. R. Civ. P.[3], (ii) flies in the

---

[2] *See also, e.g.*, *Sussman v. Crawford*, 488 F.3d 136, (2d Cir. 2007) (preliminary injunction "should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion" (emphasis in original)); *Adams v. Whitney, et al.*, No. 8:07-CV-00452 (LEK/RFT), 2008 WL 189905, at *1 (N.D.N.Y. Jan. 18, 2008) ("A party seeking a preliminary injunction bears a heavy evidentiary burden before a court will issue this form of relief."); *The Deal, LLC v. Korangy Publ'g, Inc.*, 309 F. Supp. 2d 512, 520 (S.D.N.Y. 2004) (preliminary injunction is "'one of the most drastic tools in the arsenal of judicial remedies and should not be routinely granted" (quoting *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985))).

[3] CGMI does not submit a single affidavit in support of its Motion, but rather relies exclusively on its Verified Complaint. The verification was executed by Angela G. Vogeli, Esq., Vice President and Legal Counsel at CGMI. Ms. Vogeli states, "The allegations contained in the Complaint are true and correct, based on my personal knowledge, information or belief, or based upon information provided to me by others in the company whom I believe to be the most reliable sources for such information." While the Verified Complaint may serve as evidence for purposes of a hearing for a preliminary injunction, even if it were to rise to the evidentiary level of an affidavit—

face of the indisputable fact that VCG was CGMI's customer for purposes of the FINRA Rules, and (iii) at a minimum, establishes VCG's right to discovery relating to the customer issue in aid of VCG's opposition to the Motion.

- CGMI's "waiver" argument is for determination by an arbitrator, not this Court, and is in any event unavailing as it is directly contrary to controlling law in this Circuit.

- CGMI cannot suffer any harm—much less irreparable harm—by being required to fulfill its pre-existing legal duties to which it voluntarily consented when it joined FINRA.

- The balance of hardships tips decidedly in VCG's favor because the Arbitration is the *only* forum where it may seek redress for CGMI's violations of FINRA's conduct rules.

As a result, the Motion should be denied in its entirety.

### A.   CGMI Cannot Succeed On The Merits Because The Facts It Has Concealed From the Court Make It Clear That It Must Participate In The Arbitration

CGMI has not been honest with this Court. It deliberately omitted highly relevant and material facts from its Motion. Those facts are fatal to CGMI's Motion, because, as set forth below:

- CGMI is a member of FINRA.

- FINRA Rules apply to all members and persons associated with a member.

- FINRA Rule 12200 requires arbitration when requested by a customer and the dispute arises in connection with the business activities of the FINRA member.

- VCG is a customer of CGMI and has requested arbitration.

---

which it does not—an affidavit based on information and belief should be given no weight. *See* 11 Wright & Miller, Fed. Prac. & Proc., § 2949 (2008) ("[T]he question of how much weight an affidavit will be given is left to the trial court's discretion. The quality of the affidavit will have a significant effect on this determination. Not surprisingly, therefore, when the primary evidence introduced is an affidavit made on information and belief rather than on personal knowledge, it generally is considered insufficient to support a motion for a preliminary injunction."). Here, VCG and the Court are left to guess as to what allegations in the Complaint are based (i) on Ms. Vogeli's personal knowledge, (ii) on her information or belief, or (iii) upon information provided to her by others in the company. As a result, plaintiff's Verified Complaint is insufficient to support its Motion.

- The dispute that gave rise to the Arbitration relates to the business activities of CGMI.

- The PBA, by its plain terms, is irrelevant to the instant action because it does cover or relate in any way to the CDS—a non-security investment—which gave rise to the Arbitration.

Under these circumstances, FINRA requires arbitration—there is no discretion because, as the Second Circuit has repeatedly held, FINRA "Rules create enforceable contract rights for non-members in certain specified circumstances. *No agreement is required between the parties to the arbitration* before a non-member may invoke" FINRA Rule 12200. *Spear, Leeds & Kellogg v. Central Life Ass. Co.*, 85 F.3d 21, 26 (2d Cir. 1996) ("the arbitration rules of a securities exchange are themselves 'contractual in nature'") (emphasis supplied).[4] Indeed, VCG had no option other than the Arbitration to seek redress for CGMI's breaches of FINRA Rules, because those Rules do not confer a private right of action in a court proceeding. *See, e.g., Brady v. Calyon Securities (USA), et al.*, 406 F. Supp. 2d 307, 312 (S.D.N.Y. 2005) ("While defendants may be subject to the rules and by-laws of NYSE and NASD, the rules of NYSE and NASD do not confer a private right of action.") (citing cases).[5] Thus, the relief CGMI seeks would result in the permanent denial of VCG's right to seek redress for the harms committed by

