UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITIGROUP GLOBAL MARKETS INC.,

        Plaintiff,

-against-

VCG SPECIAL OPPORTUNITIES MASTER FUND LIMITED f/k/a CDO Plus Master Fund Limited,

        Defendant.

No. 08 CV 5520 (BSJ)

## DECLARATION OF JONNATHAN X. WONG IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Jonnathan X. Wong, pursuant to 28 U.S.C. § 1746, declares:

1. I am a Portfolio Manager for Vanquish Capital Group, whose subsidiary Vanquish Advisors LLC serves as the investment manager to VCG Special Opportunities Master Fund Limited (f/k/a/ CDO Plus Master Fund Limited) ("VCG"), defendant in the above-captioned action, and acts as the agent for VCG in dealing with plaintiff, Citigroup Global Markets Inc. ("CGMI"). Unless otherwise indicated, I have personal knowledge of the following facts.

2. I have been employed by Vanquish Capital Group for 1.5 years. As a Portfolio Manager, I focus on managing the firm's investment in asset-backed securities, mortgage and collateralized debt obligations ("CDOs").

3. Prior to joining Vanquish Capital Group, I was part of the CDOs Investment Management Team at AllianceBernstein, focusing on the management of the firm's CDOs as well as investing in secondary CDO tranches for various accounts. I also served as a

market analyst in the CDO-Structured Finance Group of LPC-Reuters where I modeled and performed in-depth analysis of CDOs. Additionally, I have worked as an analyst for Citigroup's Corporate and Investment Bank in the Emerging Markets Group where I was based in South America. I received a B.S. in International Economics from Georgetown University's School of Foreign Service.

4. VCG is an Isle of Jersey exempted corporation having its principal place of business at Le Masurier House, St. Helier JE2 4YE Jersey, Channel Islands.

5. VCG, a hedge fund, was formerly known as CDO Plus Master Fund Limited ("CDO Plus").

6. In June 2007, VCG had only eight investors and net assets of approximately $25 million.

7. I was intimately involved in the credit default swap transaction which gave rise to the FINRA arbitration at issue here. CGMI recommended and set the terms for this transaction. My colleagues and I, as agents for VCG, dealt with several CGMI representatives in connection with the transaction, but most often with Jeff Gapusan, Donald Quentin, and Jaime Aldama. Attached hereto as Exhibit A are true and correct copies of the business cards for Messrs. Gapusan, Quentin, and Aldama, which reflect their employment by CGMI, and upon which I relied in dealing with them.

VCG Was A Long-Standing Customer of CGMI

8. VCG has been a customer of CGMI since 2006.

9. This customer relationship arose through written and oral agreements and business dealings.

10. During this relationship, my colleagues and I were in constant contact with

2

CGMI by telephone and e-mail about potential deals, such as offers by CGMI to sell the equity and debt from collateralized debt obligations, and offers to sell debt from mortgage backed securities. In this regard, we regularly communicated with several CGMI employees, including Jeff Gapusan, Donald Quentin, and Jaime Aldama, and disclosed that we were acting as agents for VCG.

11. Jeff Gapusan, as a Salesperson, was in charge of managing VCG's relationship with CGMI. Donald Quentin and Jaime Aldama were traders on CGMI's Structured Finance desk.

12. Based upon information provided to me by my colleagues, I understand that in mid-2006, almost a year before the brokered credit default swap contract at issue here, VCG entered into with CGMI (i) a master repurchase agreement, (ii) a global master repurchase agreement, and (iii) an institutional futures agreement.

13. Based upon information provided to me by my colleagues, I understand that on July 17, 2006, VCG entered into a Prime Brokerage Agreement with CGMI.

CGMI Recommends A Credit Default Swap Transaction To VCG

14. In the summer of 2007, in the regular course of its business dealings with CGMI, as an agent of VCG, I asked CGMI about the possibility of entering into a credit default swap trade.

15. CGMI recommended to me as agent for VCG trades relating to several underlying debt instruments, one being Class B Notes of Millstone III CDO Ltd. III-A, a CDO ("Millstone").

16. A credit default swap is a contract under which two financial institutions trade the default risk of a debt instrument, such as a corporate bond or, in this case, a CDO. It

bears some similarities to an insurance policy, except that neither counterparty to the swap necessarily holds the debt instrument on which the swap is based. Under the credit default swap agreement, one party (the "protection buyer") pays a fixed, periodic fee to the seller of the swap. In return for receiving the fee, the seller of the swap agrees to undertake the credit exposure of the underlying debt instrument, *i.e.*, to pay all or a portion of the unpaid obligation to the buyer of the swap upon the triggering of certain credit defaults.

17. VCG was advised by CGMI that this was a "clean deal" with highly-rated collateral.

18. Relying on CGMI's advice, VCG agreed to this transaction.

19. In addition to recommending the investment, CGMI set the terms of the transaction. In this case, the fee to be paid to CGMI was 5.5% per annum, calculated on the "notional amount" of $10,000,000 of the collateralized debt obligation, Millstone. VCG was required to place $2,000,000 as "initial margin" to secure the obligation. In return, VCG agreed to pay CGMI only upon the occurrence of a credit event. Neither VCG nor CGMI were to hold the collateralized debt obligation. Rather, the contractual relationship concerned the credit default swap only. The terms of the contract were negotiated directly with CGMI employee, Jeff Gapusan, who acted as liaison for the trading desk at CGMI. I communicated regularly with Mr. Gapusan during this time, including by telephone.

20. The credit default swap transaction which CGMI recommended and set the terms for involving VCG is not a "Fixed Income Security," which is an investment that provides a return in the form of fixed periodic payments and the eventual return of principal at maturity. The transaction VCG entered into does not provide for such a return.

21. All dealings by VCG and its representatives were with CGMI, which

recommended Millstone and set the terms of the transaction.

22.     I have no doubt that in recommending the specific credit default swap transaction that VCG bought and setting its terms, VCG clearly had a customer relationship with CGMI that related directly to investment services. Indeed, VCG could not have dealt with CGMI to the extent it did over the years, and specifically with regard to the credit default swap transaction involving Millstone, without being considered a customer.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: July 23, 2008

*/s/ Jonnathan X. Wong*

# EXHIBIT A



corporate and
investment banking

Donald J. Quintin
*Managing Director*
*Global Structured Credit Products*

Global Capital Markets
390 Greenwich Street- 4th Floor
New York, NY 10013
Tel 212 723 1024
Fax 212 898 0105
donald.j.quintin@citigroup.com

Member NYSE

Citigroup Global Markets Inc.



corporate and
investment banking

Jaime Aldama
*Director*
*Global Structured Credit Products*

Global Capital Markets
390 Greenwich Street, 4th Floor
New York, NY 10013
Tel 212 723 6453
Fax 212 723 8673
jaime.r.aldama@citigroup.com

Member NYSE

Citigroup Global Markets Inc.

citigroup
corporate and
investment banking

Jeffrey Gapusan
*Vice President*
*Global Fixed Income*

Global Capital Markets
390 Greenwich Street, 4th Floor
New York, NY 10013
Tel 212 723 6080
Fax 212 723 8856
jeffrey.gapusan@citigroup.com

Member NYSE

Citigroup Global Markets Inc.