UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITIGROUP GLOBAL MARKETS INC.,<br><br>                    Plaintiff,<br><br>v.<br><br>VCG SPECIAL OPPORTUNITIES MASTER<br>FUND LIMITED f/k/a CDO PLUS MASTER<br>FUND LIMITED,<br><br>                    Defendant. | No. 08 CV 5520 |

## PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  212-373-3000
Facsimile:  212-757-3990

Attorneys for Plaintiff Citigroup
Global Markets Inc.

## TABLE OF CONTENTS

Page

Preliminary Statement ................................................................................................ 1

Argument ..................................................................................................................... 4

    I.    VCG HAS FAILED TO ESTABLISH ANY AGREEMENT TO
         ARBITRATE ................................................................................................ 5

        A.    VCG Was Not a Customer of CGMI With Respect to the CDS
            Contract ................................................................................................ 5

        B.    The CDS Contract Did Not Arise in Connection With CGMI's
            Business Activities ............................................................................. 10

        C.    VCG Submitted to the Exclusive Jurisdiction of the New York
            Courts With Respect to Any Dispute In Connection with the
            CDS Contract ...................................................................................... 12

    II.    CGMI WILL SUFFER IRREPARABLE HARM ABSENT
         INJUNCTIVE RELIEF ............................................................................... 12

    III.    FOR THESE SAME REASONS, CGMI HAS DEMONSTRATED A
         LIKELIHOOD OF SUCCESS ON THE MERITS; AT THE LEAST,
         THE BALANCE OF HARDSHIPS FAVORS INJUNCTIVE RELIEF ............. 13

    IV.    VCG IS NOT ENTITLED TO ATTORNEYS' FEES AND COSTS;
         IF ANYONE IS, IT IS CGMI THAT IS ENTITLED TO FEES AND
         COSTS ....................................................................................................... 15

Conclusion ................................................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdelhamid* v. *Altria Group, Inc.*,
   515 F. Supp. 2d 384 (S.D.N.Y. 2007) ................................................................. 15

*Almontaser* v. *N.Y. City Dep't of Educ.*,
   519 F.3d 505 (2d Cir. 2008) ............................................................................. 4

*Barrack, Rodos & Bacine* v. *Ballon Stoll Bader & Nadler, P.C.*,
   2008 WL 759353 (S.D.N.Y. 2008) .................................................................... 4

*Bavaria Int'l Aircraft Leasing GmbH* v. *Clayton, Dubilier & Rice, Inc.*,
   No. 03 Civ. 0377, 2003 WL 21767739 (S.D.N.Y. July 30, 2003) ........................ 7

*Bensadoun* v. *Jobe-Riat*,
   316 F.3d 171 (2d Cir. 2003) ............................................................................. 5

*Dattner* v. *ConAgra Foods, Inc.*,
   458 F.3d 98 (2d Cir. 2006) .............................................................................. 15

*In re Alper Holdings USA*,
   No. 07 Civ. 12148, 2008 WL 541154 (Bkrtcy. S.D.N.Y. Feb. 25, 2008) .............. 7

*Jackson Dairy, Inc.* v. *H.P. Hood & Sons, Inc.*,
   596 F.2d 70 (2d Cir. 1979) ............................................................................... 4

*Lewis* v. *Credit Suisse First Boston Corp.*, NASD Dispute Resolution Award, Docket No. 03-
   06140, 2004 WL 383337 (Feb. 2, 2004) ............................................................. 5

*Masefield AG* v. *Colonial Oil Indus., Inc.*,
   No. 05 Civ. 2231, 2005 WL 911770 (S.D.N.Y. Apr. 18, 2005) .......................... 13

*Merrill Lynch Inv. Managers* v. *Optibase, Ltd.*,
   337 F.3d 125 (2d Cir. 2003) ........................................................................... 13

*Revson* v. *Cinque & Cinque, P.C.*,
   221 F.3d 71 (2000) ........................................................................................ 15

*Sands Bros. & Co., Ltd.* v. *Ettinger*,
   2004 WL 541846 (S.D.N.Y. Mar. 19, 2004) .................................................. 5, 6

