UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITIGROUP GLOBAL MARKETS INC.,<br><br>                    Plaintiff,<br><br>                    v.<br><br>VCG SPECIAL OPPORTUNITIES MASTER<br>FUND LIMITED f/k/a CDO PLUS MASTER<br>FUND LIMITED,<br><br>                    Defendant. | Case No. 08 CV 5520 (BSJ) |

## REPLY DECLARATION OF ALLAN J. ARFFA IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

ALLAN J. ARFFA, Esq., declares, pursuant to 28 U.S.C. § 1746:

1.      I am a member of the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel to plaintiff Citigroup Global Markets Inc. ("CGMI") in this action. I respectfully submit this Reply Declaration in further support of Plaintiff's Motion for a Preliminary Injunction.

2.      Attached as Exhibit 1 is a true and correct copy of the ISDA 2002 Master Agreement, between Citibank, N.A. and CDO Plus Master Fund Limited, dated September 1, 2006.

3.      Attached as Exhibit 2 is a true and correct copy of the Schedule to the ISDA 2002 Master Agreement between Citibank, N.A. and CDO Plus Master Fund Limited, dated September 1, 2006.

4.      Attached as Exhibit 3 is a true and correct copy of the 1994 ISDA Credit Support Annex to the Schedule to the ISDA Master Agreement, between Citibank, N.A. and CDO Plus Master Fund Limited, dated as of September 1, 2006.

5.      Attached as Exhibit 4 is a true and correct copy of the confirmation letter for Credit Derivative Transactions on Collateralized Debt Obligations with Pay-As-

You-Go or Physical Settlement (Dealer Form), between Citibank, N.A. and CDO Plus

Master Fund Limited, dated July 5, 2007 with a Trade Date of June 29, 2007.

6.    Attached as Exhibit 5 is a true and correct copy of the ISDA

Standard Terms Supplement For Use With Credit Derivative Transactions on

Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement in the form

published by ISDA on June 6, 2007

7.    Attached as Exhibit 6 is a true and correct copy of VCG's initial

disclosures in *VCG Special Opportunities Master Fund Ltd.* v. *Citibank, N.A.*, No. 08

Civ. 01563 (BSJ), dated May 21, 2008.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury

that the foregoing is true and correct.


Dated:  New York, New York
August 15, 2008

_____
Allan J. Arffa

2

# Exhibit 1

*[Execution Copy]*
*[Reference No. CB11-130]*

# ISDA

International Swaps and Derivatives Association, Inc.

# 2002 MASTER AGREEMENT

dated as of September 1, 2006

between

| CITIBANK, N.A. | CDO PLUS MASTER FUND LTD. |
| :---: | :---: |
| ("Party A") | ("Party B") |

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this 2002 Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation) exchanged between the parties or otherwise effective for the purpose of confirming or evidencing those Transactions. This 2002 Master Agreement and the Schedule are together referred to as this "Master Agreement.

Accordingly, the parties agree as follows:-

### Interpretation

*(a)*     **Definitions.** The terms defined in Section 14 and elsewhere in this Master Agreement will have the meanings therein specified for the purpose of this Master Agreement.

*(b) Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement, such Confirmation will prevail for the purpose of the relevant Transaction.

*(c) Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement), and the parties would not otherwise enter into any Transactions.

2.     **Obligations**

*(a)*     *General Conditions.*

(i)     Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement. (ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

Copyright © 2002 by International Swaps and Derivatives Association, Inc.

(iii)      Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other condition specified in this Agreement to be a condition precedent for the purpose of this Section 2(a)(iii).

(b)     *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the Scheduled Settlement Date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)     *Netting of Payments.* If on any date amounts would otherwise be payable:—

     (i)      in the same currency; and

     (ii)     in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by which the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount and payment obligation will be determined in respect of all amounts payable on the same date in the same currency in respect of those Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or any Confirmation by specifying that "Multiple Transaction Payment Netting" applies to the Transactions identified as being subject to the election (in which case clause (ii) above will not apply to such Transactions). If Multiple Transaction Payment Netting is applicable to Transactions, it will apply to those Transactions with effect from the starting date specified in the Schedule or such Confirmation, or, if a starting date is not specified in the Schedule or such Confirmation, the starting date otherwise agreed by the parties in writing. This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)     *Deduction or Withholding for Tax.*

     (i)      *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

          (1)     promptly notify the other party ("Y") of such requirement;

          (2)     pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

          (3)     promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

ISDA® 2002

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii)    *Liability.* If:—

(1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)    X does not so deduct or withhold; and

(3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

**3.**    **Representations**

Each party makes the representations contained in Sections 3(a), 3(b), 3(c), 3(d), 3(e) and 3(f) and, if specified in the Schedule as applying, 3(g) to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement). If any "Additional Representation" is specified in the Schedule or any Confirmation as applying, the party or parties specified for such Additional Representation will make and, if applicable, be deemed to repeat such Additional Representation at the time or times specified for such Additional Representation.

(a)    *Basic Representations.*

(i)    *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

        **ISDA® 2002**

(iii)    *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)    *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it, any of its Credit Support Providers or any of its applicable Specified Entities any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

(g)    *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

4.    **Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information.* It will deliver to the other party or, in certain cases under clause (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

4

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.*  It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply With Laws.*  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.*  It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.*  Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled or considered to have its seat, or where an Office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction"), and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    **Events of Default and Termination Events**

(a)    *Events of Default.*  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes (subject to Sections 5(c) and 6(e)(iv)) an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver.*  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) required to be made by it if such failure is not remedied on or before the first Local Business Day in the case of any such payment or the first Local Delivery Day in the case of any such delivery after, in each case, notice of such failure is given to the party;

(ii)    *Breach of Agreement; Repudiation of Agreement.*

(1)    Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied within 30 days after notice of such failure is given to the party; or

(2)    the party disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, this Master Agreement, any Confirmation executed and delivered by that party or any

5                                    ISDA® 2002

Transaction evidenced by such a Confirmation (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iii)    *Credit Support Default.*

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document, or any security interest granted by such party or such Credit Support Provider to the other party pursuant to any such Credit Support Document, to be in full force and effect for the purpose of this Agreement (in each case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or 3(f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default Under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1)    defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

(2)    defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

(3)    defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

(4)    disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

6                                                ISDA® 2002

(vi)    *Cross-Default.* If "Cross-Default" is specified in the Schedule as applying to the party, the occurrence or existence of:—

   (1)    a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) where the aggregate principal amount of such agreements or instruments, either alone or together with the amount, if any, referred to in clause (2) below, is not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments before it would otherwise have been due and payable; or

   (2)    a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments under such agreements or instruments on the due date for payment (after giving effect to any applicable notice requirement or grace period) in an aggregate amount, either alone or together with the amount, if any, referred to in clause (1) above, of not less than the applicable Threshold Amount;

(vii)   *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

   (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4)(A) institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (B) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (A) above and either (I) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (II) is not dismissed, discharged, stayed or restrained in each case within 15 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 15 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) above (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)    *Merger Without Assumption.*  The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganises, reincorporates or reconstitutes into or as, another entity and, at the time of such consolidation, amalgamation, merger, transfer, reorganisation, reincorporation or reconstitution:—

(1)    the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party; or

(2)    the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events.*  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes (subject to Section 5(c)) an Illegality if the event is specified in clause (i) below, a Force Majeure Event if the event is specified in clause (ii) below, a Tax Event if the event is specified in clause (iii) below, a Tax Event Upon Merger if the event is specified in clause (iv) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to clause (v) below or an Additional Termination Event if the event is specified pursuant to clause (vi) below:—

(i)    *Illegality.*  After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, due to an event or circumstance (other than any action taken by a party or, if applicable, any Credit Support Provider of such party) occurring after a Transaction is entered into, it becomes unlawful under any applicable law (including without limitation the laws of any country in which payment, delivery or compliance is required by either party or any Credit Support Provider, as the case may be), on any day, or it would be unlawful if the relevant payment, delivery or compliance were required on that day (in each case, other than as a result of a breach by the party of Section 4(b)):—

(1)    for the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction to perform any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)    for such party or any Credit Support Provider of such party (which will be the Affected Party) to perform any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, to receive a payment or delivery under such Credit Support Document or to comply with any other material provision of such Credit Support Document;

(ii)    *Force Majeure Event.*  After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, by reason of force majeure or act of state occurring after a Transaction is entered into, on any day:—

(1)    the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction is prevented from performing any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, from receiving a payment or delivery in respect of such Transaction or from complying with any other material provision of this Agreement relating to such Transaction (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or

ISDA® 2002

impracticable for such Office so to perform, receive or comply (or it would be impossible or impracticable for such Office so to perform, receive or comply if such payment, delivery or compliance were required on that day); or

(2)     such party or any Credit Support Provider of such party (which will be the Affected Party) is prevented from performing any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, from receiving a payment or delivery under such Credit Support Document or from complying with any other material provision of such Credit Support Document (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply (or it would be impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply if such payment, delivery or compliance were required on that day),

so long as the force majeure or act of state is beyond the control of such Office, such party or such Credit Support Provider, as appropriate, and such Office, such party or Credit Support Provider could not, after using all reasonable efforts (which will not require such party or Credit Support Provider to incur a loss, other than immaterial, incidental expenses), overcome such prevention, impossibility or impracticability;

(iii)     *Tax Event.* Due to (1) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (2) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Settlement Date (A) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (B) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 9(h)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iv)     *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Settlement Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets (or any substantial part of the assets comprising the business conducted by it as of the date of this Master Agreement) to, or reorganising, reincorporating or reconstituting into or as, another entity (which will be the Affected Party) where such action does not constitute a Merger Without Assumption;

(v)     *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, a Designated Event (as defined below) occurs with respect to such party, any Credit Support Provider of such party or any applicable Specified Entity of such party (in each case, "X") and such Designated Event does not constitute a Merger Without Assumption, and the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X, after taking into account any applicable Credit Support Document, is materially weaker immediately after the occurrence of such Designated Event than that of X immediately prior to the occurrence of such Designated Event (and, in any such event, such party or its successor, surviving or transferee entity, as appropriate, will be the Affected Party). A "Designated Event" with respect to X means that:—

(1)     X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the

date of this Master Agreement) to, or reorganises, reincorporates or reconstitutes into or as, another entity;

(2)      any person, related group of persons or entity acquires directly or indirectly the beneficial ownership of (A) equity securities having the power to elect a majority of the board of directors (or its equivalent) of X or (B) any other ownership interest enabling it to exercise control of X; or

(3)      X effects any substantial change in its capital structure by means of the issuance, incurrence or guarantee of debt or the issuance of (A) preferred stock or other securities convertible into or exchangeable for debt or preferred stock or (B) in the case of entities other than corporations, any other form of ownership interest; or

(vi)      *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties will be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)      *Hierarchy of Events.*

(i)      An event or circumstance that constitutes or gives rise to an Illegality or a Force Majeure Event will not, for so long as that is the case, also constitute or give rise to an Event of Default under Section 5(a)(i), 5(a)(ii)(1) or 5(a)(iii)(1) insofar as such event or circumstance relates to the failure to make any payment or delivery or a failure to comply with any other material provision of this Agreement or a Credit Support Document, as the case may be.

(ii)      Except in circumstances contemplated by clause (i) above, if an event or circumstance which would otherwise constitute or give rise to an Illegality or a Force Majeure Event also constitutes an Event of Default or any other Termination Event, it will be treated as an Event of Default or such other Termination Event, as the case may be, and will not constitute or give rise to an Illegality or a Force Majeure Event.

(iii)      If an event or circumstance which would otherwise constitute or give rise to a Force Majeure Event also constitutes an Illegality, it will be treated as an Illegality, except as described in clause (ii) above, and not a Force Majeure Event.

(d)      *Deferral of Payments and Deliveries During Waiting Period.* If an Illegality or a Force Majeure Event has occurred and is continuing with respect to a Transaction, each payment or delivery which would otherwise be required to be made under that Transaction will be deferred to, and will not be due until: —

(i)      the first Local Business Day or, in the case of a delivery, the first Local Delivery Day (or the first day that would have been a Local Business Day or Local Delivery Day, as appropriate, but for the occurrence of the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event) following the end of any applicable Waiting Period in respect of that Illegality or Force Majeure Event, as the case may be; or

(ii)      if earlier, the date on which the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event ceases to exist or, if such date is not a Local Business Day or, in the case of a delivery, a Local Delivery Day, the first following day that is a Local Business Day or Local Delivery Day, as appropriate.

(e)      *Inability of Head or Home Office to Perform Obligations of Branch.* If (i) an Illegality or a Force Majeure Event occurs under Section 5(b)(i)(1) or 5(b)(ii)(1) and the relevant Office is not the Affected Party's head or home office, (ii) Section 10(a) applies, (iii) the other party seeks performance of the relevant obligation or

ISDA® 2002

compliance with the relevant provision by the Affected Party's head or home office and (iv) the Affected Party's head or home office fails so to perform or comply due to the occurrence of an event or circumstance which would, if that head or home office were the Office through which the Affected Party makes and receives payments and deliveries with respect to the relevant Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and such failure would otherwise constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1) with respect to such party, then, for so long as the relevant event or circumstance continues to exist with respect to both the Office referred to in Section 5(b)(i)(1) or 5(b)(ii)(1), as the case may be, and the Affected Party's head or home office, such failure will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1).

6.      **Early Termination; Close-Out Netting**

(a)      *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)      *Right to Terminate Following Termination Event.*

(i)      *Notice.* If a Termination Event other than a Force Majeure Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction, and will also give the other party such other information about that Termination Event as the other party may reasonably require. If a Force Majeure Event occurs, each party will, promptly upon becoming aware of it, use all reasonable efforts to notify the other party, specifying the nature of that Force Majeure Event, and will also give the other party such other information about that Force Majeure Event as the other party may reasonably require.

(ii)      *Transfer to Avoid Termination Event.* If a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, other than immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)      *Two Affected Parties.* If a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice of such occurrence is given under Section 6(b)(i) to avoid that Termination Event.

ISDA® 2002

(iv)    *Right to Terminate.*

(1)    If:—

(A)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(B)    a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there are two Affected Parties, or the Non-affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, if the relevant Termination Event is then continuing, by not more than 20 days notice to the other party, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(2)    If at any time an Illegality or a Force Majeure Event has occurred and is then continuing and any applicable Waiting Period has expired:—

(A)    Subject to clause (B) below, either party may, by not more than 20 days notice to the other party, designate (I) a day not earlier than the day on which such notice becomes effective as an Early Termination Date in respect of all Affected Transactions or (II) by specifying in that notice the Affected Transactions in respect of which it is designating the relevant day as an Early Termination Date, a day not earlier than two Local Business Days following the day on which such notice becomes effective as an Early Termination Date in respect of less than all Affected Transactions. Upon receipt of a notice designating an Early Termination Date in respect of less than all Affected Transactions, the other party may, by notice to the designating party, if such notice is effective on or before the day so designated, designate that same day as an Early Termination Date in respect of any or all other Affected Transactions.

(B)    An Affected Party (if the Illegality or Force Majeure Event relates to performance by such party or any Credit Support Provider of such party of an obligation to make any payment or delivery under, or to compliance with any other material provision of, the relevant Credit Support Document) will only have the right to designate an Early Termination Date under Section 6(b)(iv)(2)(A) as a result of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2) following the prior designation by the other party of an Early Termination Date, pursuant to Section 6(b)(iv)(2)(A), in respect of less than all Affected Transactions.

(c)    *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or 6(b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 9(h)(i) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date will be determined pursuant to Sections 6(e) and 9(h)(ii).

ISDA® 2002

(d)     *Calculations; Payment Date.*

(i)     *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (I) showing, in reasonable detail, such calculations (including any quotations, market data or information from internal sources used in making such calculations), (2) specifying (except where there are two Affected Parties) any Early Termination Amount payable and (3) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation or market data obtained in determining a Close-out Amount, the records of the party obtaining such quotation or market data will be conclusive evidence of the existence and accuracy of such quotation or market data.

(ii)     *Payment Date.* An Early Termination Amount due in respect of any Early Termination Date will, together with any amount of interest payable pursuant to Section 9(h)(ii)(2), be payable (1) on the day on which notice of the amount payable is effective in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default and (2) on the day which is two Local Business Days after the day on which notice of the amount payable is effective (or, if there are two Affected Parties, after the day on which the statement provided pursuant to clause (i) above by the second party to provide such a statement is effective) in the case of an Early Termination Date which is designated as a result of a Termination Event.

(e)     *Payments on Early Termination.* If an Early Termination Date occurs, the amount, if any, payable in respect of that Early Termination Date (the "Early Termination Amount") will be determined pursuant to this Section 6(e) and will be subject to Section 6(f).

(i)     *Events of Default.* If the Early Termination Date results from an Event of Default, the Early Termination Amount will be an amount equal to (1) the sum of (A) the Termination Currency Equivalent of the Close-out Amount or Close-out Amounts (whether positive or negative) determined by the Non-defaulting Party for each Terminated Transaction or group of Terminated Transactions, as the case may be, and (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (2) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If the Early Termination Amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of the Early Termination Amount to the Defaulting Party.

(ii)     *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)     *One Affected Party.* Subject to clause (3) below, if there is one Affected Party, the Early Termination Amount will be determined in accordance with Section 6(e)(i), except that references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and to the Non-affected Party, respectively.

(2)     *Two Affected Parties.* Subject to clause (3) below, if there are two Affected Parties, each party will determine an amount equal to the Termination Currency Equivalent of the sum of the Close-out Amount or Close-out Amounts (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions, as the case may be, and the Early Termination Amount will be an amount equal to (A) the sum of (I) one-half of the difference between the higher amount so determined (by party "X") and the lower amount so determined (by party "Y") and (II) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to Y. If the Early Termination Amount is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of the Early Termination Amount to Y.

13

      (3)    *Mid-Market Events.* If that Termination Event is an Illegality or a Force Majeure Event, then the Early Termination Amount will be determined in accordance with clause (1) or (2) above, as appropriate, except that, for the purpose of determining a Close-out Amount or Close-out Amounts, the Determining Party will:—

           (A)    if obtaining quotations from one or more third parties (or from any of the Determining Party's Affiliates), ask each third party or Affiliate (I) not to take account of the current creditworthiness of the Determining Party or any existing Credit Support Document and (II) to provide mid-market quotations; and

           (B)    in any other case, use mid-market values without regard to the creditworthiness of the Determining Party.

(iii)    *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because Automatic Early Termination applies in respect of a party, the Early Termination Amount will be subject to such adjustments as are appropriate and permitted by applicable law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Adjustment for Illegality or Force Majeure Event.* The failure by a party or any Credit Support Provider of such party to pay, when due, any Early Termination Amount will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1) if such failure is due to the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event. Such amount will (1) accrue interest and otherwise be treated as an Unpaid Amount owing to the other party if subsequently an Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions and (2) otherwise accrue interest in accordance with Section 9(h)(ii)(2).

(v)    *Pre-Estimate.* The parties agree that an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks, and, except as otherwise provided in this Agreement, neither party will be entitled to recover any additional damages as a consequence of the termination of the Terminated Transactions.

