**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------ X
CITIGROUP GLOBAL MARKETS INC.,

              Plaintiff,      08-CV-5520 (BSJ)

     -v-                **OPINION AND ORDER**

VCG SPECIAL OPPORTUNITIES MASTER
FUND LIMITED f/k/a CDO PLUS MASTER
FUND LIMITED,

              Defendant.
------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/12/09

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

     Plaintiff Citigroup Global Markets Inc. ("CGMI") moves this Court for a preliminary injunction, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, enjoining Defendant VCG Special Opportunities Master Fund Limited f/k/a CDO Plus Master Fund Limited ("VCG") from proceeding with an arbitration VCG has initiated against CGMI before the Financial Industry Regulatory Authority ("FINRA"). For the reasons that follow, Plaintiff's motion is GRANTED.

## BACKGROUND

     On May 1, 2008, VCG initiated arbitration against CGMI, its prime broker, before FINRA. The claims alleged in the arbitration relate to a larger dispute that VCG brought against CGMI's affiliate, Citibank, N.A. ("Citibank"), concerning a credit default swap ("CDS")

1



transaction between those parties. The following are the undisputed facts of this case, except where otherwise noted.

**Prime Brokerage Agreement**

On July 17, 2006, VCG and CGMI entered into a Prime Brokerage Agreement ("PBA"). (Compl. ¶ 15, at Ex. A.) The preamble to the PBA acknowledges that it is not the exclusive arrangement between VCG and CGMI, but merely "supplements any other agreement between [VCG] and CGMI relating to [VCG's] accounts." (PBA, at 1.) Paragraph One limits the scope of services covered by the PBA to those services involving the "clearance and settlement" of trades performed by other "executing brokers." (PBA ¶ 1.) Paragraph One further limits the services provided under the Agreement to those products listed on Schedule A. (PBA ¶ 1.) Schedule A states that the "products which CGMI will accept for clearance and settlement on behalf of customer [are] fixed income securities in countries where CGMI has the ability to clear and safekeep on behalf of client."

The PBA, which is governed by New York law, (Compl. ¶ 16 (citing PBA ¶ 19)), also provides:

> No dispute or controversy between the parties hereto arising out of or relating to this agreement or any transaction hereunder or breach hereof or thereof shall be subject to or settled by arbitration.



Compl. ¶ 16.

**CDS Transaction**

In September 2006, VCG and Citibank entered into a standard International Swaps and Derivatives Associates, Inc. Master Agreement (the "ISDA Master Agreement"), contemplating that those parties would subsequently enter into various CDS transactions. (Compl. ¶ 17.) On or about June 29, 2007, Citibank and VCG entered into a specific CDS transaction referencing a collateralized debt obligation vehicle (or "CDO")[1] called the "Millstone III CDO LTD III-A" (the "Millstone III CDO"). Under a typical CDS transaction of this type, one party (the "protection buyer") pays periodic fixed amounts to the other party (the "protection seller") with respect to a specified amount of a "reference obligation" issued by a "reference entity," here, the Millstone III CDO. (Compl. ¶ 19.) In return, the protection seller is required to provide the protection buyer certain consideration if specified events occur with respect to the reference obligation or entity - usually, a negative event concerning the creditworthiness of the reference obligation or entity. (Compl. ¶ 19.) The buyer

---

[1] A CDO is "a security for which cash flows are generated by an underlying pool of debt instruments such as bonds, notes or loans (called the collateral)." Merrill Lynch Int'l v. XL Capital Assurance Inc., 564 F. Supp. 2d 298, 300 (S.D.N.Y. 2008).

3

of CDS protection need not actually own the reference obligation or have any relationship to the reference entity. (Compl. ¶ 19.) Under the agreements executed by Citibank and VCG, Citibank acted as the protection buyer and VCG as the protection seller in the relevant CDS transaction.