---

[4] *See, also, e.g., Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship*, 41 F.3d 861, 863-64 (2d Cir. 1994), *cert. denied*, 117 S. Ct. 609 (1996) (NASD rules constitute an agreement in writing under the Federal Arbitration Act); *Coenen v. R.W. Pressprich & Co., Inc.*, 453 F.2d 1209, 1211 (2d Cir. 1972) ("Since the rules of the Exchange 'constitute a contract between the members, the arbitration provisions which they embody have contractual validity.' The Exchange provisions requiring arbitration constitute an agreement to arbitrate which is binding upon both [parties]." (alteration in original)). FINRA arbitrations are governed by the FINRA (formerly NASD) Code of Arbitration Procedure for Customer Disputes (the "Code"), *see, e.g., World Group Secs., Inc. v. Allen*, No. CV 07-1657-PHX-JAT, 2007 WL 4168572, at *2 (D. Ariz. Nov. 20, 2007), and, as a result, cases interpreting the NASD code are equally applicable.

[5] *Cf.* Linda D. Fienberg, President of FINRA (and formerly NASD) Dispute Resolution, Remarks at North American Securities Administrators Association Arbitration Forum (July 20, 2004) (*available at* www.connectlive.com/events/nasaa [39:20-40:00 min.]) ("In SRO/NASD arbitration, unlike in court, you get an equitable result. *You do not have to have a claim that is cognizable under state or federal law; it can be cognizable under NASD rules*. So, for example, there is only one cause of action under federal securities laws, that's 10-b. It's very limited; it has a very short statute of limitations. The rules that are applied by arbitrators looking for equitable relief are much broader than if they had to strictly follow the law." (emphasis added)).

CGMI—relief that is **unavailable** in this Court, and available only in a FINRA arbitration for violation of FINRA Conduct Rules.[6]

### i.    FINRA Rule 12200 Requires Arbitration

Despite the fact that CGMI received VCG's Arbitration Demand—indeed it was attached as an exhibit to its Complaint in this action—its Motion wholly ignores the FINRA Rule which provides VCG with the right to pursue the Arbitration.[7]

Rule 12200 of the Code (the "Rule") states that parties must arbitrate a dispute under the Code if:

- Arbitration under the Code is either:
    - o   Required by a written agreement, *or*
    - o   Requested by the customer;
- The dispute is between a customer and a member or associated person of a member; and
- The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

Thus, under the Rule, customers can compel registered members of FINRA to arbitrate certain disputes even when no written arbitration agreement exists. As set forth below, VCG's dispute with CGMI is clearly arbitrable under the Rule.

---

[6] FINRA arbitrators routinely find parties liable for violations of FINRA Conduct Rules. *See, e.g., In the matter of the arbitration between Gauzza v. Sterne Agee Fin. Servs.*, No. 06-03057, 2007 WL 2317540 (Nat'l Ass'n of Secs. Dealers. Inc. July 30, 2007) (respondent liable for, *inter alia*, violations of FINRA Conduct Rules); *In the matter of the arbitration between Pike v. Weisberg, et al.*, No. 05-03522, 2006 WL 1816360 (Nat'l Ass'n of Secs. Dealers, Inc. June 14, 2006) (same); *In the matter of the arbitration between Cherry v. Raymond James Fin. Servs., Inc.*, No. 05-03030, 2006 WL 3313526 (Nat'l Ass'n of Secs. Dealers, Inc. Dec. 22, 2006) (same); *In the matter of the arbitration between Damis v. Ohio Sav. Secs., Inc.*, No. 01-1112, 2001 WL 1736694 (Nat'l Ass'n of Secs. Dealers, Inc. Dec. 3, 2001) (violations of Conduct Rules were sole basis of award).

[7] As a FINRA member, CGMI is bound by FINRA Rules. *See* FINRA Rule 0115(a) ("These Rules shall apply to all members and persons associated with a member. Persons associated with a member shall have the same duties and obligations as a member under these Rules.").

### a. CGMI Is A FINRA Member And VCG Has Requested Arbitration

CGMI is undeniably a FINRA member. Gruber Decl. ¶ 2, Ex. A.

VCG has requested arbitration with CGMI as evidenced by its May 1, 2008 Statement of Claim. *See* Pl.'s Compl. at Ex. E.