*Tellium, Inc.* v. *Corning Inc.*,
   No. 03 Civ. 8487, 2004 WL 307238 (S.D.N.Y. Feb. 13, 2004) ..................... 12, 13

STATUTES

15 U.S.C.A. § 78a ................................................................................................................ 10

By-Laws of NASD Regulation, Inc., Article I .......................................................................... 10

Section 12200 of the NASD Code of Arbitration Procedure for Customer Disputes ................... 5

Plaintiff CGMI[1] respectfully submits this reply memorandum of law in further support of its motion for a preliminary injunction, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, enjoining defendant VCG from proceeding with VCG's purported FINRA Arbitration against CGMI during the pendency of the current action, in which CGMI seeks, among other things, an order permanently enjoining VCG from proceeding with the FINRA Arbitration.

## Preliminary Statement

VCG's opposition papers are replete with shrill rhetoric and meritless accusations of misconduct on CGMI's part, but they utterly fail to demonstrate how CGMI ever agreed to arbitrate any of VCG's claims as to VCG's CDS Contract with CGMI's affiliate, Citibank, N.A. ("Citibank").

The fact of the matter remains that, as is clear from its own submission, VCG is a sophisticated hedge fund that knowingly negotiated and entered into the CDS Contract with Citibank – not CGMI. After market events caused the triggering of VCG's obligation to pay Citibank under the CDS Contract, VCG sued Citibank in this Court with respect to that CDS Contract (the "SDNY Action"). Indeed, in its papers in the SDNY Action, VCG has conceded that, in entering into the CDS Contract, VCG dealt with "Citibank employees" who sat on "the trading desk at Citibank." (Arffa Ex. 7 at 2-4.)[2]

---

[1]    Capitalized terms used in this reply memorandum of law have the same meaning as set forth in plaintiff's initial memorandum of law in support of its motion for a preliminary injunction.

[2]    Citations to "Arffa Ex. __" refer to exhibits attached to the Reply Declaration of Allan J. Arffa in Further Support of Plaintiff's Motion for a Preliminary Injunction, dated August 15, 2008 ("Arffa Decl.").

Perhaps realizing that its claims against Citibank as to the CDS Contract are likely to fail, VCG has seized upon the fact that the Citibank representatives it dealt with were formally employed by CGMI at the time of the CDS Contract, and the fact that CGMI is a registered FINRA broker-dealer. Accordingly, VCG now contends that it is entitled to a "second bite at the apple" by arbitrating with CGMI over the very same CDS Contract at issue in its action against Citibank.

In its opposition papers, however, VCG concedes it can only demonstrate the arbitrability of its claims against CGMI under the FINRA Rules if it proves that (a) it was a customer of CGMI, and (b) its claims as to the CDS Contract arise out of its business dealings with CGMI. Yet, VCG comes nowhere close to proving either proposition.

VCG has failed to produce any brokerage agreement with CGMI or brokerage account statements to substantiate any brokerage relationship between VCG and CGMI – other than its prime brokerage agreement with CGMI, which expressly provides for court litigation, not arbitration, and which VCG itself argues has no application here. Indeed, VCG can point to no agreement at all with CGMI that either suggests a brokerage relationship with CGMI (other than the prime brokerage relationship) or any agreement by CGMI to arbitrate VCG's claims as to its CDS Contract with Citibank.

While VCG wrongly accuses CGMI of "hiding the ball" with the Court (which it did not), it is VCG that fails to bring to the Court's attention what is arguably the most relevant fact of all. In the CDS Contract itself, VCG expressly acknowledged that, in entering into the CDS Contract, neither Citibank itself nor any of its affiliates (a term that would clearly include CGMI) acted as VCG's "advisor" with respect to the CDS Contract. VCG's entire position on this motion – that it can sue CGMI because CGMI "recommended"

2

the transaction to it – runs directly contrary to this unambiguous acknowledgement in the CDS Contract. In fact, VCG neglects to mention that, contrary to its position here, in the CDS Contract itself, VCG expressly agreed to bring *all claims* regarding that Contract in court proceedings, and not in any arbitration.