(f)    *Set-Off.* Any Early Termination Amount payable to one party (the "Payee") by the other party (the "Payer"), in circumstances where there is a Defaulting Party or where there is one Affected Party in the case where either a Credit Event Upon Merger has occurred or any other Termination Event in respect of which all outstanding Transactions are Affected Transactions has occurred, will, at the option of the Non-defaulting Party or the Non-affected Party, as the case may be ("X") (and without prior notice to the Defaulting Party or the Affected Party, as the case may be), be reduced by its set-off against any other amounts ("Other Amounts") payable by the Payee to the Payer (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so set off, those Other Amounts will be discharged promptly and in all respects. X will give notice to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Amounts (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

If an obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) will be effective to create a charge or other security interest. This Section 6(f) will be without prejudice and in addition to any right of set-off, offset, combination of accounts, lien, right of retention or withholding or similar right or requirement to which any party is at any time otherwise entitled or subject (whether by operation of law, contract or otherwise).

7.    **Transfer**

Subject to Section 6(b)(ii) and to the extent permitted by applicable law, neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any Early Termination Amount payable to it by a Defaulting Party, together with any amounts payable on or with respect to that interest and any other rights associated with that interest pursuant to Sections 8, 9(h) and 11.

Any purported transfer that is not in compliance with this Section 7 will be void.

8.    **Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in good faith and using commercially reasonable procedures in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in clause (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purpose of such judgment or order and the rate of exchange at which such party is able, acting in good faith and using

15                                    ISDA® 2002

commercially reasonable procedures in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party.

(c)     *Separate Indemnities.* To the extent permitted by applicable law, the indemnities in this Section 8 constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)     *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

9.    **Miscellaneous**

(a)     *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter. Each of the parties acknowledges that in entering into this Agreement it has not relied on any oral or written representation, warranty or other assurance (except as provided for or referred to in this Agreement) and waives all rights and remedies which might otherwise be available to it in respect thereof, except that nothing in this Agreement will limit or exclude any liability of a party for fraud.

(b)     *Amendments.* An amendment, modification or waiver in respect of this Agreement will only be effective if in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system.

(c)     *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)     *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)     *Counterparts and Confirmations.*

(i)     This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission and by electronic messaging system), each of which will be deemed an original.

(ii)     The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation will be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes, by an exchange of electronic messages on an electronic messaging system or by an exchange of e-mails, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex, electronic message or e-mail constitutes a Confirmation.

(f)     *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)     *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

(h)   *Interest and Compensation.*

(i)    *Prior to Early Termination.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction:—

(1)    *Interest on Defaulted Payments.* If a party defaults in the performance of any payment obligation, it will, to the extent permitted by applicable law and subject to Section 6(c), pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (3)(B) or (C) below), at the Default Rate.

(2)    *Compensation for Defaulted Deliveries.* If a party defaults in the performance of any obligation required to be settled by delivery, it will on demand (A) compensate the other party to the extent provided for in the relevant Confirmation or elsewhere in this Agreement and (B) unless otherwise provided in the relevant Confirmation or elsewhere in this Agreement, to the extent permitted by applicable law and subject to Section 6(c), pay to the other party interest (before as well as after judgment) on an amount equal to the fair market value of that which was required to be delivered in the same currency as that amount, for the period from (and including) the originally scheduled date for delivery to (but excluding) the date of actual delivery (and excluding any period in respect of which interest or compensation in respect of that amount is due pursuant to clause (4) below), at the Default Rate. The fair market value of any obligation referred to above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party that was entitled to take delivery.

(3)    *Interest on Deferred Payments.* If:—

(A)    a party does not pay any amount that, but for Section 2(a)(iii), would have been payable, it will, to the extent permitted by applicable law and subject to Section 6(c) and clauses (B) and (C) below, pay interest (before as well as after judgment) on that amount to the other party on demand (after such amount becomes payable) in the same currency as that amount, for the period from (and including) the date the amount would, but for Section 2(a)(iii), have been payable to (but excluding) the date the amount actually becomes payable, at the Applicable Deferral Rate:

(B)    a payment is deferred pursuant to Section 5(d), the party which would otherwise have been required to make that payment will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the amount of the deferred payment to the other party on demand (after such amount becomes payable) in the same currency as the deferred payment, for the period from (and including) the date the amount would, but for Section 5(d), have been payable to (but excluding) the earlier of the date the payment is no longer deferred pursuant to Section 5(d) and the date during the deferral period upon which an Event of Default or Potential Event of Default with respect to that party occurs, at the Applicable Deferral Rate; or

(C)    a party fails to make any payment due to the occurrence of an Illegality or a Force Majeure Event (after giving effect to any deferral period contemplated by clause (B) above), it will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as the event or circumstance giving rise to that Illegality or Force Majeure Event

17                          ISDA® 2002

continues and no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the date the party fails to make the payment due to the occurrence of the relevant Illegality or Force Majeure Event (or, if later, the date the payment is no longer deferred pursuant to Section 5(d)) to (but excluding) the earlier of the date the event or circumstance giving rise to that Illegality or Force Majeure Event ceases to exist and the date during the period upon which an Event of Default or Potential Event of Default with respect to that party occurs (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (B) above), at the Applicable Deferral Rate.

(4)    *Compensation for Deferred Deliveries.* If:—

(A)    a party does not perform any obligation that, but for Section 2(a)(iii), would have been required to be settled by delivery;

(B)    a delivery is deferred pursuant to Section 5(d); or

(C)    a party fails to make a delivery due to the occurrence of an Illegality or a Force Majeure Event at a time when any applicable Waiting Period has expired,

the party required (or that would otherwise have been required) to make the delivery will, to the extent permitted by applicable law and subject to Section 6(c), compensate and pay interest to the other party on demand (after, in the case of clauses (A) and (B) above, such delivery is required) if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

(ii)    *Early Termination.* Upon the occurrence or effective designation of an Early Termination Date in respect of a Transaction:—

(1)    *Unpaid Amounts.* For the purpose of determining an Unpaid Amount in respect of the relevant Transaction, and to the extent permitted by applicable law, interest will accrue on the amount of any payment obligation or the amount equal to the fair market value of any obligation required to be settled by delivery included in such determination in the same currency as that amount, for the period from (and including) the date the relevant obligation was (or would have been but for Section 2(a)(iii) or 5(d)) required to have been performed to (but excluding) the relevant Early Termination Date, at the Applicable Close-out Rate.

(2)    *Interest on Early Termination Amounts.* If an Early Termination Amount is due in respect of such Early Termination Date, that amount will, to the extent permitted by applicable law, be paid together with interest (before as well as after judgment) on that amount in the Termination Currency, for the period from (and including) such Early Termination Date to (but excluding) the date the amount is paid, at the Applicable Close-out Rate.

(iii)    *Interest Calculation.* Any interest pursuant to this Section 9(h) will be calculated on the basis of daily compounding and the actual number of days elapsed.

18                                                      ISDA® 2002

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to and agrees with the other party that, notwithstanding the place of booking or its jurisdiction of incorporation or organisation, its obligations are the same in terms of recourse against it as if it had entered into the Transaction through its head or home office, except that a party will not have recourse to the head or home office of the other party in respect of any payment or delivery deferred pursuant to Section 5(d) for so long as the payment or delivery is so deferred.  This representation and agreement will be deemed to be repeated by each party on each date on which the parties enter into a Transaction.

(b)    If a party is specified as a Multibranch Party in the Schedule, such party may, subject to clause (c) below, enter into a Transaction through, book a Transaction in and make and receive payments and deliveries with respect to a Transaction through any Office listed in respect of that party in the Schedule (but not any other Office unless otherwise agreed by the parties in writing).

(c)    The Office through which a party enters into a Transaction will be the Office specified for that party in the relevant Confirmation or as otherwise agreed by the parties in writing, and, if an Office for that party is not specified in the Confirmation or otherwise agreed by the parties in writing, its head or home office.  Unless the parties otherwise agree in writing, the Office through which a party enters into a Transaction will also be the Office in which it books the Transaction and the Office through which it makes and receives payments and deliveries with respect to the Transaction.  Subject to Section 6(b)(ii), neither party may change the Office in which it books the Transaction or the Office through which it makes and receives payments or deliveries with respect to a Transaction without the prior written consent of the other party.

**11.    Expenses**

A Defaulting Party will on demand indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, execution fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness.*  Any notice or other communication in respect of this Agreement may be given in any manner described below (except that a notice or other communication under Section 5 or 6 may not be given by electronic messaging system or e-mail) to the address or number or in accordance with the electronic messaging system or e-mail details provided (see the Schedule) and will be deemed effective as indicated: —

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date it is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date it is delivered or its delivery is attempted;

(v)    if sent by electronic messaging system, on the date it is received; or

ISDA® 2002

      (vi)     if sent by e-mail, on the date it is delivered,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication will be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Details.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system or e-mail details at which notices or other communications are to be given to it.

13.    **Governing Law and Jurisdiction**

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to any dispute arising out of or in connection with this Agreement ("Proceedings"), each party irrevocably:—

      (i)     submits:—

          (1)     if this Agreement is expressed to be governed by English law, to (A) the non-exclusive jurisdiction of the English courts if the Proceedings do not involve a Convention Court and (B) the exclusive jurisdiction of the English courts if the Proceedings do involve a Convention Court; or

          (2)     if this Agreement is expressed to be governed by the laws of the State of New York, to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City;

      (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party; and

      (iii)   agrees, to the extent permitted by applicable law, that the bringing of Proceedings in any one or more jurisdictions will not preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent, if any, specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12(a)(i), 12(a)(iii) or 12(a)(iv). Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by applicable law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction or order for specific performance or recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

          ISDA® 2002

14.    **Definitions**

As used in this Agreement:—

*"Additional Representation"* has the meaning specified in Section 3.

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Force Majeure Event, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event (which, in the case of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2), means all Transactions unless the relevant Credit Support Document references only certain Transactions, in which case those Transactions and, if the relevant Credit Support Document constitutes a Confirmation for a Transaction, that Transaction) and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Agreement"* has the meaning specified in Section 1(c).

*"Applicable Close-out Rate"* means:—

(a)    in respect of the determination of an Unpaid Amount:—

    (i)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

    (ii)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate;

    (iii)    in respect of obligations deferred pursuant to Section 5(d), if there is no Defaulting Party and for so long as the deferral period continues, the Applicable Deferral Rate; and

    (iv)    in all other cases following the occurrence of a Termination Event (except where interest accrues pursuant to clause (iii) above), the Applicable Deferral Rate; and

(b)    in respect of an Early Termination Amount:—

    (i)    for the period from (and including) the relevant Early Termination Date to (but excluding) the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable:—

        (1)    if the Early Termination Amount is payable by a Defaulting Party, the Default Rate;

        (2)    if the Early Termination Amount is payable by a Non-defaulting Party, the Non-default Rate; and

        (3)    in all other cases, the Applicable Deferral Rate; and

(ii)     for the period from (and including) the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable to (but excluding) the date of actual payment:—

(1)     if a party fails to pay the Early Termination Amount due to the occurrence of an event or circumstance which would, if it occurred with respect to a payment or delivery under a Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and for so long as the Early Termination Amount remains unpaid due to the continuing existence of such event or circumstance, the Applicable Deferral Rate;

(2)     if the Early Termination Amount is payable by a Defaulting Party (but excluding any period in respect of which clause (1) above applies), the Default Rate;

(3)     if the Early Termination Amount is payable by a Non-defaulting Party (but excluding any period in respect of which clause (1) above applies), the Non-default Rate; and

(4)     in all other cases, the Termination Rate.

*"Applicable Deferral Rate"* means:—

(a)     for the purpose of Section 9(h)(i)(3)(A), the rate certified by the relevant payer to be a rate offered to the payer by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market;

(b)     for purposes of Section 9(h)(i)(3)(B) and clause (a)(iii) of the definition of Applicable Close-out Rate, the rate certified by the relevant payer to be a rate offered to prime banks by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer after consultation with the other party, if practicable, for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market; and

(c)     for purposes of Section 9(h)(i)(3)(C) and clauses (a)(iv), (b)(ii)(3) and (b)(ii)(1) of the definition of Applicable Close-out Rate, a rate equal to the arithmetic mean of the rate determined pursuant to clause (a) above and a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount.

*"Automatic Early Termination"* has the meaning specified in Section 6(a).

*"Burdened Party"* has the meaning specified in Section 5(b)(iv).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs after the parties enter into the relevant Transaction.

*"Close-out Amount"* means, with respect to each Terminated Transaction or each group of Terminated Transactions and a Determining Party, the amount of the losses or costs of the Determining Party that are or would be incurred under then prevailing circumstances (expressed as a positive number) or gains of the Determining Party that are or would be realised under then prevailing circumstances (expressed as a negative number) in replacing, or in providing for the Determining Party the economic equivalent of, (a) the material terms of that Terminated Transaction or group of Terminated Transactions, including the payments and deliveries by the parties under Section 2(a)(i) in respect of that Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date (assuming satisfaction of the conditions precedent in

ISDA® 2002

Section 2(a)(iii)) and (b) the option rights of the parties in respect of that Terminated Transaction or group of Terminated Transactions.

Any Close-out Amount will be determined by the Determining Party (or its agent), which will act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result. The Determining Party may determine a Close-out Amount for any group of Terminated Transactions or any individual Terminated Transaction but, in the aggregate, for not less than all Terminated Transactions. Each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable.

Unpaid Amounts in respect of a Terminated Transaction or group of Terminated Transactions and legal fees and out-of-pocket expenses referred to in Section 11 are to be excluded in all determinations of Close-out Amounts.

In determining a Close-out Amount, the Determining Party may consider any relevant information, including, without limitation, one or more of the following types of information:—

(i)      quotations (either firm or indicative) for replacement transactions supplied by one or more third parties that may take into account the creditworthiness of the Determining Party at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Determining Party and the third party providing the quotation;

(ii)     information consisting of relevant market data in the relevant market supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads, correlations or other relevant market data in the relevant market; or

(iii)    information of the types described in clause (i) or (ii) above from internal sources (including any of the Determining Party's Affiliates) if that information is of the same type used by the Determining Party in the regular course of its business for the valuation of similar transactions.

The Determining Party will consider, taking into account the standards and procedures described in this definition, quotations pursuant to clause (i) above or relevant market data pursuant to clause (ii) above unless the Determining Party reasonably believes in good faith that such quotations or relevant market data are not readily available or would produce a result that would not satisfy those standards. When considering information described in clause (i), (ii) or (iii) above, the Determining Party may include costs of funding, to the extent costs of funding are not and would not be a component of the other information being utilised. Third parties supplying quotations pursuant to clause (i) above or market data pursuant to clause (ii) above may include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendors, brokers and other sources of market information.

Without duplication of amounts calculated based on information described in clause (i), (ii) or (iii) above, or other relevant information, and when it is commercially reasonable to do so, the Determining Party may in addition consider in calculating a Close-out Amount any loss or cost incurred in connection with its terminating, liquidating or re-establishing any hedge related to a Terminated Transaction or group of Terminated Transactions (or any gain resulting from any of them).

Commercially reasonable procedures used in determining a Close-out Amount may include the following:—

(1)      application to relevant market data from third parties pursuant to clause (ii) above or information from internal sources pursuant to clause (iii) above of pricing or other valuation models that are, at the time of the determination of the Close-out Amount, used by the Determining Party in the regular course of its business in pricing or valuing transactions between the Determining Party and unrelated third parties that are similar to the Terminated Transaction or group of Terminated Transactions; and

ISDA® 2002

(2)      application of different valuation methods to Terminated Transactions or groups of Terminated Transactions depending on the type, complexity, size or number of the Terminated Transactions or group of Terminated Transactions.

*"Confirmation"* has the meaning specified in the preamble.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Contractual Currency"* has the meaning specified in Section 8(a).

*"Convention Court"* means any court which is bound to apply to the Proceedings either Article 17 of the 1968 Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters or Article 17 of the 1988 Lugano Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Cross-Default"* means the event specified in Section 5(a)(vi).

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Designated Event"* has the meaning specified in Section 5(b)(v).

*"Determining Party"* means the party determining a Close-out Amount.

*"Early Termination Amount"* has the meaning specified in Section 6(e).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"electronic messages"* does not include e-mails but does include documents expressed in markup languages, and *"electronic messaging system"* will be construed accordingly.

*"English law"* means the law of England and Wales, and *"English"* will be construed accordingly.

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Force Majeure Event"* has the meaning specified in Section 5(b).

*"General Business Day"* means a day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits).

*"Illegality"* has the meaning specified in Section 5(b).

ISDA® 2002

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority), and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means (a) in relation to any obligation under Section 2(a)(i), a General Business Day in the place or places specified in the relevant Confirmation and a day on which a relevant settlement system is open or operating as specified in the relevant Confirmation or, if a place or a settlement system is not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) for the purpose of determining when a Waiting Period expires, a General Business Day in the place where the event or circumstance that constitutes or gives rise to the Illegality or a Force Majeure Event, as the case may be, occurs, (c) in relation to any other payment, a General Business Day in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment and, if that currency does not have a single recognised principal financial centre, a day on which the settlement system necessary to accomplish such payment is open, (d) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), a General Business Day (or a day that would have been a General Business Day but for the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event) in the place specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (e) in relation to Section 5(a)(v)(2), a General Business Day in the relevant locations for performance with respect to such Specified Transaction.

*"Local Delivery Day"* means, for purposes of Sections 5(a)(i) and 5(d), a day on which settlement systems necessary to accomplish the relevant delivery are generally open for business so that the delivery is capable of being accomplished in accordance with customary market practice, in the place specified in the relevant Confirmation or, if not so specified, in a location as determined in accordance with customary market practice for the relevant delivery.

*"Master Agreement"* has the meaning specified in the preamble.

*"Merger Without Assumption"* means the event specified in Section 5(a)(viii).

*"Multiple Transaction Payment Netting"* has the meaning specified in Section 2(c).

*"Non-affected Party"* means, so long as there is only one Affected Party, the other party.

*"Non-default Rate"* means the rate certified by the Non-defaulting Party to be a rate offered to the Non-defaulting Party by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the Non-defaulting Party for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Other Amounts"* has the meaning specified in Section 6(f).

ISDA® 2002

*"Payee"* has the meaning specified in Section 6(f).

*"Payer"* has the meaning specified in Section 6(f).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Proceedings"* has the meaning specified in Section 13(b).

*"Process Agent"* has the meaning specified in the Schedule.

*"rate of exchange"* includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Schedule"* has the meaning specified in the preamble.

*"Scheduled Settlement Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is not a Transaction under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (ii) which is a type of transaction that is similar to any transaction referred to in clause (i) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are to be made, (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Stamp Tax Jurisdiction"* has the meaning specified in Section 4(e).

ISDA® 2002

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means, with respect to any Early Termination Date, (a) if resulting from an Illegality or a Force Majeure Event, all Affected Transactions specified in the notice given pursuant to Section 6(b)(iv), (b) if resulting from any other Termination Event, all Affected Transactions and (c) if resulting from an Event of Default, all Transactions in effect either immediately before the effectiveness of the notice designating that Early Termination Date or, if Automatic Early Termination applies, immediately before that Early Termination Date.

*"Termination Currency"* means (a) if a Termination Currency is specified in the Schedule and that currency is freely available, that currency, and (b) otherwise, euro if this Agreement is expressed to be governed by English law or United States Dollars if this Agreement is expressed to be governed by the laws of the State of New York.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Close-out Amount is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Force Majeure Event, a Tax Event, a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Threshold Amount"* means the amount, if any, specified as such in the Schedule.