**Southern District of New York Litigation**

On February 14, 2008, VCG commenced an action against Citibank in this Court. <u>VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.</u>, No. 08-CV-01563 (BSJ), 2008 WL 4809078 (S.D.N.Y. Nov. 5, 2008) (the "SDNY Action"). The SDNY Action involved two distinct disagreements regarding the scope of VCG's obligations under the same CDS transaction: (1) VCG alleged that Citibank's requests for additional collateral were improper; (2) VCG alleged that Citibank was not entitled to certain consideration (or "Floating Payments") because a triggering event (or "Floating Agreement Event") with respect to the reference obligation, the Millstone III CDO Class B Notes, had not occurred. <u>Id.</u> at *4. In an Opinion and Order dated November 5, 2008, this Court granted Citibank's motion on the pleadings and dismissed VCG's complaint in its entirety. <u>Id.</u> at *9.

**FINRA Arbitration**

CGMI is a member of FINRA. (Gruber Decl. ¶ 2, Ex. A.) Pursuant to this membership, VCG initiated arbitration against CGMI on May 1, 2008. (Compl. ¶ 32.) As set forth in VCG's Statement of Claim, CGMI allegedly:

> [E]ngaged in unfair dealing and commercial dishonorable and inequitable trading practices by <u>discriminating against customer VCG in favor of another customer [Citibank]</u> . . . and <u>failing to disclose certain inside information</u> known by [CGMI] through proprietary sources that the investment contract with terms and with the underlying collateralized debt obligation suggested and arranged by [CGMI], was an unfair and exceptionally risky deal for VCG . . . <u>[CGMI] suckered VCG into the swap deal, with risk and terms that [CGMI] knew, or should have known, were grossly unfair and predatory vis-à-vis VCG, for the benefit of another client</u>.

(Compl. ¶ 33, Ex. E, at 3-5 (emphasis added).)

Based on these allegations, VCG asserts that CGMI is liable to it for breach of fiduciary duty, negligence, fraud, and other wrongdoing.[2] (Compl. ¶ 33.)

## DISCUSSION[3]

To obtain a preliminary injunction in this District, the moving party must show "irreparable harm absent injunctive relief, and either a likelihood of success on

---

[2] VCG has agreed to extend CGMI's time to respond to its Statement of Claim in the FINRA arbitration, and to stay all other events and deadlines in the arbitration pending the resolution of the instant motion. (Def.'s Mem. Opp'n Pl.'s Mot. for Prelim. Inj. ("Def.'s Mem.") at 8.) In light of this agreement between the parties, CGMI's request for a temporary restraining order prohibiting VCG from proceeding with the arbitration while the instant motion is pending is denied as moot.

[3] In deciding the instant motion, the Court has considered all papers, including the several sur-replies, submitted by the parties.

the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor." Almontaser v. N.Y. City Dep't of Educ., 519 F.3d 505, 508 (2d Cir. 2008). In considering whether CGMI has sustained this burden, the Court is mindful that a preliminary injunction "is an extraordinary remedy, and should not be routinely granted." Coleman v. Bd. of Educ. of the City of Mount Vernon, 990 F. Supp. 221, 226 (S.D.N.Y. 1997).

Whether CGMI has sustained its burden of proving irreparable harm cannot be seriously disputed. Compelling arbitration of a matter not properly subject to arbitration constitutes "per se irreparable harm." Tellium, Inc. v. Corning Inc., No. 03 Civ. 8487, 2004 WL 307238, at *3 (S.D.N.Y. Feb. 13, 2004). If CGMI's assertions that it never agreed to arbitrate this dispute with VCG are proven accurate, CGMI would suffer irreparable harm by being forced to expend additional time and resources in connection with the arbitration. Id. Accordingly, CGMI has sustained its burden of alleging irreparable injury.