### b. VCG Is A Customer Of CGMI

FINRA Rules provide no precise definition of "customer" other than to state that a "customer shall not include a broker or dealer." *See* FINRA Rule 12100(i). The Second Circuit, however, has unequivocally stated that the term "customer" is to be construed broadly. *See, e.g.*, *Bensadoun v. Jobe-Riat, et al.*, 316 F.3d 171, 176 (2d Cir. 2003); *John Hancock Life Ins. Co. v. Wilson, et al.*, 254 F.3d 48, 59 (2d Cir. 2001). Moreover, if there is any ambiguity as to the definition of "customer," the Court is "compelled to construe the provision in favor of arbitration, unless [it] could say with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *John Hancock Life Ins. Co.*, 254 F.3d at 59 (internal citations and quotations omitted).

The Second Circuit has also held that general denials of a customer relationship are insufficient. *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 357 (2d Cir. 1995) ("Although Oppenheimer repeatedly uttered general denials of Claimants' contentions, it offered no evidence casting doubt on the accuracy of Claimants' evidence or on the inference from this evidence that they are customers."). Moreover, a direct customer relationship between the member and customer is not required, *John Hancock Life Ins. Co.*, 254 F.3d at 60, and an investor need not open an account to be a customer, *Oppenheimer & Co., Inc.*, 56 F.3d at 357.

Rather, for a customer relationship to exist, courts look for a nexus between the investor and the member in order for a party to take advantage of the arbitration provision provided by

13

the various securities' regulators. *See John Hancock Life Ins. Co.*, 254 F.3d at 60. Relying on

the advice of a broker is sufficient to create a customer relationship. *See, e.g.*, *Oppenheimer*, 56

F.3d at 357 (holding that if an associated person of the member firm induces, or shepherds, the

investment, then the investor is likely a customer of that firm); *John Hancock Life Ins.*, 254 F.3d

at 59 (same); *Lehman Bros., Inc. v. Certified Reporting Co.*, 939 F. Supp. 1333, 1340 (N.D. Ill.

1996) (finding that a customer relationship arose with a broker when investors purchased stocks

in reliance on advice from that broker, even when the investors' actual purchase of stocks was

accomplished through other brokerage firms).[8]

> As summed up by New York's Supreme Court, Appellate Division, First Department:

> > When the investor deals with an agent or representative of a member, the investor deals with the member, and on that basis the investor is entitled to have resolved in arbitration any dispute that arises out of that relationship. Customer status is not negated by an investment firm's lack of knowledge as to its representatives' customers. Reliance on the advice or recommendation of the registered representative will suffice and it is not required that he or she be the broker of record . . . The Rule does not require the sale of a security. It suffices that there was a business relationship with the representative that related directly to investment services.

*Fin. Network Inv. Corp. v. Becker*, 305 A.D.2d 187, 188-89 (1st Dep't 2003).[9]

> Here, VCG is undeniably a customer of CGMI:

- VCG has had an ongoing business relationship with CGMI since 2006. Wong Decl. ¶ 8.

- That relationship arose through written and oral agreements and business dealings. *Id.* at ¶ 9.

---

[8] *See also, e.g.*, *Hornor, Townsend & Kent, Inc. v. Hamilton*, 218 F. Supp. 2d 1369, 1383 (N.D. Ga. 2002) (holding that a customer relationship exists if one actively participated in the sale of the investment and profited from the sale), *vacated on other grounds*, No. Civ.A.1:02 CV 2979 J, 2003 WL 23832424 (N.D. Ga. Sept. 29, 2003); *In the matter of the arbitration between MML Investors Servs., Inv. and William D. Pittman Co., Inc.*, 210 A.D.2d 868, 868-69 (3d Dep't 1994).

[9] FINRA members are held responsible for the actions of its agents/employees. *See, e.g.*, *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 357 (2d Cir. 1995).

- During this relationship, VCG was in almost constant contact with CGMI by telephone and e-mail about potential deals, such as offers by CGMI to sell the equity and debt from collateralized debt obligations, and offers to sell debt from mortgage backed securities. *Id.* at ¶ 10.

- VCG and its representatives regularly communicated with several CGMI employees, including Jeff Gapusan, Donald Quentin, and Jaime Aldama. *Id.*

- In mid-2006, almost a year before the brokered CDS contract at issue here, VCG entered into with CGMI: (i) a master repurchase agreement, (ii) a global master repurchase agreement, and (iii) an institutional futures agreement. *Id.* at ¶ 12.

- In the summer of 2007, in the regular course of its business dealings with CGMI, VCG asked CGMI about the possibility of entering into a CDS trade. *Id.* at ¶ 14.

- CGMI recommended CDS trades relating to several underlying debt instruments, one being Class B Notes of Millstone III CDO Ltd. III-A, a CDO. *Id.* at ¶ 15.

- VCG was advised by CGMI that this was a "clean deal" with highly-rated collateral. *Id.* at ¶ 17.

- Relying on CGMI's advice, VCG agreed to this transaction. *Id.* at ¶ 18.