In fact, as its "evidence" of a brokerage relationship with CGMI, VCG offers only (a) the business cards of three Citibank representatives it says it negotiated the CDS Contract with, and (b) three entirely unrelated agreements between VCG and CGMI involving repurchase agreements (or "repos") and futures agreements. As to the business cards, they hardly suffice to prove either a brokerage relationship or an agreement to arbitrate. These individuals (who, unfortunately, are no longer employed at either Citibank or CGMI) were clearly acting on behalf of Citibank – not CGMI – when they negotiated the CDS Contract with VCG. VCG's own statements in the SDNY Action – that the individuals it dealt with on the CDS Contract were "Citibank employees," and in fact part of the "trading desk at Citibank" – make that clear. As to the other agreements with CGMI, they have absolutely no relationship at all to credit default swaps generally or the CDS Contract specifically.

As CGMI noted in its moving papers, CGMI simply did not "broker, clear or settle" the CDS Contract. VCG tries to belittle, yet it cannot refute, this fact. Nor could CGMI have brokered the CDS Contract; as VCG concedes, a credit default swap is a negotiated *contract*, not a *security* that is brokered.

In sum, CGMI is entitled to a preliminary injunction of the FINRA Arbitration because (a) VCG cannot establish CGMI's consent to arbitration, (b) CGMI will suffer irreparable harm should it be forced to arbitrate a non-arbitrable dispute, (c) CGMI has

3

demonstrated a likelihood of success on its claim for non-arbitrability, and (d) at the least, CGMI has raised serious issues as to its claim of non-arbitrability, and the balance of hardships strongly favors entry of a preliminary injunction pending final resolution of that claim.

<u>**Argument**</u>

The parties appear to agree that, to obtain a preliminary injunction in this Circuit, the moving party must show "irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor." *Almontaser* v. *N.Y. City Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008); *Barrack, Rodos & Bacine* v. *Ballon Stoll Bader & Nadler, P.C.*, 2008 WL 759353, at *4 (S.D.N.Y. 2008) (citing *Sweeney* v. *Bane*, 996 F.2d 1384, 1388 (2d. Cir. 1993)); *Jackson Dairy, Inc.* v. *H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979).

In its moving papers, CGMI demonstrated that it readily satisfied these standards here, because it never agreed to arbitrate any claim by VCG with respect to the CDS Contract. In fact, VCG's only brokerage agreement with CGMI was a prime brokerage agreement that expressly provides for court resolution, and not arbitration, of any disputes, and (b) CGMI simply had nothing to do with the CDS Contract, which was between VCG and Citibank, not CGMI.

In its opposition papers, VCG attempts to argue that CGMI in fact agreed to arbitrate any claims by VCG with respect to the CDS Contract. That argument is entirely unconvincing.

**I.**

## VCG HAS FAILED TO ESTABLISH ANY AGREEMENT TO ARBITRATE

VCG argues that, by virtue of CGMI's membership in FINRA, CGMI has consented to arbitrate VCG's claims relating to the CDS Contract, and accuses CGMI of hiding its FINRA membership and the FINRA rules from the Court. (VCG Mem. 1-2.) This theory, and VCG's accusations, are demonstrably false.

There is no dispute that CGMI is a registered broker/dealer and a member of FINRA. Nor is there any dispute that, under the FINRA rules, absent an agreement to the contrary, CGMI must arbitrate any dispute (a) **with a customer** arising (b) **in connection with CGMI's business** if that customer requests arbitration. *See* Section 12200 of the NASD Code of Arbitration Procedure for Customer Disputes. The FINRA Rule, however, is no substitute for an arbitration agreement here because the record is clear that: (a) VCG was *not* a customer of CGMI with respect to the CDS Contract, and (b) the CDS Contract did *not* arise in connection with CGMI's business as a broker-dealer.