*"Transaction"* has the meaning specified in the preamble.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii) or due but for Section 5(d)) to such party under Section 2(a)(i) or 2(d)(i)(4) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date, (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii) or 5(d)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered and (c) if the Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions, any Early Termination Amount due prior to such Early Termination Date and which remains unpaid as of such Early Termination Date, in each case together with any amount of interest accrued or other

ISDA® 2002

compensation in respect of that obligation or deferred obligation, as the case may be, pursuant to Section 9(h)(ii)(1) or (2), as appropriate. The fair market value of any obligation referred to in clause (b) above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it will be the average of the Termination Currency Equivalents of the fair market values so determined by both parties.

**"Waiting Period"** means:

(a) in respect of an event or circumstance under Section 5(b)(i), other than in the case of Section 5(b)(i)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of three Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance; and

(b) in respect of an event or circumstance under Section 5(b)(ii), other than in the case of Section 5(b)(ii)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of eight Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**CITIBANK, N.A.**

By: _~~Linda L Cook~~_

             Linda Cook
Print Name: _Vice President_
            Citibank, N.A.

Title: _____

Date: _____

**CDO PLUS MASTER FUND LTD.,** by Rekon Advisors LLC, as Investment Advisor and not in its individual capacity

By: _~~signature~~_

Print Name: _Eric Rosenfield_

Title: _Director_

Date: _September 1, 2006_

Copyright © 2002 by International Swaps and Derivatives Association, Inc.

# Exhibit 2

*Execution Copy*
*[Reference No. CB11-130]*

SCHEDULE

to the

ISDA 2002 Master Agreement

dated as of September 1, 2006,

between

CITIBANK, N.A.,
a national banking association organized under the laws of the United States
("Party A")

and

CDO PLUS MASTER FUND LTD.,
an exempted company organized and existing
under the laws of Jersey
("Party B")

Part 1

Termination Provisions

In this Agreement:

(a)    **"Specified Entity"** means for the purpose of Section 5(a)(v) of this Agreement, in relation to Party A, Citigroup Global Markets Limited, Citigroup Global Markets Inc., Citigroup Forex Inc., Citigroup Global Markets Commercial Corp., Citicorp Securities Services, Inc., Citigroup Global Markets Deutschland AG, Citigroup Energy Inc., and Citigroup Financial Products Inc. (individually a "Section 5(a)(v) Affiliate"), and in relation to Party B, not applicable.

(b)    **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement. For purposes of clause (c) of such definition, Specified Transaction includes any securities options, margin loans, short sales, and any other similar transaction now existing or hereafter entered into between Party A (or any Section 5(a)(v) Affiliate) and Party B.

(c)      The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and will apply to Party B.

For purposes of Section 5(a)(vi), the following provisions apply:

**"Specified Indebtedness** shall have the meaning set forth in Section 14 of this Agreement, provided, however, that Specified Indebtedness shall not include deposits received in the course of a party's ordinary banking business.

**"Threshold Amount"** means,

(i) with respect to Party A, 2% of the stockholders' equity of Party A; and
(ii) with respect to Party B, the lessor of 2% of the Net Asset Value of Party B or 10,000,000USD;

including the U.S. Dollar equivalent on the date of any default, event of default or other similar condition or event of any obligation stated in any other currency.

For purposes of (i) above, stockholders' equity shall be determined by reference to the relevant party's most recent consolidated (quarterly, in the case of a U.S. incorporated party) balance sheet and shall include, in the case of a U.S. incorporated party, legal capital, paid-in capital, retained earnings and cumulative translation adjustments. Such balance sheet shall be prepared in accordance with accounting principles that are generally accepted in such party's country of organization. For purposes of (ii) above, the Net Asset Value shall be determined by reference to Party B's most recent NAV and Performance Statement (as defined in Part 3(f)) delivered to Party A.

(d)      The **"Credit Event Upon Merger"** provisions of Section 5(b)(v) of this Agreement will apply to Party A and will apply to Party B.

(e)      The **"Automatic Early Termination"** provisions of Section 6(a) will not apply to Party A and will not apply to Party B; provided, however, that with respect to a party, where the Event of Default specified in Section 5(a)(vii)(1), (3), (4), (5), (6) or to the extent analogous thereto, (8) is governed by a system of law which does not permit termination to take place after the occurrence of the relevant Event of Default, then the Automatic Early Termination provisions of Section 6(a) will apply to such party.

(f)      **"Termination Currency"** means United States Dollars.

(g)      **"Additional Termination Event"** will apply.

(i) **Net Asset Value.** It shall constitute an Additional Termination Event, Party B shall be the Affected Party and Party A shall be the party entitled to designate an Early Termination Date and determine the Close-out Amount, if at any time the Net Asset Value of Party B (i) declines by 35% or more as measured at any month end as compared

to the month end 12 months prior; (ii) declines by 25% or more as measured at any month end compared to the month end 3 months prior; (iii) declines by 15% or more as measured at any month end compared to the immediately prior month end; or (iv) falls below the NAV Floor (as defined below).

The "NAV Floor" shall be defined as follows:

From and including the date of this Agreement to and including December 31, 2006, the NAV Floor shall equal 65% of the Net Asset Value of Party B as of the date of this Agreement. On January 1st of each year thereafter the NAV Floor shall be redetermined as the greater of the NAV Floor in effect for the previous year, or 65% of the Net Asset Value of Party B on December 31st of the previous year.

(ii)    **Investment Advisor.** It shall constitute an Additional Termination Event, with each of Party A and Party B as an Affected Party and Party A shall be the party entitled to designate an Early Termination Date and determine the Close-out Amount, if at any time Party B shall have failed to maintain Rekon Advisors LLC (the "Investment Advisor") or an Affiliate thereof, or a successor thereto acceptable to Party A in its sole discretion, as investment advisor.

Part 2

Tax Representations

(a) **Payer Representations.** For the purpose of Section 3(e) of this Agreement, Party A will make the following representation and Party B will make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 9(h) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, except that it will not be a breach of this representation where reliance is placed on clause (ii) above and the other party does not deliver a form or documents under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b) **Payee Representations.** For the purpose of Section 3(f) of the Agreement, Party A and Party B make the representations specified below, if any:

The following representation will apply to Party A:

It is a national banking association organized under the laws of the United States and its U.S. taxpayer identification number is 13-5266470. It is "exempt" within the meaning of Treasury Regulation sections 1.6041-3(p) and 1.6049-4(c) from information reporting on Form 1099 and backup withholding.

The following representation will apply to Party B:

Each payment received or to be received by it in connection with this Agreement will not be effectively connected with the conduct of a trade or business in the United States.

Part 3

Agreement to Deliver Documents

For the purpose of Section 4(a) of this Agreement:

I.    Tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| (i) Party B | As required under Section 4(a)(i) of the Agreement, IRS Form W-9, IRS Form W-8BEN, IRS Form W-8ECI, IRS Form W-8EXP and/or IRS Form W-8IMY, whichever is relevant. | Promptly upon execution of this Agreement; and promptly upon learning that any form previously provided by Party B has become obsolete or incorrect. |

II. Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| (a) Party A and Party B | Evidence reasonably satisfactory to the other party of the (i) authority of such party to enter into the Agreement and any Transactions and (ii) the authority and genuine signature of the individual signing the Agreement on behalf of such party to execute the same. | As soon as practicable after execution of this Agreement and, if requested by the other party, as soon as practicable after execution of any Confirmation of any other Transaction. | Yes |
| (b) Party B | A certificate of an authorized officer for such party certifying the authority, names and true signatures of the officers signing this and the officers or other entities or agents, including the Investment Advisor, authorised to sign any Confirmations or approve any Transactions, reasonably satisfactory in form and substance to Party A. | Upon execution of this Agreement and as necessary for any further documentation. | Yes |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| (c) Party B | Certified copies of (A) Party B's certificate of incorporation and by-laws (or any similar chartering documents), (B) the current Investment Advisory Agreement (or other similar agreement) between the Investment Advisor and Party B, (C) any investment policies, trading strategies or restrictions of Party B that relate to derivative transactions, and (D) the Confidential Private Placement Memorandum of Party B. | Upon execution of this Agreement and each time that any document or policy referenced therein is revised. | Yes |

| Party required To deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| (d)   Party A | The party's Consolidated Reports of Condition and Income for a Bank with Domestic and Foreign Offices – FFIEC 031 | Upon request, provided, however, that such financials are "deemed " to be delivered hereunder on the date the same shall be posted on the Citibank.com website (www.citibank.com) | Yes |
| (e)   Party B | The party's annual report containing audited consolidated financial statements prepared in accordance with accounting principles that are generally accepted in such party's country of organization and certified by independent certified public accountants for each fiscal year. | As soon as available and in any event within 120 days (or as soon as practicable after becoming publicly available) after the end of each of its fiscal years. | Yes |
| (f)   Party B | The party's unaudited consolidated financial statements, the consolidated balance sheet and related statements of income for each fiscal quarter prepared in accordance with accounting principles that are generally accepted in Party B's country of organization. | As soon as available and in any event within 60 days (or as soon as practicable after becoming publicly available) after the end of each of its fiscal years. | Yes |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
| --- | --- | --- | --- |
| (f) Party B | A statement including a calculation of Party B's Net Asset Value and Performance as of the end of each calendar month (the "NAV and Performance Statement"). | Within 15 days after the end of each calendar month. | Yes |
| (g) Party B | A letter from the Process Agent in the City of New York designated pursuant to paragraph (b) of Part 4 of this Schedule in which such Process Agent agrees to act as agent for service of process with respect to this Agreement and each Transaction and to forward promptly to Party B all process received by such Process Agent. | As soon as practicable after execution of this Agreement and the first Confirmation of a Transaction. | Yes |
| (h) Party A and Party B | The Credit Support Document(s) | Upon execution of this Agreement | No |
| (i) Party B | Such other documents as Party A may reasonably request in connection with any Transaction. | Promptly upon request by Party A. | Yes |

Part 4

Miscellaneous

(a) **Addresses for Notices.** For the purpose of Section 12(a) of this Agreement:

**Address for notices or communications to Party A:**

With respect to a particular Transaction, all notices or communications to Party A shall be sent to the address or facsimile number indicated in the Confirmation of that Transaction.

In addition, in the case of notices or communications relating to Section 5, 6, 11 or 13 of this Agreement, a copy of any such notice or communication shall be addressed to the attention of:

Address:      Citibank, N.A.
              250 West Street
              10th Floor
              New York, New York  10013

Attention:    Director Derivatives Operations

Facsimile No.: 212 723 2956

(For all purposes)

In addition, in the case of notices or communications relating to Section 5, 6, 11 or 13 of this Agreement, a second copy of any such notice or communication shall be addressed to the attention of Party A's legal department as follows:

Address:      Legal Department
              77 Water Street
              9th Floor
              New York, New York 10004

Attention:    Department Head

Facsimile No.: 212 657 1452

**Address for notices or communications to Party B:**

Address:     CDP Plus Master Fund Ltd.
               C/o Rekon Advisors LLC
               497 S.E. 1st Street
               Delray Beach, FL 33483

Attention:    Robert Fasulo
               General Counsel

Facsimile No: 561 330 8006

       (b)    **Process Agent.** For the purpose of Section 13(c) of this Agreement:

             Party B appoints as its Process Agent:

             CDP Plus Master Fund Ltd.
             C/o Rekon Advisors LLC
             497 S.E. 1st Street
             Delray Beach, FL 33483

             Attention:    Robert Fasulo
                            General Counsel

             Facsimile No: 561 330 8006

       (c)    **Offices.** The provisions of Section 10(a) will apply to this Agreement.

       (d)    **Multibranch Party.** For the purpose of Section 10(b) of this Agreement:

             Party A is a Multibranch Party and may enter into a Transaction through any of the following offices: New York, London, Tokyo, Singapore and Sydney.

             Party B is not a Multibranch Party

       (e)    **Calculation Agent.** The Calculation Agent will be Party A unless otherwise specified in a Confirmation in reference to the relevant Transaction.

(f)     **Credit Support Document.**   Credit Support Documents means, with respect to both parties, the ISDA Credit Support Annex between Party A and Party B annexed hereto and dated as of the date hereof.

(g)     **Credit Support Provider.** Not Applicable.

(h)     **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York.

(i)     **Jurisdiction.**   Section 13(b)(i) of the Agreement is hereby amended by deleting in line 2 of paragraph 2 the word "non-" and by deleting paragraph (iii) thereof. The following shall be added at the end of Section 13(b):  "Nothing in this provision shall prohibit a party from bringing an action to enforce a money judgment in any other jurisdiction."

(j)     **"Affiliate"** will have the meaning specified in Section 14 of this Agreement, provided, however that except as set forth in Part 1(g)(ii) in relation to Party B "Affiliate" shall be not applicable.

(k)     **Absence of Litigation.**   For the purpose of Section 3(c):  "Specified Entity" means in relation to Party A, any Affiliate of Party A, and in relation to Party B, not applicable.

(l)     **No Agency.**   The provisions of Section 3(g) will apply to this Agreement.

(m)     **Additional Representation** will apply.  For the purpose of Section 3 of this Agreement, the following will constitute an Additional Representation:

"(h) **Relationship Between Parties.** Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(1) **No Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction.  It has not received from the other party any assurance or guarantee as to the expected results of that Transaction.

(2) **Evaluation and Understanding.** It is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the financial and other risks of that Transaction.

(3) **Status of Parties.** The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

(i) **Eligible Contract Participant Representation.** (a) It is an "eligible contract participant" within the meaning of Section 1(a)(12) of the Commodity Exchange Act, as amended (the "CEA"), (b) this Agreement and each Transaction is subject to individual negotiation by each party, and (c) neither this Agreement nor any Transaction will be executed or traded on a "trading facility" within the meaning of Section 1a(33) of the CEA.

(j) **Financial Institution.** It is a "financial institution" as defined in the Federal Deposit Insurance Corporation Improvement Act of 1991 or Regulation EE promulgated by the Federal Reserve Board thereunder.

(k) **ERISA.** The assets that are used in connection with the execution, delivery and performance of this Agreement and the Transactions entered into pursuant hereto are not the assets of an employee benefit or other plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan described in Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), an entity whose underlying assets include "plan assets" by reason of Department of Labor regulation section 2510.3-101, or a governmental plan that is subject to any federal, state, or local law that is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code."

(n) **"Netting of Payments"** Either party may notify the other in writing, not less than one Local Business Day in advance of one or more Scheduled Payment Dates, that with regard to payments due on that date, Multiple Transaction Payment Netting will apply. Except to the extent that such advance written notice shall have been given, subparagraph Multiple Transaction Payment Netting will not apply for purposes of Section 2(c) of this Agreement. Provided however, that for each of the following groups of Transactions, Party A and Party B hereby elect to net payments of all amounts payable on the same day in the same currency (and through the same Office of Party A) by specifying that Section 2(c) of the Agreement will apply with respect to each of the following groups of Transactions:

(i)     FX Transactions entered into by the parties; and

(ii)    Currency Option Transactions entered into by the parties.

The starting date for the election commences upon entering the first Transaction under the Agreement with respect to either of the above groups of Transactions.

Part 5

Other Provisions

(a)    **Waiver of Right to Trial by Jury.**  Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement.

(b)    **Severability.**  Except as otherwise provided in Sections 5(b)(i) or 5(b)(ii) in the event that any one or more of the provisions contained in this Agreement should be held invalid, illegal, or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. The parties shall endeavor, in good faith negotiations, to replace the invalid, illegal or unenforceable provisions with valid provisions, the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

(c)    **Netting.**  In the event that any Terminated Transaction cannot be aggregated and netted against all other Terminated Transactions under Section 6(e) of the Agreement, such excluded Terminated Transactions shall be aggregated and netted amongst themselves to the fullest extent permitted by law.

(d)    **Confirmation Procedures.**  For each Transaction that Party A and Party B enter hereunder, Party A shall promptly send to Party B a Confirmation setting forth the terms of such Transaction.  Party B shall execute and return the Confirmation to Party A or request correction of any error within five Business Days of receipt.  Failure of Party B to respond within such period shall not affect the validity or enforceability of such Transaction and shall be deemed to be an affirmation and acceptance of such terms.

(e)    **Escrow Payments.**  If by reason of the time difference between the cities in which payments are to be made, it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may at its option and in its sole discretion notify the other party that payments on that date are to be made in escrow.  In this case the deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the party giving the notice, accompanied by irrevocable payment instructions (i) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by the irrevocable payment instructions to the same effect or (ii) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow.  The party that elects to have payments made in escrow shall pay the costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 am. local time on that day) if that payment is not released by 5:00

p.m. on the date it is deposited for any reason other than the intended recipients' failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(f)  **Recording of Conversations.** Each party hereto consents to the recording of its telephone conversations relating to this Agreement or any potential Transaction. To the extent that one party records telephone conversations (the "Recording Party") and the other party does not (the "Non-Recording Party"), the Recording Party shall, in the event of any dispute, make a complete and unedited copy of such party's tape of the entire day's conversations with the Non-Recording Party's personnel available to the Non-Recording Party. The Recording Party's tapes may be used by either party in any forum in which a dispute is sought to be resolved and the Recording Party will retain tapes for a consistent period of time in accordance with the Recording Party's policy unless one party notifies the other that a particular transaction is under review and warrants further retention.

(g)  **Limitation of Liability.** No party shall be required to pay or be liable to the other party for any consequential, indirect or punitive damages, opportunity costs or lost profits.

(h)  **Additional Party B Covenant.** For purposes of Section 4 of this Agreement, the following shall be added immediately following paragraph (e) thereof:

"(f) **Notification Requirements.** Party B shall notify Party A in writing immediately upon the occurrence of (a) an event set forth in Part 1(g)(ii), and (b) a material change in Party B's investment policies in particular as the same relates to Party B's investment restrictions and/or trading strategies."

(i)  For purposes of Section 3 of this Agreement, the following shall be added immediately following paragraph (k) thereof:

"(l) **Compliance with Investment Policies.** Party B hereby represents to Party A that the execution, delivery, and performance by it of this Agreement and each Confirmation does not conflict with or violate the investment policies, trading strategies and/or restrictions of Party B as set forth in Party B's prospectus or organizational documents as currently in effect.

(m) **Investment Advisor Authorized as Agent.** Party B represents and warrants to Party A that the Investment Advisor is duly authorized to act as Party B's agent in entering into and confirming Transactions and receiving notices to Party B under this Agreement, and that the Investment Advisor's entering into or confirmation of any Transaction shall be sufficient to bind Party B, with the result that Party B's signature shall not be required on any Confirmation."

(j) **Investment Advisor Representations.** The following representations shall be made by the Investment Advisor in accordance with Section 3 of the Agreement as if the Investment Advisor was a party to the Agreement:

"(i) Investment Advisor Representations. The Investment Advisor represents and warrants to Party A that it is (x) duly authorized to act as Party B's agent in entering into and confirming Transactions and in receiving notices to Party B under this Agreement, and (y) that any Transaction shall be entered into in accordance with the applicable investment policies, trading strategies and/or restrictions of Party B as are then in effect.

(ii) No Investment Advice from Party A. The Investment Advisor represents and agrees that no advice given by Party A or its Affiliates shall form a primary basis for any decision by or on behalf of the Investment Advisor relating to any Transaction under or in connection with this Agreement, that neither Party A nor any of its Affiliates is or shall be a fiduciary or advisor with respect to the Investment Advisor or Party B and that no amounts paid or to be paid to Party A or its Affiliates are attributable to any advice provided by Party A or its Affiliates."

(k) **Definitions.** The following shall constitute additional definitions for the purposes of this Schedule and Section 14 of this Agreement.