**Arbitrability**

Turning to the strength of the merits of CGMI's request for a preliminary injunction, the relevant inquiry is whether CGMI did agree, either expressly or implicitly,

6

to arbitrate with VCG. Id. at *5. Arbitrability is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002). The Court can only determine whether an agreement to arbitrate exists "and if it does, enforce it in accordance with its terms." Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 719 (9th Cir. 1999). The strong presumption in favor of arbitration does not apply when examining whether the parties agreed to submit their disputes to arbitration. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 945 (1995) (reasoning that if courts applied the presumption to the question of arbitrability, it "might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator would decide").

On the record before the Court, there is no "clear and unmistakable evidence" that the parties intended to arbitrate the question of arbitrability. Id. at 944. The only explicit agreement between the parties is the PBA, which is inapplicable to this dispute because its scope is confined to the products listed on Schedule A: fixed income securities. (PBA ¶ 1.) The parties agree that the underlying CDS transaction is not a security. (Def.'s Mem.

at 18; Pl.'s Reply Mem. Supp. Mot. for Prelim. Inj. ("Pl.'s Reply Mem.") at 3 ("[A] credit default swap is a negotiated contract, not a security that is brokered."))  Moreover, the mere fact that CGMI is a member of FINRA is insufficient evidence to show that the parties clearly and unmistakably agreed to submit the question of arbitrability to the arbitrators.  John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 53 (2d Cir. 2001).  Accordingly, the Court must search further to determine whether the instant dispute is arbitrable.

### Agreement to Arbitrate under FINRA rules

The question of whether CGMI is bound to arbitrate with VCG depends upon the applicability of FINRA rules; it is undisputed that CGMI is a FINRA member and, as such, must arbitrate certain matters that fall within the purview of that organization's rules.  FINRA arbitrations are governed by the National Association of Securities Dealers ("NASD") Code of Arbitration Procedure (the "Code").  Rule 12200 of the Code states:

> Parties must arbitrate a dispute under the Code if:
>
> • Arbitration under the Code is either:
> (1) Required by a written agreement; or
> (2) Requested by the customer.
>
> • The dispute is between a customer and a member or associated person of a member; and

> • The dispute <u>arises in connection with the business activities of the member</u> or the associated person, except the insurance business activities of a member that is also an insurance company.

NASD Code Arb. Proc. 12200 (emphasis added).[4] As evidenced by the PBA, CGMI concedes that it had a customer relationship with VCG in connection with CGMI's business activities as a broker-dealer. (Pl.'s Reply Mem. at 5-6.) The dispositive issues are therefore whether CGMI can sustain its burden on its contentions that VCG is not its "customer" with regard to the "swap" transaction, see <u>Sands Bros. & Co., Ltd. v. Ettinger</u>, No. 03 Civ.7854, 2004 WL 541846, at *3 (S.D.N.Y. Mar. 19, 2004) ("An investor is a 'customer' of a brokerage house, and able to compel the brokerage house to arbitrate, only for conduct that falls within the scope of the specific account between the investor and the brokerage house."), and/or that the current dispute did not arise in connection with its business activities governed by FINRA.

---

[4] Rule 12200 of the Code is an amended version of former Rule 10301 that went into effect on April 16, 2007. The cases interpreting Rule 10301 thus apply with equal force to Rule 12200, as the amendment did not involve any substantive change to the Rule. <u>Herbert J. Sims & Co., Inc. v. Roven</u>, 548 F. Supp. 2d 759, 763 n.2 (N.D. Cal. 2008) (citing Comparison Chart of Old and New NASD Arbitration Codes for Customer Disputes, Rule 12200, www.finra.org/web/groups/rules_regs/documents/rule_filing/p018366.pdf).