- In addition to recommending the investment, CGMI set the terms of the transaction. *Id.* at ¶ 19. In this case, the fee to be paid to CGMI was 5.5% per annum, calculated on the "notional amount" of $10,000,000 of the collateralized debt obligation, Millstone. *Id.* VCG was required to place $2,000,000 as "initial margin" to secure the obligation. *Id.* In return, VCG agreed to pay CGMI only upon the occurrence of a credit event. *Id.* Neither VCG nor CGMI were to hold the collateralized debt obligation. *Id.* Rather, the contractual relationship concerned the CDS only. *Id.*

- The terms of the contract were negotiated directly with CGMI employee, Jeff Gapusan, who acted as liaison for the trading desk at CGMI. *Id.* VCG and Mr. Gapusan communicated regularly during this time, including by telephone. *Id.*

Thus, even at this early juncture the facts support a finding of a customer relationship, as they show: (i) VCG's lengthy and ongoing relationship with CGMI, and (ii) CGMI recommendation and setting of the terms of the CDS which gave rise to the Arbitration.[10]

---

[10] As VCG's counsel told the Court during the June 26, 2008 hearing, VCG should be permitted to conduct discovery in connection with its opposition to the Motion. Because the Motion scarcely addresses the existence *vel non* of the dispositive customer relationship between the parties, it is extremely likely that CGMI will attempt to

The Northern District of California decisions that that plaintiff cites in passing do not

suggest otherwise. For example, in *Herbert J. Sims & Co., Inc. v. Roven*, 548 F. Supp. 2d 759,

765 (N.D. Cal. Mar. 7, 2008), see Pl.'s Mot. at 9, the court found a customer relationship lacking

because, among other reasons, the "[i]nvestors themselves did not [have] any communications,

written or oral, with Plaintiff or . . . Plaintiff's employee." By contrast, here VCG and CGMI

were in constant communication since 2006 and in particular during the summer of 2007 when

CGMI recommended and set the terms of the CDS which gave rise to the Arbitration.[11]

In *World Group Secs. v. Ko*, No. C035055 MJJ(EDL), 2004 WL 1811145 (N.D. Cal. Feb.

11, 2004), *see* Pl.'s Mot. at 9, the court stayed arbitration, finding that the defendant had

---

rebut the facts set forth herein in its reply brief. To the extent that plaintiff attempts to submit any facts on reply that are not set forth in the June 20, 2008 Memorandum of Law in support of its Motion, VCG should have the opportunity to test those facts in discovery, because:

1. Fed. R. Civ. P. 65 clearly contemplates discovery conducted in connection preliminary injunction motions. *See, e.g., Davis, et al. v. Hernandez, et al.*, 166 F.3d 432, 438 (2d Cir. 1999) ("motions for preliminary injunction should not be resolved on the basis of affidavits that evince disputed issues of fact"); *Fengler, et al. v. Numismatic American, Inc., et al.*, 832 F.2d 745 (2d Cir. 1987) (holding that "on a motion for preliminary injunction, where essential facts are in dispute, there must be a hearing and appropriate findings of fact must be made . . . A party against whom an injunction is sought will be found to have waived its right to a hearing only where the party was demonstrably 'content to rest' on affidavits submitted to the court."); 11 Wright & Miller, Fed. Prac. & Proc., § 2949 (2008) ("[I]f there is a factual controversy, oral testimony is preferable to affidavits because of the opportunity it provides to observe the demeanor of the witnesses. Accordingly, a motion for preliminary injunction supported only by written evidence usually will be denied when the facts are in dispute.").

2. The Federal Arbitration Act specifically provides that "[i]f the making of the arbitration agreement . . . be in issue, the [district] court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. While VCG has yet to file a motion to compel arbitration—based on its view that the Court should quickly dispose of plaintiff's frivolous Motion—should it be necessary VCG will file the necessary motion such that the appropriate discovery and trial take place expeditiously.

Accordingly, to the extent the Court is disinclined to deny plaintiff's Motion outright, VCG respectfully requests the opportunity to conduct discovery regarding the facts necessary to demonstrate its customer relationship with CGMI for purposes of the FINRA Rules.

[11] Moreover, *Sims* is inapposite because it involved two brokers where there was no disclosed agency relationship between the investors' agent and the brokerage firm through which the investment was actually made. *See Herbert J. Sims & Co., Inc.*, 548 F. Supp. 2d at 765-66 ("Defendants cite no case, nor can the Court find any, that supports the proposition that an investment made through a brokerage firm, on advice from an agent at a separate firm, creates a customer relationship between the investor and the latter firm on the basis of agency principles."). Here, by contrast, CGMI knew that VCG was the customer at all times, Wong Decl. ¶¶ 14, 22, and therefore there was a disclosed agency relationship.