**A.**    **VCG Was Not a Customer of CGMI With Respect to the CDS Contract**

As the party effectively seeking to compel a FINRA arbitration as to the CDS Contract, VCG must demonstrate that it was a customer of CGMI with respect to that transaction. *See Lewis* v. *Credit Suisse First Boston Corp.*, NASD Dispute Resolution Award, Docket No. 03-06140, 2004 WL 383337 (Feb. 2, 2004). "An investor is a 'customer' of a brokerage house, and able to compel the brokerage house to arbitrate, only for conduct that falls within the scope of the specific account between the investor and the brokerage house." *Sands Bros. & Co., Ltd.* v. *Ettinger*, 2004 WL 541846, at *3 (S.D.N.Y. Mar. 19, 2004); *accord, Bensadoun* v. *Jobe-Riat*, 316 F.3d 171, 178 (2d Cir. 2003). Moreover, even if

a brokerage relationship exists, an investor cannot demand arbitration on issues that fall outside the scope of that relationship.  *See Sands Bros.*, 2004 WL 541846, at *3.

Despite its conclusory assertions that "VCG has been a customer of CGMI since 2006" and the "customer relationship arose through written and oral agreements and business dealings" (VCG Mem. 4, 14; Wong Decl. ¶ 2), VCG fails to provide to the Court *any* brokerage agreement between VCG and CGMI – other than the prime brokerage agreement that disclaims arbitration and that VCG says does not apply here at all.  Nor does VCG provide any brokerage account or other account statements that would indicate a brokerage relationship between VCG and CGMI (again, other than their prime brokerage relationship).  Nor, finally, does VCG set forth the terms and conditions of any purported oral agreement between VCG and CGMI, in which CGMI agreed to act as VCG's broker or to arbitrate disputes as to the CDS Contract.

VCG has thus failed to provide any evidence to support its entitlement to arbitration.  The fact remains that the only "brokerage" agreement between VCG and CGMI is the Prime Brokerage Agreement, which expressly disclaims arbitration and which VCG argues has no relevance because the CDS Contract has "nothing to do with prime brokerage services." (VCG Mem. 18-19.)  Put another way, to the extent VCG is bringing claims against CGMI as its "broker," the Prime Brokerage Agreement is applicable because it is the only brokerage agreement between the parties.  Yet, the Prime Brokerage Agreement clearly provides that "no dispute or controversy" "arising out of or relating to" the agreement "shall be subject to or settled by arbitration."  (Complaint Ex. A, ¶ 20.)[3]

---

[3]   Though it concedes that the Prime Brokerage Agreement cannot serve as a basis for its FINRA claims, VCG argues that CGMI has "unclean hands" because the "no arbitration" clause in the Prime Brokerage Agreement violates FINRA Rule 3110(f)(4)(B).  (VCG

Thus, the only purported "evidence" VCG offers to establish a non-prime-brokerage relationship with CGMI are: (1) the communications its portfolio manager, Jonathan Wong, had with three individuals formally employed at CGMI (Wong Decl. ¶¶ 14-22), and (2) three agreements VCG signed with CGMI in mid-2006 (Wong Decl. ¶13; VCG Mem. 15). Neither argument has any merit.[4]

The fact that VCG had communications with individuals formally employed at CGMI is insufficient to establish a customer relationship between VCG and CGMI with respect to the CDS Contract. *See In re Alper Holdings USA*, No. 07 Civ. 12148, 2008 WL 541154, at *3 (Bkrtcy. S.D.N.Y. Feb. 25, 2008) (noting that liability based on the actions of an individual employed by two different entities depends on which "hat" the employee was wearing at the time of the conduct); *Bavaria Int'l Aircraft Leasing GmbH* v. *Clayton, Dubilier & Rice, Inc.*, No. 03 Civ. 0377, 2003 WL 21767739, at *3 (S.D.N.Y. July 30, 2003) (same).

The business cards of Jeff Gapusan, Donald Quintin and Jaime Aldama, attached to VCG's papers (Wong Decl. Ex. A) make clear that all three individuals were part of the Global Capital Markets group in Citigroup's Corporate and Investment Bank. (*Id.*) Their business cards do not identify them as brokers or financial advisors (*id.*); nor did those

---

Mem. 19.) FINRA Rule 3110(f)(4), however, applies only to "predispute arbitration agreement[s]," not agreements to litigate in lieu of arbitration. The policy behind Rule 3110(f) is to ensure that customers who agree to arbitrate can raise whatever claims they wish to bring in such an arbitration, not to prevent parties from electing court litigation over arbitration. *See* NASD Notice 05-09. In fact, the Rule itself refers to court proceedings which, under VCG's reading of the Rule, could never occur.