"Net Asset Value" means as of any date the Total Assets minus Total Liabilities, in each case as of such date. As used herein, "Total Assets" means, at any date, all assets of Party B which in accordance with generally accepted accounting principles would be classified as assets upon a balance sheet of Party B prepared as of such date. As used herein, "Total Liabilities" means, at any date, all liabilities of Party B which in accordance with generally accepted accounting principles would be classified as liabilities upon a balance sheet of Party B prepared as of such date.

(l) **2002 Master Agreement Protocol.** The parties agree that the definitions and provisions contained in Annexes 1 to 16 and Section 6 of the 2002 Master Agreement Protocol published by the International Swaps and Derivatives Association, Inc. on 15th July, 2003 are incorporated into and apply to this Agreement.

PART 6

FX Transactions and Currency Option Transactions

(a) The 1998 FX and Currency Option Definitions.

(1)     The provisions of the 1998 FX and Currency Option Definitions as published by ISDA, Emerging Markets Traders Association and The Foreign Exchange Committee (the "FX Definitions"), are hereby incorporated herein in its entirety and shall apply to FX Transactions and Currency Option Transactions entered into by the Offices of the parties specified in Part 4 of this Schedule.  FX Transactions and Currency Option Transactions are each deemed to be "Transactions" pursuant to the ISDA Master Agreement.

(2)     Unless otherwise agreed to by the parties, all FX and Currency Option Transactions entered into between the parties prior to the date of this Agreement shall be deemed to be Transactions for purposes of this Agreement.  The confirmation of all FX and Currency Option Transactions via any electronic media, telex, facsimile or writing shall constitute a "Confirmation" as referred to in this Agreement even where not so specified in the Confirmation.  Such Confirmations will supplement, form a part of, and be subject to this Agreement.

(b) Article 3 General Terms Relating to Currency Option Transactions.

The FX Definitions are hereby amended by adding the following new Section 3.9:

Section 3.9 Discharge and Termination of Options. Unless otherwise agreed, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or Put, respectively, written by the other party, such termination and discharge to occur automatically upon the payment in full of the last Premium payable in respect of such Currency Option Transaction; provided that such termination and discharge may only occur in respect of Currency Option Transactions with the same material terms, including but not limited to:

(a)     each being with respect to the same Put and the same Call (i.e., a Put may only be discharged against another Put and not against a Call);

(b)     each having the same Expiration Date and Expiration Time;

(c)     each being of the same style (i.e., either both being of American or European Style);

(d)     each having the same Strike Price;

(e)     neither of which shall have been exercised;

(f)     each of which has been entered into by the same pair of Offices of the parties; and

(g)     each having the same procedures for exercise;

and, upon the occurrence of such termination and discharge, neither party shall have any further obligation to the other party in respect of the relevant Currency Option Transactions terminated and discharged.  In the case of a partial termination and discharge (i.e., where the relevant Currency Option Transactions are for different amounts of the Currency Pair), the remaining portion of the Currency Option Transaction shall continue to be a Currency Option Transaction for all purposes hereunder.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

CITIBANK, N.A.

By: _____

Print Name: _____

Title: _____
Linda Cook
Vice President
Citibank, N.A.

Date: _____

CDO PLUS MASTER FUND LTD., by Rekon Advisors LLC, as Investment Advisor and not in its individual capacity.

By: _____

Print Name: Eric Rosenfield

Title: Director

Date: September 1, 2006

REKON ADVISORS LLC, in its individual capacity in respect of the representations made by the Investment Advisor in Part 5 of this Schedule.

By: _____

Name: Eric Rosenfield

Title: Director

Date: September 1, 2006

# Exhibit 3

**(Bilateral Form)**

[Execution Copy]
Reference No. CB11-130
(ISDA Agreements Subject to New York Law Only)



International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

.............................................. ISDA Master Agreement ....................................................

dated as of September 1, 2006

between

**CITIBANK, N.A.**                    **CDO PLUS MASTER FUND LTD.**

and

("Party A")                              ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:

**Paragraph 1. Interpretation**

(a)      *Definitions and Inconsistency.*  Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)      *Secured Party and Pledgor.*  All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions    of law generally relating to security interests and secured parties.

**Paragraph 2. Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

Copyright 1994 by International Swaps and Derivatives Association, Inc.

**Paragraph 3. Credit Support Obligations**

(a)     *Delivery Amount.*  Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

(i) the Credit Support Amount

exceeds

(ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)     *Return Amount.*  Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

(i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

exceeds

(ii) the Credit Support Amount.

*"Credit Support Amount"*  means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)     *Conditions Precedent.*  Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

(i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

(ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)     *Transfer Timing.*  Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)     *Calculations.*  All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

2

**(d)    *Substitutions.***

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

## Paragraph 5. Dispute Resolution

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

3

**Paragraph 6. Holding and Using Posted Collateral**

(a)  *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)  *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)  *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)  *Distributions and Interest Amount.*

(i) *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

4

ISDA®1994

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

## Paragraph 7. Events of Default

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8. Certain Rights and Remedies

(a)    *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

ISDA®1994

(b)    *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

    (i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

    (ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

    (iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

    (iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

        (A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

        (B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)    *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

    (i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

    (ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

    (iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

    (iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

ISDA®1994

**Paragraph 10. Expenses**

(a)    *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)    *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)    *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)    *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)    *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)    *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)    *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)    *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)    *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

ISDA®1994

**Paragraph 12. Definitions**

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day"*, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

8

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however*, that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

  (i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

  (ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

  (iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

  (iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

ISDA®1994

*"Valuation Agent"* has the meaning specified in Paragraph 13.

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"Valuation Time"* has the meaning specified in Paragraph 13.

*"Value"* means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

    (i) Eligible Collateral or Posted Collateral that is:

        (A) Cash, the amount thereof; and

        (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

    (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

    (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

ISDA®1994

11

*[Reference No. CB11-130B]*

**Paragraph 13. Elections and Variables**

(a)      **Security Interest for "Obligations".** The term "Obligations" shall have the meaning set forth in Paragraph 12.

(b)      **Credit Support Obligations.**

(i) **Delivery Amount, Return Amount and Credit Support Amount; Addition to Paragraph 3.**

(A) **"Delivery Amount"** has the meaning set forth in Paragraph 3(a).

(B) **"Return Amount"** has the meaning set forth in Paragraph 3(b).

(C) **"Credit Support Amount"** means for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) the Pledgor's Threshold, if any; provided, however, that (x) in the case where the sum of the Independent Amounts applicable to the Pledgor exceeds zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Pledgor and (y) in all other cases, the Credit Support Amount will be deemed to be zero whenever the calculation of the Credit Support Amount yields an amount less than zero.

(ii) **Eligible Collateral.** The items set forth on Schedule I hereto will qualify as **"Eligible Collateral"** for the party specified.

(iii) **Other Eligible Support.** There shall be no "Other Eligible Support" for either party for purposes of this Annex.

(iv) **Thresholds.**

(A) **"Independent Amount"** shall mean, with respect to Party A and Party B and with regard to any Transaction, the USD equivalent of the amount as specified in the relevant Confirmation.

(B) **"Threshold"** shall mean, with respect to both Party A and Party B, zero.

(C) **"Minimum Transfer Amount"** for purposes of computing a Delivery Amount pursuant to Paragraph 3(a) and a Return Amount pursuant to Paragraph 3(b) , as of any date shall be 250,000USD.

(D) **Rounding.** The Delivery Amount and the Return Amount will not be rounded.

(c)      **Valuation and Timing.**

(i) **"Valuation Agent"** means, for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for purposes of Paragraphs 4(d)(ii) and 6(d), the Secured Party receiving or deemed to receive the Substitute Credit Support or the Distributions of the Interest Amount, as applicable.

(ii) **"Valuation Date"** means each Local Business Day.

(iii) **"Valuation Time"** means, with respect to the determination of Exposure, Value of Eligible Credit Support and Posted Credit Support, the close of business on the Local Business Day immediately before the Valuation Date or date of calculation, as applicable.

(iv) **"Notification Time"** means 10:00 a.m., New York time on a Valuation Date provided, however, that, notwithstanding Paragraph 4(b), if a request for Transfer is made by the Notification Time, then the relevant Transfer shall be made not later than the close of business on such day and, if such request is received after the Notification Time, not later than the close of business on the next Local Business Day following such request.   Notwithstanding anything herein to the contrary, with regard to Transfers of Independent Amounts, the relevant Transfer shall be made by the close of business on the second Local Business Day following the Trade Date of the applicable Transaction.

(d)    **Conditions Precedent and Secured Party's Rights and Remedies.** Each Termination Event specified below with respect to a party will be a *"Specified Condition"* for that party (the specified party being the Affected Party if a Termination Event or Additional Termination Event occurs with respect to such party):

|  | Party A | Party B |
|---|---|---|
| Illegality | [  ] | [  ] |
| Tax Event | [  ] | [  ] |
| Tax Event Upon Merger | [  ] | [  ] |
| Credit Event Upon Merger | [X] | [X] |
| Additional Termination Events specified in the Schedule to this Agreement | [X] | [X] |

(e)    **Substitution.**  **"Substitution Date"** has the meaning specified in Paragraph 4(d)(ii).

(f)    **Dispute Resolution.**

(i)    **"Resolution Time"** means 1:00 p.m., New York time, on the Local Business Day following the date on which notice is given that gives rise to a dispute under Paragraph 5.

(ii) Value. For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support will be calculated as follows: the sum of (i) (x) the arithmetic mean of the mid market quotations on the relevant date of three nationally recognized principal market makers (which may include an affiliate of Party A) for such security chosen by the Valuation Agent multiplied by the applicable Valuation Percentage or (y) if no quotations are available from such principal market makers on the relevant date, the arithmetic mean of the closing bid prices on the next preceding date multiplied by the applicable Valuation Percentage plus (ii) the accrued interest on such security (except to the extent Transferred to a party pursuant to any applicable provision of this Agreement or included in the applicable price referred to in (i) of this clause) as of such date.

(iii) **Alternative.** The provisions of Paragraph 5 will apply.

**(g) Holding and Using Posted Collateral**.

(i) **Eligibility to Hold Posted Collateral; Custodians**.  A party or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b) provided that such party is not a Defaulting Party.  Initially Party A shall not be using a Custodian and initially the Custodian for Party B shall be as set forth in a written notice delivered to Party A to the address and in the manner as set forth in Paragraph (k).

(ii) **Use of Posted Collateral**.  The provisions of Section 6(c) will apply to both parties.

(h)      **Distributions and Interest Amount**.

(i) **Interest Rate**.  The "Interest Rate" will be the overnight ask rate in effect for such day, as set forth opposite the caption "O/N" under the heading "USD" on Telerate Page 3750 or any successor page thereto on or about 11:00 a.m., New York time, on such day and if no successor page is quoted, as agreed by the parties.

(ii) **Transfer of Interest Amount**.  Transfers of the Interest Amount will be made in arrears on the last Local Business Day of each calendar month.

(iii) **Alternative to Interest Amount**.  The provisions of Paragraph 6(d)(ii) will apply, provided, however, that the Interest Amount will compound daily.

(i) **Additional Representations**.

(i) Notwithstanding anything to the contrary contained herein, ("X") shall be the beneficial owner, within the meaning of the U.S. tax laws, of any securities it shall Transfer as collateral to the other party ("Y") pursuant to the terms hereof.

(ii) X shall promptly provide to Y, upon written request, any tax documentation reasonably requested by Y to allow Y to make gross interest payments to X in respect of any Posted Collateral Transferred to Y pursuant hereto.

(j)      **Other Eligible Support and Other Posted Support**.

(i) **"Value"** with respect to Other Eligible Support and Other Posted Support shall not be applicable.

(ii) **"Transfer"** with respect to Other Eligible Support and Other Posted Support shall not be applicable.

(k)      **Demands and Notices**.

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Annex, provided, that the address for Party A for such purposes shall be:

Citibank N.A.
Collateral Management Group
333 West 34th Street, 2nd FL
New York, NY  10001
Telephone no. (212) 615-8406
Facsimile no. (212) 994-0727;

N:\CBNA\CB11-130B

14

and the address for Party B for such purposes shall be:

CDP Plus Master Fund Ltd.
C/o Rekon Advisors LLC
497 S.E. 1st Street
Delray Beach, FL 33483
Telephone no. (561) 330 6999
Facsimile No: (561) 330 8006

(l)    **Other Provisions.**

(i) **Custodians.**    A party shall be eligible to serve as Custodian if and for so long as it (i) is not affiliated with Party A or Party B, (ii) is a trust company or commercial bank with trust powers, organized under the laws of the United States of America or any state thereof and subject to supervision or examination by federal or state authority, having a combined capital and surplus of at least $500,000,000 and (iii) shall have general unsecured short-term obligations rated at least "P-1" by Moody's or "A-2" by S&P or have outstanding long term unsecured unsubordinated debt securities rated at least "Baa2" by Moody's or "BBB" by S&P.

(ii) **Actions Hereunder.**    Either party may take any actions hereunder, including liquidation rights, through its Custodian or other agent.

(iii) **Events of Default.**    Paragraph 7(i) shall be amended and restated in its entirety as follows: "(i) that party fails (or fails to cause its Custodian) to make, when due any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount as applicable, required to be made by it and that failure continues for one Local Business Day after notice of that failure is given to that party;"

IN WITNESS WHEREOF, the parties hereto have executed this Annex as of the date first above written.

CITIBANK, N.A.

By:
Name:
Title:    Linda Cook
Vice President
Citibank, N.A.

CDO PLUS MASTER FUND LTD., by Rekon Advisors LLC, as Investment Advisor and not in its individual capacity.

By:
Name: Eric Rosenfield
Title: Director

N:\CBNA\CB11-130B

15

Schedule I

| | Party A | Party B | Valuation Percentage |
|---|---|---|---|
| (A) Cash | [X] | [X] | [100%] |
| (B) (x) Negotiable debt obligations issued by the U.S. Treasury Department or the Government National Mortgage Association ("Ginnie Mae"), or (y) mortgage backed securities issued by Ginnie Mae (but with respect to either (x) or (y) excluding interest only or principal only stripped securities, securities representing residual interests in mortgage pools, or securities that are not listed on a national securities exchange or regularly quoted in a national quotation service) and in each case having a remaining maturity of: | | | |
| (i) less than one year | [X] | [X] | [100%] |
| (ii) one year or greater but less than 10 years | [X] | [X] | [98%] |
| (iii) 10 years or greater | [X] | [X] | [95%] |
| (C) (x) Negotiable debt obligations issued by the Federal Home Loan Mortgage Association ("Freddie Mac") or the Federal National Mortgage Association ("Fannie Mae") or (y) mortgage-backed securities issued by Freddie Mac or Fannie Mae but excluding interest only or principal only stripped securities, securities representing residual interests in mortgage pools, or securities that are not listed on a national securities exchange or regularly quoted in a national quotation service. | [X] | [X] | [95%] |

N:\CBNA\CB11-I30B

16

| | | |
|---|---|---|
| (D)  Agency CMO. "Agency CMO" means U.S. Dollar-denominated collateralized mortgage obligations of fixed maturity with a rating classification of Aaa by Moody's and AAA by S&P (in the event of a split rating, the lower rating shall apply) and issued directly by or guaranteed by FNMA, FHLMC or Ginnie Mae which (i) is  a senior tranche security ranking pari passu with the highest debt class for payment priority in the issuance and (ii) is listed as a pac, sequential, scheduled or support obligation on Bloomberg or Intex or successor listing service excluding interest only or principal only stripped securities and securities representing residual interest on mortgage pools. | [X]     [X] | [ 95%] |
| (E)  Any other collateral acceptable to the Secured Party in its sole discretion | [X]     [X] | [*/] |

*/ The Valuation Percentage shall be determined by the Valuation Agent from time to time and in its sole discretion.

# Exhibit 4



Date:        July 5, 2007

To:          CDO PLUS MASTER FUND LTD. ("Counterparty")
Attn:        Andrea Miller
Phone:       1-561-330-6999
Fax:

From:        Citibank N.A., New York ("Citibank")
             333 West 34th Street, 2nd Floor
             New York, NY 10001, USA
Phone:       1-212-615-8468/9448
Fax:         +1 (646) 2913386
Email:       creditderivconfirms@citigroup.com

RE:          Credit Derivative Transaction on Collateralized Debt Obligation with Pay-As-You-Go or
             Physical Settlement (Dealer Form)

Our Ref:     C98101459
Your Ref:    Please provide

---

Dear Sir/Madam:

The purpose of this communication (the "Confirmation") is to confirm the terms and conditions of the Credit Derivative Transaction relating to a collateralized debt obligation reference obligation entered into between you CDO PLUS MASTER FUND LTD. ("Counterparty") and us Citibank N.A., New York ("Citibank") on the Trade Date specified below (the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions (the "Credit Derivatives Definitions"), as published by the International Swaps and Derivatives Association, Inc. ("ISDA") and the ISDA Standard Terms Supplement for use with Credit Derivatives Transactions on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement, as published by ISDA on June 6, 2007 (the "CDS on CDO Terms"), and, if Optional Early Termination is specified as being applicable, the Additional Provisions for Optional Early Termination published by ISDA on December 8, 2006, are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions or the CDS on CDO Terms and this Confirmation, this Confirmation will govern. In the event of any inconsistency between the CDS on CDO Terms and the Credit Derivatives Definitions, the CDS on CDO Terms will govern.

This Confirmation supplements, forms a part of, and is subject to, the ISDA Master Agreement, dated as of September 1, 1996, as amended and supplemented from time to time (the "Agreement"), between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

The terms of the Transaction to which this Confirmation relates are as follows:

Trade Date:          June 29, 2007

Effective Date:      July 5, 2007

Copyright © June 2007 by International Swaps & Derivatives Association, Inc.

| | | |
|---|---|---|
| Floating Rate Payer: | Counterparty | (the "Seller"). |
| Fixed Rate Payer: | Citibank | (the "Buyer"). |
| Calculation Agent: | Citibank | |
| Calculation Agent City: | New York | |
| Business Day: | New York, London | |
| Reference Entity: | MILLSTONE III CDO LTD III-A | |
| Reference Obligation: | The obligation identified as follows: | |

| | |
|---|---|
| Insurer: | N/A |
| CUSIP/ISIN: | 60129WAD1 |
| Bloomberg ID: | MLST III-A B |
| Legal final maturity date: | July 5, 2046 |
| Original Principal Amount: | USD 20,000,000 |
| Initial Factor: | 1.0 |
| Issuer: | The Reference Entity |

| | |
|---|---|
| Reference Policy: | Not Applicable |
| Reference Price: | 100% |
| Initial Face Amount: | USD 10,000,000.00 |
| Initial Payment: | Not Applicable |
| Fixed Rate: | 5.50% per annum |
| Implied Writedown | Applicable |
| Interest Shortfall Cap: | Applicable |

**If Interest Shortfall Cap is applicable, then specify:**

| | |
|---|---|
| Interest Shortfall Cap Annex: | Annex A |
| Interest Shortfall Cap Basis: | Fixed Cap |
| Interest Shortfall Compounding: | Applicable |
| Rate Source: | USD-LIBOR-BBA |

| | | |
|---|---|---|
| **Optional Termination:** | **Early** | Not Applicable |

2

**Additional Terms:**    Credit Support Annex Provisions:

This Transaction shall be subject to the Credit Support Annex dated as of September 1, 1996 between Citibank and Counterparty, provided however, for purposes of this Transaction the Independent Amount shall be 20.00 percent of the Floating Rate Payer Calculation Amount with respect to Counterparty.