9

Rule 12200 defines the term "customer" broadly, excluding only brokers and dealers. See NASD Code Arb. Proc. 12100 ("A customer shall not include a broker or dealer."). In keeping with this expansive definition, the Second Circuit has stated that if any ambiguity exists, "the term should be construed in favor of arbitration." Bensadoun v. Jobe-Riat, et al., 316 F.3d 171, 176 (2d Cir. 2003); John Hancock, 254 F.3d at 59. The Second Circuit's parameters on the "customer" relationship include: if an investor invests directly with a member firm, the investor is likely a "customer" of that firm. Oppenheimer & Co. v. Neidhardt, 56 F.3d 352, 357 (2d Cir. 1995) (finding dispute was arbitrable when investors gave money to the NASD member brokerage firm Vice President, but did not open accounts with the firm). Additionally, if an "associated person" of the member firm induces, or shepherds, the investment, then the investor is also likely a "customer" of that firm. See id.; John Hancock, 254 F.3d at 59. While these principles counsel that the term "customer" should not be too narrowly construed, they should not go so far as to upset the reasonable expectations of FINRA members. See Wheat, First Sec., Inc. v. Green, 993 F.2d 814, 820 (11th Cir. 1993).

Turning to the present case, VCG relies primarily upon the declaration of Jonathan X. Wong, a Portfolio Manager

for Vanquish Capital Group, whose subsidiary served as the investment manager to VCG in the underlying CDS transaction. (Wong Decl. ¶ 1.) In his declaration, Wong asserts that "VCG has been a customer of CGMI since 2006." (Id. ¶ 8.) Wong further states that CGMI advised VCG that the CDS transaction giving rise to the FINRA arbitration was a "clean deal" (Wong Decl. ¶ 17), and that "CGMI recommended and set the terms for this transaction" (Wong Decl. ¶ 7). In fact, Wong asserts that "[t]he terms of the contract were negotiated directly with CGMI employees," with whom Wong communicated regularly. (Wong Decl. ¶ 19.)

In response, CGMI relies upon the contractual documents executing the CDS deal between Citibank and VCG. In essence, CGMI submits that Citibank is the counterparty designated in these documents and therefore, although formally employed by CGMI, the individuals who negotiated the terms of that transaction with VCG were "clearly acting on behalf of Citibank – not CGMI." (Pl.'s Reply Mem. at 3.) However plausible this interpretation may be, Citibank introduces no affidavits of witnesses with personal knowledge stating that the employees were acting on behalf of Citibank. In this regard, CGMI has not made a showing of probable success that VCG's alleged financial advice and involvement with the terms of the CDS contract did not

11

create a customer relationship between CGMI and VCG. See Oppenheimer, 56 F.3d at 357 (general denials are not adequate proof that no customer relationship existed); see also Lehman Bros., Inc. v. Certified Reporting Co., 939 F. Supp. 1333, 1340 (N.D. Ill. 1996) (ruling that a "customer" relationship arose with a broker when investors purchased stocks in reliance on advice from that broker, even when the investors' actual purchase of stocks was accomplished through other brokerage firms); Brookstreet Sec. Corp. v. Bristol Air, Inc., No. C02-0863, 2002 U.S. Dist. LEXIS 16784, at *25-26 (N.D. Cal. Aug. 5, 2002) (noting that courts have generally found that investors qualify as "customers" when there is a more significant connection between the parties that may include direct communications, advice, or agreements).

Nevertheless, CGMI has provided the Court with enough evidence to conclude that there are serious questions raised about whether VCG qualifies as a "customer" in the swap transaction, as relevant for Rule 12200. In particular, the documentary evidence confirms that the relevant CDS contract was between Citibank and VCG. (See, e.g., Arffa Decl., Ex. 4 ("The purpose of this communication (the "Confirmation") is to confirm the terms and conditions of the [relevant CDS transaction] entered

into between you [VCG] . . . and us [Citibank].").)
Indeed, the contract documents nowhere mention CGMI and,
significantly, Wong's description of the transaction
declares incorrectly that CGMI, not Citibank, was the
designated counterparty. (Wong Decl. ¶ 19 ("In this case,
the fee to be paid to CGMI was 5.5% per annum . . . VCG
agreed to pay CGMI only upon the occurrence of a credit
event." (emphasis added)).)[5] Moreover, the Court finds that
Wong's declaration is internally inconsistent in that it
describes CGMI's role in the transaction as both a
fiduciary advisor and as an agent of Citibank, VCG's
counterparty in the swap transaction. Assuming the truth
of Wong's assertion that CGMI acted to negotiate and to
settle the terms of the swap transaction at issue, the
Court questions whether CGMI could ever act in an advisory
capacity.