16

"attempt[ed] to piggyback his brother's personal claims on the arbitration agreement that Defendant [had] with Plaintiff," despite the fact that the brother had *died* two years *before* the plaintiff-NASD member was formed. Here, of course, VCG's claims in the Arbitration arose during its long-standing customer relationship with FINRA member CGMI.[12]

### c.    VCG's Dispute With CGMI Arose In Connection With CGMI's Business Activities

The Rule requires that the arbitrable dispute arise in connection with CGMI's business activities. "[I]nformal business relationships, even tenuous connections among the customer, associated person, and . . . member are sufficient compel arbitration." *Beer v. Nutt*, No. 06 Civ. 94224 (HB), 2007 WL 13100, at *4 (S.D.N.Y. Jan. 3, 2007). Here, VCG's Arbitration Demand alleges highly inappropriate conduct clearly related to CGMI's business activities. *See supra*, at pp. 7-8.

In other words, by recommending and setting the terms for the CDS, CGMI violated FINRA Conduct Rules. The conduct VCG complains about in its Arbitration Demand plainly relates to CGMI's "business activities" and is therefore subject to arbitration.

*        *        *

VCG has clearly met all of the FINRA Rule 12200 criteria necessary to pursue the Arbitration. The fact that plaintiff's Motion does not even reference the basis on which VCG commenced the arbitration is telling. Like any litigant, plaintiff is entitled to vigorous advocacy. It is not, however, entitled to its own facts, particularly when the facts that it deliberately omitted from its Motion are fatal to its claim for injunctive relief.

---

[12] Plaintiff's counsel's apparent reliance at the June 26, 2008 hearing before the Court on the (i) 2002 ISDA Master Agreement between Citibank, N.A. and CDO Plus Master Fund Ltd., and (ii) VCG's May 21, 2008 Initial Disclosures in the SDNY Action, to disclaim a customer relationship is entirely misplaced. The ISDA Master Agreement, which purports to disclaim any *fiduciary* relationship between VCG and Citibank, N.A. and any of its affiliates, has no bearing on the discrete issue before this Court in this action—*arbitrability* of a *customer* dispute. Moreover, the Initial Disclosures were served in a case where CGMI is not even a party and the claims, as noted earlier, are entirely distinct.

17

ii.    **The Prime Brokerage Agreement Is Irrelevant To The Arbitration**

As set forth below, CGMI's reliance on the PBA is unavailing because, by its plain terms, that agreement does not apply to the instant dispute.

Paragraph 20 of the PBA—the "no arbitration" clause—states:

> No dispute or controversy between the parties hereto arising out of or relating to this agreement or any transaction hereunder or breach hereof or thereof shall be subject to or settled by arbitration. Each party submits to the nonexclusive jurisdiction of the U.S. federal and New York State courts.

Pl.'s Compl. at Ex. A.

The "no arbitration" clause is thus *limited* to "any action arising out of this Agreement or any transaction thereunder." However, the Arbitration does *not* arise out of the PBA and is *not* a "transaction thereunder."

The preamble to the PBA acknowledges that it is not the exclusive arrangement between VCG and CGMI, but merely "supplements any other agreement." *Id.* Paragraph 1 limits the scope of services covered by the PBA to those services involving "clearance and settlement" of trades executed by other "executing brokers." *Id.* Paragraph 1 further limits the services provided under the Agreement to those products listed on Schedule A. *Id.* Schedule A provides that the PBA is limited solely to "Fixed Income Securities." *Id.* This limiting language makes the PBA irrelevant to the CDS for two reasons:

1. The CDS which CGMI recommended and set the terms for involving VCG is not a "Fixed Income Security," which is an investment that provides a return in the form of fixed periodic payments and the eventual return of principal at maturity. Wong Decl. ¶ 20. Here, the CDS does not provide for such a return. *Id.* Indeed, the transaction at issue is not even by definition a "security." *See* Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, § 302(a), 114 Stat. 2763, 2763A-451.

2. The CDS did not involve the "clearing and settlement" of trades by other "executing brokers" and is therefore not within the scope of services covered by

the Agreement. CGMI admits so in its Motion. *See* Pl.'s Mot. at 6 (CGMI did not "clear or settle the CDS Contract."). Not surprisingly, the CDS does not appear on the prime brokerage reports provided to VCG by Citibank, N.A. D'Amore Decl. at ¶¶ 4-5.

Thus, the CDS brokered by CGMI was a business transaction having *nothing* to do with prime brokerage services. Rather, the transaction involved *other* types of brokerage services for a non-security investment product, involving a course of dealing in other types of investment products between customer VCG and broker CGMI without any outside "executing broker."