[4]   Notably, VCG relies on Jonnathan Wong for the conclusory statement that "VCG has been a customer of CGMI since 2006," even though Wong concedes he has only been employed by VCG for "1.5 years." (*Compare* Wong Decl. ¶ 2 and ¶ 8.)

three individuals in fact hold positions as brokers or financial advisors (Vogeli Decl ¶ 4-5.)[5]

Although Messrs. Gapusan, Quintin and Aldama were formally employed at CGMI, they

were part of sales and trading desks where they regularly dealt with counterparties on behalf

of different Citigroup entities, including Citibank.  (Vogeli Decl. ¶ 6.)

       In fact, all of these individuals' negotiations with VCG leading up to the CDS

Contract were on behalf of Citibank.  Thus, VCG completely ignores the undisputed fact

that, in September of 2006, VCG, through its dealings with these individuals, had entered

into an International Swaps and Derivatives Association, Inc. ("ISDA") 2002 Master

Agreement, the Schedule to the ISDA 2002 Master Agreement and the 1994 ISDA Credit

Support Annex, all with *Citibank* as VCG's counterparty, which documents set forth the

basic terms for contemplated future credit swap agreements between those parties (and which

in fact subsequently formed part of the parties' CDS Contract).  (Arffa Exs. 1-5.)  Indeed,

Citibank is the counterparty for all CDS transactions involving Citigroup, in which (as here)

CDO obligations serve as reference obligations for credit default swaps.  (Vogeli Decl. ¶ 13.)

       Accordingly, any conversations VCG had with Jeff Gapusan, Donald Quintin

and Jaime Aldama about credit default swaps in the summer of 2007 would have been in

their capacity as representatives of Citibank, with whom VCG already had in place an ISDA

Master Agreement that contemplated such swap transactions between those parties.

       In fact, while VCG accuses CGMI of playing fast and loose with the Court, it

is VCG that does so here.  Thus, VCG has admitted in its initial disclosures in *VCG Special*

---

[5]   Citations to "Vogeli Ex. __" refer to exhibits attached to the Declaration of Angela G.
Vogeli in Support of Plaintiff's Reply Memorandum of Law in Support of its Motion for
a Preliminary Injunction ("Vogeli Decl."), dated August 15, 2008.

*Opportunities Master Fund Ltd.* v. *Citibank, N.A.*, No. 08 Civ. 01563 (BSJ), the SDNY

Action it brought in this Court against Citibank with respect to the CDS Contract, that its

communications regarding the CDS Contract were with ***Citibank*** – not CGMI.  (Arffa Ex. 6.)

In those disclosures, VCG identifies seven "***Citibank*** employees" (including Messrs.

Gapusan, Quintin and Aldama), and no CGMI employees, as individuals likely to have

discoverable information. (*Id.* at 2-4 (emphasis added).)  VCG further describes Jonnathan

Wong as "the trader at Vanquish who discussed the initial margin and pricing of the swap

***with the trading desk at Citibank***" and Donald Quintin as "the ***Citibank trader*** who

negotiated the credit default swap with Vanquish".  (*Id.* at 2-3 (emphasis added).)  VCG's

own court filings thus demonstrate it knew all the time that, when it came to the CDS

Contract, it was dealing with ***Citibank*** representatives, not CGMI representatives.

Finally, VCG's reliance on "(i) a master repurchase agreement, (ii) a global

master repurchase agreement, and (iii) an institutional futures agreement" signed with CGMI

in "mid-2006" is entirely misplaced.  (VCG Mem. 5, 15; Wong Decl. ¶ 12.)  These

agreements, which VCG fails to attach to its papers, make clear that none of them relate to

credit default swaps or the CDS Contract.  (Vogeli Exs. 1-3.)