**Office, Notice and Account Details:**

The Office of Counterparty for this Transaction is:

Please advise

The Office of Citibank for this Transaction is:    New York

Telephone, Telex and/or Facsimile Numbers and Contact Details for Notices:

Counterparty:    Please advise

Citibank:

| | | |
|---|---|---|
| Telephone number: | 8468 | 1-212-615- |
| Facsimile number: | 3386 | 1-646-291- |
| Attention: | Hershenov | Laurie |

Account Details:

Account Details of Counterparty:    To be advised

Account Details of Seller:

CITIBANK N.A. NEW YORK
BIC: CITIUS33
ACCOUNT NO 00167679
ACCOUNT NAME: FINANCIAL
FUTURES

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours sincerely,
Citibank N.A., New York

By: **JUSTIN PALAMARA**
Authorized Signatory

By: _____
    Name:
    Title:

Confirmed as of the date first above written:

CDO PLUS MASTER FUND LTD.

By:
    Name: DAVID Z. CRATH
    Title: CFO

4

# Exhibit 5

## ISDA STANDARD TERMS SUPPLEMENT FOR USE WITH CREDIT DERIVATIVE TRANSACTIONS ON COLLATERALIZED DEBT OBLIGATION WITH PAY-AS-YOU-GO OR PHYSICAL SETTLEMENT[1]

### (published on June 6, 2007)

This ISDA Standard Terms Supplement for use with Credit Derivative Transactions on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement (the "CDS on CDO Terms") hereby incorporates by reference the definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions as published by the International Swaps and Derivatives Association, Inc. ("ISDA") (the "Credit Derivatives Definitions"). In the event of any inconsistency between the Credit Derivatives Definitions and these CDS on CDO Terms, these CDS on CDO Terms will govern.[2]

References to the "Reference Obligation" in these CDS on CDO Terms or in the relevant Confirmation shall be to the terms of the Reference Obligation (as defined below) set out in the Underlying Instruments (as defined below) as amended from time to time unless otherwise specified below.

1.    **General Terms:**

        Trade Date:                 As shown in the relevant Confirmation.

        Effective Date:           As shown in the relevant Confirmation.

        Scheduled Termination Date:    The Legal Final Maturity Date of the Reference Obligation, subject to adjustment in accordance with the Following Business Day Convention.

---

THE FOOTNOTES TO THIS CDS ON CDO STANDARD TERMS SUPPLEMENT ARE PROVIDED FOR CLARIFICATION ONLY AND DO NOT CONSTITUTE ADVICE AS TO THE STRUCTURING OR DOCUMENTATION OF A CREDIT DERIVATIVE TRANSACTION.

ISDA has not undertaken to review all applicable laws and regulations of any jurisdiction in which the Credit Derivatives Definitions or these CDS on CDO Terms may be used. Therefore, parties are advised to consider the application of any relevant jurisdiction's regulatory, tax, accounting, exchange or other requirements that may exist in connection with the entering into and documenting of a privately negotiated credit derivative transaction.

[1]    The definitions and provisions in this ISDA Standard Terms Supplement for use with Credit Derivatives Transactions on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement may be incorporated into a Confirmation or other document (including in electronic form) (a "**Confirmation**") by wording in the Confirmation indicating that, or the extent to which, the Confirmation is subject to this ISDA Standard Terms Supplement for use with Credit Derivatives Transactions on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement. All definitions and provisions so incorporated in a Confirmation will be applicable to that Confirmation unless otherwise provided in that Confirmation.

[2]    Parties who wish to novate a trade documented by way of a Confirmation incorporating these CDS on CDO Terms should consider using the Form of Novation Confirmation set out in the Schedule to this ISDA Standard Terms Supplement.

Copyright © June 2007 by International Swaps & Derivatives Association, Inc.

Termination Date:                   The last to occur of:

     (a)    the fifth Business Day following the Effective Maturity Date;

     (b)    the last Floating Rate Payer Payment Date;

     (c)    the last Delivery Date; and

     (d)    the last Additional Fixed Amount Payment Date.

Floating Rate Payer:                As shown in the relevant Confirmation (the "Seller").

Fixed Rate Payer:                   As shown in the relevant Confirmation (the "Buyer").

Calculation Agent:                  As shown in the relevant Confirmation.

Calculation Agent City:             As shown in the relevant Confirmation.

Business Day:                       As shown in the relevant Confirmation.

Business Day Convention:            Following (which, with the exception of the Effective Date, the Final Amortization Date, each Reference Obligation Payment Date and the period end date of each Reference Obligation Calculation Period, shall apply to any date referred to in these CDS on CDO Terms or in the relevant Confirmation that falls on a day that is not a Business Day).

Reference Entity:                   As shown in the relevant Confirmation.

Reference Obligation:               As shown in the relevant Confirmation.

                                        Section 2.30 of the Credit Derivatives Definitions shall not apply.

Reference Policy:                   As shown in the relevant Confirmation.

Reference Price:                    As shown in the relevant Confirmation.

Applicable Percentage:              On any day, a percentage equal to A divided by B.

                                        "A" means the product of the Initial Face Amount and the Initial Factor as decreased on each Delivery Date by an amount equal to (a) the outstanding principal balance of Deliverable Obligations Delivered to Seller (as adjusted by the Relevant Amount, if any) divided by the Current Factor on such day multiplied by (b) the Initial Factor.

                                        "B" means the product of the Original Principal Amount and the Initial Factor;

     (a)    as increased by the outstanding principal

balance of any further issues by the Reference Entity that are fungible with and form part of the same legal series as the Reference Obligation; and

(b)     as decreased by any cancellations of some or all of the Outstanding Principal Amount resulting from purchases of the Reference Obligation by or on behalf of the Reference Entity.[3]

Initial Face Amount:          As shown in the relevant Confirmation.

---

[3]     This represents the percentage covered by the relevant Transaction of the Outstanding Principal Amount. It may be more than 100%.

Reference Obligation Notional
Amount:

On the Effective Date, the product of:

(a)    the Original Principal Amount;

(b)    the Initial Factor; and

(c)    the Applicable Percentage.

Following the Effective Date, the Reference Obligation Notional Amount will be:

(i)    decreased on each day on which a Principal Payment is made by the relevant Principal Payment Amount;

(ii)    decreased on the day, if any, on which a Failure to Pay Principal occurs by the relevant Principal Shortfall Amount;

(iii)    decreased on each day on which a Writedown occurs by the relevant Writedown Amount;

(iv)    increased on each day on which a Writedown Reimbursement occurs by any Writedown Reimbursement Amount in respect of a Writedown Reimbursement within paragraphs (ii) or (iii) of the definition of "Writedown Reimbursement"; and

(v)    decreased on each Delivery Date by an amount equal to the relevant Exercise Amount minus the amount determined pursuant to paragraph (b) of "Physical Settlement Amount" below, provided that if any Relevant Amount is applicable, the Exercise Amount will also be deemed to be decreased by such Relevant Amount (or increased by the absolute value of such Relevant Amount if such Relevant Amount is negative) with effect from such Delivery Date;

provided that if the Reference Obligation Notional Amount would be less than zero, it shall be deemed to be zero.

For the avoidance of doubt, the Reference Obligation Notional Amount shall not be increased by any deferral or capitalization of interest that relates to the Term of this Transaction or decreased by payment of any portion of the principal balance of the Reference Obligation that is attributable to the deferral or capitalization of interest during the Term of this Transaction.

Initial Payment:      As shown in the relevant Confirmation.

2.      **Fixed Payments:**

Fixed Rate Payer:      Buyer

Fixed Rate:      As shown in the relevant Confirmation.

Fixed Rate Payer Period End Date:      The first day of each Reference Obligation Calculation Period.

Fixed Rate Payer Payment Dates:      Each day falling five Business Days after a Reference Obligation Payment Date; provided that the final Fixed Rate Payer Payment Date shall fall on the fifth Business Day following the Effective Maturity Date.

Fixed Amount:      With respect to any Fixed Rate Payer Payment Date, an amount equal to the product of:

(a)      the Fixed Rate;

(b)      an amount determined by the Calculation Agent equal to:

         (i)      the sum of the Reference Obligation Notional Amount as at 5:00 p.m. in the Calculation Agent City on each day in the related Fixed Rate Payer Calculation Period (provided that, if the Reference Obligation is a Delayed Payment Reference Obligation, the Reference Obligation Notional Amount on each day from and including the first day of the related Reference Obligation Calculation Period to but excluding the relevant Reference Obligation Payment Date shall be deemed to be adjusted to take into account any adjustment to the Reference Obligation Notional Amount on such Reference Obligation Payment Date); divided by

         (ii)      the actual number of days in the related Fixed Rate Payer Calculation Period; and

(c)      the Fixed Rate Day Count Fraction.

Additional Fixed Amount Payment Dates:     

(a)      Each Fixed Rate Payer Payment Date; and

(b)      in relation to each Additional Fixed Payment Event occurring after the second Business Day prior to the last Fixed Rate Payer Payment Date, the fifth Business Day after Buyer has

|                                   | received notification from Seller or the Calculation Agent of the occurrence of such Additional Fixed Payment Event. |

Additional Fixed Payments:

Following the occurrence of an Additional Fixed Payment Event in respect of the Reference Obligation, Buyer shall pay the relevant Additional Fixed Amount to Seller on the first Additional Fixed Amount Payment Date falling at least two Business Days (or in the case of an Additional Fixed Payment Event that occurs after the second Business Day prior to the last Fixed Rate Payer Payment Date, five Business Days) after the delivery of a notice by the Calculation Agent to the parties or by Seller to Buyer stating that the related Additional Fixed Amount is due and showing in reasonable detail how such Additional Fixed Amount was determined; provided that any such notice must be given on or prior to the fifth Business Day following the day that is one calendar year after the Effective Maturity Date.

Additional Fixed Payment Event:

The occurrence on or after the Effective Date and on or before the day that is one calendar year after the Effective Maturity Date of a Writedown Reimbursement, a Principal Shortfall Reimbursement or an Interest Shortfall Reimbursement.

Additional Fixed Amount:

With respect to each Additional Fixed Amount Payment Date, an amount equal to the sum of:

(a)     the Writedown Reimbursement Payment Amount (if any);

(b)     the Principal Shortfall Reimbursement Payment Amount (if any); and

(c)     the Interest Shortfall Reimbursement Payment Amount (if any).

For the avoidance of doubt, each Writedown Reimbursement Payment Amount, Principal Shortfall Reimbursement Payment Amount or Interest Shortfall Reimbursement Payment Amount (as applicable) shall be calculated using the Applicable Percentage which takes into account the aggregate adjustment made to the Applicable Percentage in respect of all Delivery Dates that have occurred prior to the date of such calculation.

3.     **Floating Payments:**

Floating Rate Payer:

Seller.

Floating Rate Payer Payment

In relation to a Floating Amount Event, the first Fixed

Dates:

Rate Payer Payment Date falling at least two Business Days (or in the case of a Floating Amount Event that occurs on the Legal Final Maturity Date or the Final Amortization Date, the fifth Business Day) after delivery of a notice by the Calculation Agent to the parties or a notice by Buyer to Seller that the related Floating Amount is due and showing in reasonable detail how such Floating Amount was determined; provided that any such notice must be given on or prior to the fifth Business Day following the Effective Maturity Date.

Floating Payments:

If a Floating Amount Event occurs, then on the relevant Floating Rate Payer Payment Date, Seller will pay the relevant Floating Amount to Buyer. For the avoidance of doubt, the Conditions to Settlement are not required to be satisfied in respect of a Floating Payment.

Implied Writedown:

As shown in the relevant Confirmation.

Floating Amount Event:

A Writedown, a Failure to Pay Principal or an Interest Shortfall.

Floating Amount:

With respect to each Floating Rate Payer Payment Date, an amount equal to the sum of:

(a)    the relevant Writedown Amount (if any);

(b)    the relevant Principal Shortfall Amount (if any); and

(c)    the relevant Interest Shortfall Payment Amount (if any).

For the avoidance of doubt, each Writedown Amount, Principal Shortfall Amount or Interest Shortfall Payment Amount (as applicable) shall be calculated using the Applicable Percentage which takes into account the aggregate adjustment made to the Applicable Percentage in respect of all Delivery Dates that have occurred prior to the date of such calculation.

4.    **Credit Events and Physical Settlement**

Conditions to Settlement:        Credit Event Notice

Notifying Party:  Buyer

Notice of Physical Settlement

Notice of Publicly Available Information:  Applicable

Public Sources:    The public sources listed in Section 3.7 of the Credit Derivatives Definitions; provided that Servicer Reports in respect of the Reference Obligation and, in respect of a Distressed Ratings Downgrade Credit Event only, any public communications by any of the Rating Agencies in respect of the Reference Obligation shall also be deemed Public Sources.

Specified Number:        one

provided that if the Calculation Agent has previously delivered a notice to the parties or Buyer has previously delivered a notice to Seller pursuant to the definition of "Floating Rate Payer Payment Dates" above in respect of a Writedown or a Failure to Pay Principal, the only Conditions to Settlement with respect to any Credit Event shall be a Notice of Physical Settlement and, in relation to the Failure to Pay Interest Credit Event, the Additional Condition to Settlement specified below.

| | |
|---|---|
| Additional Condition to Settlement for Failure to Pay Interest: | In addition to the Conditions to Settlement above, in respect of the Failure to Pay Interest Credit Event, if the Reference Obligation is PIK-able,[4] it shall be a Condition to Settlement that a period of at least 360 calendar days has elapsed since the occurrence of the Credit Event without the relevant Interest Shortfall having been reimbursed in full. For the avoidance of doubt, if it is not explicitly made clear in the Servicer Report whether or not, or to what extent, a particular Interest Shortfall has been reimbursed but the Calculation Agent determines that such Interest Shortfall has been reimbursed by a certain amount on the basis of information in such Servicer Report, then the relevant Interest Shortfall reimbursement shall be calculated by the Calculation Agent on the basis of such information.[5] |
| Additional agreements relating to Physical Settlement: | The parties agree that with respect to the Transaction and notwithstanding anything to the contrary in the Credit Derivatives Definitions: |

(a)     the Conditions to Settlement may be satisfied on more than one occasion;

(b)     multiple Physical Settlement Amounts may be payable by Seller;

(c)     Buyer, when providing a Notice of Physical Settlement, must specify an Exercise Amount and an Exercise Percentage;

(d)     if Buyer has delivered a Notice of Physical Settlement that specifies an Exercise Amount that is less than the Reference Obligation Notional Amount as of the date on which such Notice of Physical Settlement is delivered (calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full), the rights and obligations of the parties under the Transaction shall continue and Buyer may deliver additional Notices of Physical Settlement with respect to the initial Credit Event or with respect to any additional Credit Event at any time thereafter; and

(e)     any Notice of Physical Settlement shall be delivered no later than 30 calendar days after the fifth Business Day following the Effective Maturity Date.

---

[4]     See definition of "PIK-able" in paragraph 8(c) of these CDS on CDO Terms.

[5]     This is intended to cover any situation in which the Servicer Report does not cover Interest Shortfalls.

Section 3.2(d) of the Credit Derivatives Definitions is amended to delete the words "that is effective no later than thirty calendar days after the Event Determination Date".

Section 3.3 of the Credit Derivatives Definitions is amended so that the following is added as sub-clause (d):

"(d) the expiration of any applicable grace period for a Failure to Pay Principal Credit Event".

Credit Events:

The following Credit Events shall apply to the Transaction (and the first sentence of Section 4.1 of the Credit Derivatives Definitions shall be amended accordingly):

Failure to Pay Principal

Writedown

Failure to Pay Interest

Payment Requirement: USD 10,000

Distressed Ratings Downgrade

The definition of "Payment Requirement" in Section 4.8(d) of the Credit Derivatives Definitions shall be amended so that the words "Failure to Pay" are deleted and replaced by the words "Failure to Pay Interest".

Obligation:

Reference Obligation Only

5. **Interest Shortfall:**

Interest Shortfall Payment Amount:

In respect of an Interest Shortfall, the relevant Interest Shortfall Amount; provided that, if Interest Shortfall Cap is specified as applicable in the relevant Confirmation and the Interest Shortfall Amount exceeds the Interest Shortfall Cap Amount, the Interest Shortfall Payment Amount in respect of such Interest Shortfall shall be the Interest Shortfall Cap Amount.

Interest Shortfall Cap:

As shown in the relevant Confirmation.

Interest Shortfall Cap Amount:

As set out in the relevant Interest Shortfall Cap Annex.

Actual Interest Amount:

With respect to any Reference Obligation Payment Date, payment by or on behalf of the Issuer of an amount in respect of interest due under the Reference Obligation (including, without limitation, any deferred interest or default interest but excluding payments in respect of prepayment penalties, yield maintenance provisions or

principal, except that the Actual Interest Amount shall include any payment of principal representing capitalized interest that relates to the Term of the Transaction) to the holder(s) of the Reference Obligation in respect of the Reference Obligation.

Expected Interest Amount:

With respect to any Reference Obligation Payment Date, the amount of current interest that would accrue during the related Reference Obligation Calculation Period calculated using the Reference Obligation Coupon on a principal balance of the Reference Obligation equal to:

(a)    the Outstanding Principal Amount taking into account any reductions due to a principal deficiency balance or realized loss amount (however described in the Underlying Instruments) that are attributable to the Reference Obligation; minus

(b)    the Aggregate Implied Writedown Amount (if any)

and that will be payable on the related Reference Obligation Payment Date assuming for this purpose that sufficient funds are available therefor in accordance with the Underlying Instruments. Except as provided in (a) in the previous sentence, the Expected Interest Amount shall be determined without regard to (i) unpaid amounts in respect of accrued interest on prior Reference Obligation Payment Dates; (ii) any prepayment penalties or yield maintenance provisions; or (iii) the effect of any provisions (however described) of such Underlying Instruments that otherwise permit the limitation of due payments to distributions of funds available from proceeds of the Underlying Assets, or that provide for the capitalization or deferral of interest on the Reference Obligation during the Term of the Transaction, or that provide for the extinguishing or reduction of such payments or distributions (each a "Limitation Provision") (but, for the avoidance of doubt, taking account of any Writedown within paragraph (i) of the definition of "Writedown" occurring in accordance with the Underlying Instruments)[6].

For the purposes of calculating the Expected Interest Amount, and notwithstanding any other provision herein, the Reference Obligation Coupon shall be deemed to include any cap stated in the Underlying Instrument that is not a Limitation Provision.

Interest Shortfall:

With respect to any Reference Obligation Payment Date, either (a) the non-payment of an Expected Interest Amount or (b) the payment of an Actual Interest Amount that is less than the Expected Interest Amount.

---

[6]    Note that this will not impact the determination of "Expected Interest Amount" in respect of a Reference Obligation that does not have a Limitation Provision.

For the avoidance of doubt, the occurrence of an event within (a) or (b) shall be determined taking into account any payment made under the Reference Policy, if applicable.

Interest Shortfall Amount:

With respect to any Reference Obligation Payment Date, an amount equal to the greater of:

(a)     zero; and

(b)     the amount equal to the product of:

      (i)     (A)     the Expected Interest Amount;

                  minus

            (B)     the Actual Interest Amount; and

      (ii)     the Applicable Percentage;

provided that, with respect to the first Reference Obligation Payment Date only, the Interest Shortfall Amount shall be the amount determined in accordance with (a) and (b) above multiplied by a fraction equal to:

(x)     the number of days in the first Fixed Rate Payer Calculation Period; over

(y)     the number of days in the first Reference Obligation Calculation Period.