Finally, VCG's initial disclosures in the related SDNY
Action identify the individuals it now argues acted on
behalf of CGMI with respect to the CDS deal as employees of

---

[5] Although CGMI contends that, in the CDS supporting documents, VCG disclaimed any reliance on representations or advice furnished by Citibank or any of its affiliates, this argument is for the arbitrator, not the Court, to decide. See Howsam, 537 U.S. at 83-85 (distinguishing between "questions or arbitrability" and other "gateway matters," such as defenses to arbitrability, which are presumptively reserved for the arbitrator's resolution). CGMI's contention that VCG has waived any possible right to arbitrate by commencing litigation against Citibank in the SDNY Action fails for the same reason. See id. (including waiver as an example of a defense to arbitrability that is for the arbitrator to decide).

13

Citibank, not CGMI. VCG also referred to the individuals with whom it negotiated the CDS contract as being the "trading desk at Citibank" or "Citibank trader[s]." The Court notes that these disclosures have since been amended and are thus not judicial admissions demonstrating that VCG knew that it was dealing with Citibank, not CGMI, representatives. Macheda v. Household Fin. Realty Corp. of New York, No. 5:04-CV-325, 2008 WL 2562003, at *3 n.1 (N.D.N.Y. June 26, 2008) ("A statement in a pleading that is superseded by an amended pleading without the statement is no longer a conclusive judicial admission.") (citing Tho Dinh Tran v. Alphones Hotel Corp., 281 F.3d 23, 32 (2d Cir. 2002), overruled on other grounds by Slayton v. Am. Exp. Co., 460 F.3d 215, 226-28 (2d Cir. 2006)). At the very least, however, they give the Court pause when considering VCG's current assertions of its understanding about the roles of these employees at the time of the transaction. In short, while not sustaining its burden of showing a probability of success on the merits, CGMI can show that it has presented legal and factual issues that make its assertions a fair ground for litigation. Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 967 (2d Cir. 1995).

With regard to CGMI's contention that the dispute did not arise in connection with its business activities as a

broker-dealer, the Court likewise concludes that although CGMI cannot make a showing of probable success, it has raised sufficiently serious questions on the merits. CGMI primarily argues that the dispute does not meet this condition of Rule 12200 because a CDS transaction is not a security and, under the definition set forth in the Securities Exchange Act of 1934, a "broker" must be a "person engaged in the business of effecting transactions in securities for the account of others." (Pl.'s Reply Mem. at 10 (citing 15 U.S.C. § 78a, Section 3(a)(4)(A) (emphasis added)).) But CGMI does not cite to any case indicating that the Code contains a requirement that the alleged customer must have purchased a security as defined by the Securities Exchange Act of 1934. Instead, there is authority for the proposition that the term "arises in connection with the business activities" of a FINRA member may apply to claims involving non-securities. See Miller v. Flume, 139 F.3d 1130, 1136 (7th Cir. 1998) (rejecting the argument that the dispute was not arbitrable because the transaction between the customer and brokers involved "fraudulent conveyances" and not the "buying and selling of securities"); see also Daugherty v. Washington Square Sec., Inc., 271 F. Supp. 2d 681, 692-93 (W.D. Pa. 2003) (finding dispute over the purchase of certain financial products

that were not securities to be arbitrable under the NASD Code); Jefferson Pilot Sec. Corp. v. Blankenship, 257 F. Supp. 2d 962, 966-67 (N.D. Ohio 2003) (citing cases where the SEC affirmed the NASD's sanctions against brokers who engaged in certain non-securities-related misconduct); Smith v. Bartolini, No. 01 C 4311, 2003 WL 21148940, at *8 (N.D. Ill. May 14, 2003) (noting that the plain language of Rule 12200 does not tie arbitrability to the presence of a "security," but rather to a "dispute" that meets the specified conditions).