Ironically, the *only* effect of the "no arbitration" clause in the PBA is to establish another violation of FINRA Rules prohibiting such clauses. *See* FINRA Conduct Rule 3110(f)(4)(B) ("No predispute arbitration agreement shall include any condition that . . . limits the ability of a party to file any claim in arbitration."). Plaintiff's "unclean hands" should not be rewarded and in fact precludes any equitable relief from this Court. *See, e.g., Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 505 (S.D.N.Y. 2003) ("the estoppel doctrine invoked by defendants is rooted in equity, and is therefore subject to the equitable maxim that 'he who comes into equity must come with clean hands'" (internal citations omitted)).

In sum, the PBA does not, and cannot, limit VCG's right to pursue the Arbitration. Plaintiff's reliance on the PBA is groundless, and offers no support to its Motion.

### iii.    Arbitrability Is The Only Issue Properly Before The Court On CGMI's Motion

As a matter of subject matter jurisdiction, the sole issue before this Court is the arbitrability of VCG's claims against CGMI under the auspices of FINRA. *See, e.g., John Hancock Life Ins. Co.*, 254 F.3d at 53 ("Issues of 'arbitrability' are presumptively for the court to decide, while issues other than 'arbitrability are presumptively for the arbitrator."). "In deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to

19

rule on the potential merits of the underlying claims." *Longstreet Assocs., L.P. v. Bevona*, 16 F. Supp. 2d 290, 294 (S.D.N.Y. 1998).

In evaluating the arbitrability of VCG's claim, the Court must recognize and acknowledge "the strong public policy in favor of arbitration." *Longstreet Assocs., L.P. v. Bevona*, No. 98 Civ. 0128 (BSJ), 1998 WL 27134, at *1 (S.D.N.Y. Jan. 23, 1998) (citing *Ermenegildo Zegna Corp. v. Zegna*, 133 F.3d 177 (2d Cir. 1998)). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . [U]nless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute, the federal courts are obliged to find a particular claim falls within the scope of an arbitration clause." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 389-90 (2d Cir. 2007) (internal citations and quotations omitted).

CGMI attempts to divert this Court's attention away from its sole duty of determining arbitrability, by focusing on extraneous procedural issues, such as a purported "significant waste of time and resources" or "duplicative depositions" in connection with the Arbitration. These issues, however, are for arbitrators to determine, and are totally irrelevant to the issue of arbitrability and outside the subject matter jurisdiction of this Court. *See, e.g., Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83-84 (2002) ("The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is an issue for judicial determination . . . At the same time the Court has found the phrase 'question of arbitrability' *not* applicable in other kinds of general circumstance where parties would likely expect that an arbitrator would decide the gateway matter. Thus 'procedural' questions which grow out of the dispute and bear on its final disposition are presumptively *not* for the judge, but for an arbitrator, to decide. So, too, the presumption is that the arbitrator should decide 'allegations of waiver,

delay, or a like defense to arbitrability." (emphasis in original, internal citations and quotations omitted)); *Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n, Local 38*, 351 F.3d 43, 45-46 (2d Cir. 2003) (relying on *Howsam* and holding that the issue of repudiation of an arbitration agreement "most closely resembles the defenses to arbitrability such as waiver, estoppel, or delay that the Supreme Court listed as questions properly decided by arbitrators").[13]

### iv.    VCG Has Not Waived Its Right To Arbitrate

CGMI's claims that VCG has "waived" its right to arbitration and is attempting an "end run" around the SDNY Action are wholly without merit. As plaintiff's own cases make clear, there is a waiver of a right to arbitrate only when (i) there is "prior litigation of the *same legal and factual issues* as those the party now wants to arbitrate," (ii) against the *same* party. *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 132-33 (2d Cir. 1997) (emphasis added). Thus, there is no waiver if the two suits involve different issues or different parties. "[B]ecause of the strong federal policy favoring arbitration, courts resolve doubts as to whether waiver occurred in favor of arbitration." *Id.* at 130; *see also Cotton v. Slone*, 4 F.3d 176, 179 (2d Cir. 1993) ("We have emphasized that there is a strong presumption in favor of arbitration, and that waiver of the right to arbitration is not to be lightly inferred." (internal citations and quotations omitted)).