VCG and CGMI executed all three agreements on July 17, 2007.[6]  (*Id.*)  The

master repurchase agreement and the global master repurchase agreement merely permit

VCG and Citibank to engage in "repo" transactions – that is, to enter into transactions where

securities are transferred in exchange for funds, provided that the securities are returned on a

specific date or upon demand.  (Vogeli Exs. 1, 2.)  The futures account agreement enables

---

[6]    The Futures Account Agreement was signed by VCG on July 17, 2007 and by its
       "Account Manager," Rekon Advisors LLC, on September 11, 2007.

VCG to engage in the purchase and sale of futures contracts.  (Vogeli Ex. 3.)  These agreements are generated from different platforms in business areas within CGMI not related to credit default swaps.  (Vogeli Decl. ¶ 12.)[7]

There can be no doubt that the CDS Contract is not a repurchase agreement or a futures contract.  Thus, the three agreements do not establish a customer relationship between VCG and CGMI with respect to the CDS Contract and are simply irrelevant to this motion.

### B.    The CDS Contract Did Not Arise in Connection With CGMI's Business Activities

VCG's reliance on the FINRA rules is also misplaced because VCG fails to demonstrate that the CDS Contract arose in connection with CGMI's business activities as a broker-dealer.  A "broker" is "any person engaged in the business of effecting *transactions in securities* for the account of others."  15 U.S.C.A. § 78a, Section 3(a)(4)(A) (emphasis added); By-Laws of NASD Regulation, Inc., Article I.  A "dealer" is "any person engaged in the business of *buying and selling securities* for his own account".  15 U.S.C.A. § 78a, Section 3(a)(5)(A) (emphasis added); By-Laws of NASD Regulation, Inc., Article I.

Here, VCG readily admits that "a credit default swap is a *contract* under which two financial institutions trade the default risk of a debt instrument" (Wong. Decl. ¶ 16) and "the transaction at issue is not even by definition a 'security'" (VCG Mem. 18).  Thus, by definition, the CDS Contract could not have arisen in connection with CGMI's business activities as a broker-dealer.

---

[7]    Interestingly, none of these agreements contain an arbitration clause.  All three appear to contemplate court proceedings to resolve disputes under the agreements.  (Vogeli Ex. 1 at Annex 1, ¶ 4; Ex. 2 at 15; Ex. 3 at ¶ 18 on pg. 7.)

Although that should be sufficient to dispose of the issue, it is also clear from the CDS Contract itself that CGMI did not "broker" the CDS Contract. Indeed, the language of the CDS Contract – which VCG neglected to mention to the Court – completely eviscerates VCG's position on this motion.

In the CDS Contract, VCG explicitly agreed that the CDS Contract "constitutes the entire agreement and understanding of the parties with respect to its subject matter" (Arffa Ex. 1 at ¶ 9(a) on p. 16). Further, VCG agreed that "[VCG] has not relied on any oral or written representation, warranty or other assurance (except as provided for or referred to in this Agreement)" (*id.*), and "neither [Citibank] nor any of its Affiliates is or shall be a fiduciary *or advisor* with respect to the Investment Advisor or [VCG]" (Arffa Ex. 2 at Part 5(j)(ii) on p. 17) (emphasis added). Thus, VCG's repeated assertion that CGMI in fact advised it on (or "recommended") the CDS Contract is entirely inconsistent with VCG's own acknowledgement in that Contract.[8]

---

[8] Oddly, VCG also repeatedly asserts – without any support – that CGMI "set the terms of" the CDS Contract. The statement is belied by VCG's own papers which repeatedly note that VCG itself "negotiated" the terms of the CDS Contract. (*See, e.g.*, VCG Mem. 15.) It is also belied by the fact that all of the terms of the CDS Contract are set forth in documents executed by VCG and *Citibank*, not CGMI.

**C.    VCG Submitted to the Exclusive Jurisdiction of the New York Courts
With Respect to Any Dispute In Connection with the CDS Contract**

Finally, VCG's claims against CGMI in connection with the CDS Contract are

not arbitrable for an additional reason that VCG never addresses in its papers.  In the CDS

Contract, VCG expressly agreed "irrevocably" to submit "any suit, action or proceedings

relating to any dispute arising out of or in connection with [the CDS Contract] . . . to the

exclusive jurisdiction of the courts of the State of New York and the United States District

Court located in the Borough of Manhattan in New York City."  (Arffa Ex. 1 at ¶ 13(b) on p.