Interest Shortfall Reimbursement:

With respect to any Reference Obligation Payment Date, the payment by or on behalf of the Issuer of an Actual Interest Amount in respect of the Reference Obligation that is greater than the Expected Interest Amount.

Interest Shortfall Reimbursement Amount:

With respect to any Reference Obligation Payment Date, the product of (a) the amount of any Interest Shortfall Reimbursement on such day and (b) the Applicable Percentage.

Interest Shortfall Reimbursement Payment Amount:

If Interest Shortfall Cap is specified as not applicable in the relevant Confirmation, the relevant Interest Shortfall Reimbursement Amount. If Interest Shortfall Cap is specified as applicable in the relevant Confirmation, the amount determined pursuant to the relevant Interest Shortfall Cap Annex.

6.     **Settlement Terms**

Settlement Method:     Physical Settlement

Terms Relating to Physical Settlement:

Physical Settlement Period:     Five Business Days

| | |
|---|---|
| Deliverable Obligations: | Exclude Accrued Interest |
| Deliverable Obligations: | Deliverable Obligation Category: Reference Obligation Only |
| Physical Settlement Amount: | An amount equal to: |

(a) the product of the Exercise Amount and the Reference Price; minus

(b) the sum of:

    (i) if the Aggregate Implied Writedown Amount is greater than zero, the product of (A) the Aggregate Implied Writedown Amount, (B) the Applicable Percentage, each as determined immediately prior to the relevant Delivery and (C) the relevant Exercise Percentage; and

    (ii) the product of (A) the aggregate of all Writedown Amounts in respect of Writedowns within paragraph (i)(B) of the definition of "Writedown" minus the aggregate of all Writedown Reimbursement Amounts in respect of Writedown Reimbursements within paragraph (ii)(B) of the definition of "Writedown Reimbursement" and (B) the relevant Exercise Percentage,

provided that if the Physical Settlement Amount would exceed the product of:

(1) the Reference Obligation Notional Amount as of the date on which the relevant Notice of Physical Settlement is delivered calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full; and

(2) the Exercise Percentage;

then the Physical Settlement Amount shall be deemed to be equal to such product.

| | |
|---|---|
| Delayed Payment: | With respect to a Delivery Date, if a Servicer Report that describes a Delayed Payment is delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date, Buyer will pay the applicable Delayed Payment Amount to Seller no later than five Business Days following the later of (a) the day on which such Servicer Report is delivered and (b) the day on which such Delayed Payment is due and payable. |

Escrow:                                    Applicable

Non-delivery by Buyer or                   If Buyer has delivered a Notice of Physical Settlement and:
occurrence of the Effective
Maturity Date:                             (a)    Buyer does not Deliver in full the Deliverable
                                                  Obligations specified in that Notice of Physical
                                                  Settlement on or prior to the Physical Settlement
                                                  Date; or

                                           (b)    the Effective Maturity Date occurs after delivery
                                                  of the Notice of Physical Settlement but before
                                                  Buyer Delivers the Deliverable Obligations
                                                  specified in that Notice of Physical Settlement;

                                           then such Notice of Physical Settlement shall be deemed
                                           not to have been delivered and any reference in these CDS
                                           on CDO Terms to a previously delivered Notice of
                                           Physical Settlement shall exclude any Notice of Physical
                                           Settlement that is deemed not to have been delivered.
                                           Sections 9.2(c)(ii) (except for the first sentence thereof),
                                           9.3, 9.4, 9.5, 9.6, 9.9 and 9.10 of the Credit Derivatives
                                           Definitions shall not apply.

## 7.    Additional Provisions:

(a)    *Delivery of Servicer Report*

If either party makes a request in writing, the Calculation Agent agrees to provide such party
with a copy of the most recent Servicer Report promptly following receipt of such request, if
and to the extent such Servicer Report is reasonably available to the Calculation Agent
(whether or not the Calculation Agent is a holder of the Reference Obligation). In addition, if
a Floating Payment or an Additional Fixed Payment is due hereunder, then the Calculation
Agent or the party that notifies the other party that the relevant Floating Payment or
Additional Fixed Payment is due, as applicable, (the "Notifying Party") shall deliver a copy of
any Servicer Report relevant to such payment that is requested by the party that is not the
Notifying Party or by either party where the Notifying Party is the Calculation Agent, if and
to the extent that such Servicer Report is reasonably available to the Notifying Party (whether
or not the Notifying Party is a holder of the Reference Obligation).

(b)    *Calculation Agent and Buyer and Seller Determinations*

The Calculation Agent shall be responsible for determining and calculating (i) the Fixed
Amount payable on each Fixed Rate Payer Payment Date; (ii) the occurrence of a Floating
Amount Event and the related Floating Amount and (iii) the occurrence of an Additional
Fixed Payment Event and the related Additional Fixed Amount; provided that
notwithstanding the above, each of Buyer and Seller shall be entitled to determine and
calculate the above amounts to the extent that Buyer or Seller, as applicable, has the right to
deliver a notice to the other party demanding payment of such amount. The Calculation
Agent or Buyer or Seller, as applicable, shall make such determinations and calculations
based solely on the basis of the Servicer Reports, to the extent such Servicer Reports are
reasonably available to the Calculation Agent or such party. The Calculation Agent or Buyer
or Seller, as applicable, shall, as soon as practicable after making any of the determinations or
calculations specified in (i) and (ii) above, notify the parties or the other party, as applicable,
of such determinations and calculations. For the avoidance of doubt, if an Interest Shortfall

Amount is not explicitly set out in the Servicer Report but the Calculation Agent determines that an Interest Shortfall has occurred on the basis of information in such Servicer Report, then the relevant Interest Shortfall Amount shall be calculated by the Calculation Agent on the basis of such information.[7]

(c)    *Adjustment of Calculation Agent Determinations*

To the extent that a Servicer furnishes any Servicer Reports correcting information contained in previously issued Servicer Reports, and such corrections impact calculations pursuant to the Transaction, the calculations relevant to the Transaction shall be adjusted retroactively by the Calculation Agent to reflect the corrected information (provided that, for the avoidance of doubt, no amounts in respect of interest shall be payable by either party and provided that the Calculation Agent in performing the calculations pursuant to this paragraph will assume that no interest has accrued on any adjusted amount), and the Calculation Agent shall promptly notify both parties of any corrected payments required by either party. Any required corrected payments shall be made within five Business Days of the day on which such notification by the Calculation Agent is effective.

**8.    Additional Definitions and Amendments to the Credit Derivatives Definitions:**

(a)    References in Sections 4.1, 8.2, 9.1 and 9.2(a) of the Credit Derivatives Definitions as well as Section 3(a)(iv) of the form of Novation Agreement set forth in Exhibit E to the Credit Derivatives Definitions to the Reference Entity shall be deemed to be references to both the Reference Entity and the Insurer in respect of the Reference Policy, if applicable.

(b)    (i)    The definition of "Publicly Available Information" in Section 3.5 of the Credit Derivatives Definitions shall be amended by (i) inserting the words "the Insurer in respect of the Reference Policy, if applicable" at the end of subparagraph (a)(ii)(A) thereof, (ii) inserting the words ", servicer, sub-servicer, master servicer" before the words "or paying agent" in subparagraph (a)(ii)(B) thereof and (iii) deleting the word "or" at the end of subparagraph (a)(iii) thereof and inserting at the end of subparagraph (a)(iv) thereof the following: "or (v) is information contained in a notice or on a website published by an internationally recognized rating agency that has at any time rated the Reference Obligation".

(ii)    The definition of "Physical Settlement" in Section 8.1 of the Credit Derivatives Definitions shall be amended by (i) deleting the words "Physical Settlement Amount" from the last line of the second paragraph thereof and (ii) inserting in lieu thereof the words "Exercise Amount".

(iii)    The definition of "Physical Settlement Date" in Section 8.4 of the Credit Derivatives Definitions shall be amended by deleting the last sentence thereof.

---

[7]    This is intended to cover any situation in which the Servicer Report does not report on Interest Shortfalls.

(c)    For the purposes of the Transaction only, the following terms have the meanings given below:

"Actual Principal Amount" means, with respect to the Final Amortization Date or the Legal Final Maturity Date, an amount paid on such day by or on behalf of the Issuer in respect of principal (excluding any amount representing capitalized interest that relates to the Term of the Transaction) to the holder(s) of the Reference Obligation in respect of the Reference Obligation.

"Aggregate Implied Writedown Amount" means the greater of (i) zero and (ii) the aggregate of all Implied Writedown Amounts minus the aggregate of all Implied Writedown Reimbursement Amounts, provided that if Implied Writedown is specified as not applicable in the relevant Confirmation, the Aggregate Implied Writedown Amount shall be deemed to be zero.

"Current Factor" means the factor of the Reference Obligation as specified in the most recent Servicer Report; provided that if the factor is not specified in the most recent Servicer Report or the factor specified includes deferred or capitalized interest that relates to the Term of the Transaction, then the Current Factor shall be the ratio equal to (i) the Outstanding Principal Amount as of such date, determined in accordance with the most recent Servicer Report over (ii) the Original Principal Amount.

"Current Period Implied Writedown Amount" means, in respect of a Reference Obligation Calculation Period, an amount determined as of the last day of such Reference Obligation Calculation Period equal to the greater of:

(i)    zero; and

(ii)    the product of:

    (A)    the Implied Writedown Percentage; and

    (B)    the greater of:

        (1)    zero; and

        (2)    the lesser of (x) the Pari Passu Amount and (y) the product of (I) the Pari Passu Amount plus the Senior Amount and (II) an amount equal to one minus the Overcollateralization Ratio.

"Delayed Payment" means, with respect to a Delivery Date, a Principal Payment, Principal Shortfall Reimbursement or a Writedown Reimbursement within paragraph (i) of the definition of "Writedown Reimbursement" that is described in a Servicer Report delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date.

"Delayed Payment Amount" means, if persons who are holders of the Reference Obligation as of a date prior to a Delivery Date are paid a Delayed Payment on or after such Delivery Date, an amount equal to the product of (i) the sum of all such Delayed Payments, (ii) the Reference Price, (iii) the Applicable Percentage immediately prior to such Delivery Date and (iv) the Exercise Percentage.

"Delayed Payment Reference Obligation" means a Reference Obligation with Reference Obligation Payment Dates that fall after the final day of the related Reference Obligation Calculation Periods.

"Distressed Ratings Downgrade" means that the Reference Obligation:

(i)    if publicly rated by Moody's, (A) is downgraded to "Caa2" or below by Moody's or (B) has the rating assigned to it by Moody's withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "Baa3" or higher by Moody's immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "Caa1" by Moody's within three calendar months after such withdrawal; or

(ii)    if publicly rated by Standard & Poor's, (A) is downgraded to "CCC" or below by Standard & Poor's or (B) has the rating assigned to it by Standard & Poor's withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "BBB-" or higher by Standard & Poor's immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "CCC+" by Standard & Poor's within three calendar months after such withdrawal; or

(iii)    if publicly rated by Fitch, (A) is downgraded to "CCC" or below by Fitch or (B) has the rating assigned to it by Fitch withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "BBB-" or higher by Fitch immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "CCC+" by Fitch within three calendar months after such withdrawal.

"Effective Maturity Date" means the earlier of (a) the Scheduled Termination Date and (b) the Final Amortization Date.

"Exercise Amount" means, for purposes of the Transaction, an amount to which a Notice of Physical Settlement relates equal to the product of (i) the original face amount of the Reference Obligation to be Delivered by Buyer to Seller on the applicable Physical Settlement Date; and (ii) the Current Factor as of such date. The Exercise Amount to which a Notice of Physical Settlement relates shall (A) be equal to or less than the Reference Obligation Notional Amount (determined, for this purpose, without regard to the effect of any Writedown or Writedown Reimbursement within paragraphs (i)(B) or (iii) of the definition of "Writedown" or paragraphs (ii)(B) or (iii) of the definition of "Writedown Reimbursement", respectively) as of the date on which the relevant Notice of Physical Settlement is delivered calculated as though the Physical Settlement of all previously delivered Notices of Physical Settlement has occurred in full and (B) not be less than the lesser of (1) the Reference Obligation Notional Amount as of the date on which the relevant Notice of Physical Settlement is delivered calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full and (2) USD100,000 or its equivalent in the relevant Obligation Currency. The cumulative original face amount of Deliverable Obligations specified in all Notices of Physical Settlement shall not at any time exceed the Initial Face Amount. For the avoidance of doubt: (a) if any capitalization or deferral of interest in respect of the Reference Obligation has occurred during the Term of the Transaction and has not been recovered by holders of the Reference Obligation pursuant to the terms of the Underlying Instruments, then, for the purpose of determining the amount of Deliverable Obligations to be Delivered, the Exercise Amount (determined above by reference to the original face amount) will represent an outstanding principal balance of the Reference Obligation to be Delivered by Buyer that includes the proportion of unrecovered interest attributable to the Reference Obligation to be Delivered and (b) notwithstanding the

foregoing, the Physical Settlement Amount payable by Seller in relation to such Exercise Amount shall not include any amount in respect of such unrecovered interest.

"Exercise Percentage" means, with respect to a Notice of Physical Settlement, a percentage equal to the original face amount of the Deliverable Obligations specified in such Notice of Physical Settlement divided by an amount equal to (i) the Initial Face Amount minus (ii) the aggregate of the original face amount of all Deliverable Obligations specified in all previously delivered Notices of Physical Settlement.

"Expected Principal Amount" means, with respect to the Final Amortization Date or the Legal Final Maturity Date, an amount equal to (i) the Outstanding Principal Amount of the Reference Obligation payable on such day (excluding any amount representing capitalized interest that relates to the Term of the Transaction) assuming for this purpose that sufficient funds are available for such payment, where such amount shall be determined in accordance with the Underlying Instruments, minus (ii) the sum of (A) the Aggregate Implied Writedown Amount (if any) and (B) the net aggregate principal deficiency balance or realized loss amounts (however described in the Underlying Instruments) that are attributable to the Reference Obligation. The Expected Principal Amount shall be determined without regard to the effect of any provisions (however described) of the Underlying Instruments that permit the limitation of due payments or distributions of funds in accordance with the terms of such Reference Obligation or that provide for the extinguishing or reduction of such payments or distributions.

"Failure to Pay Interest" means the occurrence of an Interest Shortfall Amount or Interest Shortfall Amounts (calculated on a cumulative basis) in excess of the relevant Payment Requirement.

"Failure to Pay Principal" means (i) a failure by the Reference Entity (or any Insurer) to pay an Expected Principal Amount on the Final Amortization Date or the Legal Final Maturity Date, as the case may be, or (ii) payment on any such day of an Actual Principal Amount that is less than the Expected Principal Amount; provided that the failure by the Reference Entity (or any Insurer) to pay any such amount in respect of principal in accordance with the foregoing shall not constitute a Failure to Pay Principal if such failure has been remedied within any grace period applicable to such payment obligation under the Underlying Instruments or, if no such grace period is applicable, within three Business Days after the day on which the Expected Principal Amount was scheduled to be paid.

"Final Amortization Date" means the first to occur of (i) the date on which the Reference Obligation Notional Amount is reduced to zero and (ii) the date on which the assets securing the Reference Obligation or designated to fund amounts due in respect of the Reference Obligation are liquidated, distributed or otherwise disposed of in full and the proceeds thereof are distributed or otherwise disposed of in full; provided that, for the purposes of determining the date on which the Reference Obligation Notional Amount is reduced to zero where (A) the Aggregate Implied Writedown Amount is greater than zero and (B) Interest Shortfall Cap Annex B is specified as applicable in the relevant confirmation, the Reference Obligation Notional Amount shall be determined without regard to the effect of any Writedown or Writedown Reimbursement within paragraph (iii) of "Writedown" or paragraph (iii) of Writedown Reimbursement respectively, unless, prior to the date of determination, a Distressed Ratings Downgrade Credit Event has occurred or a Failure to Pay Interest Credit Event has occurred and, as of the date of determination, a period of at least 720 calendar days have elapsed since the occurrence of such Failure to Pay Interest Credit Event without the relevant Interest Shortfall, having been reimbursed in full.

"Fitch" means Fitch Ratings or any successor to its rating business.

"Interest Shortfall Cap Annex" means the Interest Shortfall Cap Annex A or the Interest Shortfall Cap Annex B as specified in the relevant Confirmation.

"Implied Writedown Amount" means, (i) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, an amount determined by the Calculation Agent equal to the excess, if any, of the Current Period Implied Writedown Amount over the Previous Period Implied Writedown Amount, in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, and (ii) in any other case, zero.

"Implied Writedown Percentage" means (i) the Outstanding Principal Amount divided by (ii) the Pari Passu Amount.

"Implied Writedown Reimbursement Amount" means, (i) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, an amount determined by the Calculation Agent equal to the excess, if any, of the Previous Period Implied Writedown Amount over the Current Period Implied Writedown Amount, in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, and (ii) in any other case, zero, provided that the aggregate of all Implied Writedown Reimbursement Amounts at any time shall not exceed the Outstanding Principal Amount.

"Legal Final Maturity Date" means the date set out in paragraph 1 above (subject, for the avoidance of doubt, to any business day convention applicable to the legal final maturity date of the Reference Obligation), provided that if the legal final maturity date of the Reference Obligation is amended, the Legal Final Maturity Date shall be such date as amended.

"Moody's" means Moody's Investors Service, Inc. or any successor to its rating business.

"Outstanding Principal Amount" means, as of any date of determination with respect to the Reference Obligation, the outstanding principal balance of the Reference Obligation as of such date, which shall take into account:

(i)    all payments of principal;

(ii)   all writedowns or applied losses (however described in the Underlying Instruments) resulting in a reduction in the outstanding principal balance of the Reference Obligation (other than as a result of a scheduled or unscheduled payment of principal);

(iii)  forgiveness of any amount by the holders of the Reference Obligation pursuant to an amendment to the Underlying Instruments resulting in a reduction in the outstanding principal balance of the Reference Obligation;

(iv)   any payments reducing the amount of any reductions described in (ii) and (iii) of this definition; and

(v)    any increase in the outstanding principal balance of the Reference Obligation that reflects a reversal of any prior reductions described in (ii) and (iii) of this definition; and

19

(vi)     any increase in the outstanding principal balance of the Reference Obligation that is attributable to the deferral or capitalization of interest prior to the Effective Date.

For the avoidance of doubt, the Outstanding Principal Amount shall not include any portion of the outstanding principal balance of the Reference Obligation that is attributable to the deferral or capitalization of interest during the Term of this Transaction.