This said, these cases have dealt in large part with individual brokers' fraudulent conveyances or investments, where there is a strong policy argument favoring arbitration, particularly with respect to a financial firm's incentive to supervise its agents and representatives in providing investment advice regarding all financial products. See Miller, 139 F.3d at 1136; Daugherty, 271 F. Supp. 2d at 692-93; Jefferson Pilot Sec. Corp, 257 F. Supp. 2d at 966-67. In light of the undefined scope of Rule 12200 and the unique set of facts before the Court, the Court concludes that CGMI has presented legal and factual issues that make its assertions a fair ground for litigation.

Given that a preliminary injunction will simply maintain the status quo until this Court decides the underlying issues, the balance of hardships also tips decidedly in CGMI's favor. Tellium, 2004 WL 307238, at *8. VCG will eventually be able to pursue its claim in arbitration if this Court decides that CGMI is a proper respondent. Conversely, if the Court were to deny the preliminary injunction motion, CGMI would be forced to expend time and resources to defend itself in an arbitration to which it may ultimately be determined not to have been a proper party, and any award would be unenforceable. Id. Because CGMI has shown irreparable harm and sufficiently serious questions going to the merits of its case, CGMI's motion for a preliminary injunction is granted.[6]

---

[6] CGMI alternatively argues that VCG's claims are not arbitrable because VCG agreed "irrevocably" in the underlying CDS transaction to submit "any suit, action or proceedings relating to any dispute arising out of or in connection with [the swap] . . . to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City" (Pl.'s Reply Mem. at 12 (citing Arffa Decl., Ex. 1 ¶ 13(b)).) This argument fails because, under this Circuit's case law, if there is a reading of the various agreements that permits an arbitration clause to remain in effect, the Court must choose it: "[T]he existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 74 (2d Cir. 1997) (internal quotation marks omitted). See also Bank Julius Baer & Co., Ltd. v. Waxfield Ltd., 424 F.3d 278, 284 (2d Cir. 2005). Moreover, when a forum selection clause conflicts with an arbitration clause, the Court cannot nullify an arbitration clause "unless the forum selection clause specifically precludes arbitration."

**VCG's Claim for Attorneys' Fees and Costs**

VCG requests its attorneys' fees and costs incurred in opposing the instant motion on the ground that CGMI withheld critical facts – specifically, that CGMI is a member of FINRA – in a deliberate attempt to mislead the Court. (Def.'s Mem. at 25.) An award of attorneys' fees and costs under 28 U.S.C. § 1927 "is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." Oliveri v. Thompson, 803 F.2d 1265, 1273 (2d Cir. 1986); id. ("[A]n award made under § 1927 must be supported by a finding of bad faith similar to that necessary to invoke the court's inherent power."). The Court sees no evidence of improper purpose or bad faith here and thus denies VCG's request.

**CONCLUSION**

For the reasons set forth above, CGMI's motion for a preliminary injunction is granted.

---

Apr. 26, 2006). As the "Jurisdiction" clause in the ISDA Master Agreement relied upon by CGMI does not mention arbitration, the Agreement does not "specifically preclude[]" arbitration, nor does it give the Court "positive assurance" that the current dispute may not be governed by FINRA rules. Bank Julius Baer, 44 F.3d at 284; Pers. Sec. & Safety Sys., 297 F.3d at 395-96.

**SO ORDERED:**

_Barbara S. Jones_
**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Dated:   New York, New York
         November 12, 2008

19