Here, plaintiff relies on mere conclusory assertions to support its argument. *See, e.g.*, Pl.'s Mot. at 14 ("both the FINRA Arbitration and the SDNY Action relate to the CDS Contract"). But CGMI ignores the dispositive issue—VCG's Arbitration Demand alleges violations of FINRA Conduct Rules concerning CGMI's recommendation and setting of the CDS's terms. These claims arose well *before* the acts giving rise to the SDNY Action, and the

---

[13] Notably, depositions are generally not permitted in FINRA arbitrations so CGMI's concerns are entirely misplaced. *See* FINRA Rule 12510 ("Depositions are strongly discouraged in arbitration. Upon motion of a party, the panel may permit depositions, but only under very limited circumstances . . . .").

two proceedings therefore involve different claims for distinct conduct committed by two different entities.[14]

As a result, the issues raised in the Arbitration will not be adjudicated in the SDNY Action. There can be no waiver by VCG under such circumstances. Moreover, CGMI will not (and cannot) suffer any prejudice to its legal position in having to defend against distinct claims in two different forums. *See, e.g., PPG Indus., Inc. v. Webster Auto Parts Inc.*, 128 F.3d 103, 107 (2d Cir. 1997) ("[P]rejudice as defined by our cases refers to the inherent unfairness - in terms of delay, expense, or damage to a party's legal position - that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue. Incurring legal expenses inherent in litigation, without more, is insufficient evidence of prejudice to justify a finding of waiver.").

### B.    CGMI Cannot Suffer Harm—Must Less Irreparable Harm—By Being Required To Fulfill Pre-Existing Legal Duties

CGMI voluntarily consented to arbitration by virtue of its membership in FINRA. Because CGMI is not being forced to arbitrate, it cannot be said that CGMI is suffering harm— much less irreparable harm—by participating in the Arbitration. *See, e.g., O.N. Equity Sales Co. v. Staudt*, No. 2:07-CV-142, 2008 WL 271329, at \*5 (D. Vt. Jan. 30, 2008) ("In the absence of any likelihood of [plaintiff's] success on the merits, there is no threat of irreparable harm to [plaintiff] by compelling it to arbitrate."); *WMA Secs., Inc. v. Rupert, et al.*, 80 F. Supp. 2d 786, 790-91 (S.D. Ohio 1999) ("The harm asserted by Plaintiff is that it would be forced to defend itself against claims in a forum to which it has not agreed. Having concluded that NASD Rule

---

[14] The Second Circuit has unequivocally held that there is no waiver under such circumstances. *See, e.g., Doctor's Assocs., Inc.*, 107 F.3d at 132 ("First, we can easily dispose of the argument that DAI waived its right to arbitrate claims brought by franchisees against whom DAI never instituted eviction proceedings. In *Stuart*, we held that DAI 'obviously' had not waived its right to arbitrate claims brought by franchisees against whom DAI had never instituted particular eviction proceedings.").

22

10301(a) [predecessor to FINRA Rule 12200] is tantamount to an agreement to arbitrate the claims Defendants have asserted, the Court further concludes that Plaintiff will not suffer irreparable harm if it is compelled to arbitrate those claims."); *Lawrence v. Wilder Richman Secs. Corp.*, 359 F. Supp. 2d 161, 166-67 (D. Conn. 2005) (holding plaintiff failed to establish irreparable harm because, *inter alia*, "the Federal Arbitration Act, which governs the NASD arbitration at issue here, requires arbitration 'even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.'" (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985))).

The only other conceivable harm that CGMI may suffer is the expenditure of legal fees, which are fully compensable by money damages, and therefore not irreparable. FINRA Rule 12904(e) specifically provides that the arbitrator may award "damages and other relief." Thus, plaintiff is not precluded from pursuing those fees and costs to which it believes it may be entitled to in the arbitration. *See, e.g.*, *Intercity Co. Establishment v. Ahto, et al.*, 13 F. Supp. 2d 253, 264 (D. Conn. 1998) (citing *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1202 (2d Cir. 1996)) ("The NASD Code provides that the arbitrators may award 'damages and other relief.' Absent a provision in the arbitration agreement foreclosing attorney's fees as a remedy, respondents were not precluded from seeking fees and there was nothing improper in their award."); *Porush v. Lemire*, 6 F. Supp. 2d 178, 186 (E.D.N.Y. 1998).

### C.     The Balance of Hardships Favors VCG

As a customer of CGMI, VCG is entitled to pursue the Arbitration, which relates to CGMI's unique duties as a FINRA member and seeks relief only available through the FINRA arbitration process. Indeed, granting the relief CGMI seeks would result in a ***permanent denial*** of a remedy, for damages caused by violation of FINRA Conduct Rules, that is ***only*** available to

VCG through the Arbitration.  Denying VCG this right would be manifestly unfair.  *See, e.g.,* *WMA Secs., Inc.*, 80 F. Supp. 2d at 790 ("Defendants would be harmed by the issues of an order enjoining the arbitration proceeding they have initiated.  Such an order would deprive them of the forum of their choice and the ability of that forum to dispose of claims rapidly and without the delays associated with the court systems.").