20, as amended by Arffa Ex. 2 at Part 4(i) on p. 12.)   By its express terms, this provision is

not limited to claims against Citibank, VCG's counterparty to the CDS Contract.

Thus, in addition to the fact that CGMI has not consented to arbitrate (under

the FINRA rules or otherwise) VCG's claims as to the CDS Contract, VCG is actually

precluded under the CDS Contract from initiating arbitration on any claims relating to that

agreement.

## II.

## CGMI WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

VCG does not dispute the well-settled law that forcing a party to arbitrate

non-arbitrable claims is *per se* irreparable harm.  *See, e.g.*, *Tellium, Inc.* v. *Corning Inc.*,

No. 03 Civ. 8487, 2004 WL 307238, at *3 (S.D.N.Y. Feb. 13, 2004).  Instead, in discussing

the issue of irreparable harm, VCG merely repeats its argument that CGMI agreed to

arbitration under the FINRA rules.

Because, as demonstrated above, VCG has failed to establish either a

brokerage relationship with CGMI as to the CDS Contract, or that the CDS Contract arose in

connection with CGMI's brokerage business, it cannot establish that CGMI consented to

arbitration by virtue of its FINRA membership. As a matter of well-settled law, forcing CGMI to proceed with the FINRA arbitration, and to incur substantial costs for a dispute resolution process, when it never consented to that process, would therefore result in *per se* irreparable harm to CGMI. *See id.*; *Merrill Lynch Inv. Managers* v. *Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003); *Masefield AG* v. *Colonial Oil Indus., Inc.,* No. 05 Civ. 2231, 2005 WL 911770, at *7 (S.D.N.Y. Apr. 18, 2005).

### III.

### FOR THESE SAME REASONS, CGMI HAS DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS; AT THE LEAST, THE BALANCE OF HARDSHIPS FAVORS INJUNCTIVE RELIEF

As set forth above, VCG has completely failed to demonstrate any agreement by CGMI to arbitrate VCG's disputes as to the CDS Contract. Further, even if VCG could bring an arbitration as to the CDS Contract, it has waived any such right by commencing litigation against Citibank in the Southern District of New York over the CDS Contract. (*See generally* CGMI Mem. 13-14.)[9] Because VCG is already litigating its disputes in this Court, it should be precluded from pursuing a largely duplicative arbitration proceeding before FINRA.

For all of these reasons, CGMI has demonstrated that it is likely to succeed on the merits of its claims in this action that VCG's claims against CGMI as to the CDS Contract are not arbitrable.

---

[9]    VCG's only response to the waiver argument is to say that waiver is inapplicable because there is not a precise identity of the parties or purported claims here. This is elevating form over substance. VCG is trying to litigate the exact same dispute over the exact same contract in two forums at the same time.

At the very least, CGMI has raised serious issues going to the merits of its request for a permanent injunction against the FINRA Arbitration. In addition, CGMI has demonstrated that the balance of hardships here is decidedly in CGMI's favor. VCG makes no showing to the contrary. Nor can it.

It is undeniable that, to proceed with the FINRA Arbitration while this action for a permanent injunction is pending would cause CGMI to expend substantial time and resources on an arbitration that ultimately may be deemed entirely improper. CGMI faces a severe hardship if a preliminary injunction is denied. VCG, on the other hand, faces only a delay in the arbitration proceeding should the Court grant a preliminary injunction but ultimately deny CGMI's motion for a permanent injunction. Thus, the hardships clearly balance in CGMI's favor.

In response, VCG asserts only that a preliminary injunction "would result in a *permanent denial* of a remedy" available only through FINRA arbitration. (VCG Mem. 23-24 (emphasis added).) That makes no sense. This is, after all, only a motion for a *preliminary* injunction. Nothing *permanent* is now being resolved. In any event, VCG's argument presupposes (incorrectly) an entitlement to pursue the FINRA Arbitration, which VCG (to say the least) has not demonstrated at this point.