"Overcollateralization Ratio" means, in respect of a Reference Obligation Calculation Period:

(i)      if the most recent Servicer Report sets out a ratio representing the ratio of (A) the aggregate asset pool balance securing the payment obligations on the Reference Obligation (subject to certain adjustments as described in the Underlying Instruments) to (B) the Pari Passu Amount plus the Senior Amount, then such ratio; or

(ii)     if the ratio cannot be determined under (i) but the most recent Servicer Report for one or more senior Related Obligations (if any) sets out such a ratio, then a ratio equal to the ratio of (A) the product of (1) such ratio determined with respect to the senior Related Obligation ranking closest in priority of payment to the Reference Obligation for which such a ratio is set out, and (2) the aggregate outstanding principal balance of such Related Obligation and any other Related Obligations ranking in priority of payment either pari passu with or senior to such Related Obligation to (B) the sum of the Pari Passu Amount plus the Senior Amount with respect to such Reference Obligation; or

(iii)    if the ratio cannot be determined under (ii) but the most recent Servicer Report for one or more junior Related Obligations (if any) sets out such a ratio, then a ratio equal to the ratio of (A) the product of (1) such ratio determined with respect to the junior Related Obligation ranking closest in priority of payment to the Reference Obligation for which such a ratio is set out, and (2) the aggregate outstanding principal balance of such Related Obligation and any other Related Obligations ranking in priority of payment either pari passu with or senior to such Related Obligation (including the Reference Obligation) and (B) the sum of the Pari Passu Amount plus the Senior Amount with respect to such Reference Obligation; or

(iv)     if the ratio cannot be determined under (iii), then a ratio representing the ratio of (A) the aggregate asset pool balance securing the payment obligations under the Reference Obligation to (B) the Pari Passu Amount plus the Senior Amount.

"Pari Passu Amount" means, as of any date of determination, the aggregate of the Outstanding Principal Amount of the Reference Obligation and the aggregate outstanding principal balance of all obligations of the Reference Entity secured by the Underlying Assets and ranking *pari passu* in priority with the Reference Obligation.

"PIK-able" means, in relation to a Reference Obligation, that the Underlying Instruments include provisions that provide for capitalization or deferral of interest on such Reference Obligation.

"Previous Period Implied Writedown Amount" means, in respect of a Reference Obligation Calculation Period, the Current Period Implied Writedown Amount as determined in relation to the last day of the immediately preceding Reference Obligation Calculation Period; provided that in respect of the first Reference Obligation Calculation Period only, the Previous Period Implied Writedown shall be the Current Period Implied Writedown Amount determined in relation to the last day of the preceding interest accrual period of the Reference Obligation and each reference to "Reference Obligation Calculation Period" in the

definition of Current Period Implied Writedown Amount shall be deemed to be a reference to that interest accrual period.

"Principal Payment" means, with respect to any Reference Obligation Payment Date, the occurrence of a payment of an amount to the holders of the Reference Obligation in respect of principal (scheduled or unscheduled) in respect of the Reference Obligation other than a payment in respect of principal representing capitalized interest that relates to the Term of the Transaction, excluding, for the avoidance of doubt, any Writedown Reimbursement or Interest Shortfall Reimbursement.

"Principal Payment Amount" means, with respect to any Reference Obligation Payment Date, an amount equal to the product of (i) the amount of any Principal Payment on such date and (ii) the Applicable Percentage.

"Principal Shortfall Amount" means, in respect of a Failure to Pay Principal, an amount equal to the greater of:

(i)     zero; and

(ii)    the amount equal to the product of:

  (A)    the Expected Principal Amount minus the Actual Principal Amount;

  (B)    the Applicable Percentage; and

  (C)    the Reference Price.

If the Principal Shortfall Amount would be greater than the Reference Obligation Notional Amount immediately prior to the occurrence of such Failure to Pay Principal, then the Principal Shortfall Amount shall be deemed to be equal to the Reference Obligation Notional Amount at such time.

"Principal Shortfall Reimbursement" means, with respect to any day, the payment by or on behalf of the Issuer of an amount in respect of the Reference Obligation in or toward the satisfaction of any deferral of or failure to pay principal arising from one or more prior occurrences of a Failure to Pay Principal.

"Principal Shortfall Reimbursement Amount" means, with respect to any day, the product of (i) the amount of any Principal Shortfall Reimbursement on such day, (ii) the Applicable Percentage and (iii) the Reference Price.

"Principal Shortfall Reimbursement Payment Amount" means, with respect to an Additional Fixed Amount Payment Date, the sum of the Principal Shortfall Reimbursement Amounts in respect of all Principal Shortfall Reimbursements (if any) made during the Reference Obligation Calculation Period relating to such Additional Fixed Amount Payment Date, provided that the aggregate of all Principal Shortfall Reimbursement Payment Amounts at any time shall not exceed the aggregate of all Floating Amounts paid by Seller in respect of occurrences of Failure to Pay Principal prior to such Additional Fixed Amount Payment Date.

"Rating Agencies" means Fitch, Moody's and Standard & Poor's.

"Reference Obligation Calculation Period" means, with respect to each Reference Obligation Payment Date, a period corresponding to the interest accrual period relating to such Reference Obligation Payment Date pursuant to the Underlying Instruments.

"Reference Obligation Coupon" means the periodic interest rate applied in relation to each Reference Obligation Calculation Period on the related Reference Obligation Payment Date, as determined in accordance with the terms of the Underlying Instruments as at the Effective Date, without regard to any subsequent amendment.

"Reference Obligation Payment Date" means (i) each scheduled distribution date for the Reference Obligation occurring on or after the Effective Date and on or prior to the Scheduled Termination Date, determined in accordance with the Underlying Instruments and (ii) any day after the Effective Maturity Date on which a payment is made in respect of the Reference Obligation.

"Related Obligation" means, in relation to the Reference Obligation, an obligation of the Reference Entity that is also secured by the Underlying Assets but ranks senior or junior to the Reference Obligation in priority of payment. In relation to a Related Obligation, the terms "Servicer", "Servicer Report" and "Underlying Instruments" shall have the meanings set out in this Confirmation but with references in the definitions of those terms to "Reference Obligation" being deemed, solely for this purpose, to be references to the Related Obligation.

"Relevant Amount" means, if a Servicer Report that describes a Principal Payment, Writedown or Writedown Reimbursement (other than a Writedown Reimbursement within paragraph (i) of the definition of "Writedown Reimbursement"), in each case that has the effect of decreasing or increasing the interest-accruing principal balance of the Reference Obligation as of a date prior to a Delivery Date but such Servicer Report is delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date, an amount equal to the product of (i) the sum of any such Principal Payment (expressed as a positive amount), Writedown (expressed as a positive amount) or Writedown Reimbursement (expressed as a negative amount), as applicable; (ii) the Reference Price; (iii) the Applicable Percentage immediately prior to such Delivery Date; and (iv) the Exercise Percentage.

"Senior Amount" means, as of any day, the aggregate outstanding principal balance of all obligations of the Reference Entity secured by the Underlying Assets and ranking senior in priority to the Reference Obligation.

"Servicer" means any trustee, servicer, sub-servicer, master servicer, fiscal agent, paying agent or other similar entity responsible for calculating payment amounts or providing reports pursuant to the Underlying Instruments.

"Servicer Report" means a periodic statement or report regarding the Reference Obligation provided by the Servicer to holders of the Reference Obligation.

"Standard & Poor's" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. or any successor to its rating business.

"Underlying Assets" means the assets securing the Reference Obligation for the benefit of the holders of the Reference Obligation and which are expected to generate the cashflows required for the servicing and repayment (in whole or in part) of the Reference Obligation, or the assets to which a holder of such Reference Obligation is economically exposed where such exposure is created synthetically.

"Underlying Instruments" means the indenture, trust agreement, pooling and servicing agreement or other relevant agreement(s) setting forth the terms of the Reference Obligation.

"Writedown" means the occurrence at any time on or after the Effective Date of:

(i)　　(A)　　a writedown or applied loss (however described in the Underlying Instruments) resulting in a reduction in the Outstanding Principal Amount (other than as a result of a scheduled or unscheduled payment of principal); or

(B)　　the attribution of a principal deficiency or realized loss (however described in the Underlying Instruments) to the Reference Obligation resulting in a reduction or subordination of the current interest payable on the Reference Obligation;

(ii)　　the forgiveness of any amount of principal by the holders of the Reference Obligation pursuant to an amendment to the Underlying Instruments resulting in a reduction in the Outstanding Principal Amount; or

(iii)　　if Implied Writedown is applicable and the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) above to occur in respect of the Reference Obligation, an Implied Writedown Amount being determined in respect of the Reference Obligation by the Calculation Agent.

"Writedown Amount" means, with respect to any day, the product of (i) the amount of any Writedown on such day, (ii) the Applicable Percentage and (iii) the Reference Price.

"Writedown Reimbursement" means, with respect to any day, the occurrence of:

(i)　　a payment by or on behalf of the Issuer of an amount in respect of the Reference Obligation in reduction of any prior Writedowns;

(ii)　　(A)　　an increase by or on behalf of the Issuer of the Outstanding Principal Amount of the Reference Obligation to reflect the reversal of any prior Writedowns; or

(B)　　a decrease in the principal deficiency balance or realized loss amounts (however described in the Underlying Instruments) attributable to the Reference Obligation; or

(iii)　　if Implied Writedown is applicable and the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (ii) above to occur in respect of the Reference Obligation, an Implied Writedown Reimbursement Amount being determined in respect of the Reference Obligation by the Calculation Agent.

"Writedown Reimbursement Amount" means, with respect to any day, an amount equal to the product of:

(i)　　the sum of all Writedown Reimbursements on that day;

(ii)　　the Applicable Percentage; and

(iii)　　the Reference Price.

"Writedown Reimbursement Payment Amount" means, with respect to an Additional Fixed Amount Payment Date, the sum of the Writedown Reimbursement Amounts in respect of all Writedown Reimbursements (if any) made during the Reference Obligation Calculation

Period relating to such Additional Fixed Amount Payment Date, provided that the aggregate of all Writedown Reimbursement Payment Amounts at any time shall not exceed the aggregate of all Floating Amounts paid by Seller in respect of Writedowns occurring prior to such Additional Fixed Amount Payment Date.

**Interest Shortfall Cap Annex A**

If Interest Shortfall Cap is specified as applicable and Annex A is elected in the relevant Confirmation, then the following provisions will apply:

| | |
|---|---|
| Interest Shortfall Cap Basis: | As shown in the relevant Confirmation. |

Interest Shortfall Cap Amount:

If the Interest Shortfall Cap Basis is Fixed Cap, the Interest Shortfall Cap Amount in respect of an Interest Shortfall shall be the Fixed Amount calculated in respect of the Fixed Rate Payer Payment Date immediately following the Reference Obligation Payment Date on which the relevant Interest Shortfall occurred.

If the Interest Shortfall Cap Basis is Variable Cap, the Interest Shortfall Cap Amount applicable in respect of a Floating Rate Payer Payment Date shall be an amount equal to the product of:

(a)     the sum of the Relevant Rate and the Fixed Rate applicable to the Fixed Rate Payer Calculation Period immediately preceding the Reference Obligation Payment Date on which the relevant Interest Shortfall occurs (or, in respect of the first Fixed Rate Payer Calculation Period, the Relevant Rate and the Fixed Rate as of the Effective Date);

(b)     the amount determined by the Calculation Agent under sub-clause (b) of the definition of "Fixed Amount" in relation to the relevant Fixed Rate Payer Payment Date; and

(c)     the Fixed Rate Day Count Fraction.

Interest Shortfall Compounding:

As shown in the relevant Confirmation.

Interest Shortfall Reimbursement Payment Amount:

With respect to the first Additional Fixed Amount Payment Date, zero, and with respect to any subsequent Additional Fixed Amount Payment Date and calculated as of the Reference Obligation Payment Date immediately preceding such Additional Fixed Amount Payment Date, as specified by the Calculation Agent in its notice to the parties or by Seller in its notice to Buyer of the existence of an Interest Shortfall Reimbursement, an amount equal to the greater of:

(a)     zero; and

(b)     the amount equal to:

(i)     the product of:

(A)     the Cumulative Interest Shortfall Payment Amount as of the Additional Fixed Amount Payment

Date immediately preceding such Reference Obligation Payment Date; and

(B)    either:

    (1)    if Interest Shortfall Compounding is specified as applicable in the relevant Confirmation, the relevant Cumulative Interest Shortfall Payment Compounding Factor for the Fixed Rate Payer Calculation Period immediately preceding such Additional Fixed Amount Payment Date (or 1.0 in respect of any Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Payment Date); or

    (2)    if Interest Shortfall Compounding is specified as not applicable in the relevant Confirmation, one;

minus

(ii)    the Cumulative Interest Shortfall Amount as of such Reference Obligation Payment Date;

provided that if the Interest Shortfall Reimbursement Payment Amount on an Additional Fixed Amount Payment Date would exceed the Interest Shortfall Reimbursement Amount in respect of the related Reference Obligation Payment Date, then such Interest Shortfall Reimbursement Payment Amount shall be deemed to be equal to such Interest Shortfall Reimbursement Amount.

| Cumulative Interest Shortfall Amount: | With respect to any Reference Obligation Payment Date, an amount equal to the greater of: |
|---|---|

(a)    zero; and

(b)    an amount equal to:

    (i)    the Cumulative Interest Shortfall Amount as of the Reference Obligation Payment Date immediately preceding such Reference Obligation Payment Date or, in the case of the first Reference Obligation Payment Date, zero; plus

    (ii)    the Interest Shortfall Amount (if any) in respect of such Reference Obligation Payment Date; plus

    (iii)    either:

        (A)    if Interest Shortfall Compounding is specified as applicable in the relevant Confirmation, an amount determined by the Calculation Agent as the amount of interest that would accrue on the Cumulative Interest Shortfall Amount immediately preceding such Reference Obligation Payment Date during the related Reference Obligation Calculation Period pursuant to the Underlying Instruments or, in the case of the first Reference Obligation Payment Date, zero; or

        (B)    if Interest Shortfall Compounding is specified as not applicable in the relevant Confirmation, 0; minus

    (iv)    the Interest Shortfall Reimbursement Amount (if any) in respect of such Reference Obligation Payment Date.

Upon the occurrence of each Delivery, the Cumulative Interest Shortfall Amount shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Interest Shortfall Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a

fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference Obligation Calculation Period divided by (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

Cumulative Interest Shortfall
Payment Amount:

The Cumulative Interest Shortfall Payment Amount with
respect to any Fixed Rate Payer Payment Date and any
Additional Fixed Amount Payment Date falling on such
Fixed Rate Payer Payment Date shall be an amount equal to
the greater of:

(a)    zero; and

(b)    the amount equal to:

    (i)    the sum of:

        (A)    the Interest Shortfall Payment
Amount for the Reference Obligation
Payment Date corresponding to such
Fixed Rate Payer Payment Date; and

        (B)    the product of:

            (1)    the Cumulative Interest
Shortfall Payment Amount as
of the Fixed Rate Payer
Payment Date immediately
preceding such Fixed Rate
Payer Payment Date (or zero
in the case of the first Fixed
Rate Payer Payment Date);
and

            (2)    either:

               (AA)    if Interest Shortfall
Compounding    is
specified    as
applicable    in    the
relevant
Confirmation,    the
relevant    Cumulative
Interest    Shortfall
Payment
Compounding
Factor; or

               (BB)    if Interest Shortfall
Compounding    is
specified    as    not
applicable    in    the
relevant
Confirmation, one;

minus

    (ii)    any Interest Shortfall Reimbursement
Payment Amount paid on such Fixed Rate
Payer Payment Date.

With respect to any Additional Fixed Amount Payment Date falling after the final Fixed Rate Payer Payment Date, the Cumulative Interest Shortfall Payment Amount shall be equal to:

(x)     the Cumulative Interest Shortfall Payment Amount as of the Additional Fixed Amount Payment Date immediately preceding such Additional Fixed Amount Payment Date (or as of the final Fixed Rate Payer Payment Date in the case of the first Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Payment Date); minus

(y)     any Interest Shortfall Reimbursement Payment Amount paid on such Additional Fixed Amount Payment Date.

Upon the occurrence of each Delivery, the Cumulative Interest Shortfall Payment Amount shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Interest Shortfall Payment Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference Obligation Calculation Period divided by (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

| | |
|---|---|
| Cumulative Interest Shortfall Payment Compounding Factor: | With respect to any Fixed Rate Payer Calculation Period, an amount equal to the sum of: |

(a)     one;

        plus

(b)     the product of:

        (i)      the sum of (A) the Relevant Rate plus (B) the Fixed Rate; and

        (ii)     the actual number of days in such Fixed Rate Payer Calculation Period divided by 360;

        provided, however, that the Cumulative Interest Shortfall Payment Compounding Factor shall be deemed to be one during the period from but excluding the Effective Maturity Date to and including the Termination Date.

Relevant Rate:

With respect to a Fixed Rate Payer Calculation Period, the Floating Rate, expressed as a decimal number with seven decimal places, that would be determined if:

(a) the 2000 ISDA Definitions (and not the 2003 ISDA Credit Derivatives Definitions) applied to this paragraph;

(b) the Fixed Rate Payer Calculation Period were a "Calculation Period" for purposes of such determination; and

(c) the following terms applied:

    (i) the Floating Rate Option were the Rate Source;

    (ii) the Designated Maturity were the period that corresponds to the usual length of a Fixed Rate Payer Calculation Period; and

    (iii) the Reset Date were the first day of the Calculation Period;

provided, however, that the Relevant Rate shall be deemed to be zero during the period from but excluding the Effective Maturity Date to and including the Termination Date.

Rate Source:

As shown in the relevant Confirmation.

### Interest Shortfall Cap Annex B

If Interest Shortfall Cap is specified as applicable and Annex B is elected in the relevant Confirmation, then the following provisions will apply:

Interest Shortfall Cap Basis: As shown in the relevant Confirmation.

Interest Shortfall Cap Amount: If the Interest Shortfall Cap Basis is Fixed Cap, the Interest Shortfall Cap Amount in respect of an Interest Shortfall shall be the Fixed Amount calculated in respect of the Fixed Rate Payer Payment Date immediately following the Reference Obligation Payment Date on which the relevant Interest Shortfall occurred.

If the Interest Shortfall Cap Basis is Variable Cap, the Interest Shortfall Cap Amount applicable in respect of a Floating Rate Payer Payment Date shall be an amount equal to the product of:

(a) the sum of the Relevant Rate and the Fixed Rate applicable to the Fixed Rate Payer Calculation Period immediately preceding the Reference Obligation Payment Date on which the relevant Interest Shortfall occurs (or, in respect of the first Fixed Rate Payer Calculation Period, the Relevant Rate and the Fixed Rate as of the Effective Date);

(b) the amount determined by the Calculation Agent under sub-clause (b) of the definition of "Fixed Amount" in relation to the relevant Fixed Rate Payer Payment Date; and

(c) the Fixed Rate Day Count Fraction.

Interest Shortfall Compounding: As shown in the relevant Confirmation.

Interest Shortfall Reimbursement Payment Amount: If Interest Shortfall Cap is specified as applicable in the relevant Confirmation, then with respect to the first Additional Fixed Amount Payment Date, zero, and with respect to any subsequent Additional Fixed Amount Payment Date and calculated as of the Reference Obligation Payment Date immediately preceding such Additional Fixed Amount Payment Date, as specified by the Calculation Agent in its notice to the parties or by Seller in its notice to Buyer of the existence of an Interest Shortfall Reimbursement, an amount equal to:

(a) the greater of:

(i) zero; and

(ii) (A) the product of:

(1) the Cumulative Interest Shortfall

32

Payment Amount as of the Additional Fixed Amount Payment Date immediately preceding such Reference Obligation Payment Date; and

(2)    either:

(AA)    if Interest Shortfall Compounding is specified as applicable in the relevant Confirmation, the relevant Cumulative Interest Shortfall Payment Compounding Factor for the Fixed Rate Payer Calculation Period immediately preceding such Additional Fixed Amount Payment Date (or one in respect of any Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Payment Date); or

(BB)    if Interest Shortfall Compounding is specified as not applicable in the relevant Confirmation, one;

minus

(B)    the Cumulative Interest Shortfall Amount as of such Reference Obligation Payment Date;

plus

(b)    the Cumulative Implied Writedown Interest Payment Amount as of such Additional Fixed Amount Payment Date without giving effect to clause (iii) or clause (y) of such definition (the "Current CIWIPA");

provided that if the Interest Shortfall Reimbursement Payment Amount on an Additional Fixed Amount Payment Date would exceed the Interest Shortfall Reimbursement Amount in respect of the related Reference Obligation Payment Date, then such Interest Shortfall Reimbursement Payment Amount shall be deemed to be equal to such Interest Shortfall Reimbursement Amount.