Moreover, CGMI's conclusory assertions regarding burden and "duplicative" discovery are irrelevant.  As noted earlier, the sole issue before this Court is arbitrability.  Once this Court finds—as it should—that CGMI is properly subject to the Arbitration, the Court's inquiry should end.  VCG's choice of forum—in fact only forum to seek redress of breaches of FINRA conduct rules—should be respected and tips the balance of hardships decidedly in its favor.

\*        \*        \*

As noted above, the grant of injunctive relief is an extraordinary remedy.  At this early stage of the proceedings, plaintiff has utterly failed to show a likelihood of success on the merits, irreparable harm, or a balance of hardships tipping decidedly in its favor.  Given that CGMI is required to arbitrate a dispute requested by its customer, VCG, pursuant to the regulatory framework it has voluntarily consented to, it is clear that plaintiff's motion for a preliminary injunction should be denied.

## II.    VCG Is Entitled To Its Attorneys' Fees and Costs

VCG hereby requests its attorneys' fees and costs incurred in opposing plaintiff's meritless and wasteful Motion in accordance with 28 U.S.C. § 1927 and the inherent powers of this Court.

As set forth above, plaintiff withheld crucial facts from its moving papers in a deliberate attempt to mislead this Court.  Specifically, CGMI's failure to mention in its Motion the basis

upon which VCG sought arbitration cannot be considered a mere oversight.  Under such

circumstances, this Court has previously found the award of fees and costs appropriate:

> Defendant has moved for an award of attorneys fees 'for having to
> defend against this unreasonable and untimely action.'  Although
> there is no statutory authority for the award of attorneys' fees in
> these circumstances, the Court has the legal authority to award
> such fees where 'the party refusing arbitration acted without
> justification or did not have a reasonable chance to prevail.'  Here,
> Plaintiffs have failed to make even a colorable argument
> explaining why A1 Nasser could not require the Individual
> Plaintiffs to arbitrate, but instead decided to mischaracterize or
> ignore the law of the Circuit -- a tactic that they could not have
> expected to 'have a reasonable chance to prevail.'    Thus,
> Defendant is entitled to an award of attorneys' fees, and he is
> directed to submit an affidavit itemizing costs and attorneys fees
> within ten days of the date of this Opinion and Order.

*Sands Bros. & Co. v. Nasser*, No. 03 Civ. 8128 (BSJ), 2004 WL 26550, at *3 (S.D.N.Y. Jan. 5,

2004).  VCG is therefore entitled to recovery of its attorneys' fees and costs in opposing the

Motion.[15]

---

[15] Factual omissions may be the basis for a violation of Rule 11.  *See, e.g., In re Ronco, Inc.*, 838 F.2d 212, 218 (7th
Cir. 1988); *Sharjah Inv. Co. Ltd. v. P.C. Telemart, Inc.*, 108 F.R.D. 90, 92-93 (S.D.N.Y. 1985) (attorney was
sanctioned under Rule 11 for failure to disclose a material fact); *Itel Containers Int'l Corp. v. Puerto Rico Marine
Mgmt., Inc.*, 108 F.R.D. 96, 102 (D.N.J. 1985) ("The defense argument that it did not contain a false statement not
only overlooks that falsity may lie in omission as well as commission.").

In *Ronco*, the Seventh Circuit explained that:

> While the appellant did not misstate an empirical fact, it did omit facts that were
> highly relevant to an accurate characterization of the facts that were stated. Such
> an obvious omission placed a heavy burden on the court.  The presentation
> amounts, in its totality, to a half-truth that can be just as misleading, sometimes
> more misleading, than an absolutely false representation.  For purposes of
> determining whether sanctions are appropriate, it is not relevant that a later
> submission by the appellees brought the truth to light . . . . The impact on the
> court and on the opposing party occurs when the initial omission is made. Later
> correction does not permit a recoupment of the time, energy or, in some cases,
> money that has already been expended.

*In re Ronco*, 838 F.2d at 218.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiff's Motion in its entirety.

Further, VCG respectfully requests that this Court award its attorneys' fees and costs incurred in preparing this opposition, in accordance with 28 U.S.C. § 1927 and the inherent powers of this Court.

Dated: New York, New York
      July 23, 2008                     Respectfully submitted,

**DREIER LLP**

By: /s/ Joshua H. Epstein
     Joshua H. Epstein (JE 2187)
     Alan S. Gruber (AG 3086)
499 Park Avenue
New York, New York 10022
Telephone: (212) 328-6100
Facsimile: (212) 328-6101
jepstein@dreierllp.com
agruber@dreierllp.com

*Attorneys for Defendant*

26