In sum, the potential harm to CGMI in having to proceed, while this action is pending, with a FINRA arbitration it never agreed to clearly outweighs the potential harm to VCG in delaying the FINRA Arbitration while this action is litigated.

**IV.**

## VCG IS NOT ENTITLED TO ATTORNEYS' FEES AND COSTS; IF ANYONE IS, IT IS CGMI THAT IS ENTITLED TO FEES AND COSTS

Finally, VCG has the gall to request attorneys' fees and costs, and to suggest that counsel for CGMI should be sanctioned under Rule 11 of the Federal Rules of Civil Procedure, on the grounds that CGMI "fail[ed] to mention in its Motion the basis upon which VCG sought arbitration," and refuses to arbitrate without justification and without a reasonable chance to prevail. (VCG Mem. 24-25, 25 n.15.) This argument is facially absurd.

CGMI submitted VCG's entire FINRA complaint to the Court (Compl. Ex. E) and referenced that complaint in its motion (Citi Mem. 8). CGMI's knowledge of the basis upon which VCG sought arbitration comes solely from the face of that complaint, which is hardly a model of clarity on the issue and which, in any event, was presented to the Court in VCG's own words. The fact that CGMI is a member of FINRA was neither "hidden" from the Court nor is it in dispute; as discussed above, however, the FINRA rules have no applicability where (as here) the claimant was not a customer of the broker-dealer for purposes of the transaction, and the transaction at issue did not arise in connection with the broker-dealer's business activities.

An award of attorneys' fees and costs under 28 U.S.C. § 1987 requires both "clear evidence that the challenged actions are *entirely without color*" and a showing that the actions are taken in bad faith "for reasons of harassment or delay or for other improper purposes" *Revson* v. *Cinque & Cinque, P.C.*, 221 F.3d 71, 78-79 (2000) (internal quotation marks omitted); *see Dattner* v. *ConAgra Foods, Inc.*, 458 F.3d 98, 103-04 (2d Cir. 2006). Sanctions under Rule 11 are imposed only where "a competent attorney could not form a reasonable belief that the pleading is well-grounded in fact and warranted by existing law or

a good faith argument for the extension, modification or reversal of existing law" and "it is patently clear that a claim has absolutely no chance of success." *Abdelhamid* v. *Altria Group, Inc.*, 515 F. Supp. 2d 384, 391-92 (S.D.N.Y. 2007).

Far from being "entirely without color," in "bad faith" and without any chance of success, CGMI's arguments are *entirely meritorious* for all of the reasons discussed above. If any party is guilty of "hiding the ball" and making frivolous arguments, it is VCG. Its entire argument here flies in the face of (a) the language of the parties' CDS Contract, in which VCG acknowledged that neither CGMI (nor any other Citibank affiliate) was VCG's advisor with respect to the CDS Contract, and which acknowledgement VCG neglected to bring to the Court's attention; (b) VCG's own initial disclosures in the action it brought against Citibank, in which VCG acknowledged that it dealt with *Citibank* employees, not CGMI employees, in entering into the CDS Contract; and (c) VCG's own agreement, in the CDS Contract, to litigate in court – and not in arbitration – any dispute as to that Contract.

In short, if anyone is entitled to costs or fees here, it is CGMI, not VCG.

### Conclusion

For all of the reasons set forth above and in CGMI's initial moving papers, CGMI respectfully requests that the Court enter an order preliminarily enjoining VCG from proceeding in any way with the FINRA Arbitration during the pendency of this action in which CGMI seeks an order permanently enjoining the FINRA Arbitration.

Dated: August 15, 2008
       New York, New York

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____ /s/  Allan J. Arffa _____
                Allan J. Arffa
                Karen R. King
                David W. Wang

1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  212-373-3203
Facsimile:  212-373-0203

Email:  aarffa@paulweiss.com
Email:  kking@paulweiss.com
Email:  dwang@paulweiss.com

*Attorneys for Plaintiff*
*Citigroup Global Markets, Inc.*