Cumulative Interest Shortfall Amount:

With respect to any Reference Obligation Payment Date, an amount equal to the greater of:

(a)    zero; and

(b)    an amount equal to:

    (i)    the Cumulative Interest Shortfall Amount as of the Reference Obligation Payment Date immediately preceding such Reference Obligation Payment Date or, in the case of the first Reference Obligation Payment Date, zero; plus

    (ii)    the Interest Shortfall Amount (if any) in respect of such Reference Obligation Payment Date; plus

    (iii)    either:

        (A)    if Interest Shortfall Compounding is specified as applicable in the relevant Confirmation, an amount determined by the Calculation Agent as the amount of interest that would accrue on the Cumulative Interest Shortfall Amount immediately preceding such Reference Obligation Payment Date during the related Reference Obligation Calculation Period pursuant to the Underlying Instruments or, in the case of the first Reference Obligation Payment Date, zero; or

        (B)    if Interest Shortfall Compounding is specified as not applicable in the relevant Confirmation, zero;

    minus

    (iv)    the greater of:

        (A)    zero; and

        (B)    the Interest Shortfall Reimbursement Amount (if any) in respect of such Reference Obligation Payment Date, minus the Current CIWIPA determined on the Additional Fixed Amount Payment Date immediately following such Reference Obligation Payment Date.

Upon the occurrence of each Delivery, the Cumulative Interest Shortfall Amount shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Interest Shortfall Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference Obligation Calculation Period over (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

Cumulative Interest Shortfall Payment Amount:

The Cumulative Interest Shortfall Payment Amount with respect to any Fixed Rate Payer Payment Date and any Additional Fixed Amount Payment Date falling on such Fixed Rate Payer Payment Date shall be an amount equal to the greater of:

(a)     zero; and

(b)     the amount equal to:

    (i)     the sum of:

        (A)     the Interest Shortfall Payment Amount for the Reference Obligation Payment Date corresponding to such Fixed Rate Payer Payment Date; and

        (B)     the product of:

            (1)     the Cumulative Interest Shortfall Payment Amount as of the Fixed Rate Payer Payment Date immediately preceding such Fixed Rate Payer Payment Date (or zero in the case of the first Fixed Rate Payer Payment Date); and

            (2)     either:

                (AA)     if Interest Shortfall Compounding is specified as applicable in the relevant Confirmation, the

35

relevant
Cumulative Interest
Shortfall Payment
Compounding
Factor; or

(BB)   if Interest Shortfall
Compounding is
specified as not
applicable in the
relevant
Confirmation, one;

minus

(ii)   the greater of:

(A)   zero; and

(B)   (1)   any Interest Shortfall
Reimbursement Payment
Amount paid on such
Additional Fixed Amount
Payment Date;

minus

(2)   the Current CIWIPA
determined on such
Additional Fixed Amount
Payment Date.

With respect to any Additional Fixed Amount Payment Date
falling after the final Fixed Rate Payer Payment Date, the
Cumulative Interest Shortfall Payment Amount shall be
equal to:

(x)   the Cumulative Interest Shortfall Payment Amount
as of the Additional Fixed Amount Payment Date
immediately preceding such Additional Fixed
Amount Payment Date (or as of the final Fixed Rate
Payer Payment Date in the case of the first
Additional Fixed Amount Payment Date occurring
after the final Fixed Rate Payer Payment Date);
minus

(y)   the greater of:

(aa)   zero; and

(bb)   any Interest Shortfall Reimbursement
Payment Amount paid on such Additional
Fixed Amount Payment Date minus the
Current CIWIPA determined on such

Additional Fixed Amount Payment Date.

Upon the occurrence of each Delivery, the Cumulative Interest Shortfall Payment Amount shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Interest Shortfall Payment Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference Obligation Calculation Period and (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

Cumulative Implied Writedown Interest Payment Amount:

With respect to the first Fixed Rate Payer Payment Date, zero and with respect to any subsequent Fixed Rate Payer Payment Date and any Additional Fixed Amount Payment Date falling on such Fixed Rate Payer Payment Date, an amount equal to the greater of:

(a)     zero; and

(b)     the amount equal to:

(i)     the product of:

(A)     the Aggregate Implied Writedown Amount as of the Reference Obligation Payment Date relating to the immediately preceding Fixed Rate Payer Payment Date;

(B)     the Applicable Percentage;

(C)     the sum of (1) the Relevant Rate and (2) the Fixed Rate; and

(D)     the Fixed Rate Day Count Fraction;

plus

(ii)     the product of:

(A)     the Cumulative Implied Writedown Interest Payment Amount as of the Fixed Rate Payer Payment Date immediately preceding such Fixed Rate Payer Payment Date (or zero in the case of the first Fixed Rate

Payer Payment Date); and

(B)    either:

(1)    if Interest Shortfall Compounding is specified as applicable in the relevant Confirmation, the relevant Cumulative Interest Shortfall Payment Compounding Factor; or

(2)    if Interest Shortfall Compounding is specified as not applicable in the relevant Confirmation, one;

minus

(iii)    the lesser of:

(A)    any Interest Shortfall Reimbursement Payment Amount paid on such Additional Fixed Amount Payment Date; and

(B)    the Current CIWIPA determined on such Additional Fixed Amount Payment Date.

With respect to any Additional Fixed Amount Payment Date falling after the final Fixed Rate Payer Payment Date, the Cumulative Implied Writedown Interest Payment Amount shall be equal to:

(x)    the Cumulative Implied Writedown Interest Payment Amount as of the Additional Fixed Amount Payment Date immediately preceding such Additional Fixed Amount Payment Date (or as of the final Fixed Rate Payer Payment Date in the case of the first Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Payment Date); minus

(y)    the lesser of:

(aa)    any Interest Shortfall Reimbursement Payment Amount paid on such Additional Fixed Amount Payment Date; and

(bb)    the Current CIWIPA determined on such Additional Fixed Amount Payment Date.

Upon the occurrence of each Delivery, the Cumulative Implied Writedown Interest Payment Amount shall be

38

multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Implied Writedown Interest Payment Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference Obligation Calculation Period and (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

**Cumulative Interest Shortfall Payment Compounding Factor:**    With respect to any Fixed Rate Payer Calculation Period, an amount equal to the sum of:

(a)    one;

plus

(b)    the product of:

(i)    the sum of (A) the Relevant Rate plus (B) the Fixed Rate; and

(ii)    the Fixed Rate Day Count Fraction;

provided, however, that the Cumulative Interest Shortfall Payment Compounding Factor shall be deemed to be one during the period from but excluding the Effective Maturity Date to and including the Termination Date.

**Relevant Rate:**    With respect to a Fixed Rate Payer Calculation Period, the Floating Rate, expressed as a decimal number with seven decimal places, that would be determined if:

(a)    the 2000 ISDA Definitions (and not the 2003 ISDA Credit Derivatives Definitions) applied to this paragraph;

(b)    the Fixed Rate Payer Calculation Period were a "Calculation Period" for purposes of such determination; and

(c)    the following terms applied:

(i)    the Floating Rate Option were the Rate Source;

(ii)    the Designated Maturity were the period that corresponds to the usual length of a Fixed Rate Payer Calculation Period; and

(iii)     the Reset Date were the first day of the
          Calculation Period;

provided, however, that the Relevant Rate shall be deemed
to be zero during the period from but excluding the Effective
Maturity Date to and including the Termination Date.

Rate Source:                    As shown in the relevant Confirmation.

## Schedule

### Form of Novation Confirmation

[Headed paper of Party A]

NOVATION CONFIRMATION

for use with the ISDA Standard Terms Supplement for use with Credit Derivative Transactions on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement as published by the International Swaps and Derivatives Association, Inc.


Date:


To:     [Name and Address or Facsimile Number of Party B and Party C]

From:   [Party A]

Re:     Novation Transaction

_____

_____

Dear _____:

The purpose of this [facsimile][letter] is to confirm the terms and conditions of the Novation Transaction entered into between the parties and effective from the Novation Date specified below. This Novation Confirmation constitutes a "Confirmation" as referred to in the New Agreement specified below.

1.      The definitions and provisions contained in the 2004 ISDA Novation Definitions (the "Definitions"), the terms and provisions of the 2003 ISDA Credit Derivatives Definitions (the "Credit Derivatives Definitions"), as published by the International Swaps and Derivatives Association, Inc. and amended from time to time and the Annex hereto are each incorporated in this Novation Confirmation. In the event of any inconsistency between (i) the Definitions (as amended by the Annex hereto), (ii) the Credit Derivatives Definitions and/or (iii) the Novation Agreement (as amended by the Annex hereto) and this Novation Confirmation, this Novation Confirmation will govern.

2.      The terms of the Novation Transaction to which this Novation Confirmation relates are as follows:


[Novation Trade Date:]
Novation Date:
Novated Amount:
[Transferor][Transferor 1 (and notwithstanding Section 1.5 of the Definitions)]:
[Transferor 2 (and notwithstanding Section 1.5 of the Definitions)]:
[Transferee][Transferee 1]:

[Remaining Party (and notwithstanding Section 1.6 of the Definitions)][Transferee 2 (and notwithstanding Section 1.6 of the Definitions)]:

[New Agreement (between [Transferee 1 and Transferee 2][Transferee and Remaining Party])]:    ISDA Master Agreement [dated as of_____ ][as per Section 1.11 of the Definitions] subject to [English law][the laws of the State of New York]

3.    The terms of each Old Transaction to which this Novation Confirmation relates[, for identification purposes, are as follows:][shall be specified in the copy of the Old Confirmation attached hereto as Exhibit A.]

Reference Entity:
Reference Obligation:
Trade Date of Old Transaction:
Effective Date of Old Transaction:
Applicable Percentage of Old Transaction:
Scheduled Termination Date of Old
Transaction:

4.    The terms of each New Transaction to which this Novation Confirmation relates [are as follows:][shall be specified in Section[s] __ [,___and___] of the copy of the Old Confirmation attached hereto as Exhibit A.][shall be specified in the New Confirmation attached hereto as Exhibit [A][B]].

Full First Calculation Period:    Applicable, [commencing on [ ]] [commencing on [ ], with respect to any amounts to be paid by the Transferee, and [ ], with respect to any amounts to be paid by the Remaining Party].

5.    Other Provisions: [[Additional Provisions relating to the New Transaction][Credit Support Documents relating to the New Transaction]]:

6.    Miscellaneous Provisions: [Non-Reliance][                ]

7.    Notice Details:

Telephone and/or Facsimile Numbers for Notices:
Transferee:    [                    ]
Remaining Party:    [                    ]

8.    [The parties confirm their acceptance to be bound by this Novation Confirmation as of the Novation Date by executing a copy of this Novation Confirmation and returning it to us]. [The Transferor, by its execution of a copy of this Novation Confirmation, agrees to the terms of the Novation Confirmation as it relates to each Old Transaction. The Transferee, by its execution of a

copy of this Novation Confirmation, agrees to the terms of the Novation Confirmation as it relates to each New Transaction.].

9.    The Remaining Party and the Transferee agree that, notwithstanding any provision in the Old Transaction to which this Novation Confirmation relates, all rights of the Remaining Party and the Transferor in respect of Floating Amounts and Additional Fixed Amounts that arose before the Novation Date shall be deemed to have been exercised and all obligations of such parties in respect of such events that have arisen or are deemed to have arisen shall be deemed to have been satisfied in full, in each case solely for the purposes of determining the rights and obligations of the Remaining Party and the Transferee under the New Transaction.    Nothing in this paragraph shall affect the rights or obligations of the Remaining Party or the Transferor under the Old Transaction.


..........................................          .......................................
(Name of Remaining Party)                         (Name of Transferor)

By: .......................................        By: ...................................
Name:                                              Name:
Title:                                             Title:
Date:                                              Date:


.......................................
(Name of Transferee)

By: .......................................
Name: ...................................
Title: ...................................
Date: ...................................


43

Annex

1.   Section 2(a) of the Novation Agreement shall be deemed to be amended as follows:

   (a)    by the insertion of "(i)" after the words "with respect to" in the fifth line thereof; and

   (b)    by the addition of the following at the end thereof:

       "and (ii) any rights or obligations arising in respect of Floating Amount Events or Additional Fixed Amount Events, in each case in respect of which the Remaining Party or the Transferor (each an "Original Party"), as applicable, had the right to deliver a notice pursuant to the terms of the Old Transaction but such notice was not delivered by that party or the Calculation Agent prior to the Novation Date (each an "Excluded Event") provided that the rights of the Original Parties to deliver a notice in respect of an Excluded Event pursuant to the Old Transaction shall expire on the 60th calendar day following the Novation Date."

2.   Section 2(b) of the Novation Agreement shall be deemed to be amended by the addition of the following after the words "Novation Date," in the last line thereof:

       "but excluding any rights or obligations in respect of Excluded Events,"

3.   Section 2.1(a)(iii)(D)(i) of the Definitions shall not apply

# Exhibit 6

**MINTZ & GOLD LLP**
Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, N.Y. 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*
*VCG Special Opportunities Master Fund Ltd.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------X

VCG SPECIAL OPPORTUNITIES :     **08 CV 01563 (BSJ)**
MASTER FUND LIMITED, :
:
           Plaintiff, :
:
    - against - :     **ECF CASE**
:
CITIBANK, N.A., :
:
           Defendant. :
------------------------------------------------------X

## PLAINTIFF'S INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26

Pursuant to Rule 26 of the Federal Rules of Civil Procedure, Plaintiff, VCG Special

Opportunities Master Fund, Ltd., by its attorneys Mintz & Gold LLP, hereby submits the

following:

     **A.**      **The name and, if known, the address and telephone number of each**

**individual likely to have discoverable information that the disclosing party may use to**

**support his claim or defenses, unless solely for impeachment, identifying the objects of the**

**information:**

**Vanquish Capital Group:**

Donald S. Uderitz
David Zierath
David A. Jefferds
Alyssa D'Amore
Andrea Miller
Eric Rosenfield
Jonnathan Wong
Robert H. Fasulo, Esq.

All of the foregoing persons are located at:
407 SE 1st Street
Delray Beach, FL 33483
(561) 330-6999

Jorge Rodriguez-Lugo
1647 Breakers West Blvd.
West Palm Beach, FL 33411

The foregoing potential witnesses are past or present employees and/or principals of

Vanquish Capital Group, LLC, which controls VCG Special Opportunities Master Fund, Ltd.

Mr. Uderitz has personal knowledge regarding the negotiation, execution and performance of the

swap agreement at issue in this case. Mr. Rodriguez is the former President of Vanquish Capital

Group. Mr. Rodriguez and the other employees have personal knowledge regarding Citibank's

demands for collateral during 2007. Jonnathan Wong is the trader at Vanquish who discussed

the initial margin and pricing of the swap with the trading desk at Citibank.

**Citibank:**

Angela Vogeli, Vice President
Citigroup Global Markets Inc.
388 Greenwich Street
17th Floor
New York, N.Y. 10013
(212) 816-2046

2

Ms. Vogeli corresponded with Vanquish regarding the amount of margin held by

Citibank, Vanquish's request for return of margin and the subsequent determination by Citibank

to terminate the swap transaction and liquidate the collateral.

Trading personnel

Jeffrey Gapusan, Vice President (Salesman)
(No longer at Citibank)
Cantor Fitzgerald & Co.
110 East 59th Street
4th Floor DCM
New York, N.Y.  10022

Mr. Gapusan proposed to Vanquish a number of credit default swap transactions, from

among which Vanquish selected the Millstone CDO/CDS.

Justin Palamara (Trader)
[Contact information not known]

Mr. Palamara executed the confirmation letter for the credit default swap at issue in this

action.

Donald T. Quintin (Trader)
(No longer at Citibank)
Merrill Lynch, Pierce, Fenner & Smith Inc.
250 Vesey Street
4 World Financial Center
New York, NY 10080

Mr. Quintin was the Citibank trader who negotiated the credit default swap with

Vanquish.  Mr. Quintin participated in identifying the initial margin and negotiating the credit

default transaction along with Mr. Gapusan.

Linda Cook
Citibank, N.A.
[address not known]

Ms. Cook executed the ISDA Master Agreement related to the credit default swap

transaction.

<u>Credit Personnel</u>

Anshuman Sharma
Christos Sahinis
Michael Bonaccolto
Mary Murphy
333 West 34th Street, 2nd Floor
New York, N.Y. 10001
(212) 615-8482

Scott L. Flood
338 Greenwich Street
17th Floor
New York, N.Y. 10013

Frank A. Licciardello

The foregoing Citibank employees have personal knowledge concerning Citibank's

collection of collateral from Vanquish, the determination that an implied writedown had taken

place with regard to the reference obligation and the termination of the credit default swap.

**B.    A copy of, or a description by category and location of, all documents, data**

**compilations, and tangible things that are in the possession, custody, or control of the party**

**and that the disclosing party may use to support its claims or defenses unless solely for**

**impeachment.**

The Confirmation Letter, ISDA Master Agreement, Schedule and Credit Support Annex

are in each party's possession. Related documents would include trade documentation; e-mail

correspondence concerning the negotiation of the independent amount; correspondence relating

to Citibank's subsequent demands for variation margin; correspondence regarding Citibank's

mark-to-market of the position; and Plaintiff's dispute regarding the accuracy of Citibank's

valuation. Such documents are located at the offices of counsel for the Plaintiff and in Plaintiff's

offices in Delray Beach, Florida, and will be made available for inspection by Defendant upon

request.

4

C.    A computation of any category of damages claimed by the disclosing party making available for inspection and copying as under Fed. R. Civ. P. 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including material bearing on the nature and extent of injuries suffered.

Plaintiff has been damaged in the amount of the collateral that Defendant has improperly seized, *i.e.*, $9,960,000, plus interest thereon; the improperly withheld margin interest and fixed payments on the swap since Citibank issued the notice of default and purported to terminate the swap transaction. Plaintiff's damages further include the lost opportunity for income from the trading of its investors' funds arising from the unnecessary collection of collateral during the course of the swap transaction and the subsequent liquidation of the collateral following Citibank's purported early termination of the swap.

Plaintiff reserves the right to revise its damages calculation upon the acquisition of further information.

D.    For inspection and copying under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payment made to satisfy the judgment.

Not applicable.

Plaintiff has not yet engaged an expert in this case, but will make the disclosures required by Rule 26 at the appropriate time.

* * * * * * *

5

Plaintiff reserves the right to supplement this disclosure upon further discovery in this action.

Dated: New York, New York
       May 21, 2008

MINTZ & GOLD LLP

_Terence W. McCormick_

Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, NY 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*
*VCG Special Opportunities Master Fund Ltd.,*
*(f/k/a CDO Plus Master Fund Ltd.)*

To:   **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
      Allan J. Arffa, Esq.
      David W. Wang, Esq.
      1285 Avenue of the Americas
      New York, New York  10019-6064
      *Attorneys for Defendant*
      *Citibank, N.A.*

6